# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF OKLAHOMA

**F I L E D**

DEC 2 2 2000

Phil Lombardi, Clerk
U.S. DISTRICT COURT

Case No.99-CV-732-K(E)

JACK DUBBS, Individually, and JACK DUBBS as Father and Next of Friend
TIFFANI DUBBS, a minor, et al,

Plaintiffs,

v.

HEAD START, INC., an Oklahoma corporation, et al,

Defendants.

## COMMUNITY ACTION PROJECT OF TULSA COUNTY, OKLAHOMA'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**William S. Helfand,** SBOT 09388250
Rachel D. Ziolkowski, SBOT 24003234
3600 One Houston Center
1221 McKinney Street
Houston, Texas 77010
(713) 609-7700
(713) 609-7777

- and -

**John E. Dowdell,** OBA #2460
**Christine D. Little,** OBA #16677
NORMAN WOHLGEMUTH CHANDLER & DOWDELL
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, OK 74103-4023
(918) 583-7571
(918) 584-7847 (Facsimile)

**ATTORNEYS FOR DEFENDANTS
COMMUNITY ACTION PROJECT OF
TULSA COUNTY, OKLAHOMA**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF UNDISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    I.    The Evidence Establishes No Constitutional Violation . . . . . . . . . . . . . . 7
        A.    The Evidence Disproves a Fourth Amendment Violation . . . . . . . . 8
            1.    These examinations took place with consent of the parent
                  Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            2.    There was no Fourth Amendment search. . . . . . . . . . . . . . 10
            3.    Even if a constitutionally protected search or seizure occurred,
                  the search and/or seizure was reasonable. . . . . . . . . . . . . 13
            4.    No Evidence of a Fourteenth Amendment Parental Liberty
                  Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    II.    Even If A Fact Issue Exists as to Whether a Constitutional Violation
          Occurred, There is No Evidence of a Policy of CAP Which
          Caused the Constitutional Violation . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.    CAP Is Entitled To Dismissal of the Plaintiffs' State Law Claims . . . . . . . 21
        A.    No Evidence of Intentional Infliction of Emotional Distress . . . . . . . 21
        B.    No Evidence of Negligent Infliction of Emotional Distress . . . . . . . 22
        C.    The Evidence Disproves Invasion of Privacy . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*Breeden v. League Servs. Corp.*
575 P.2d 1374, 1377 (Okla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brock v. Thompson*
948 P.2d 279 (Okla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bullington v. United Air Lines, Inc.,*
186 F.3d 1301, 1313 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*City of Oklahoma v. Tuttle*
471 U.S. 808, 105 S. Ct. 2427, 2436 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Elkins v. United States*
364 U.S. 206, 222, 80 S.Ct. 1437 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gonzalez v. Ysleta Indep. Sch. Dist.*
996 F.2d 745, 759 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McCormack v. Oklahoma Publishing Co.*
613 P.2d 737, 739 (Okla. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Munley v. ISC Financial House, Inc.*
584 P.2d 1336, 1340 (Okla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pembaur v. City of Cincinnati*
475 U.S. 469, 480-83, 106 S.Ct. 1292 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Stokes v. Bullins*
844 F.2d 269, 273 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Van Emrik v. Chemung County Dept. of Social Service*
911 F. 2d 863 (2nd Cir.) *appeal dismissed without op.*, 668 N.E.2d 419 (1996) . . . . . . 12

*Accord McKee v. City of Rockwall*
877 F.2d 409 (5th Cir.), *cert. denied*, 493 U.S. 1023 (1990) . . . . . . . . . . . . . . . . . 18

*Bell v. Wolfish*
441 U.S. 520, 559, 99 S.Ct. 1861 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Board of County Comm'rs v. Brown*
520 U.S. 397, 404, 117 S.Ct. 1382 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Board of the County Commissioners of Bryan County v. Brown*
520 U.S. 397, 117 S.Ct. 1382, 1390 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brown v. Reardon*
770 F.2d 896, 904 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Brown v. Texas*
443 U.S. 47, 51 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Canton v. Harris*
489 U.S. 378, 390, n.10, 109 S.Ct. 1197, 1205, n.10, (1989) . . . . . . . . . . . . . . . . . 20

*City of Los Angeles v. Heller*
475 U.S. 796, 106 S. Ct. 1571, 1573 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Daemi v. Church's Fried Chicken, Inc.*
931 F.2d 1379, 1387 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Eddy v. Brown*
715 P.2d 74, 76-77 (Okla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Ee Gilbert v. Homar*
520 US. 924, 931-32 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ferguson v. City of Charleston*
186 F.3d 469, 476 (4th Cir. 1999), *cert. granted*    U.S.    , 120 S.Ct. 1239 (2000) . . 13-15

*Florida v. Jimeno*
500 U.S. 248, 250-51, 111 S.Ct. 1801, 1803 (1991) . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Gates v. Unified Sch. Dist.*
996 F.2d 1035, 1041 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Griffin v. Wisconsin*
483 U.S. 868, 873 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hall v. Tallapoosa*
50 F.3d 1579 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*J.B. v. Washington County*
127 F.3d 919, 925 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kia P. v. McIntyre*
2 F.Supp.2d 281 (E.D. NY 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Languirand v. Hayden*
717 F.2d 229 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Merrick v. Northern Nat. Gas Co.*
911 F.2d 426, 432 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Michigan Dept. of St. Police v. Sitz*
496 U.S. 444, 110 S.Ct. 2481 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Monell v. New York City Dept. of Social Servs.*
426 US. 658, 694, 98 S.Ct. 2018 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*National Treasury Employees Union v. Von Raab*
489 U.S. 489 U.S. 656, 665, 109 S.Ct. 1384 (1989) . . . . . . . . . . . . . . . . . . . . . 14

*Renbarger v. Lockhart*
921 F.2d 1032, 1036 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Renbarger v. Lockhart*
921 F.2d 1032, 1036 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Richardson v. J.C. Penney Co., Inc.*
649 P.2d 565, 566-67 nn. 2 - 4 (Okla. Civ. App. 1982) . . . . . . . . . . . . . . . . . . . 22, 23

*Seamons v. Snow*
206 F.3d 1021, 1029 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Seidenbach's, Inc. v. Williams*
361 P.2d 185 (Okla. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Starr v. Pearle Vision, Inc.*
54 F.3d 1548, 1558 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tenenbaum v. Williams*
193 F.3d 581, 595 (2nd Cir.), *cert. denied* ___ U.S. ___, 120 S.Ct. 1832 (2000) . . . . . . . 12

*Thomas v. IBM*
48 F.3d 478, 484 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Attson*
900 F.2d 1427, 1429 (9th Cir.) *cert. denied*, 498 U.S. 961, 111 S. Ct. 393 (1990) . . 10, 11

*Vernonia School District 47J v. Acton*
515 U.S. 646, 115 S. Ct. 2386 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Veronia Sch. Dist. 47J v. Acton*
515 U.S. 646, 661, 115 S.Ct. 2386 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Von Raab*
489 U.S. at 665-66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wassum v. City of Bellaire*
861 F.2d 953 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Webber v. Mefford*
43 F.3d 1340, 1344-45 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Yin v. California*
95 F.3d 864, 870 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Other Authorities

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FED. R. CIV. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

N.D. LR 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rule 56 of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*The Supreme Court, 1986 Term – Leading Cases*
101 Harv. L. Rev. 119, 230 (1987)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S. CONST. AMEND. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and    §
JACK DUBBS as Father and Next Of    §
Friend of TIFFANI DUBBS, a minor,    §
et al,    §
   §
        Plaintiffs,    §
   §
vs.    §    No. 99-CV-732-K(E)
   §
HEAD START, INC., an Oklahoma    §
Corporation, et al,    §
   §
        Defendants.    §

## COMMUNITY ACTION PROJECT OF TULSA COUNTY, OKLAHOMA'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTORY STATEMENT

1.     Community Action Project of Tulsa County, Oklahoma, is the local grantee of the federal

Head Start Program in Tulsa, Oklahoma. Plaintiffs, Jack Dubbs, Francisco Aguirre, Joy Brown,

Keenya Cowans, Shanika Crowley, Raichelle Loftin, and Elisha Porterfield, individually and on

behalf of their minor children, bring suit against CAP, as well as the other Defendants, for

violations of their civil rights pursuant to 42 U.S.C. § 1983 and for various state law claims

arising from medical examinations allegedly conducted on their children while they were attending

the Head Start program housed at Roosevelt Elementary. CAP now brings this Memorandum of

Law in Support of its Motion for Summary Judgment, seeking to have all of the Plaintiffs' claims

dismissed against it, with prejudice, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## STATEMENT OF UNDISPUTED FACTS

2.    In accordance with N.D. LR 56.1, CAP submits the following statement of material facts as to which no genuine issue exists:

3.    Community Action Project of Tulsa County, Oklahoma (CAP) is the local grantee for the federal Head Start program. *Affidavit of Jerome Lee, attached hereto as Ex. A.*.

4.    In order to meet federal Head Start requirements and remain in the program, each Head Start enrollee is required to receive a physical examination within ninety days of enrollment. *Ex. A.*

5.    At the time of enrollment, each parent or guardian is explained this requirement and advised that CAP will provide these medical examinations, free of charge, if no record of an examination is received. *Ex. A.*

6.    It is CAP's policy not to conduct any physical examination without consent of a child's parent or guardian. *Ex. A.*

7.    In order to further this policy, upon enrollment, each parent or guardian is required to complete two separate consent forms. *Ex. A.*

8.    These two consent forms were received from all parents. *Authorizations for Treatment to Minors and Parent Consent Forms, attached to Ex. A*

9.    Once CAP receives these consent forms, CAP believes it has consent to perform physical examinations on its enrollees. *Ex. A.*

10.   Prior to conducting any examinations, however, it is the policy of CAP to notify the parents of the date that the examinations are to take place and invite the parents or guardians to attend. *Ex. A.*

11.    Unfortunately, although the notification letters were distributed to the Roosevelt site prior to the date of these examinations, they were apparently not distributed to the children to take home to their parents. *Ex. A.*

12.    At the time these examinations were conducted, CAP had no reason to suspect that any of its enrollees were victims of child abuse. *Ex. A.*

13.    No law enforcement agencies were involved in these examinations, and the results of these examinations were not turned over to any law enforcement authority. *Ex. A.*

14.    On November 5, 1998, Jackie Strayhorn and Kim Baker, Tulsa City/County Health Department employees, went to the Head Start program housed at Roosevelt Elementary to conduct physical examinations. *Deposition of Jackie Strayhorn, p. 22, l. 18 through p. 23, l. 2, attached hereto as Ex. B; Deposition of Kim Baker, p. 14, ll. 23 - 25; p. 15, ll. 21 - 24, attached hereto as Ex. C.*

15.    Misti Dubbs, stepmother of Tiffani Dubbs and a teacher's aide at the Roosevelt site, was present at the physical examination of Tiffani and consented to the examination of Tiffani. *Deposition of Misti Dubbs, p. 21, ll. 2 -7; p. 23, ll. 7-17, attached hereto as Ex. D.* No other parent was present during the physical examinations.

16.    Misti Dubbs admits that she place a signed copy of CAP's Authorization for Treatment of Minors in Tiffani's file. *Ex. D, p. 41, ll. 10-25.*

17.    Aguirre admits that the Parent Consent Form gave CAP authority to perform the medical procedures listed on that form. *Deposition of Francisco Aguirre, p. 24, ll. 9-12, attached hereto as Ex. E.*

18.     No parent contacted CAP to withdraw their consent or to limit their consent in any way. *Deposition of Keenya Cowans, p. 63, ll. 16-19, attached hereto as Ex. F; Deposition of Elisha Porterfield, p. 42, ll. 19-25, attached hereto as Ex. G; Deposition of Shanika Crowley, p. 74, ll. 18-24, attached hereto as Ex. H; Ex. E, p. 25, ll. 13-20.*

19.     The parent Plaintiffs understand that there is a correlation between a child's physical health and their ability to learn. *Ex. F, p. 76, ll. 11-14; Ex. G, p. 37, l. 12; Ex. H, p. 34, ll. 15-18; Ex. D, p. 36, l. 20 through p. 37, l. 7, Deposition of Joy Brown, p. 52, ll. 14-17, attached hereto as Ex. I. Deposition of Daphine Suddarth, p. 75, ll. 12 - 22, attached hereto as Ex. P.*

20.     The parent Plaintiffs admit that in attempting to make sure that each child is in the best condition possible to participate in Head Start that Head Start has an incentive to make sure that each child is in good physical health. *Ex. H, p. 36, ll. 15-20; Ex. E, p. 32, ll. 5-10; Ex. D, p. 37, l. 8 through p. 38, l. 4; Ex. G, p. 34, l. 7; Ex. I, p. 53, ll. 7-12; Ex. P, p. 76, ll. 3 - 9.*

21.     Cowans understands why Head Start wants to have a medical examinations performed on children prior to them starting Head Start. *Ex. F, p. 76, ll. 15-18.*

22.     No child was physically injured as a result of these examinations. *Deposition of Raichelle Loftin, p. 16, ll. 20 - 25, attached hereto as Ex. J; Ex. G, p. 33, ll. 21-32; Ex. H, p. 33, ll. 8-10; Ex. E, p. 19, ll. 14-18; Ex. D, p. 166, l. 15-18; Ex. I, p. 28, ll. 15-17; Ex. P, p. 73, ll. 3 - 6.*

23.     No parent has sent their child to or felt the need to send their child to see a psychiatrist, psychologist or any type of mental health care provider due to this examinations. *Ex. G, p. 18, ll. 8-11; p. 10, ll. 7 - 11; Ex. H, p. 29, ll. 5-9; Ex. F, p. 18, l. 22 through p. 19, l. 9; Ex. P, p. 81, ll. 20 - 24.*

24.    In fact, most of the parents admit that their child suffered no emotional injury as a result of this examination. *Ex. J, p. 17, ll. 1 - 3; Ex. G, p. 33, ll. 21-32; Ex. H, p. 33, ll. 11-13; Ex. I, p. 31, ll. 4-7.*

25.    Suddarth admits that Ronisha is no different today than she would have been without this examination. *Ex. D, p. 80, ll. 17 - 20.*

26.    Moreover, when La Quante Porterfield told his mother about the examination, he was not upset at all. *Ex. G, p. 31, ll. 14-20.*

27.    Additionally, many of these students continued in the Head Start program for the rest of the year. *Ex. F, p. 91, ll. 20-24; Ex. J, p. 33, 6 - 8; Ex. H, p. 89, ll. 15-18; Ex. E, p. 46, ll. 2-8.*

28.    The parents admit that their relationships with their children have not been affected by these examinations. *Ex. J, p. 23, ll. 22- 24; Ex. F, p.58, ll.9-11; Ex. G, p. 25, ll. 17-22; Ex. P, p. 84, ll. 14 - 17.*

29.    In fact, as a result of this examination, Aguirre admits that he is now able to have more open conversations with Jessica regarding strangers and when it is appropriate for people to touch her. *Ex. E, p. 38, ll. 11-24.*

30.    As a result of this examination, several of the children were found to have physical or developmental problems: Aguirre (ear infection and cavities); Loftin (speech impediment); Dubbs (anemia); Suddarth (heart murmur). *Ex. E, p. 33, ll. 24-34, l. 12; Ex. J, p. 27, ll. 5 - 10; Deposition of Jack Dubbs, p. 16, l. 2-9, attached hereto as Ex. K.; Ex. P, p. 31, l.1, p.35, l.9; Ex. D, p. 151, ll. 4-8.*

31.    It is undisputed that a genital examination is a standard procedure in any well-child examination in any three or four year old. *Deposition of Dr. Nelson, p. 56, l. 25 through p. 57, l. 25, attached hereto as Ex. L.*

32.    It is further undisputed that doing a "needle stick" or hematocrit screening is neither unusual or unexpected during a well-child examination. *Ex. L, p. 149, ll. 1 - 15.*

33.    Plaintiffs own expert finds no fault at all with the conduct of the examinations that were conducted. *Ex. L, p. 66, ll. 19 - 20.*

34.    In fact, local Tulsa doctors agree that a genital examination is appropriately conducted during well-child examinations. *Deposition of Dr. Graham, p. 10, ll. 1-5, attached hereto as Ex. M; Deposition of Dr. August, p. 7, ll. 8-15, attached here to as Ex. N; Deposition of Dr. Suhail, p. 20, ll. 18-24, attached hereto as Ex. O.*

35.    Moreover, Dr. Suhail agrees that when a doctor secures permission of a parent to treat a child, generally, that implies, among other things, examination of the genitals and, if necessary, a small amount of blood to be taken and tested. *Ex. O, p. 41, l. 12 through p. 42, l. 7.*

36.    Raichelle Loftin even admits that this examination did not exceed a reasonable medical examination. *Ex. J, p. 31, ll. 18 - 20.*

37.    In fact, Jack Dubbs and Francisco Aguirre admit that had they been notified of the examinations, they would have allowed the examination to take place. *Ex. E, p. 16, ll. 5-8; Ex. K, p. 19, ll. 17-20.*

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In applying this standard, the Court should examine the factual record and draw reasonable inferences therefrom in a light most favorable to the nonmoving party. *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1313 (10th Cir. 1999). As the moving party, a defendant shoulders "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995). If a defendant meets this burden, it falls to the plaintiff to "identify specific facts that show the existence of a genuine issue of material fact." *Id.* "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* This evidence must be based on more than mere speculation, conjecture, or surmise. *See Brown v. Reardon*, 770 F.2d 896, 904 (10th Cir. 1985). Because the Plaintiffs, have no evidence to support their claims against CAP in this suit, CAP moves for summary judgment as a matter of law.

## ARGUMENT AND AUTHORITIES

**I.    The Evidence Establishes No Constitutional Violation**

In order to establish liability under 42 U.S.C. § 1983, the Plaintiffs must first establish that there has been a deprivation of a federally, protected right. *See Renbarger v. Lockhart*, 921 F.2d 1032, 1036 (10th Cir. 1990). Because the undisputed evidence clearly establishes that the Plaintiffs' civil rights were not violated, dismissal is clearly appropriate as a matter of law.[1]

---

As this Court has previously recognized in its Order on the Motions to Dismiss, the Plaintiffs' claims for violations of the Oklahoma Constitution are relatively identical to their federal constitutional claims. Accordingly, should this Court grant CAP's Motion for Summary Judgment as to Plaintiffs' federal claims, Plaintiffs' state constitutional claims should also be dismissed.

## A.    The Evidence Disproves a Fourth Amendment Violation

On behalf of their minor children, Plaintiffs contend that the physical examinations giving rise to this suit violated their children's Fourth Amendment rights.  The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. CONST. AMEND. IV. There are essentially two elements to a Fourth Amendment claim.  First, the Plaintiffs must establish that the alleged search or seizure is the type protected under the Fourth Amendment. Second, if the Plaintiffs establish that alleged action is a protected search or seizure, the Plaintiffs must then establish that the protected search or seizure was unreasonable.  Because Plaintiffs' claims fail on both elements, dismissal is appropriate.

### 1.    These examinations took place with consent of the parent Plaintiffs.

The Supreme Court has "long approved consensual searches because it is no doubt reasonable for [a governmental employee] to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250-51, 111 S.Ct. 1801, 1803 (1991).  "The standard for measuring the scope of [the] consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood [the scope of the consent to be]?" *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1803-4.

In *Jimeno*, a police officer pulled over a suspect after overhearing him arrange what appeared to be a drug deal and after witnessing the suspect commit a traffic violation.  The officer requested

permission to search the suspect's vehicle, which was given by the suspect gave permission to search the vehicle. While opening the passenger door, the officer noticed a brown paper bag lying on the floorboard. The officer picked up the back, opened it, and found cocaine inside.

Prior to trial, the trial court granted the suspect's motion to suppress, holding that a general consent to search the car for narcotics did not extend to sealed containers within the car. The state appellate court, as well as the state supreme court, affirmed.

The United States Supreme Court, however, reversed and remanded, holding that the search of the bag was not violative of the Fourth Amendment. Specifically, the Supreme Court held that it was "objectively reasonable for the police to conclude that the general consent to search respondents' car included consent to search containers within that car which might bear drugs." *Jimeno*, 500 U.S. at 251, 111 S.Ct. at 1804. "A suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.*

It is undisputed in this case that each parent Plaintiff, or their representative, upon enrollment of their children in the program, signed not just one, but two different consent forms in this matter. *Attachments to Ex. A.* The first consent form, entitled "Parent Consent Form," sought permission of the parents to have various tests performed on their children. These include a test for tuberculosis, speech/language services, dental examination/treatment, developmental screening, hearing screening, hemoglobin/HCT, and vision screening. *Id.* As to each of these procedures, the parents were given the option of checking "no," thereby limiting their consent. *Id.*

Accordingly, the evidence clearly establishes that the parent Plaintiffs gave express, written consent for many of the elements of these examinations. As such, at least to the items listed in this form, dismissal is clearly appropriate because the parents all expressly consented to these medical tests and/or screenings.

The second consent form, entitled "Authorization for Treatment to Minors," served as a more general consent form. *Attachments to Ex. A.* All Plaintiffs admit signing this form prior to the examination giving rise to this suit. *Id.* There is no evidence that any of these Plaintiffs attempted to limit these consents in any way. Accordingly, the evidence makes clear that each of these parents gave general consent to conduct examinations of their children while they were attending Head Start.

Moreover, it is clear that the examination of Tiffani Dubbs took place in her stepmother's presence and with full consent from Misti Dubbs. *Ex. D, p. 21, ll. 2-7; p. 23, ll. 7-17.* When Misti Dubbs determined that a genital examination would occurred, she discontinued the examination. *Id., p. 23, l. 18 through p. 24, l. 4.* Jack Dubbs admits that Misti Dubbs is held out to be Misti's mother. *Ex. K, 12, ll. 16-25.* Accordingly, Tiffani Dubbs examination was conducted with the express authority of an apparent guardian. At the very least, dismissal of the Dubbs Plaintiffs is clearly appropriate.

### 2. There was no Fourth Amendment search.

"The phrase 'searches and seizures' connotes that the type of conduct regulated by the Fourth Amendment must be somehow designed to elicit a benefit for the government in an investigatory, or , more broadly, an administrative capacity." *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir.) *cert. denied*, 498 U.S. 961, 111 S. Ct. 393 (1990), *cert. denied Attson v.*

*United States,* 498 U.S. 961, 115. Ct. 393 (1990). The "Fourth Amendment cannot be triggered simply because a person is acting on behalf of the government. Instead, the Fourth Amendment will only apply to governmental conduct that can reasonably be characterized as a 'search' or 'seizure'" *Id.* "This threshold inquiry is particularly appropriate where the challenged conduct falls outside the area to which the Fourth Amendment most commonly and traditionally applies – law enforcement." *Attson*, 900 F.2d at 1430.

"Only rarely . . . has the [Supreme] Court considered the nature of Fourth Amendment restrictions on the conduct of governmental officials in noncriminal investigations." *Id.* (*quoting The Supreme Court, 1986 Term – Leading Cases*, 101 Harv. L. Rev. 119, 230 (1987)). "Even rarer are the instances in which the Court has considered the application of the Fourth Amendment to noncriminal non-investigatory governmental conduct." *Id.* "Yet when the Court has considered the application of the Fourth Amendment to governmental conduct in a noncriminal context, it has been careful to observe that the application of the amendment is limited." *Id.*

The opinion in of *Kia P. v. McIntyre*, 2 F.Supp.2d 281 (E.D. NY 1998), is instructive to the case at bar. In *McIntyre*, Kia P., who was HIV positive, gave birth to Mora P. at Long Island College Hospital. Not long after delivery, the Hospital took a urine sample from Mora, which tested positive for methadone. *McIntyre*, 2 F.Supp.2d at 285. Although the hospital allowed Kia to be released from the hospital within two days of delivery, the hospital held Mora, who had been evidencing withdrawal symptoms, pending the results of a confirmation test regarding the detection of methadone in Mora's urine. *Id.* Kia denied having used methadone during her pregnancy. *Id.*

A hospital social worker also become involved and contacted the authorities. After a

11

"confirmation test" failed to confirm the presence of methadone in the baby's urine, Mora was released from the hospital. *McIntyre*, 2 F.Supp.2d at 286. Subsequently, Kia, on behalf of her minor child, brought suit against the hospital and its employees for violations of Mora's Fourth Amendment right to be free from unlawful search, claiming the urine test constituted an illegal search.

In dismissing this plaintiffs' Fourth Amendment unlawful search claim on summary judgment, the district court held that the urine test did not constitute a "search" of Mora in violation of the Fourth Amendment. *McIntyre*, 2 F.Supp. 2d at 292. Although the court recognized that Fourth Amendment protections are triggered when "state authorities have children undergo medical procedures for *investigatory purposes*", the court held that because this test, which was not ordered by CWA, was conducted for *medical* and not investigatory purposes, this urine test did not constitute a "search" under the Fourth Amendment. *Id.* (emphasis added).

Although there have been cases which have held that medical examinations of children by governmental employees constitute a search under the Fourth Amendment, each of these cases concerned medical examinations conducted for the *sole purpose* of detecting child abuse. *See Tenenbaum v. Williams,* 193 F.3d 581, 595 (2nd Cir.), *cert. denied* ___ U.S. ___, 120 S.Ct. 1832 (2000) (gynecological exam of child during an investigation for sexual abuse); *Van Emrik v. Chemung County Dept. of Social Services,* 911 F. 2d 863 (2nd Cir.) *appeal dismissed without op.,* 668 N.E.2d 419 (1996) (long bone x-rays during child abuse investigation). The evidence here directly refutes any suggestion that child abuse was even a consideration of the exam.

The summary judgment evidence clearly establishes these examinations were conducted for medical, rather than investigatory, purposes in accordance with Federal Head Start mandate.

In fact, other than the Plaintiffs' own unsupported conclusory statements, there is simply no evidence that the purpose of these examination was to investigate a child abuse.[2]   No law enforcement agency was involved in these examinations and none were contacted regarding the results of the examinations.  *Ex. A.*   Moreover, no one suspected these children to be sexually abused at the time prior to the examinations taking place.  *Ex. A.*   As all of the evidence clearly establishes that these examinations were conducted strictly for medical, and not investigatory, purposes, no Fourth Amendment protection is implicated, and dismissal is appropriate as a matter of law.

> **3.**     **Even if a constitutionally protected search or seizure occurred, the search and/or seizure was reasonable.**

      However, even if this Court finds that a fact issue exists as to whether CAP had consent to conduct these examinations, dismissal is still appropriate because these examinations were reasonable.   The protection afforded under the Fourth Amendment is determined by the circumstances surrounding the search and/or seizure.  "Simply put, this amendment guarantees that governmental intrusion into privacy by means of searches or seizures must be reasonable." *Ferguson v. City of Charleston*, 186 F.3d 469, 476 (4th Cir. 1999), *cert. granted* ___ U.S. ___, 120 S.Ct. 1239 (2000).  It is clear that "what the Constitution forbids is not all searches and seizures, but *unreasonable* searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437 (1960) (emphasis added).   While, in a law enforcement context, a warrant, or at least probable cause, is generally required before a search could be considered constitutional,

---

[2]In fact, Plaintiffs' own expert admits that during any routine physical examination, child abuse is merely a "peripheral issue." *Ex. L, p. 261, ll. 17 - 18.*  It is not the purpose of the examination, but simply acted upon as a doctor would act upon any other type of unexpected, physical finding, such as a heart murmur. *Ex. L, p. 261, ll. 18 - 23.*

"neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, in an indispensable component of reasonableness in every circumstance." *National Treasury Employees Union v. Von Raab*, 489 U.S. 489 U.S. 656, 665, 109 S.Ct. 1384 (1989). This exception applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). In these type of cases, the Court must balance "the individual's privacy expectations against the government's interests," *Von Raab*, 489 U.S. at 665-66, with the "degree to which the [intrusion] advances the public interest." *Brown v. Texas*, 443 U.S. 47, 51 (1979).

This "special needs" test, however, is not generally different from the test of reasonableness in the law enforcement context. As the Supreme Court has held:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861 (1979).

The first factor in evaluating the reasonableness of a Fourth Amendment search focuses on the governmental need for the intrusion. "The Fourth Amendment does not require a governmental need that is compelling in an absolute sense." *Ferguson*, 186 F.3d at 477, *citing Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661, 115 S.Ct. 2386 (1995). "Instead, the interest must be 'important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy.'" *Ferguson*, 186 F.3d at 477, *quoting*, 515 U.S. at 661.

"The second factor, the effectiveness of the search, focuses on 'the degree to which [it] advances the public interest.'" *Ferguson*, 186 F.3d at 478, *quoting Michigan Dept. of St. Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481 (1990). In looking at this factor, the Court must leave "the decision as to which among reasonable alternative . . . techniques should be employed" to "the government officials who have a unique understanding of, and a responsibility for, limited public resources." *Sitz*, 496 U.S. at 453-54.

In *Ferguson*, the Medical University of South Carolina (MUSC) "instituted a policy providing for testing of urine of pregnant women suspected of cocaine use and for reporting, under certain circumstances, of test results to law enforcement officials." *Ferguson*, 186 F.3d at 473. The plaintiffs in *Ferguson*, all of whom were subjected to the policy, brought suit for, among other causes of action, violation of the Fourth Amendment right to be free from unreasonable searches and seizures. In affirming the trial court's summary judgment, the Fourth Circuit held that the alleged searches, which involved collecting urine of these women, was reasonable and, therefore, not violative of the Fourth Amendment.

The Fourth Circuit found, first, that testing the urine of these women was an effective means of identifying and treating maternal cocaine use while conserving the limited resources of public health. 186 F.3d at 478. Next, the court went on to hold that the degree of intrusion suffered by these women was minimal at best. "[I]n today's world, a medical examination that does not include either a blood test or urinalysis would be unusual." *Yin v. California*, 95 F.3d 864, 870 (9th Cir. 1996). By balancing these two factors, the Fourth Circuit determined that "the searches conducted were reasonable and thus not violative of the Fourth Amendment." *Ferguson*, 186 F.3d at 479.

As the summary judgment evidence establishes, the examinations at issue an the case at bar were clearly reasonable. There was nothing unusual about the manner in which they were conducted. In fact, Plaintiffs' own expert admits that these examinations, including the brief genital examination, comported with recognized pediatric standards. Plaintiffs' own expert establishes that a well-child examination, which includes a finger prick blood test and or genital examination, would not be unusual in today's society. Moreover, local Tulsa physicians who have attended to some of the Plaintiffs in this matter admit that genital examinations are historically done in every well-child examination. *See Exs. M, N, O.*

Additionally, the evidence establishes that these examinations, done in order to comply with federal regulations, is an effective means of identifying physical and developmental impediments in children prior to them starting school, a goal of Head Start which the Plaintiffs recognize. In fact, Cowans, Loftin, Dubbs and Porterfield were all notified that their children needed to seek medical attention in order to correct possible defects. Accordingly, not only were these examinations conducted in a proper manner, they achieved the purpose of the examination. Accordingly, it is clear that no Fourth Amendment violation occurred and dismissal is appropriate.

### 2. No Evidence of a Fourteenth Amendment Parental Liberty Violation

The Tenth Circuit has recognized a parental liberty interest of paramount importance in the custody, care, and management of one's children, warranting the protection of procedural due process. *See J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997). In order to determine the constitutionally required process, the Court must look at three factors: (1) the private interest affected by the official action; (2) the risk of erroneous deprivation through the

16

procedures used and the probable value of additional or substitute safeguards; and (3) the government's interest, which encompass both the function involved and the burdens entailed by these alternative safeguards. *Ee Gilbert v. Homar*, 520 US. 924, 931-32 (1997).

Contrary to the allegations made in the Plaintiffs' complaint, the evidence establishes that these examinations occurred with parental consent and notification. *See § I(A)(1), supra.* The parent Plaintiffs were presented with two, different consent/notification forms prior to the examination, which they signed and never questioned. *See attachments to Ex. A.* The Plaintiffs were all afforded process prior to the examinations. Dismissal is clearly appropriate.

Moreover, as established by the Plaintiffs' own expert, these examinations did not exceed the normal scope of such examinations in similar circumstances. In fact, Dr. Nelson admits that a genital examination is a standard element of a well-child examination for any three or four year old. Additionally, all of the Plaintiff parents admit that their relationships with their children have not been damaged in any way as a result of these examinations and, further, it is undisputed that none of these children suffered any emotional or physical injury as a result of these examinations. *See ¶s 22 - 24, supra.* Dismissal is clearly appropriate.

**II.    Even If A Fact Issue Exists as to Whether a Constitutional Violation Occurred, There is No Evidence of a Policy of CAP Which Caused the Constitutional Violation**

If the Plaintiffs were not the victims of a constitutional deprivation, it is irrelevant whether the CAP's policies would have authorized the conduct of which the Plaintiffs complain. *See City of Los Angeles v. Heller*, 475 U.S. 796, 106 S. Ct. 1571, 1573 (1986). *Accord McKee v. City of Rockwall*, 877 F.2d 409 (5th Cir.), *cert. denied*, 493 U.S. 1023 (1990). Moreover, under § 1983, claims of inadequate training, supervision and policies, "cannot be made out against a supervisory authority absent a finding of a constitutional violation by the person supervised." *Webber v. Mefford*, 43 F.3d 1340, 1344-45 (10th Cir. 1994). Because there exists no evidence that the Plaintiffs' rights were violated, dismissal of CAP is clearly appropriate.

As the Tenth Circuit has established, in order to hold CAP liable for alleged violations of § 1983, the Plaintiff must plead and prove: (1) "The existence of a continuing, persistent and widespread practice of unconstitutional conduct by [CAP's] employees"; (2) "Deliberate indifference to or tacit approval of such misconduct by [CAP's] policymaking officials . . . after notice to the officials of that particular conduct"; and (3) Injury to the plaintiffs "by virtue of the unconstitutional acts pursuant to [CAP's] custom and the custom was the moving force behind the unconstitutional act." *Gates v. Unified Sch. Dist.*, 996 F.2d 1035, 1041 (10th Cir. 1991).

A state actor may not be held liable under § 1983 simply because it may employ a person who violated a plaintiff's federally protected rights. *Monell v. New York City Dept. of Social Servs.*, 426 US. 658, 694, 98 S.Ct. 2018 (1978). To establish liability under § 1983, a plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the [state actor] or were carried out by an official with final policy making

18

authority with respect to the challenged action." *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000), *citing Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-83, 106 S.Ct. 1292 (1986). As the Supreme Court has held,

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the [state actor]. The plaintiff must also demonstrate that, through its deliberate conduct, the [state actor] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the [state] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [state] action and the deprivation of federal rights.

*Board of County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382 (1997).

As the affidavit of Jerome Lee establishes, it is the policy of CAP to not conduct medical examinations of its students without parental consent and such a policy is clearly consistent with constitutional mandates. To conduct an examination without parental consent would be a direct violation of CAP's policies on this issue. Accordingly, the evidence establishes that there no policy of CAP which was the moving force behind the alleged constitutional violations. As a violation of a policy cannot be the basis for a claim under § 1983, dismissal is appropriate. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 2436 (1985).

Moreover, in order to prevail on their § 1983 claim against CAP, the evidence must establish a pattern and practice that results in a constitutional violation. *Stokes v. Bullins*, 844 F.2d 269, 273 (5th Cir. 1988); *Languirand v. Hayden*, 717 F.2d 229 (5th Cir. 1983); *Wassum v. City of Bellaire*, 861 F.2d 953 (5th Cir. 1988). As the Supreme Court has stated, "where the policy relied upon is not itself unconstitutional, considerable more proof than the single incident will be necessary." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 2436 (1985). As the affidavit of Jerome Lee establishes, this case is the only instance where the parents did not

receive notice that the examinations were going to take place on a specific date. *Ex. A.* Accordingly, the failure to notify the parents was nothing more than a single, isolated incident, and cannot be the basis for imposing liability against CAP pursuant to § 1983.

In fact, if anything, all the Plaintiffs could, if at all, establish was that CAP was negligent in failing to assure that the notification forms were properly distributed to the students. However, the law is clear that claims of negligence are insufficient to create § 1983 liability. *See Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir. 1993). In fact, the Supreme Court has stated in even more refined terms the requisite standard for culpability of a municipality:

> a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that municipal action was taken with "deliberate indifference" as to its known or obvious consequences. [citation omitted]. A showing of simple or even heighten negligence will not suffice.

*Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1390 (1997); *Canton v. Harris*, 489 U.S. 378, 390, n.10, 109 S.Ct. 1197, 1205, n.10, (1989). Plaintiffs have no evidence of deliberate indifference, and dismissal is appropriate.

Moreover, not only have the Plaintiffs failed to establish a policy, the Plaintiffs have also failed to establish that they suffered any injury as a result of the alleged unconstitutional conduct. Section 1983 requires a causal connection between an alleged constitutional violation and injury. *See Hall v. Tallapoosa*, 50 F.3d 1579 (11th Cir. 1995). The Plaintiffs admit that their children have suffered no physical or mental harm as a result of this examination and these examinations have not affected the relationships between the parents and the children in any manner. *See ¶s 22-24, 28, supra.* In fact, as a result of these examinations, many of these children benefitted because previously undiscovered physical and development problems were discovered. *See ¶ 30,*

*supra*. Because the evidence establishes that there is no injury, this causal connection cannot be made, and dismissal is appropriate.

### III. CAP Is Entitled To Dismissal of the Plaintiffs' State Law Claims

#### A. No Evidence of Intentional Infliction of Emotional Distress

In Oklahoma, in order to maintain a claim for intentional infliction of emotional distress, a plaintiff must allege and prove four elements: (i) intentional or reckless actions by the defendant; (ii) the defendant's conduct was extreme and outrageous; (iii); the plaintiff actually experienced emotional distress; and (iv) the emotional distress was severe. *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir. 1995); *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1981); *see Eddy v. Brown*, 715 P.2d 74, 76-77 (Okla. 1986). The trial court must initially determine as a matter of law whether the alleged conduct meets the extreme and outrageous standard necessary to sustain a claim for intentional infliction of emotional distress. *Daemi*, 931 F.2d at 1387; *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1377 (Okla. 1978). Specifically, the court must determine whether the conduct "has been so extreme in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as utterly atrocious, and intolerable in a civilized community." *Breeden*, 575 P.2d at 1376. "Nothing short of 'extraordinary transgressions of the bounds of civility' will give rise to liability for intentional infliction of emotional distress." *Starr*, 54 F.3d at 1558, *quoting Merrick v. Northern Nat. Gas Co.*, 911 F.2d 426, 432 (10th Cir. 1990). The distress must be "of such a character that 'no reasonable person could be expected to endure it.'" *Daemi*, 931 F.2d t 1389, *quoting* Restatement (Second) of Torts § 46, cmt. j.

As a matter of law, the conduct of which plaintiffs complain – conducting a physical examination of the minor plaintiffs – does not rise to the level of being so extreme in degree, utterly atrocious, and intolerable in a civilized society. As the court stated in *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S. Ct. 2386 (1995):

> According to the American Academy of Pediatrics, most public schools "provide vision and hearing screening and dental and dermatological checks. . . . Others also mandate scoliosis screening at appropriate grade levels." In the 1991-1992 school year, all 50 states required public school students to be vaccinated against diphtheria, measles, rubella, and polio. Particularly with regard to medical examinations and procedures, therefore, "students within the school environment have a lesser expectation of privacy than members of the population generally."

*Id.*, 515 U.S. at 657, 115 S. Ct. at 2395. In this case, the physical examinations that are the subject of Plaintiffs' action could not, as a matter of law, be so outrageous, extreme, or utterly intolerable as to support the maintenance of a claim for intentional infliction of emotional distress. In fact, as previously stated, Plaintiffs' own expert establishes that these examinations were not ourtrageous, extreme or utterly intolerable. Rather, the were nothing more than standard well-child examinations. Where, as here, the conduct alleged does not amount to extreme and outrageous conduct which causes severe emotional distress, dismissal is appropriate. *See, e.g., Brock v. Thompson*, 948 P.2d 279 (Okla. 1997).

## B.     No Evidence of Negligent Infliction of Emotional Distress

Oklahoma law requires that, to recover for mental distress under a negligence theory, the mental distress must be produced by, connected with, or the result of, some form of physical injury to the plaintiff. *Seidenbach's, Inc. v. Williams*, 361 P.2d 185 (Okla. 1961); *Richardson v. J.C. Penney Co., Inc.*, 649 P.2d 565, 566-67 nn. 2 - 4 (Okla. Civ. App. 1982). Plaintiffs admit that they have suffered no physical injury. Because there is no evidence of physical injury or

suffering, the Plaintiffs' claim for negligently inflicted emotional distress must be dismissed. *See Richardson*, 649 P.2d at 566-67.

## C.    The Evidence Disproves Invasion of Privacy

Oklahoma has adopted the Restatement (Second) Torts, § 652 for actions based upon invasion of privacy. *Munley v. ISC Financial House, Inc.*, 584 P.2d 1336, 1340 (Okla. 1978); *McCormack v. Oklahoma Publishing Co.*, 613 P.2d 737, 739 (Okla. 1980). There are four distinct categories of invasion of privacy: (i) unreasonable intrusion upon the seclusion of another; (ii) appropriation of the other's name or likeness; (iii) unreasonable publicity given to the other's private life; and (iv) publicity that unreasonably places the other in a false light before the public. *McCormack*, 613 P.2d at 739 (citing Restatement (Second) Torts § 652A). Apparently, Plaintiffs attempt to establish a claim for unreasonable intrusion upon seclusion. However, as the evidence negates such a claim, dismissal is appropriate.

Intrusion upon seclusion "consists solely of an intentional inference with [the plaintiff's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Restatement (Second) Torts § 652B, cmt. a. However, when the information is part of a record of a legitimate concern to the person acquiring the information, this tort does not apply. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986). As this information was a necessary element of the minor Plaintiffs' enrollment in Head Start, no invasion occurred and dismissal is appropriate.

Moreover, the conduct alleged by Plaintiffs (that the minor Plaintiffs were given physical examinations) does not rise to the requisite level of "highly offensive to a reasonable person." Restatement (Second) Torts § 652B. In order to be actionable as an invasion of privacy, conduct

must be a substantial interference and must be a "substantial burden to [the plaintiff's] existence." *Id.*, cmt. d. A physical examination, particularly where that examination was a requirement for participation in the Head Start program, is not and cannot be considered "highly offensive to a reasonable person." In fact, the evidence establishes that these examinations were consistent with examinations that children from Oklahoma to Pennsylvania receive everyday. Dismissal is clearly appropriate.

## CONCLUSION

The undisputed evidence in this case established that CAP is entitled to summary judgment as a matter of law as to all of the Plaintiff's claims. First, the summary judgment evidence established that the Plaintiff's constitutional rights were not violated. Second, even if the court finds that a fact issue exists as to whether one or more of the Plaintiff's rights were violated, dismissal is still appropriate because no policy of CAP was the moving force behind any violation. Finally, all of Plaintiff's state law claim are untenable.

FOR THESE REASONS, COMMUNITY ACTION PROJECT OF TULSA COUNTY, OKLAHOMA, Defendant, moves this Court to grant its Motion for Summary Judgment, to dismiss the Plaintiffs' claims against it, with prejudice, and for any other relief to which this Defendant has shown itself justly entitled.

Respectfully submitted,

William S. Helfand
SBOT 09388250
Rachel D. Ziolkowski
SBOT 24003234
MAGENHEIM, BATEMAN & HELFAND, PLLC
3600 One Houston Center
1221 McKinney Street
Houston, Texas 77010
(713) 609-7700 Telephone
(713) 609-7777 Facsimile

- and -

John E. Dowdell, OBA #2460
Christine D. Little, OBA #16677
NORMAN WOHLGEMUTH CHANDLER & DOWDELL
2900 Mid-Continent Tower
Tulsa, Oklahoma 74103
(918)583-7571 (Telephone)
(918)584-7847 (Facsimile)

**ATTORNEYS FOR DEFENDANT,
COMMUNITY ACTION PROJECT OF
TULSA COUNTY, OKLAHOMA**

## CERTIFICATE OF MAILING

I hereby certify that on the 22nd day of December 2000, a true and correct copy of the above and foregoing instrument was sent via facsimile and/or regular mail to:

Christopher W. Goree, Esq.
Jack Y. Goree, Esq.
Goree & Goree, P.C.
6901 South Yorktown, Suite E
Tulsa, Oklahoma 74136

Leah Farish, Esq.
2834 East 26th Place
Tulsa, Oklahoma 74114-4310

J. Douglas Mann, Esq.
525 South Main, Suite 700
Tulsa, Oklahoma 74103-4508

Eric J. Begin, Esq.
Atkinson Haskins
525 South Main, Suite 1500
Tulsa, Oklahoma 74103

Scott B. Wood, Esq.
Whitten McGuire
3600 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103

Christine D. Little

A

## AFFIDAVIT OF JEROME LEE

STATE OF OKLAHOMA    §
                               §

COUNTY OF _Tulsa_    §

BEFORE ME, the undersigned notary public, on this day personally appeared Jerome Lee, who being by me duly sworn on his oath, deposed and stated as follows:

My name is Jerome Lee. I am over the age of twenty-one (21) and am in all other ways qualified to make this affidavit. The statements contained herein are true and correct and, as the Director of the Head Start and First Start programs for the Community Action Project of Tulsa County, Oklahoma ("CAP"), I am authorized to make the statements contained herein. The statements herein are made of my own personal knowledge because they relate to my own actions or things which I personally observed.

Since 1998, CAP has been the local grantee for the federal Head Start program. In order to maintain its funding, CAP is required to comply with all federal Head Start regulations. As part of the federal Head Start regulations, all enrollees of the Head Start program are required to receive a physical examination within ninety days of enrollment. The purpose of this requirement is to identify any physical and developmental impediments that may prevent a child from fully participating in the program. Because many Head Start enrollees do not have a regular pediatrician, as a service to the families, CAP makes physical examinations available to its Head Start enrollees free of charge. In 1998, CAP contracted with both the University of Oklahoma and the Tulsa City/County Health Department to conduct these examinations at different Head Start locations.

I understand that there has been an allegation in this lawsuit that the purpose of these examinations was to investigate for child abuse. This statement is simply false. At the time these examinations were conducted, there was no indication or suggestion that any of these children who were examined were sexually abused. No law enforcement or other investigatory authorities were involved in these examinations. None of the findings of these examinations were reported to any law enforcement authorities. The sole purpose of these examinations was to identify any physical or developmental impediments a child may have that may prevent a child from fully participating in the program consistent with the federal Head Start requirements.

In addition, I also understand that there is an allegation that CAP had a policy of conducting examinations without informed, parental consent. This is also simply wrong. It is CAP's policy that all examinations be conducted with parental consent. If any examination was conducted without parental consent, such an examination would be in direct derogation of CAP's policies.

In order to further this policy, upon enrollment in the program, all parents and/or guardians are notified of the federal regulations which require that all enrollees in the program receive a medical examination within ninety days of enrollment. At that time, the parents or guardians are also asked to sign two separate consent forms regarding medical care and treatment to enrollees in the program. It is explained to the parents that if the required examination is not conducted within the required period, CAP will provide the examination, free of charge, to the enrollees. Attached to this affidavit are true and correct copies of these forms as kept in the regular course of business at CAP, which are signed by the parents or guardians of the minor Plaintiffs in this matter. These consent forms are similar to other consent forms which are used in other Head Start programs across the country and are consistent with the consent forms used at local healthcare facilities around Tulsa.

Upon receiving these two consent forms, CAP understands that it has the authority from the parents or guardians of each child to conduct physical examinations. Although CAP has full authority to conduct these examinations at the time that these consent forms are completed, as a courtesy to the parents and in order to give the parents one last opportunity to turn in the appropriate paperwork to CAP, before an examination is conducted, CAP provides the parents notice of the date of these examinations and allows each parent an opportunity to attend. The notification form is given to the appropriate on-site person and is given to each child to give to their parents and return.

This procedure was followed in the *Barnes* case when the notification form on OU letterhead was sent. Regrettably, in the *Dubbs* matter, although CAP sent notification forms to the Roosevelt Elementary site, they were never distributed to the children. CAP did not learn that the notifications at that site were not sent out until the afternoon of the examinations.

The failure to distribute the notification forms at the Roosevelt Elementary site is a single, isolated incident. Before the Roosevelt Elementary incident, CAP had never received a complaint from any parent that they did not receive notification of a medical examination prior to its occurrence. Regardless, at all times, CAP believed that it had consent from the parents to perform these examinations.

B

Further Affiant Sayeth Not.

Jerome Lee

SUBSCRIBED AND SWORN TO BEFORE ME on this 20th day of December 2000.

NOTARY PUBLIC IN AND FOR THE
STATE OF OKLAHOMA

MY COMMISSION EXPIRES FEBRUARY 28, 2001

```
 1              IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT
 2

 3   JACK DUBBS, et al,                )
                                       )
 4                      Plaintiffs,    )
                                       )
 5        vs.                          )   Case No. 99-CV-0732K(E)
                                       )
 6   HEAD START, INC., et al           )
                                       )
 7                      Defendants.    )

 8

 9

            DEPOSITION OF JACQUELINE LOU STRAYHORN, taken at 20
10   East Fifth Street, Suite 405, Tulsa, Oklahoma, on the 17th day
     of October, 2000, on behalf of the plaintiffs, before the
11   undersigned Certified Shorthand Reporter, pursuant to notice.

12            Fee for original, $        paid by plaintiffs.

13
     _____
14   Michael A. Bailey, CSR-RPR-CLVS

15

16

17

18

19

20

21

22

23                        COPY

24

25
```

1    Q     Now, I want to direct your attention to a time of

2    November 5th, or thereabouts, 1998.  Are you familiar with

3    circumstances that occurred during that period of time?

4    A     Yes.

5          MR. BEGIN:  Object to the form.

6    Q     (By Mr. Goree) Were you an employee of the Tulsa City-

7    County Health Department on or about November 5th, 1998?

8    A     Yes.

9    Q     And in what capacity were you employed?

10   A     As a pediatric nurse practitioner.

11   Q     And what were your duties primarily during the month of

12   October 1998, the month immediately before November 5th of '98?

13   A     I don't know what you want me -- what -- what are you

14   asking me?

15   Q     Okay.  Well, let me just rephrase it.  Thank you for

16   asking me that.

17   A     Uh-huh.

18   Q     In November of 1998, on or about the 5th, were you at

19   the Roosevelt Elementary School in the Tulsa Public Schools for

20   some reason?

21   A     Yes.

22   Q     And were you required to sign in at the school when you

23   got there that day?

24   A     No.  I don't recall signing in.

25   Q     What was your role to be as a nurse when you went to

1   Roosevelt Elementary School on or about November 5th, 1998?

2       A    To perform Head Start physicals.

3       Q    And who told you where and when to report to the

4   school?

5       A    My supervisor.

6       Q    And who was that at that time?

7       A    It was Mary Anne Welker.

8       Q    Did she give you any instructions in writing?

9       A    No.

10      Q    She was an employee of the Tulsa City-County Health

11  Department at the time she gave you instructions?

12      A    Yes.

13      Q    What instruction did she give you?

14      A    Just -- she told me what school to go to and that I was

15  there to do well-child physicals.

16      Q    Did she tell you anything else?

17      A    I'm not -- I'm not aware of anything else.

18      Q    All right.  Had you done what you called Head Start

19  physicals before November 5th of 1998?

20      A    Yes.

21      Q    And did you do any of those in the Tulsa Public

22  Schools?

23      A    No.

24      Q    Where, generally, had you done -- well, where exactly

25  had you done examinations for Head Start prior to November 5th,



```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT
 2

 3   JACK DUBBS, et al,                )
                                       )
 4                       Plaintiffs,   )
                                       )
 5       vs.                           )   Case No. 99-CV-0732K(E)
                                       )
 6   HEAD START, INC., et al,          )
                                       )
 7                       Defendants.   )

 8

 9

             DEPOSITION OF KIMBERLY MICHELLE BAKER, taken at 525
10   South Main Street, Suite 1500, Tulsa, Oklahoma, on the 19th day
     of October, 2000, on behalf of the plaintiffs, before the
11   undersigned Certified Shorthand Reporter, pursuant to
     stipulations of the parties.
12
                 Fee for original, $        paid by plaintiffs.
13

14   _____
     Michael A. Bailey, CSR-RPR-CLVS
15

16

17

18

19

20

21

22

23                        COPY

24

25
```

1   department?

2   A    There was a job that came open in Bartlesville and my

3   husband and I thought it would be better that I not commute.

4   Q    Before you went to work for the Tulsa City-County

5   Health Department, did you work for any other health-care

6   providing organizations?

7   A    Yes, sir.

8   Q    Where did you work?

9   A    I worked for Jane Phillips as a nurse tech and I also

10  worked for St. John's here in Tulsa as a nurse tech.

11  Q    And what does a nurse tech do?

12  A    They're like certified nurses' aides only they're able

13  to do tube feeding and glucometer checks as well.

14  Q    And did you work in the health-care field anywhere

15  other than those two places?

16  A    No, sir.

17  Q    I want to direct your attention to November 5th, 1998,

18  at which time at Roosevelt Elementary School the Tulsa City-

19  County Health Department was conducting medical examinations of

20  children.  Does that help you get on the subject where we are

21  going to go?

22  A    Yes, sir.

23  Q    And did you participate in that group that went out to

24  Roosevelt Elementary School on November 5th, 1998?

25  A    Yes, sir.

1     Q    And do you know when you were advised by anyone that

2    you were going to be part of the examination group?

3     A    I don't remember the exact date they told me.  I know

4    prior to going out to the school I was told that I would be

5    assisting.

6     Q    And who told you that?

7     A    Mary Anne Welker and Doug Ressler.

8     Q    At that time, what was the position of Doug Ressler

9    with the Tulsa City-County Health Department, if you know?

10     A    Director of nursing.

11     Q    Before November 5th, 1998 at Roosevelt, had you ever

12    done physicals on Head Start enrollees?

13     A    No, sir.

14     Q    When I use the term "enrollees," I'm talking about the

15    children who were involved in the training program under health

16    -- Head Start; do you understand that?

17     A    Yes, sir.

18     Q    This then was the first time you had conducted any part

19    of medical examinations on Head Start enrollees?

20     A    Yes, sir.

21     Q    What did Mary Anne Welker tell you when she told you

22    you would be part of the group going out there to Roosevelt?

23     A    That I would be going out to the school and doing

24    physical examinations.

25     Q    Did she tell you anything else?

D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFIANI DUBBS, a minor, et al.,



                    Plaintiffs,

vs.                                    No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

                    Defendants.

**DEPOSITION OF MISTI DUBBS,**

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
3:30 p.m., on July 19, 2000, pursuant to notice.


                 KATHLEEN McCLANAHAN, CSR #283


            NICHOLS-McCLANAHAN REPORTING
                    Two Main Plaza
              616 South Main, Suite 302
                Tulsa, Oklahoma  74119-1261
                    918/585-9969

1     A.     Yes.

2     Q.     Okay.  Was there ever a time that the --

3 that Tiffani was being examined in any way, in

4 connection with the medical examination your husband

5 is suing over, where you were not in the same room as

6 your daughter?

7     A.     No.

8     Q.     Okay.  Did you ever tell anyone,

9 regardless of who they were working for, that you did

10 not agree or you would not agree to allow Tiffani to

11 have the examination?

12    A.     I told everyone that we had no parental

13 consent form signed.

14    Q.     That's not the answer to any question

15 I've asked you, Ms. Dubbs.

16    A.     Well, ask it again, then, sir.

17    Q.     Did you ever tell anyone that you did not

18 consent to allow Tiffani's exam to go forward?

19    A.     Now, I want you to think about that

20 question.  How can I give consent for Tiffani to get

21 a physical when I'm not her legal guardian?

22    Q.     Listen again to my question, Ms. Dubbs.

23    A.     I don't have that authority, sir.

24    Q.     So is the answer no?

25    A.     That would be up to your father.

1       A.      I did, sir, sure did.  I did.

2       Q.      But you did so, Ms. Dubbs, after some of

3   the exam had already been done?

4       A.      No, that's not how it worked at all.

5       Q.      Okay.  Well, let me see, because I'm

6   presupposing something that I may be wrong about.

7       Did Tiffani Dubbs participate in any aspect of

8   the medical examination being administered by the

9   Head Start -- under the auspices of the Head Start

10  program at Roosevelt Elementary?

11      A.      Yes, yes.

12      Q.      And were you there during whatever

13  medical examination was done with Tiffani?

14      A.      Yes.

15      Q.      Okay.  So you did participate, you were

16  there while Tiffani was being examined?

17      A.      Yes.

18      Q.      Okay.  When was it that you chose to

19  discontinue Tiffani's examination?

20      A.      Okay.  We went behind a partition, and

21  they were listening to her heart, perfectly normal.

22  I'm looking over another direction and I see another

23  little boy in our class with his pants down and a

24  nurse over there looking at his private areas.  When

25  I looked back around, they were starting to pull my

1  daughter's -- she had tights and a skirt on, down,

2  and getting ready to look at their -- her private

3  area, and I pulled her off the table and said they

4  are not going to do that to her.

5      Q.   Okay.  Did somebody look at your

6  daughter's private parts before you pulled her away?

7      A.   They was -- had their fingers right down

8  in her little private area getting ready to pull it

9  apart when I looked back.

10     Q.   Okay.  But, now, see if you can answer my

11 question.

12     A.   I answered your question.  Yes, they did.

13     Q.   Okay.  So you actually removed your

14 daughter after they had examined her private parts?

15     A.   Before.  They was on the verge of

16 touching it, and I took her off the table.

17     Q.   Okay.  My questions really don't require

18 the level of explanation that you are trying to give

19 me.

20     Did you discontinue the exam before or after

21 Tiffani Dubbs' private parts were examined?

22     A.   I'll tell you one more time.  I pulled

23 her off the table when I seen her pulling her private

24 parts, getting ready to pull her privates parts open,

25 like this, no gloves, and I pulled her off the table.

1    A.    I'll do the best I can.

2    Q.    Is it your understanding that if somebody

3  is properly treated for anemia they will continue to

4  have blood tests that show that they're anemic or

5  that that will go away?

6    A.    That's not a yes or no question.

7    Q.    Can you answer the question I've asked

8  you, ma'am?

9    A.    Could you ask it again?

10   Q.    Is it your belief or understanding that

11  if somebody is being treated for anemia that they

12  will continue to have blood tests that show anemia or

13  that that will eventually go away in the blood tests?

14   A.    I've been explained it will eventually go

15  away.

16   Q.    Okay.  Yet when a blood test at Roosevelt

17  showed that she was anemic, you're telling me that

18  was not a source of concern for you at all?

19   A.    No, it was not.

20   Q.    Now, do you understand that one of the

21  effects of anemia is to make a child or an adult or

22  anybody who has it more tired than they might be if

23  they didn't have the anemia?

24   A.    Yes.

25   Q.    And can we agree that a child being tired

1    is an impediment to learning?

2         A.    Yes.

3         Q.    And so if there's some physical reason

4    that a child is tired, that might be an impediment to

5    learning that could be controlled or fixed, can we

6    agree on that?

7         A.    Yes.

8         Q.    And if you want to give the child the

9    best learning opportunity, one thing you would

10   obviously want to do, then, is try to address

11   physical things like anemia that might make them

12   tired and therefore less likely to learn, right?

13        A.    Yes.

14        Q.    Okay.  And do you understand that the

15   goal of the Head Start program is to give kids the

16   best opportunity to learn to be ready for school?

17        A.    Yes.

18        Q.    And do you understand that that goal is

19   not just teaching them specific educational things,

20   but also addressing their overall physical and

21   emotional well-being to prepare them for school?

22        A.    Yes.

23        Q.    And so can you understand that part of

24   the concern of preparing a child for school is not

25   just whether they know the ABC's or their colors or

1    right or left, but also whether they have a good diet

2    and whether they're physically fit and ready to

3    learn?

4         A.    Yes.

5         Q.    And you understand that the Head Start

6    program is required by the federal government to

7    require that participants have children evaluated

8    within 90 days of starting the program?

9         A.    Yes, I do.

10         Q.    Okay.  And did Tiffani have a visit with

11    any doctor within 90 days of starting the Head Start

12    program?

13         A.    Yes.

14         Q.    And who was that?

15         A.    Doctor Miller.

16         Q.    And did Doctor Miller give you evidence

17    of that evaluation to bring to the Head Start

18    program?

19         A.    Yes.

20         Q.    And who did you turn that over to?

21         A.    I put it in the file.

22         Q.    You put it in the file yourself?

23         A.    Yes.

24         Q.    Okay.  Who did you notify that you were

25    doing that?

1  that discussion?

2      A.    No, because they also needed her birth

3  certificate and a copy of her shot records.  I had to

4  have all three of them brought in the same day.

5      Q.    Okay.

6      A.    And they -- she either faxed it to them,

7  we had a fax machine in our office.

8      Q.    Okay.  I want to show you also, ma'am,

9  two documents, which they're actually in reverse

10 order.  The top one is Suddarth Exhibit Number 3 and

11 the bottom one is Suddarth Exhibit Number 2.  Have

12 you ever filled out forms like that for Tiffani?

13     A.    This one, the second one.

14     Q.    Okay.  You're showing me what's filled

15 out as -- I'm sorry, what would be marked in Ms.

16 Suddarth's deposition as Exhibit Number 2.  You

17 filled out that form for Tiffani Dubbs?

18     A.    Yes.

19     Q.    And did you sign that form?

20     A.    I believe Jackie did, Jack.

21     Q.    Oh, Jack, okay.

22     A.    Sorry.

23     Q.    Okay.  So you actually took that to Mr.

24 Dubbs and had him sign it?

25     A.    Yes.

1    abuse of Tiffani?

2        A.    Yes.

3        Q.    Okay.  Do you now believe that Tiffani

4    was in fact not abused?

5        A.    No, she was.

6        Q.    Or you still believe she was?

7        A.    Yes, she was.

8        Q.    Okay.  Do we agree -- Well, how has that

9    physical abuse that you --

10       You're telling me you know for a fact that it

11   happened?

12       A.    Yes.

13       Q.    Okay.  And I take it that that's what

14   motivated you to accuse somebody else?

15       A.    Yes.

16       Q.    For some reason, however, if I understand

17   correctly, somebody somewhere along the line decided

18   not only did it not happen but you were falsely

19   accusing somebody of it happening?

20       A.    Yes.

21       Q.    Okay.  How has the fact, in your mind at

22   least, that Tiffani was physically abused --

23       And this physical abuse, was it sexual abuse?

24       A.    Yes.

25       Q.    So how has the fact that Tiffani was

1   Q.   All right.  And what entity ran it?

2   A.   What's an entity?

3   Q.   An organization.

4   A.   I don't --

5   Q.   Maybe I should ask it this way:  Is it

6   fair to say that from your observations of the

7   day-to-day operations, the Tulsa Public Schools had

8   nothing to do with the operations of the Head Start

9   program?  Is that fair?

10   A.   Yes.

11   Q.   Okay.  And the Tulsa Public Schools had

12   nothing whatsoever to do with regard to the physical

13   exams that occurred that your husband is suing over,

14   right?

15   A.   Right, yes.

16   Q.   And you're not aware of any evidence or

17   facts that any Tulsa school district employee knew

18   about these physical exams before they actually

19   happened, are you?

20   A.   My director went and asked the principal

21   to assign her a room for the physicals to take place.

22   Q.   Did you actually hear your director ask

23   that?

24   A.   No.

25   Q.   So you don't know if your director made

1   that you had with her, that some further consent was

2   needed to do the exams, or did she simply say we're

3   going to do the exams?

4       A.    She just simply said we are going to do

5   the exams.

6       Q.    Okay.  Did she ever say anything to

7   indicate to you that she thought some further consent

8   was necessary?

9       A.    No.

10      Q.    Okay.  When you overheard Peggy talking

11  to anybody else, did she say anything that made you

12  believe or that she directly acknowledged that some

13  further consent was necessary to do the exam?

14      A.    No.

15      Q.    Okay.  Can you think of any injury to

16  Tiffani that occurred as a result of any part of the

17  examination that she had that day?

18      A.    No.

19      Q.    Okay.

20            MR. HELFAND:  Then I don't have any other

21  questions at this time.  I appreciate that, and I

22  appreciate your willingness to come back after we've

23  reviewed the documents that you're going to produce.

24      Oh, one other question.

25      Q.    (By Mr. Helfand)  I was going to send you

E

1

```
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
```

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

Plaintiffs,

vs.                                No. 99-CV-0732K(E)
HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

Defendants.


**DEPOSITION OF FRANCISCO AGUIRRE**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
11:10 a.m., on July 24, 2000, pursuant to notice.


_____
KATHLEEN McCLANAHAN, CSR #283



NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma  74119-1261
918/585-9969

1    A.    That they didn't use no gloves.

2    Q.    Anything else?

3    A.    And they didn't let no parents be in

4  there with the children when they conducted.

5    Q.    Had you been notified of this

6  examination, would you have allowed Jessica to have

7  had the examination?

8    A.    Yes, I will.

9    Q.    Were you present when this medical

10  examination was done?

11    A.    No.

12    Q.    So would it be correct, sir, that

13  everything that you know about this medical

14  examination would be based on what someone else has

15  told you?

16    A.    Yes.

17    Q.    Okay.  Who have you spoken to about this

18  medical examination?

19    A.    My wife and a teacher from school.

20    Q.    And what teacher is that?

21    A.    I don't remember her name.

22    Q.    Was she a teacher, or was she a teacher's

23  assistant, do you know?

24    A.    I don't know.

25    Q.    Okay.  Can you describe her for me at

1    Jessica about it, have either you or your wife spoken

2    to your daughter again about the examination?

3        A.    No.

4        Q.    Has Jessica ever brought it up before?

5        A.    No.  We just don't want her to remember.

6        Q.    Did any part of this exam physically

7    injure your child in any way?

8        A.    Excuse me, can you --

9        Q.    Sure.

10    Did any part of this examination injure your

11    child in any way?  Was she hurt at all by this

12    physical examination?

13        A.    Emotionally.

14        Q.    Okay, but let's first talk about any

15    physical injury, did she suffer any physical

16    injury --

17        A.    No.

18        Q.    -- as a result of this examination?

19    Okay.  You've advised me that Jessica has some

20    emotional injury.  How does that present itself?

21        A.    She used to go home and just be sad and

22    used to go to her room and just -- every time you

23    tried to speak to her, her eyes would go down.  She

24    was shy, shy to talk about.

25        Q.    Prior to this examination, had she been a

1    your wife did not turn this form in to Head Start?

2         A.    I don't know.

3         Q.    Do you have any reason to believe that

4    wouldn't be the case?

5         A.    No.

6         Q.    Okay.  So I'm going to give you a chance

7    to read through this just a second, and let me know

8    when you're done, okay?

9         A.    (Complies.)

10   What's this one?

11        Q.    It's a hemoglobin.

12        A.    Can you explain that to me?

13        Q.    Well,

14             MS. CLARKE:  (Indicates.)

15        Q.    It's a blood test.

16             MR. GOREE:  I would like to go on the

17   record that counsel for the defense mentioned to you

18   and explained to you that that is in fact a blood

19   test so that you would know what it was.

20        A.    Not for sure, huh?

21        Q.    (By Ms. Ziolkowski)  The best of my

22   understanding it's a type of blood test.

23        A.    Okay.

24        Q.    Okay.  And please correct me if I'm

25   wrong, and you've read this whole document, correct?

1      A.     Yes.

2      Q.     And you understand that document?

3      A.     Yes.

4      Q.     And you understand that this document

5 gives permission for your daughter to have certain

6 medical tests performed on her, --

7      A.     Yes.

8      Q.     -- correct?

9 Do you understand this document to give my

10 client authorization to perform medical procedures on

11 your child?

12      A.     Yes.

13      Q.     Okay.  Did you ever -- Did you or your

14 wife ever tell my client they could not perform these

15 medical procedures on your child?

16      A.     No.

17      Q.     Okay.  Did you ever notify them that you

18 were going to limit or withdraw this consent in any

19 way?

20      A.     No.

21      Q.     Okay.  Now, if you'll turn the page,

22 there is a document entitled authorization for

23 treatment to minors.  That's going to be marked as

24 Defendant's Exhibit Number 3 in this matter, okay?

25 Have you ever seen this document before?

1    goals in Head Start is to get rid of any impediments

2    children may have prior to the -- to learning prior

3    to the beginning of the school year?

4         A.    Yes.

5         Q.    Okay.  And in attempting to make sure

6    that each child is in the best possible condition to

7    participate in the Head Start program, would you

8    agree that Head Start has an incentive to make sure

9    that each child is in good physical health?

10        A.    Yes.

11        Q.    Okay.  Did you identify a need for any

12   medical care for your child as a result of this

13   examination?

14        A.    Well, there is -- we try not to remind

15   her on that.  She -- she had a hard time.

16        Q.    Okay.  Well, did you identify -- Did the

17   medical examination identify any type of physical

18   problem with Jessica as a result of the examination?

19        A.    Yes.

20        Q.    And what problem was that?

21        A.    Well, they give me a -- they sent me a

22   letter --

23        Q.    Okay.

24        A.    -- about a month later.

25        Q.    And I want you to turn the page of those

1    documents I gave you, and that's going to be Exhibit

2    Number 4.

3           A.     Uh-huh.

4           Q.     Okay.  Have you seen that letter before?

5           A.     Yes.

6           Q.     And was this the letter you received?

7           A.     Yes.

8           Q.     Okay.  And what is the date on that

9    letter?

10          A.     The 19th.

11          Q.     Of what?

12          A.     Of '98.

13          Q.     And of what month?

14          A.     November.

15          Q.     Okay.  And do you remember receiving this

16   letter at or about November 19th of 1998?

17          A.     I got it December the 1st.

18          Q.     Okay.  So about two weeks later you

19   received the letter?

20          A.     Yes.

21          Q.     And have you had a chance to read through

22   that letter?

23          A.     Yes.

24          Q.     And what does it indicate was physically

25   wrong with your child during the examination?

1    pretty hard that first week for her.

2         Q.    How so?

3         A.    Well, she used to go home and just hide

4    herself.

5         Q.    And you said this lasted about a week?

6         A.    A week and a half.

7         Q.    Okay.  Is Jessica any different today

8    than she would have been had she not had the

9    examination?

10        A.    No.

11        Q.    What has happened to your daughter as a

12   result of this examination that has in any way

13   affected your daughter's life?

14        A.    We try to tell her to talk more to us,

15   whether any young or old people will make -- try to

16   make to her, you know, try to put hands around,

17   whatever, somebody wants to touch her or do something

18   they don't supposed to.

19        Q.    Okay.  Please correct me if I'm

20   mischaracterizing you in any way.  So as a result of

21   this examination, you've been able to have a more

22   open conversation with your daughter regarding

23   strangers and other people touching her?

24        A.    Yes.

25        Q.    Has this medical examination in any way

```
 1        A.      No.

 2        Q.      After this examination, did Jessica

 3    continue to participate in the Head Start program for

 4    that year?

 5        A.      Yes.

 6        Q.      And did she successfully complete the

 7    Head Start program that year?

 8        A.      Yes.

 9        Q.      And after she successfully completed the

10    program, I guess that would have been the end of the

11    1999 school year, did she go on to kindergarten, or

12    did she take another session of the Head Start

13    program?

14        A.      Kindergarten.

15        Q.      Okay.

16                MS. ZIOLKOWSKI:  That's all the questions

17    I have at this time.  I may have some follow-up

18    later.

19                    DIRECT EXAMINATION

20    BY MS CLARKE:

21        Q.      I just have a couple of questions for

22    you, sir, and forgive me if I skip around a little

23    bit.

24        But did you say that your wife does read and

25    speak English?
```

F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

      Plaintiffs,

vs.                    No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

      Defendants.


**VOLUME I OF THE DEPOSITION OF KEENYA COWANS**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants, at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:45 a.m., on July 28, 2000, pursuant to notice and
subpoena.


DANA L. YOUNG, CSR #01168

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma 74119-1261
918/585-9969

1      A.    Yes, I have.

2      Q.    And when was the last time you had to

3 discipline Keymiya?

4      A.    It's been, let's see, about two or three

5 years ago.  She was very little.

6      Q.    And when you discipline Keymiya, how do you

7 do so?

8      A.    I just sit down and talk with her like a

9 mother and just tell her things that she shouldn't be

10 doing or saying.

11      Q.    Okay.  Have you ever had to use any type of

12 corporal punishment on Keymiya?

13      A.    No.

14      Q.    Has Keymiya ever had any problems at

15 school?

16      A.    No.

17      Q.    How is Keymiya's health?

18      A.    Excellent.

19      Q.    Did she have any typical childhood diseases

20 or injuries or anything like that?

21      A.    No.

22      Q.    Have you ever felt the need for Keymiya to

23 be seen by any type of mental health care

24 professional, a psychiatrist, psychologist or

25 counselor?

1     A.    Well, after the incident that happened at

2  Roosevelt, I had thought about it, but it never did

3  occur.

4     Q.    Okay.  Let me make sure I got you straight

5  here.  When you say "it never did occur," you thought

6  about taking --

7     A.    Taking her.

8     Q.    -- but it never -- you never did so?

9     A.    Right.  Yes.

10        MR. GOREE:  Object to the form of the

11  question.

12     Q.    (By Ms. Ziolkowski)  Oh, one thing,

13  Ms. Cowans, I don't think I covered it.  It's very

14  important that we try not to talk over each other.

15  And I'll try to do my best not to talk over you if you

16  can do the same courtesy.  The court reporter is good,

17  but she's not that good.  So we're going to have to

18  try to be accommodating to her as well.  Okay?

19     A.    Okay.

20     Q.    Great.

21    Now, why did you feel like Keymiya needed to be

22  seen by some type of mental health care provider after

23  this incident?

24     A.    Because I thought that it was going to

25  bother her.  And she really took it well, but she

1    upset, or is she just like telling you --

2         A.    I don't think she's upset.

3         Q.    Go ahead.

4         A.    She's just like, "Why?"

5         Q.    Okay.  How has -- how is your child's life

6    different today than it would have been had she not

7    had this examination?

8         A.    I don't know.

9         Q.    Has your relationship changed with your

10   daughter at all as a result of this examination?

11        A.    No.

12        Q.    Tell me about your relationship with your

13   child.

14        A.    It's a mother-and-daughter relationship and

15   we get along great.

16        Q.    Have you thought about how this lawsuit is

17   going to affect your child?

18        A.    Yes.

19        Q.    Have you talked to Keymiya about it?

20        A.    A little bit.

21        Q.    What have you talked to her about?

22        A.    Well, she'll come up with a question like,

23   "What are they going to do?"

24              And I said, "Well, like mama's not for sure.

25   We're letting someone handle the situation."

1  dental, medical or surgical diagnosis or treatment by

2  any physician or dentist licensed by the State of

3  Oklahoma and hospital service that may be rendered to

4  said -- to said minor under the general, specific or

5  special consent of Tulsa County Head Start Program,

6  the temporary custodian of the minor, whether such

7  diagnosis or treatment is rendered at office -- at the

8  office of the physician or dentist to call in any

9  necessary consultants in his or their discretion.

10      Q.    Since the document speaks for itself, did

11  you ever tell my client that they could not perform

12  medical procedures on your child?

13          MR. GOREE:  I will object to the form of

14  the question.

15      A.    No.   That question never did come up.

16      Q.    (By Ms. Ziolkowski)  Did you ever notify

17  anyone at Head Start that you were going to limit or

18  withdraw this consent?

19      A.    No.

20      Q.    Now, there's a second part to this

21  document, is there not?

22      A.    Yes.

23          MR. GOREE:  Object to the form of the

24  question.

25      Q.    (By Ms. Ziolkowski)  Okay.  Tell me about

1     A.    Because she had already had a physical

2  done.

3     Q.    Is that your only reason for refusing to

4  have done it?

5     A.    No.

6     Q.    Tell me all the reasons.

7     A.    Well, like I said, she had already had a

8  physical done, and she -- no, excuse me, they didn't

9  have -- I mean, you know, they were already in her

10  business, so what more else did they need to know?

11     Q.    Okay.  Well, do you believe that there's a

12  relationship between a child's physical health and

13  their ability to learn?

14     A.    Yes.

15     Q.    Okay.  And do you understand why Head Start

16  wants to have medical examinations performed on

17  children prior to them starting Head Start?

18     A.    Yes.

19     Q.    And if your child was having trouble

20  getting started in school and it was a physical

21  problem that was causing that, you would want someone

22  to discover that, wouldn't you?

23         MR. GOREE:  I object to the form of the

24  question.

25     A.    No.

1     my question?  How could anyone hide this from you if a

2     parent of one of the students was at the examination?

3          A.    Well, I think it was hidden from the

4     teachers, period.  And so, therefore, when they went

5     in there -- when she went in there with her daughter,

6     that's how she found out.

7          I don't think it was hidden.  It was just not

8     professionally done at all.

9          Q.    It was a mistake?

10               MR. GOREE:  I object to the form of the

11    question.

12               MR. MANN:  What was your answer?  I'm

13    sorry?

14         A.    It was more of a mistake.

15         Q.    (By Ms. Ziolkowski)  What do you mean by

16    that?

17         A.    It was just a mistake.

18         Q.    Okay.

19         A.    That's all I can say.

20         Q.    Did you allow your child to continue in the

21    Head Start program for the rest of the year?

22         A.    Did I allow her?

23         Q.    Yes, ma'am.

24         A.    Yes.

25         Q.    And how did Keymiya do in the Head Start

G

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OKLAHOMA

3   JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of          COPY
    TIFFANI DUBBS, a minor, et al.,
4
5               Plaintiffs,

6   vs.                            No. 99-CV-0732K(E)

7   HEAD START, INC., an Oklahoma
    Corporation; INDEPENDENT SCHOOL
8   DISTRICT NO. 1 OF TULSA COUNTY,
    OKLAHOMA; COMMUNITY ACTION PROJECT
9   OF TULSA COUNTY, OKLAHOMA, an Oklahoma
    Not-For-Profit Corporation; TULSA
10  CITY-COUNTY HEALTH DEPARTMENT;
    KD ENTERPRISES, INC., an Oklahoma
11  Corporation; DOE GOVERNMENT AGENTS
    1 through 5; JACKIE STRAYHORN, ARNP;
12  K. BAKER, RN; PEGGY DOE; JOHN DOES
    1 through 10; JANE DOES 1 through 10,

13              Defendants.

14       **DEPOSITION OF ELISHA PORTERFIELD**,

15  before the undersigned Certified Shorthand Reporter,
    taken on behalf of the Defendants at 2900
16  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
    2:15 p.m., on July 27, 2000, pursuant to notice.

17

18

19

20      _____
        KATHLEEN McCLANAHAN, CSR #283
21

22

23      NICHOLS McCLANAHAN REPORTING
              Two Main Plaza
24       616 South Main, Suite 302
        Tulsa, Oklahoma  74119-1261
25            918/585-9969

1   A.  He's not hard-of-hearing.

2    DOCTOR SCHOEPPEY: But he is, so --

3   Q.  (By Ms. Ziolkowski) How long has he been

4 with the YMCA program?

5   A.  Just since this summer.

6   Q.  Okay. And what type of program is it at

7 the YMCA that he's attending?

8   A.  It's actually a summer camp.

9   Q.  Is it a daily camp, or is it like a

10 sleepover camp?

11   A.  It's a daily camp. And I do have to

12 correct myself; it's not the YMCA, it's the YWCA.

13   Q.  Okay. And is there any particular YWCA

14 that he attends this camp at?

15   A.  Yes.

16   Q.  Which one is that?

17   A.  Their northeastern camp.

18   Q.  And what type of activities does he do at

19 the camp for the YWCA?

20   A.  They play basketball, they do different

21 little activities, they go on field trips. That's

22 basically all I know about it.

23   Q.  Is LaQuante enjoying his time at the

24 YWCA?

25   A.  Very much so.

1  he was in below average health?

2      A.    When he was having seizures, so three

3  years ago, four years ago.

4      Q.    I thought you told me a little while ago

5  that he had stopped having seizures two years ago?

6      A.    No, he stopped having seizures when he

7  was two.

8      Q.    Okay.  Have you ever felt like you needed

9  to take LaQuante to see a mental healthcare provider

10  of any type?

11     A.    No.

12     Q.    Okay.  Did LaQuante participate in the

13  Head Start program in 1998?

14     A.    Yes.

15     Q.    Prior to 1998, had he ever participated

16  in the Head Start program before?

17     A.    No.

18     Q.    After the 1998 school year, did he

19  participate in the Head Start program?

20     A.    No.

21     Q.    How did you find out about the Head Start

22  program?

23     A.    The radio.

24     Q.    Why did you enroll LaQuante in Head

25  Start?

1    A.    Camilla Porterfield.

2    Q.    Where does Camilla live?

3    A.    In Plano.

4    Q.    Where at?

5    A.    On McCullum Drive.  McCullum Road, I'm

6  sorry.

7    Q.    Does LaQuante have any type of

8  relationship with his aunts?

9    A.    Yes.

10    Q.    How would you describe his relationship

11  with his aunts?

12    A.    They -- they talk to him just as much as

13  he talks to me.

14    Q.    Okay.  What's your relationship like with

15  LaQuante?

16    A.    He's my son, I'm his mother.

17    Q.    Well, what does that mean?

18    A.    We have a good relationship.  A

19  mother-son relationship.

20    Q.    Has this medical examination affected

21  your relationship with your child in any way?

22    A.    No.

23    Q.    Let's talk a little bit about the medical

24  examination made subject of this suit.  Were you

25  present when the medical examinations were done?

1    A.    He said, Mama, these women was looking in

2    my pants and they were looking in my ears, and that

3    was really it.  He didn't say nothing about the no

4    gloves or nothing, because he didn't understand that.

5    Q.    Okay.  So LaQuante told you that some

6    women looked in his pants and looked in his ears?

7    A.    Yes.

8    Q.    Anything else?

9    A.    No.  He said that the kids -- he said

10   some of the kids were crying.

11   Q.    Did LaQuante tell you if he cried?

12   A.    No.  I asked him, I said did you cry, he

13   said no.

14   Q.    How was LaQuante behaving when you were

15   asking him these questions?

16   A.    He was behaving normal, he was having a

17   conversation with me like we would have any other

18   day.

19   Q.    Did he appear upset at all?

20   A.    No.

21   Q.    Did LaQuante suffer any type of physical

22   injury as a result of this medical exam?

23   A.    No.

24   Q.    Has he suffered any type of emotional

25   injury?

1    Q.    Have you, other than -- Let me ask you

2    this:  Other than the time when you spoke to LaQuante

3    about this examination, the day it happened, --

4    A.    Yes.

5    Q.    -- have you ever again spoken to LaQuante

6    about this examination?

7    A.    No.  But he knows.  He -- He's told his

8    daddy, his daddy's mom, every -- he knows.  He brings

9    it up all the time.

10    Q.    Who has he spoken to about it?

11    A.    His daddy, his grandma, his friends in

12    the neighborhood.  My son -- I say my son is the

13    informer, he tells everything.

14    Q.    Well, what does he tell his daddy about

15    this examination?

16    A.    He said, Daddy, my mama is going to court

17    because some women looking in my pants.  And he told

18    the neighborhood kids that too.

19    Q.    Have you ever explained to LaQuante why

20    these women were looking in his pants?

21    A.    Yes.

22    Q.    And what did you tell him?

23    A.    I told him that they were trying to find

24    out if something was wrong with him physically.

25    Q.    And does he seem to understand that?

1      A.      Yes.

2      Q.      So do you understand that one of the

3   reasons for conducting this medical examination was

4   to make sure that these children were in the best

5   physical shape possible to participate in the Head

6   Start program?

7      A.      Yes.

8      Q.      What is it exactly about this physical

9   examination that you have a problem with?

10      A.      I have a problem with someone pulling

11   down my -- my son's pants in a little classroom.  He

12   goes to the doctor, and his doctor doesn't even pull

13   down his pants and look at him unless I feel like

14   there's a problem.  So I certainly wouldn't authorize

15   a nurse of any kind to look at my son's genitals

16   without my knowledge, or me even being there, period.

17      Q.      If you had been notified of this exam,

18   would you have any problem with the examination

19   taking place?

20      A.      Yes.

21      Q.      And what would that problem be?

22      A.      That problem would be they had no reason

23   to look at my son's genital parts.  He has a doctor

24   for that.

25      Q.      Prior to this examination as part of Head

1    that's just not using safety measures, for one, not

2    to mention that they didn't get the consent.  It's

3    just -- It's a whole bunch of things in how they went

4    about doing it.

5         Q.    Do you have any information that leads

6    you to believe that LaQuante refused to participate

7    in this exam in any way?

8         A.    No.

9         Q.    Would you agree with me that there is a

10   relationship between your child's physical health and

11   his ability to learn?

12        A.    Yes.

13        Q.    And if LaQuante was having trouble

14   getting started in school and it was a physical

15   problem that was causing that, you would want someone

16   to notify you of that, correct?

17        A.    Yes.

18        Q.    Now, you told me a little while ago that

19   Doctor English had performed an examination --

20        A.    Yes.

21        Q.     -- on LaQuante prior to him starting

22   school?

23        A.    Yes.

24        Q.    Did you give any written documentation

25   regarding this examination to anyone at Head Start?

1    custodian of the minor, whether such diagnosis or

2    treatment is rendered at the office of the physician

3    or dentist to call any necessary consultants, in his

4    or her directions.

5         Q.    I think that's discretion.

6         A.    Oh, I'm sorry, discretion.

7         Q.    Okay.  Since the document speaks for

8    itself, did you ever tell my clients that they could

9    not perform medical procedures on your child?

10             MR. GOREE:  I object to the form of the

11   question.

12        A.    No.  But in this, it says whether such --

13        Q.    (By Ms. Ziolkowski)  You answered my

14   question, thank you.

15             MR. GOREE:  You can let her continue

16   answering the question.

17             MS. ZIOLKOWSKI:  Well, she's answered my

18   question.

19        Q.    (By Ms. Ziolkowski)  Did you ever notify

20   the Head Start program that you would in any way

21   modify this consent?

22        A.    No.

23        Q.    Have you ever rescinded this consent from

24   the Head Start program?

25        A.    No.

# H

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OKLAHOMA

2

3  JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
    TIFFANI DUBBS, a minor, et al.,

4

5              Plaintiffs,

6  vs.                  No. 99-CV-0732K(E)

7  HEAD START, INC., an Oklahoma
    Corporation; INDEPENDENT SCHOOL
    DISTRICT NO. 1 OF TULSA COUNTY,

8  OKLAHOMA; COMMUNITY ACTION PROJECT
    OF TULSA COUNTY, OKLAHOMA, an Oklahoma

9  Not-For-Profit Corporation; TULSA
    CITY-COUNTY HEALTH DEPARTMENT;

10  KD ENTERPRISES, INC., an Oklahoma
     Corporation; DOE GOVERNMENT AGENTS

11  1 through 5; JACKIE STRAYHORN, ARNP;
     K. BAKER, RN; PEGGY DOE; JOHN DOES

12  1 through 10; JANE DOES 1 through 10,

13              Defendants.

14

15         **DEPOSITION OF SHANIKA CROWLEY**,

16  before the undersigned Certified Shorthand Reporter,
     taken on behalf of the Defendants at 2900

17  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
     9:40 a.m., on July 27, 2000, pursuant to notice.

18

19

20
              _____

21          KATHLEEN McCLANAHAN, CSR #283

22

23        NICHOLS McCLANAHAN REPORTING
            Two Main Plaza

24       616 South Main, Suite 302
        Tulsa, Oklahoma 74119-1261

25         918/585-9969

1      A.    I don't remember.

2      Q.    Has it been recently, not so recently,

3  the last month, year?

4      A.    Maybe last year.

5      Q.    Have you ever felt any type of need to

6  send Kwanita to any type of mental healthcare

7  provider, psychiatrist, psychologist, counselor of

8  any sort as a result of this examination?

9      A.    No.

10     Q.    How has this medical examination affected

11  your daughter?

12     A.    I know for a while she didn't like nobody

13  touching her.  Her and her friend took a bath and

14  didn't want to get out of the tub.

15     Q.    Anything else?

16     A.    No.

17     Q.    Okay.  When you say she didn't like

18  anybody touching her, what do you mean by that?

19     A.    Like when she took a bath, she didn't

20  like for me to wash her off.

21     Q.    And when did this start happening?

22     A.    After the exam.

23     Q.    How long after the exam?

24     A.    That same night.

25     Q.    Did she say anything to you about it?

1     A.    Just that night and the next night.

2     Q.    Okay.  And other than a change in your

3 daughter's bathing routine that next week, was there

4 anything else different about your daughter's -- how

5 your daughter was feeling or acting that you could

6 pick up on?

7     A.    No.

8     Q.    Okay.  Did any part of this examination

9 physically injure your child in any way?

10    A.    No.

11    Q.    Has she suffered any type of emotional

12 injury?

13    A.    No.

14    Q.    Do you know of any information that leads

15 you to believe that your child refused to participate

16 in this exam in any way?

17    A.    No.

18    Q.    If Community Action Project had told you

19 that this exam was going to take place, would you

20 have refused to do it?

21    A.    Yes.

22    Q.    Why?

23    A.    Because she had already had a physical.

24    Q.    Well, let's say she hadn't had a

25 physical.  If she had not had a physical, would you

1    have allowed this examination to take place?

2         A.    No.

3         Q.    And why not?

4         A.    Because she has a doctor.

5         Q.    And so is what I'm hearing from you, and

6    please correct me if I'm wrong here, that you would

7    prefer that your child's own doctor give her any type

8    of physical examination versus a doctor from a school

9    or anything like that?

10        A.    Yes.

11        Q.    Okay.  Do you believe that there is a

12   relationship between a child's physical health and

13   their ability to learn?

14        A.    What?

15        Q.    Do you think that there is some type of

16   connection between how a child is physically feeling

17   and how a child is learning?

18        A.    Yes.

19        Q.    Okay.  And do you understand one of the

20   purposes of the Head Start program is to remove any

21   type of impediment for learning before that child

22   starts school?

23        A.    I don't understand what you're asking me.

24        Q.    Okay.  Well, do you understand that one

25   of the goals of the Head Start program is to be able

1  trouble getting started in school was that there was

2  something physically wrong with her, you would want

3  someone to identify that, wouldn't you?

4     A.    I don't know.

5     Q.    Okay.  Well, if your child was having

6  trouble seeing, she was having trouble reading what

7  was on the board while she was at school, and that

8  was making it difficult for her to keep up with the

9  rest of the class, you would want to know that,

10  wouldn't you?

11     A.    Yes.

12     Q.    Okay.

13     A.    What does that have to do with her

14  private area?

15     Q.    Well, do you understand that in

16  attempting to make sure that each child is in the

17  best condition possible to participate in the Head

18  Start program that Head Start has an incentive to

19  make sure that each child is in good physical health?

20     A.    Yeah.

21     Q.    Okay.  Now, you said you had a doctor

22  give your child an examination prior to the beginning

23  of the school year, correct?

24     A.    Yes.

25     Q.    Did you give Head Start any type of

1    Q.    Okay.  Did you authorize any anesthetic?

2    A.    Yes.

3    Q.    Did you authorize any dental diagnosis?

4    A.    Yes.

5    Q.    Did you authorize any medical diagnosis?

6    A.    Not any.

7    Q.    Okay.  Did you authorize any medical

8    diagnosis?

9    A.    No.

10    Q.    What medical diagnosis did you not

11    authorize?

12    A.    Did I not?

13    Q.    Yes, ma'am.

14    A.    The one they gave.

15    Q.    Where does that say that in this

16    document?

17    A.    It doesn't.

18    Q.    Okay.  Did you ever tell my client that

19    they could not perform the medical procedures listed

20    on this document?

21    A.    No.

22    Q.    Did you ever tell my client that you were

23    withdrawing your consent listed on this document?

24    A.    No.

25    Q.    Okay.  Now, let's talk about the second

1       A.      Yes.

2       Q.      Why do you believe that?

3       A.      Because they did it anyway.

4       Q.      I don't understand what you mean by

5    because they did it anyway.

6       A.      Because they did the exams anyway.  If it

7    was a mistake, then they shouldn't have done it.

8       Q.      Do you think anyone at Head Start had any

9    reason for -- any reason to prevent you from

10   knowing -- That's a bad question, let me ask this

11   one:  Do you have any reason to believe that anyone

12   from Head Start wanted you not to know about this

13   medical examination?

14      A.      No.

15      Q.      Okay.  And did you allow your child to

16   continue in the Head Start program after the

17   examination took place?

18      A.      Yes.

19      Q.      And how did Kwanita do in the Head Start

20   program?

21      A.      How did she do?

22      Q.      How did she do?

23      A.      Good.

24      Q.      Did you see her performance decrease

25   after this examination?

I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

1

2

3   JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
    TIFFANI DUBBS, a minor, et al.,

4

5                   Plaintiffs,

    vs.                              No. 99-CV-0732K(E)
6

    HEAD START, INC., an Oklahoma
7   Corporation; INDEPENDENT SCHOOL
    DISTRICT NO. 1 OF TULSA COUNTY,
8   OKLAHOMA; COMMUNITY ACTION PROJECT
    OF TULSA COUNTY, OKLAHOMA, an Oklahoma
9   Not-For-Profit Corporation; TULSA
    CITY-COUNTY HEALTH DEPARTMENT;
10  KD ENTERPRISES, INC., an Oklahoma
    Corporation; DOE GOVERNMENT AGENTS
11  1 through 5; JACKIE STRAYHORN, ARNP;
    K. BAKER, RN; PEGGY DOE; JOHN DOES
12  1 through 10; JANE DOES 1 through 10,

13                  Defendants.

14         **DEPOSITION OF JOY BROWN**,

15  before the undersigned Certified Shorthand Reporter,
    taken on behalf of the Defendants at 2900
16  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
    4:30 p.m., on July 27, 2000, pursuant to notice.

17

18

19

20         _____
           KATHLEEN McCLANAHAN, CSR #283
21

22

23         NICHOLS McCLANAHAN REPORTING
                 Two Main Plaza
24         616 South Main, Suite 302
           Tulsa, Oklahoma  74119-1261
25               918/585-9969

1  there might come a time where Marii might be in the

2  same seat that you are, having to give testimony in

3  this case?

4     A.    No, I have not, and I didn't think that a

5  six-year-old would be sitting in this position

6  answering questions --

7     Q.    Well --

8     A.    -- about a physical that happened to them

9  at school.

10    Q.    Well, now that you know that that's a

11 possibility, does that concern you in any way?

12    A.    No.

13          MR. GOREE:  I object to the form of the

14 question.

15    Q.    (By Ms. Ziolkowski)  Did any part of this

16 examination physically injure your child in any way?

17    A.    Not to my knowledge.

18    Q.    Has your child been emotionally injured

19 in any way from this physical?

20    A.    She doesn't like to go to the doctor,

21 period, point-blank.  She doesn't like to get shots,

22 her finger pricked, as well.  Other than that, no.

23    Q.    Well, I don't have any children myself,

24 but I used to be one, and I know plenty of people who

25 have children, and I don't know many children who

1    Q.    Well, that's what I'm asking you.  It's

2  your lawsuit, ma'am.

3    A.    Meaning --

4    Q.    How has this -- how has this examination

5  affected your child, give me all the reasons?

6    A.    I'm going to say that it hasn't affected

7  her emotionally.

8    Q.    Is Marii any different today than she

9  would have been had she not received this

10  examination?

11    A.    Well, I can't answer that question

12  because she did have this examination.

13    Q.    What exactly is it about this exam that

14  you're suing over?

15    A.    That it happened, period, in Tulsa Public

16  Schools, without my consent and against her will.

17    Q.    Do you know of any information that leads

18  you to believe that Marii refused to participate in

19  this?

20    A.    She told me she didn't want to go.

21    Q.    Well, did Marii tell you that she

22  physically resisted in any way?

23    A.    No, she did not.

24    Q.    Did Marii tell you that she told anybody

25  that she didn't want to go?

1          MR. GOREE:  I'll object to the form of

2     the question.

3          Q.     (By Ms. Ziolkowski)  I'm asking are you

4     aware?

5          A.     Yes.

6          Q.     If Marii last had an examination April of

7     1998, that's four months before August of 1998,

8     correct?

9          A.     Correct.

10          Q.     Would that be outside the 90-day period?

11          A.     Yeah.

12          MR. MANN:  May I see that?

13          MS. ZIOLKOWSKI:  Sure.  I'll make copies.

14          Q.     (By Ms. Ziolkowski)  Do you believe

15     there's a relationship between a child's physical

16     health and their ability to learn?

17          A.     Yes.

18          Q.     And do you understand why Head Start

19     wants children to have medical examinations prior to

20     having them start in Head Start?

21          A.     Yes.

22          Q.     And if your child was having trouble

23     getting started in school and it was a physical

24     problem that was causing this difficulty, you would

25     want someone to find that out?

1         A.      Yes.

2         Q.      And you understand that one of the goals

3    of Head Start is to get rid of any impediments to

4    learning prior to starting school?

5         A.      Yes.   And my daughter has no impediments,

6    and had none before school.

7         Q.      Well, in attempting to make sure that

8    each child is in the best condition possible to

9    participate in the program, would you agree that Head

10   Start has an incentive to make sure that each child

11   is in good physical health?

12        A.      Yeah.

13        Q.      What's your relationship with your

14   daughter?

15        A.      We have -- we have a great relationship.

16   We're very outspoken, we communicate very well.

17        Q.      So if Marii was having any problems with

18   the fact that this examination had occurred, you

19   would be the first to know?

20        A.      Correct.

21        Q.      And other than this one time she has

22   spoken of it, has she ever brought this examination

23   up to you again?

24        A.      No.

25        Q.      Did you identify a need for any type of

J

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3   JACK DUBBS, Individually, and JACK
     DUBBS as Father and Next Friend of     COPY
     TIFFANI DUBBS, a minor, et al.,
 4

 5             Plaintiffs,

 6   vs.                              No. 99-CV-0732K(E)

 7   HEAD START, INC., an Oklahoma
     Corporation; INDEPENDENT SCHOOL
     DISTRICT NO. 1 OF TULSA COUNTY,
 8   OKLAHOMA; COMMUNITY ACTION PROJECT
     OF TULSA COUNTY, OKLAHOMA, an Oklahoma
 9   Not-For-Profit Corporation; TULSA
     CITY-COUNTY HEALTH DEPARTMENT;
10   KD ENTERPRISES, INC., an Oklahoma
     Corporation; DOE GOVERNMENT AGENTS
11   1 through 5; JACKIE STRAYHORN, ARNP;
     K. BAKER, RN; PEGGY DOE; JOHN DOES
12   1 through 10; JANE DOES 1 through 10,

13             Defendants.

14        DEPOSITION OF RAICHELLE LOFTIN,

15   before the undersigned Certified Shorthand Reporter,
     taken on behalf of the Defendants at 2900
16   Mid-Continent Tower, Tulsa, Oklahoma, commencing at
     9:15 a.m., on August 21, 2000, pursuant to notice.
17

18

19

20        _____
             KATHLEEN McCLANAHAN, CSR #283
21

22

23        NICHOLS McCLANAHAN REPORTING
                Two Main Plaza
24          616 South Main, Suite 302
            Tulsa, Oklahoma  74119-1261
25               918/585-9969
```

1   had touched his balls and if they had touched mine

2   too.  And he said I told him, after he told me what

3   it was, he said I told him -- he said I told him yes.

4   And that was all he ever said about that.

5        Q.    Other than that conversation where he

6   asked you that question, did -- has Quenten ever

7   brought up the examination again?

8        A.    No.

9        Q.    How has this medical examination affected

10  Quenten?

11       A.    It hasn't really.

12       Q.    What is it about the physical that you

13  are suing for?

14       A.    I'm suing because I'm his mother, I did

15  not give consent, and they touched him without any

16  gloves.  As I said, my son was sick, his nose was

17  running, and I don't think they took proper medical

18  caution for that.  So that's basically what I'm upset

19  about and what I'm suing for.

20       Q.    Did Quenten's cold get worse as a result

21  of this medical examination?

22       A.    No, I wouldn't say that, no.

23       Q.    Was Quenten physically injured in any way

24  as a result of this medical examination?

25       A.    No.

1    Q.    Did he suffer any type of emotional

2    injury?

3    A.    No.

4    Q.    I show you what's going to be marked as

5    Exhibit Number 2 to the deposition.  The notice will

6    be Number 1.  Have you ever seen that document before

7    today?

8    A.    Yes, I believe so.

9    Q.    Okay.  Can you please tell me the title

10   of the document for the record?

11   A.    It's called the parent consent form.

12   Q.    Okay.  And is that your signature at the

13   bottom?

14   A.    No.

15   Q.    Where it says Raichelle Loftin?

16   A.    That's not my signature, but -- no.

17   Q.    Do you know whose signature that is?

18   A.    I have no idea.

19         MR. GOREE:  Can I have a copy of that

20   Exhibit Number 2?

21         MS. ZIOLKOWSKI:  Uh-huh.

22         MR. GOREE:  Thank you.

23   Q.    (By Ms. Ziolkowski)  Now, you said you

24   saw this document before today.  Where did you see

25   this document before today?

1          A.      No.

2          Q.      At the time of this medical examination,

3     did you have a regular dentist for Quenten?

4          A.      No.

5          Q.      Had he ever been to the dentist before?

6          A.      No.

7          Q.      Who is Thad Taylor, IV?

8          A.      That name is familiar.  Oh.  That is the

9     name of a dentist I had put down.  We had never been

10    before, but that's one I had picked off my insurance

11    list to go to go to for our dental care.

12         Q.      Did Doctor Farrish perform any type of

13    dental examination on Quenten during the physical?

14         A.      No.

15         Q.      So would you have checked yes to the box

16    for dental examination?

17         A.      No.

18         Q.      And why not?

19         A.      Because I have my own dentist and

20    insurance, and I would have preferred for them to do

21    it.

22         Q.      How has this medical examination affected

23    your relationship with Quenten?

24         A.      It hasn't.

25         Q.      When you took Quenten to see Doctor

1          MR. GOREE:  I'll object to the form of

2    the question.

3          A.    Can you repeat that, please?

4          Q.    (By Ms. Ziolkowski)  Sure.

5          Would you agree with me that because of this

6    medical examination at Roosevelt Elementary Quenten

7    was detected to have a speech problem?

8          A.    Uh-huh.

9          Q.    Is that a yes?

10         A.    Yes.  I'm sorry.

11         Q.    That's okay.

12         And had it not been for that medical examination

13   would Quenten's speech problem have been detected?

14         MR. GOREE:  I'll object to the form of

15   the question.

16         A.    Let me think about your question.  Can I

17   phrase it to you like I think you're saying it to me?

18         Q.    (By Ms. Ziolkowski)  Sure.

19         A.    Do you mean that if it wasn't for the

20   physical, would I have ever have found out that he

21   had a speech problem?

22         Q.    Exactly.

23         A.    I think eventually, but --

24         Q.    But would you agree with me, then, that

25   you found out about the speech problem sooner rather

1     Q.    (By Ms. Ziolkowski)  What damages have

2 you suffered as a result of this lawsuit?

3     A.    I just consider my damages to be that my

4 rights basically as a parent was taken away when I

5 didn't -- I wasn't informed that my child was going

6 to be examined by people I didn't even know.

7     Q.    Anything else?

8     A.    That's about it.

9     Q.    Tell me everything that you believe was

10 improper about the examination itself.

11     A.    The examination itself.  I do think that

12 they should have used gloves on the kids, that they

13 should have had it in a more proper place, instead of

14 in a classroom, instead of laying them on mats and

15 desk tops, I believe, table tops, something like

16 that.  I just wish they would have used gloves and

17 had it in a better place.

18     Q.    Do you believe that this examination

19 greatly exceeded a reasonable medical examination?

20     A.    No.

21     Q.    Have you thought about how this lawsuit

22 will affect Quenten?

23     A.    No.

24     Q.    Have you ever spoken to Quenten about

25 this lawsuit?

1      Q.    Do you have any reason -- Do you have any

2  facts which would lead you to believe that someone

3  was purposely trying to hide these examinations from

4  you?

5      A.    No.

6      Q.    Did you allow Quenten to continue in the

7  Head Start program for the rest of the year?

8      A.    Yes, I did.

9      Q.    How did Quenten do in the Head Start

10  program that year?

11      A.    He did great.

12      Q.    Would you recommend the Head Start

13  program to other parents?

14      A.    I would on the condition that, like you

15  said, you said your clients have, you know, made --

16  they have made -- they have started trying to inform

17  parents of these physical examinations.  Other than

18  that, I think the Head Start is a really good program

19  except for the examinations.  So, yes, I would if --

20      Q.    Okay.  Ms. Loftin, in order to get you

21  here today, I served upon your attorney what's called

22  an amended -- ends up being the amended notice of

23  oral deposition --

24      A.    Okay.

25      Q.    -- and subpoena duces tecum.  Have you

K

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3    JACK DUBBS, Individually, and JACK
      DUBBS as Father and Next Friend of
 4    TIFFIANI DUBBS, a minor, et al.,

 5                   Plaintiffs,

 6    vs.                            No. 99-CV-0732K(E)

 7    HEAD START, INC., an Oklahoma
      Corporation; INDEPENDENT SCHOOL
 8    DISTRICT NO. 1 OF TULSA COUNTY,
      OKLAHOMA; COMMUNITY ACTION PROJECT
 9    OF TULSA COUNTY, OKLAHOMA, an Oklahoma
      Not-For-Profit Corporation; TULSA
10    CITY-COUNTY HEALTH DEPARTMENT;
      KD ENTERPRISES, INC., an Oklahoma
11    Corporation; DOE GOVERNMENT AGENTS
      1 through 5; JACKIE STRAYHORN, ARNP;
12    K. BAKER, RN; PEGGY DOE; JOHN DOES
      1 through 10; JANE DOES 1 through 10,
13
                     Defendants.
14

15              DEPOSITION OF JACK DUBBS,

16    before the undersigned Certified Shorthand Reporter,
      taken on behalf of the Defendants at 2900
17    Mid-Continent Tower, Tulsa, Oklahoma, commencing at
      1:50 p.m., on July 19, 2000, pursuant to notice.
18

19

20              _____
                KATHLEEN McCLANAHAN, CSR #283
21

22

23              NICHOLS McCLANAHAN REPORTING
                      Two Main Plaza
24              616 South Main, Suite 302
                  Tulsa, Oklahoma  74119-1261
25                    918/585-9969
```

COPY

1        Q.     And has Misti ever said to you anything

2   that makes you believe that the folks at Head Start

3   knew that Misti had a relationship other than

4   biological and legal mother for Tiffani?

5        A.     Can you repeat that?  You don't have to

6   rephrase it, just repeat it.

7        Q.     But I'll ask you a different question

8   that maybe makes more sense, which is, if the folks

9   at Head Start say, as far as they knew, Misti was

10  Tiffani's mother and her only mother, are you aware

11  of anything either that Misti has told you or anybody

12  else has told you that you would say, no, the people

13  at Head Start knew or should have known that Misti

14  was not her mother?

15       A.     No, I wouldn't know.

16       Q.     Okay.  And I take it, just in normal

17  day-to-day conversation and representing to folks

18  that you meet and friends that you have, you-all say

19  Misti is Tiffani's mother?

20       A.     Right, yes, sir.

21       Q.     So if my clients at the Head Start

22  thought Misti was Tiffani's only mother, both

23  maternal and legal, you can imagine that possibility

24  existing?

25       A.     Yes.

1      A.     Right.

2      Q.     And the report you got said she's anemic

3 and she should see a dietary specialist?

4      A.     Right.

5      Q.     And, in fact, she was referred to a

6 dietary specialist in Head Start's program, wasn't

7 she?

8      A.     Might have been, I don't really know.

9 She took care of all that.

10      Q.     The dietary specialist helped you-all to

11 work with her to resolve the anemia through

12 nutrition, right?

13      A.     I wouldn't know nothing about that.

14      Q.     Did the anemia go away?

15      A.     No, she still takes vitamins. You know,

16 it's not nothing you can just get rid of it, I mean,

17 you have to take a vitamin every day and do other

18 kind of stuff.

19      Q.     Okay.

20      A.     But, yeah.

21      Q.     She takes a child's multivitamin?

22      A.     Uh-huh.

23      Q.     Is that a yes?

24      A.     Yes, sir.

25      Q.     Like an over-the-counter like Flintstones

1    gloves.  And the guy from the health department said

2    that that same night in that meeting in the

3    cafeteria, that they used rubber gloves to prick

4    their fingers and check for blood, but they didn't do

5    it on the examination down here.  Okay, that right

6    there tells me, okay, well, you're worried about your

7    own employees not getting blood from the child on

8    them, but you want to take some germs from you and

9    stick it down there.

10        Q.    Okay.

11        A.    No.

12        Q.    Okay.  I appreciate that, and let me see

13   if I understand what you told me.  You told me that

14   you would have liked to have known that your daughter

15   was going to get an exam?

16        A.    Yes, sir.

17        Q.    But you believe that if you had been told

18   she was going to get an exam, you would have agreed

19   to allow it to go forward?

20        A.    Yes.

21        Q.    So the fact that you didn't know,

22   obviously that's bothersome, but it wouldn't have

23   changed your approach to the situation?

24        A.    No, sir.

25        Q.    Is that correct?

L

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3   JACK DUBBS, Individually, and JACK
     DUBBS as Father and Next Friend of          COPY
 4   TIFFANI DUBBS, a minor, et al.,

 5                  Plaintiffs,

 6   vs.                               No. 99-CV-0732K(E)

 7   HEAD START, INC., an Oklahoma
     Corporation; et al.,
 8
                    Defendants.
 9   _____
     SHANTILYA BARNES, Individually,
10   and SHANTILYA BARNES as Mother.
     and Next Friend of GERALD BARNES,
11   a minor; et al.,

12                  Plaintiffs,

13   vs.                               No. 99-CV-0733K(J)

14   HEAD START, INC., an Oklahoma.
     Corporation; et al.,
15
                    Defendants.
16
            DEPOSITION OF FREDRIC P. NELSON, M.D.,
17
     before the undersigned Certified Shorthand Reporter,
18   taken on behalf of the Defendants, at 2900
     Mid-Continent Tower, Tulsa, Oklahoma, commencing at
19   9:10 a.m., on December 4, 2000, pursuant to notice and
     subpoena.
20

21

22            DANA L. YOUNG, CSR #01168

23
                NICHOLS McCLANAHAN REPORTING
24                     Two Main Plaza
                  616 South Main, Suite 302
25              Tulsa, Oklahoma  74119-1261
                       918/585-9969
```

1     Q.    Okay.  I want to skip first to what I

2  identify -- and I'll invite you to show me otherwise

3  after we're finished.  But I want to skip first to

4  page 6 and the section titled "Genital Examinations."

5  Do you see where I'm talking about?

6     A.    Yes.

7     Q.    Okay.  Now, I see in these three paragraphs

8  essentially medical expertise as to the propriety,

9  nature, and conduct of the examination of genitalia of

10  children.  Do I see this generally correctly?

11     A.    Yes.

12     Q.    This is -- so here -- tell me if I'm wrong.

13  Here you are a pediatrician, a Fellow of the American

14  Academy of Pediatricians, telling us what

15  pediatricians ordinarily do with respect to genital

16  examinations of children in the age range of three to

17  five.

18     A.    That's correct.

19     Q.    All right.  And as a pediatrician and a

20  Fellow, I take it that it is within your expertise to

21  tell us what pediatricians do?

22     A.    That is correct.

23     Q.    Okay.  Let's take a look at that for a

24  second.

25     First of all, the American Academy of Pediatrics

1 recommends external genital examinations on all

2 routine physical examinations for children within the

3 three to five age range and actually before and after

4 that?

5     A.    Yes, actually any time a routine

6 examination is conducted, they consider a genital

7 examination part of that routine examination.

8     Q.    All right.  Would you then assert that any

9 pediatrician who does a routine examination should do

10 a genital examination of a child regardless of whether

11 it's a boy or girl?

12     A.    That's correct.

13     Q.    All right.  And any parent then that would

14 observe the examination of their child, whether it was

15 this examination or another, if it were a routine

16 examination, would likely have observed, if it were

17 conducted properly, a genital examination of the

18 manner which is recommended by the American Academy of

19 Pediatrics?

20     A.    Presumably, if all pediatricians are

21 performing that examination.  But some choose not to

22 for various reasons.

23     Q.    All right.  But you would expect them to do

24 so generally?

25     A.    I would expect them to do so.  But the

1   gloves for that?

2      A.    Not in this age group, no.

3      Q.    Is there a need to use gloves and you

4   simply don't?  Or is that simply a reasonable risk to

5   not use gloves?

6      A.    There's no risk if you wash your hands.

7      Q.    Okay.  Now, did you find any information in

8   any of the -- anything you've reviewed in this case to

9   indicate that any of the health-care providers failed

10  to wash their hands like you do in between exams?

11      A.    Well, there was very sketchy information on

12  it.  In the depositions, there was a reference to the

13  fact that the nurse practitioners cleaned their hands.

14  From my visualization of the setup, it doesn't seem

15  that, you know, there was soap and water available.

16  It sounded like they probably had wipes.  But that's

17  purely speculation and maybe they did wash their

18  hands.

19      I don't fault -- I do not fault at all the

20  conduct of the examinations that they did.

21      Q.    Okay.  Do you find any unusual or septic

22  techniques that were utilized in the exams at either

23  Wiley Post or Roosevelt from anything that you've

24  seen?

25      A.    Everything is relative.

1    Q.    In order to do hemoglobin testing, is it

2   required that some blood be extracted from the child?

3    A.    Yes.

4    Q.    Is that normally done with a pinprick or a

5   finger prick?

6    A.    Either that or a needle draw.

7    Q.    In this case, how was it done?  Do you

8   know?

9    A.    No.  Well, I shouldn't say that.  I think

10   they did finger pricks.

11    Q.    Okay.  And would hemoglobin testing be part

12   of -- an appropriate part of a well child examination

13   of a three-to-five-year-old child?

14    A.    It may be included.  It is a reasonable

15   inclusion maybe once every few years.

16    Q.    Have you looked at the Oklahoma standards

17   for when children should be tested for hemoglobin?

18    A.    No.

19    Q.    Okay.  And are children tested for

20   hemoglobin outside the context of an examination?

21    A.    Certainly.

22    Q.    Okay.  And so you would think that a parent

23   going down this sheet, Exhibit Number 3, would be

24   thinking they were authorizing these medical tests

25   outside the context of an examination of their child?

M

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

                    Plaintiffs,

vs.                                    No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

                    Defendants.

**DEPOSITION OF HUGH GRAHAM, M.D.**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
12:45 p.m., on November 20, 2000, pursuant to notice.

_____
KATHLEEN McCLANAHAN, CSR #283

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma  74119-1261
918/585-9969

1    Q.    Could you tell us -- Well, in a
2 well-child exam, not just this one, would you
3 ordinarily examine the genitalia of either the boy or
4 girl that you were examining?
5    A.    Usually one does.
6    Q.    Okay.  And in a girl, particularly, what
7 is the purpose of that examination?
8    A.    Just to be sure that they're -- that it
9 appears normal.
10    Q.    Okay.  And would you palpate or touch the
11 labia major and labia minor during that exam?
12    A.    Yes.
13    Q.    And what was the purpose for palpating or
14 touching that?
15    A.    It's to be sure that there are no
16 problems, so you have to separate the labia to get a
17 look and be sure that there's no problem.
18    Q.    Okay.  And you said you would usually do
19 that as part of an exam of a minor child?
20    A.    Frequently, yeah.
21    Q.    Very well.
22         You might note that the subjective information
23 that was provided to your office on November 6th
24 included a statement in the second sentence:  They
25 did a finger stick as well as a physical exam, comma,



1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3    JACK DUBBS, Individually, and JACK
     DUBBS as Father and Next Friend of
4    TIFFANI DUBBS, a minor, et al.,                COPY

5                    Plaintiffs,

6    vs.                              No. 99-CV-0732K(E)

7    HEAD START, INC., an Oklahoma
     Corporation; INDEPENDENT SCHOOL
8    DISTRICT NO. 1 OF TULSA COUNTY,
     OKLAHOMA; COMMUNITY ACTION PROJECT
9    OF TULSA COUNTY, OKLAHOMA, an Oklahoma
     Not-For-Profit Corporation; TULSA
10   CITY-COUNTY HEALTH DEPARTMENT;
     KD ENTERPRISES, INC., an Oklahoma
11   Corporation; DOE GOVERNMENT AGENTS
     1 through 5; JACKIE STRAYHORN, ARNP;
12   K. BAKER, RN; PEGGY DOE; JOHN DOES
     1 through 10; JANE DOES 1 through 10,
13
                     Defendants.
14

15            **DEPOSITION OF SYLVIA AUGUST, M.D.**,

16   before the undersigned Certified Shorthand Reporter,
     taken on behalf of the Defendants at 2900
17   Mid-Continent Tower, Tulsa, Oklahoma, commencing at
     3:00 p.m., on November 20, 2000, pursuant to notice.

18

19

20   _____

21            KATHLEEN McCLANAHAN, CSR #283

22

23            NICHOLS McCLANAHAN REPORTING
                   Two Main Plaza
24            616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                  918/585-9969

1    not present.

2        Q.    Okay.  But if the parent is there,

3    then you assume that the parent is consenting to

4    the --

5        A.    Oh, yes.

6        Q.    -- exam and treatment?

7        A.    Oh, yes, I do.

8        Q.    Do you, as part of a normal well-child

9    exam, whether it's for Head Start or a normal

10   well-child checkup for a three-, four-, or

11   five-year-old child, do you examine the genital area?

12       A.    Yes, I do.

13       Q.    Do you consistently do that as part of a

14   well-child exam?

15       A.    Yes.

16       Q.    Would that be considered to be an

17   appropriate element or portion of the physical exam

18   of a three-, four-, or five-year-old child?

19       A.    Four-, five-year-old, yes, I do always

20   check that.

21       Q.    All right.  Quenten Loftin is a male, am

22   I correct?

23       A.    Yes, a boy.

24       Q.    As part of the genital portion of

25   the physical exam of a male child like Quenten

O

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3   JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
4   TIFFANI DUBBS, a minor, et al.,

5                   Plaintiffs,

6   vs.                              No. 99-CV-0732K(E)

7   HEAD START, INC., an Oklahoma
    Corporation; et al.,
8
                    Defendants.
9
    SHANTILYA BARNES, Individually,
10  and SHANTILYA BARNES as Mother
    and Next Friend of GERALD BARNES,
11  a minor, et al.,

12                  Plaintiffs,

13  vs.                              No. 99-CV-733K(B)

14  HEADSTART, INC., an
    Oklahoma Corporation, et al.,
15
                    Defendants.
16
         **DEPOSITION OF MUHAMMAD SUHAIL, M.D.**,
17
    before the undersigned Certified Shorthand Reporter,
18  taken on behalf of the Defendants at 602 East Pine,
    Tulsa, Oklahoma, commencing at 9:10 a.m., on November
19  20, 2000, pursuant to notice.

20      _____
            KATHLEEN McCLANAHAN, CSR #283
21

22

23           NICHOLS McCLANAHAN REPORTING
                   Two Main Plaza
24           616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                 918/585-9969

1    A.    Standard, standard.

2    Q.    Okay.  Later when we take a break, do you

3 think somebody could get me a copy of that form?

4    A.    Oh, most definitely.  It must be -- It's

5 in this chart too somewhere.

6    Q.    Oh, do you think so?

7    A.    Uh-huh.

8    Q.    If I could trouble you to find it, I

9 really would appreciate it.

10   A.    But not on this side, no, I'm sorry.

11   Q.    Okay.

12   A.    They have -- administrative side is a

13 different side.  A clinical side is different side,

14 but they made you copies for the clinical side.

15   Q.    I don't need hers, I just need a copy of

16 the blank form.

17   A.    I see.

18   Q.    When you do an examination of a three-,

19 four-, or five-year-old child, a female child in this

20 particular case, do you examine the child's genital

21 area?

22   A.    Usually, I mean, by the standards, we

23 should, and look at it, because there -- they might

24 have some problems there, yes.

25   Q.    All right.  And what do you do then as

1       A.      Yes, I do.

2       Q.      I'm going to attach this blank form to

3   your deposition as Exhibit Number 1, but I'm just

4   telling you that so we'll refer to it as Exhibit

5   Number 1 today.  In Ms. Suddarth's file, there are

6   executed copies of that form, aren't there?

7       A.      True.

8       Q.      And that is what you rely upon as your

9   permission to do examinations and treatment of a

10  child like Ronisha Suddarth, right?

11      A.      True.

12      Q.      Okay.  I notice on that form that there

13  is nowhere that it gives you express permission to

14  touch the genitalia of the child or to take their

15  blood.  Don't you need that to do your exam?

16      A.      That is a part of the exam, so there has

17  to be nothing special authorization for that, that is

18  one.  Number two, for taking blood, this is not a

19  procedure where there's a lot of risks involved, so

20  we do not take usually consent for that.

21      Q.      All right.  So it sounds like what you're

22  telling me, and I don't want to put words in your

23  mouth, but tell me if I'm correct, that when you

24  secure the permission of a parent to examine and

25  treat their child generally, that implies, among

1   other things, examination of the genitals and, if

2   necessary, a small amount of blood to be taken and

3   tested?

4        A.    True.

5        Q.    And you expect the parent to understand

6   that that's part of a normal exam?

7        A.    True.

8        Q.    Okay.  Do you have occasion, from time to

9   time, Doctor, to fill out forms for children who are

10  participating in the Head Start program for the Head

11  Start program, those forms?

12       A.    True, I do.

13       Q.    Did you ever do that for Ronisha

14  Suddarth?

15       A.    If I would have done that, that would be

16  in the records, a copy of that.

17       Q.    Okay.  So if it's not in the records,

18  you're telling me that you didn't do it?

19       A.    Possibly so, yes.

20       Q.    Do you have any independent recollection

21  of ever doing it?

22       A.    No.

23       Q.    Okay.  And if you had seen Ronisha

24  Suddarth or any other child for a Head Start type

25  physical, wouldn't you note that in the records, that

P

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3   JACK DUBBS, Individually, and JACK
     DUBBS as Father and Next Friend of
 4   TIFFIANI DUBBS, a minor, et al.,        COPY

 5                 Plaintiffs,

 6   vs.                              No. 99-CV-0732K(E)

 7   HEAD START, INC., an Oklahoma
     Corporation; INDEPENDENT SCHOOL
 8   DISTRICT NO. 1 OF TULSA COUNTY,
     OKLAHOMA; COMMUNITY ACTION PROJECT
 9   OF TULSA COUNTY, OKLAHOMA, an Oklahoma
     Not-For-Profit Corporation; TULSA
10   CITY-COUNTY HEALTH DEPARTMENT;
     KD ENTERPRISES, INC., an Oklahoma
11   Corporation; DOE GOVERNMENT AGENTS
     1 through 5; JACKIE STRAYHORN, ARNP;
12   K. BAKER, RN; PEGGY DOE; JOHN DOES
     1 through 10; JANE DOES 1 through 10,
13
                   Defendants.
14

15           DEPOSITION OF DAPHINE SUDDARTH,

16   before the undersigned Certified Shorthand Reporter,
     taken on behalf of the Defendants at 2900
17   Mid-Continent Tower, Tulsa, Oklahoma, commencing at
     9:45 a.m., on July 19, 2000, pursuant to notice.
18

19

20           _____
             KATHLEEN McCLANAHAN, CSR #283
21

22

23            NICHOLS McCLANAHAN REPORTING
                    Two Main Plaza
24            616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                 918/585-9969
```

1    Start program.  Am I correct?

2         A.    I can't be exact on that.

3         Q.    Okay.  But you filled in the date that

4    you signed it, right?

5         A.    Yes, sir.

6         Q.    And that was August 17th, 1998, correct?

7         A.    Yes, sir.

8         Q.    Okay.  And after you filled this document

9    in, filled it out, did you turn it back to the folks

10   at the Head Start program?

11        A.    I can't be exact.

12        Q.    Okay.  If somebody from the Head Start

13   program says they had this document on August 17th,

14   1998, or shortly thereafter, you wouldn't dispute

15   that, would you?

16        A.    Can you ask me that again?

17        Q.    Yeah.

18        I think one of my clients -- somebody from the

19   Community Action Project is going to say that I have

20   Suddarth Exhibit Number 2 because you filled it out

21   when your daughter was starting the program at

22   Roosevelt, and you turned it back to them within a

23   couple of days or if not the same day of August 17th

24   of 1998.  Do you have any reason to believe that's

25   not correct?

1  date, correct?

2      A.     Yes, sir.

3      Q.     -- do hereby authorize any x-ray

4  examination, anesthetic, dental, medical, or surgical

5  diagnosis or treatment by any physician or dentist

6  licensed by the State of Oklahoma and hospital

7  service that may be rendered to the said minor under

8  the general, specific, or special consent of Tulsa

9  Head Start program, the temporary custodian of the

10  minor, whether such diagnosis or treatment is

11  rendered at the offices --

12          MR. HELFAND:  Don't point things out to

13  her, Mr. Goree, that would be you testifying, not

14  her.

15      Q.     (By Mr. Helfand)  Can you read this

16  without Mr. Goree pointing to things on the document,

17  Ms. Suddarth?

18      A.     Yes, sir.

19      Q.     Great.

20      Whether such --

21          MR. HELFAND:  Do we need to stop and go

22  see the judge for you coaching your client while I'm

23  asking her questions?

24          MR. CHRISTOPHER GOREE:  I'm following

25  with my finger exactly as you are reading in the

```
 1        A.     If that's emotional, yes, sir.
 2        Q.     My first question was did she have any
 3   physical injury --
 4        A.     Oh, no.
 5        Q.     -- as a result of the exam?
 6        A.     No physical.
 7        Q.     And you understand when I say the exam, I
 8   mean the exam at Head Start?
 9        A.     Yes, sir.
10        Q.     Now, you think she may have had some
11   emotional injury?
12        A.     Yes, sir.
13        Q.     And how has that presented itself?  What
14   is it about that that makes you think your daughter
15   may have had some emotional injury?
16        A.     She was disturbed when she told me about
17   it as if -- kind of like hurt or -- like she didn't
18   understand, basically.
19        Q.     Did she tell you she didn't understand?
20        A.     No, sir.
21        Q.     Okay.  So you're inferring that from her?
22        A.     Yes, sir, what I sensed.
23        Q.     Did you ask your daughter do you
24   understand that you had a normal physical
25   examination?
```

1      A.    No, sir.

2      Q.    Okay.  Is it your testimony,

3 Ms. Suddarth, that if the folks at Head Start had

4 specifically said to you we're going to give your

5 daughter a physical examination at the school by

6 qualified medical personnel, that you would have

7 refused to allow them to do that?

8      A.    Yes, sir.

9      Q.    Why would you do that?

10     A.    Because I just prefer for her to be at a

11 doctor's office, and I take her to go get her exam.

12     Q.    Okay.  Do you believe, Ms. Suddarth,

13 yourself, that there is a relationship between a

14 child's physical health and their ability to learn?

15     A.    Yes, sir.

16     Q.    You recognize, don't you, for example,

17 that if a child has a hearing problem or a seeing

18 problem or a breathing problem or an illness, that

19 any one or more of those things could affect the

20 child's ability to learn?  You recognize that, don't

21 you?

22     A.    Yes, sir.

23     Q.    And you know, don't you, that good

24 nutrition is an important part of preparing a child

25 for the best learning situation as possible?  You

1    know that, don't you?

2         A.    Yes, sir.

3         Q.    Okay.  So you understand, don't you, and

4    tell me if you don't, that in attempting to give kids

5    the best chance to learn in Head Start, that there is

6    an interest in making sure the kids are physically

7    and nutritionally prepared to learn, --

8         A.    Yes, sir.

9         Q.    -- you understand that, don't you?

10   And --

11        A.    Can I say something?

12        Q.    Uh-huh.

13        A.    That's why they request you to do certain

14   things before you bring your child.  There is

15   requirements for the Head Start program, that they

16   require for you to do before your child can actually

17   be in the Head Start program, --

18        Q.    Right.

19        A.    -- and that's a part of it.

20        Q.    Right.  And you're pointing to the

21   paperwork Exhibits 2 and 3, because there's other

22   paperwork that you get, right?

23        A.    Yes, sir.

24        Q.    And some of that paperwork tells you that

25   within a short time before or after the beginning of

1    Q.    Well, did you identify a need to get her

2    medical care as a result of anything that happened in

3    the exam at the Head Start program?

4    A.    I -- Can you rephrase that?

5    Q.    Yes.

6    Did you identify some need for medical care for

7    your daughter as a result of anything that you think

8    has anything to do with the medical exam that was

9    done through Head Start?

10    A.    I guess just for somebody to talk to, but

11    other than that, no.

12    Q.    Okay, I was asking about physical medical

13    care.  I'm sorry, I should have made that very clear.

14    A.    Oh, no, sir.

15    Q.    Can we agree that your daughter has not

16    needed any physical medical care for anything in

17    connection with her examination that you're suing

18    over?

19    A.    We can agree with that, yes, sir.

20    Q.    All right.  And you have not sought any

21    psychological counseling or other type of care for

22    her as a result of the medical exam that you're suing

23    over, correct?

24    A.    Correct.

25    Q.    All right.  And so have you ever

1    relationship between you and Ronisha?

2        A.    I would say it's excellent.

3        Q.    Great.

4        Has it generally always been an excellent

5    relationship between you and your daughter?

6        A.    Yes, sir.

7        Q.    All right.  And would you say that that's

8    true for Ronisha and her father as well?

9        A.    Yes, sir.

10       Q.    And would you say that that's true to the

11   extent that brothers and sisters get along at all for

12   Ronisha and her brother?

13       A.    Yes, sir.

14       Q.    Okay.  Has this medical examination

15   affected your relationship with your daughter in any

16   way?

17       A.    No, sir, I don't think so.

18       Q.    I take it you told me that one of the

19   things you told your daughter, after you learned of

20   this examination and the fact that there was a --

21   some examination of her vagina, one of the things you

22   told your daughter was generally that she should not

23   let people touch her private parts without a parent

24   knowing about it.  Did I understand you correctly?

25       A.    Not without a parent knowing about it,