

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

**F I L E D**

JAN 1 2 2001

**Phil Lombardi, Clerk**
**U.S. DISTRICT COURT**

JACK DUBBS, et al., )
)
Plaintiffs, )
)
vs. )      No.    99-CV-732-K(E)
)
HEAD START, INC., et al. )
)
Defendants. )

### PLAINTIFFS' BRIEF IN RESPONSE TO
### COMMUNITY ACTION PROJECT'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

CHRISTOPHER W. GOREE (OBA #16226)
JACK Y. GOREE (OBA #3481)

By: _Christopher W. Goree_
Attorneys for Plaintiffs

6901 South Yorktown, Suite E
Tulsa, Oklahoma 74136-3983
(918) 496-3382 Telephone
(918) 496-8275 Facsimile



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, et al.,           )
                              )
          Plaintiffs,         )
                              )
vs.                           )      No.    99-CV-732-K(E)
                              )
HEAD START, INC., et al.      )
                              )
          Defendants.         )

**PLAINTIFFS' BRIEF IN RESPONSE TO**
**COMMUNITY ACTION PROJECT'S MOTION FOR SUMMARY JUDGMENT**


Respectfully submitted,


CHRISTOPHER W. GOREE (OBA #16226)
JACK Y. GOREE (OBA #3481)


By: _____
     Attorneys for Plaintiffs

6901 South Yorktown, Suite E
Tulsa, Oklahoma 74136-3983
(918) 496-3382 Telephone
(918) 496-8275 Facsimile

# **TABLE OF CONTENTS**

**Page**

INTRODUCTORY STATEMENT     1

STATEMENT OF CONTROVERTED MATERIAL FACTS     1

STANDARD OF REVIEW     10

ARGUMENT AND AUTHORITIES     10

      I.      Consent and the Fourth Amendment     10

      II.     42 U.S.C. §1983     17

      III.     The Fourteenth Amendment     18

      IV.     The Oklahoma Constitution Was Violated     20

      V.      State Law Claims     21

           A.     Invasion of Privacy     22

           B.     Intentional Infliction of Emotional Distress     23

           C.     Negligent Infliction of Emotional Distress     23

           D.     Battery     24

           E.     Damages     24

           F.     Consent     24

           G.     Negligence     24

           H.     *Respondeat Superior*     24

      VI.     Damages     25

CONCLUSION     25

# TABLE OF AUTHORITIES

| Authority | Page |
|---|---|
| *Bell v. Wolfish*, 441 U.S. 520, 559, 99 Sup. Ct. 1861, 1884 (1979) | 15 |
| *Blair v. S. Ct. of Wyoming*, 671 F.2d 389 (10th Cir. 1982) | 18 |
| *Brady v. U.S.*, 397 U.S. 742, 90 Sup. Ct. 1463, 25 L. Ed. 2d 747 (1969) | 11 |
| *Burlington v. United Air Lines*, 186 F.3d 1301, 1313 (10th Cir. 1999) | 10 |
| *Calabretta v. Floyd*, 189 F.3d 808, n. 41 (9th Cir. 1999) | 14 |
| *Cooper v. California*, 386 U.S. 58 (1967) | 21 |
| *Cornfield v. School Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) | 14 |
| *Darryl H. v. Coler*, 801 F.2d 893, 901 (7th Cir. 1986) | 14 |
| *Doe v. Renfrow*, 631, F2d 91, 92-93 (7th Cir. 1980) | 14 |
| *Fields v. Atchison, Topeka & Santa Fe Ry. Co.*, 985 F. Supp. 1308 (D. Kan. 1997) | 22 |
| *Fuentes v. Shevin*, 407 U.S. 67, 92 Sup. Ct. 1983, 32 L. Ed. 2d. 556 (1971) | 11 |
| *Gallegher v. Neil Young Freedom Concert*, 49 F.3d 1442 (C.A. Utah) | 16 |
| *Gilbert v. Homar*, 520 U.S. 924, 931-32, 117 Sup. Ct. 1807, 1812 (1997) | 19 |
| *Good v. Dauphin County Social Services*, 891 F.2d 1087 (3rd Cir. 1989) | 14 |
| *Haldermen v. Pennhurst State School*, 465 U.S. 89 (1984) | 12 |
| *Harder v. F.C. Clinton, Oklahoma*, 948 P.2d 298 (Okla. 1997) | 24 |
| *Horton v. Goose Creek Ind. School Dist.*, 690 F. 2d 470 (1982) | 13 |
| *Kia P. v. McIntyre*, 2 F. Supp. 2d. 281 (E.D. NY 1988) | 17 |
| *McIntire v. Bethel School Dist.*, 804 F. Supp. 1415 (W.D. Okla. 1992) | 18 |

*Merrikan v. Cressman*, 364 F. Supp. 913 (E.D. Pennsylvania 1973) 13, 14

*Meyer v. Nebraska*, 262 U.S. 390, 399, 43 Sup. Ct. 625,
 67 L. Ed. 1042 (1923) 12

*Miller v. Gillis*, 315 F. Supp. 94 (N.D. Illinois 1969) 13

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) 13

*Oregon v. Hass*, 420 U.S. 714, 719 (1975) 21

*Parham v. J.R.*, 442 U.S. 584, 600-01, 99 Sup. Ct. 2493 (1979),
 quoted in *J.B. v. Washington County*, 127 F.3d 919 (10th Cir. 1997) 13, 14

*Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 Sup. Ct. 571,
 69 L. Ed. 1070 (1925) 12

*Schall v. Martin*, 467 U.S. 253, 104 Sup. Ct. 2403, 81 L. Ed. 2d 207 (1984) 19

*Scott v. Bradford*, 606 P.2d 554 (Okla. 1979) 12, 24

*Sloan v. Sprouse*, 968 P.2d 1254, 1258 (Okla. Crim. App. 1998) 21

*Skinner v. Oklahoma*, 316 U.S. 535, 541-542, 62 Sup. Ct. 1110,
 86 L. Ed. 1655 (1942) 12

*Sutton v. Utah State School*, 173 F.3d 1226 at 1239, 1241, (10th Cir. 1999),
 citing *Green v. Branson*, 108 F.3d 1296, 1302-3 (10th Cir. 1997) 17

*Terry v. Ohio*, 392 U.S. 1, 8-9, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889 (1968) 12

*Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995) 10

*Tinker v. Des Moines*, 393 U.S. 503, 511, 89 Sup. Ct. 733, at 739,
 21 L. Ed. 2d 731, (1968) 13

*Turner v. City of Lawton*, 733 P.2d 375, 380 (Okla. 1986) 21

*U.S. v. Dionisio*, 410 U.S. 1, 93 Sup. Ct. 764, 35 L. Ed. 2d 67 (1973) 13

*Vernonia School Dist. 47 J v. Acton*, 515 U.S. 646, 652-3 (1995) 11, 21, 23

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000)      25

**Statutes**

10 O.S. 413      21

21 O.S. 852      21

70 O.S. §11-107      19

28 U.S.C. §1367      22

42 U.S.C. §1983      1, 17

Ok. Const. Ar. 1 Sec. 2, "Religious Liberty"      21

F.R.C.P. Rule 56      1

F.R.C.P. Rule 56(c)      10

U.S. Const. Amend I      12

U.S. Const. Amend. IV      10, 11, 12, 13, 21

U.S. Const. Amend. XIV      12, 18

**Other**

88 ALR 3d 1008, §3.46-47      16

Charles W. Sheerer and Ronald A. Roston,
     "Some *Legal and Psychological Concerns About Personality Testing in the Public Schools*" 3 Federal Bar Journal 111
       (1971) at 1114-115      14

Fay Rosovsky, *Consent to Treatment*, 2d Ed., (1990)      16

Fowler V. Harper, et al. *The Law of Torts*, 3d Ed 1999 Cumulative Supp.
     No. 1 Vol. 1, 1999 at 3:44      16

*Law for Physicians: An Overview of Medical/Legal Issues*,
     Horn, C. et al., eds. AMA 2000 p. 94      16

Oklahoma Uniform Jury Instructions (Civil 1998) 14.11                16

Oklahoma Uniform Jury Instructions (Civil 1998) 14.12                24

Oklahoma Uniform Jury Instructions (Civil 1998) 14.13                16

Oklahoma Uniform Jury Instructions (Civil 1998) 19.1                  9

Oklahoma Uniform Jury Instructions (Civil 1998) 20.2                 23

*The Law of* Torts, 3rd Ed., Oscar S. Gray, ed.,
        1999 Cumulative Supp. No. 1, at 327-8                    5, 11, 23

*Restatement 2d of Torts,* §3.10 at 3:42                           12

*Restatement 2d of Torts,* §652(B)                                 22

*Restatemetn 2d of Torts* §892(B)                                  12

# INDEX TO EXHIBITS

Exhibit A - Answer of Defendant Community Action Project

Exhibit B - Excerpts from the Deposition of George Charlton

Exhibit C - Tulsa City-County Health Department Contract #7-55 First
        Amendment to Agreement for Services with Community Action Project

Exhibit D - Affidavit of Jerome Lee

Exhibit E - Excerpts from the Deposition of Steven Dow

Exhibit F - Opinion of Dr. Frederic Nelson, October 23, 2000

Exhibit G - Part 1304 - Program Performance Standards for Operation of Head Start Programs by
        Grantees and Delegate Agencies

Exhibit H - Excerpts from the Deposition of Misti Dubbs

Exhibit I - Excerpts from the Deposition of Elisha Porterfield

Exhibit J - Excerpts from the Deposition of Shanika Crowley

Exhibit K - Excerpts from the Deposition of Raichelle Loftin

Exhibit L - Excerpts from the Deposition of Daphine Suddarth

Exhibit M - Excerpts from the Deposition of Jackie Hope

Exhibit N - Excerpts from the Deposition of Keenya Cowans

Exhibit O - Excerpts from the Deposition of Joy Brown

Exhibit P - Excerpts from the Deposition of Jack Dubbs

Exhibit Q - Excerpts from the Deposition of Francisco Aguirre

Exhibit R - Excerpts from the Deposition of Jerome Lee

Exhibit S - Excerpts from the Deposition of Mary Ann Welker

Exhibit T - Excerpts from the Deposition of Doug Ressler

Exhibit U - Excerpts from the Deposition of Jackie Strayhorn

Exhibit V - Excerpts from the Deposition of Frederic Nelson

Exhibit W - Agreement between CAP & TCCHD

Exhibit X - Authorization for Treatment to Minors

Exhibit Y - Excerpts from the Deposition of Jacqueline Jordan

Exhibit Z - Excerpts from the Deposition of Hugh Graham

Exhibit AA - Excerpts from the Deposition of Rosemary Ligouri

Exhibit BB - Child Health Record Form 3

Exhibit CC - Excerpts from the Deposition of Sylvia August

Exhibit DD - Excerpts from the Deposition of Muhammad Suhail

Exhibit EE - Excerpts from the Deposition of Kim Baker

Exhibit FF - CAP letter to parents dated November 19, 1998

Exhibit GG - CAP Consent for Health Services

Exhibit HH - CAPTC/Tulsa County Head Start Parent Interest Sheet

Exhibit II - Excerpts from the Deposition of Judith Adams

JACK DUBBS, et al.,                    )
                                       )
            Plaintiffs,                )
                                       )
vs.                                    )        No.    99-CV-732-K(E)
                                       )
HEAD START, INC., et al.               )
                                       )
            Defendants.                )

## PLAINTIFFS' BRIEF IN RESPONSE TO
## COMMUNITY ACTION PROJECT'S MOTION FOR SUMMARY JUDGMENT

### *INTRODUCTORY STATEMENT*

1.      Plaintiffs are parents and their minor children complaining of unconsented examinations of the children, who were enrolled in a Head Start program in Tulsa, Oklahoma. They have sued Defendants for violations of their civil rights pursuant to 42 U.S.C. §1983, and made various state law claims arising from said exams.  Plaintiffs now provide this Brief in Opposition to the above-mentioned Motion pursuant to Rule 56 F.R.C.P.

### *STATEMENT OF CONTROVERTED MATERIAL FACTS*

2.      Plaintiffs submit the following Statement of Material Facts which are controverted and at issue.

3.      (i)      Undisputed.

        (ii)     It is also undisputed that Community Action Project ("CAP") is a private, non-profit corporation (Exhibit ["Ex."] A, Answer of Defendant Community Action Project; Ex. B, Depo. of George Robert Charlton, page 23, lines 16-21 and Ex. C, Plaintiffs' Trial Ex. 2, Tulsa City-County Health Department Contract #7-55 First Amendment to Agreement for Services with

Community Action Project, page 3), which gets funds from private donations and federal and state funding.

        (iii)     It is undisputed that the Affidavit of Jerome Lee affirms that CAP is required to comply with all federal Head Start Regulations. (Ex. D, Affidavit of Jerome Lee and Ex. E, Depo. of Steven Dow, page 18, lines 1-25 and page 19, lines 1-25).

    4.     (i)     Plaintiffs dispute that Community Action Project has provided any evidence as to Federal regulations requiring said exams. Its Ex. A contains no documentation of these regulations or of the enrollment dates of the children. According to the Opinion of Dr. Frederick Nelson, October 23, 2000, when recommended treatment is not crucial, the parental refusal can be respected, relying on *Pediatrics* 18th Edition, page 8. (Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, page 6).

        (ii)     Performance Standards 1304.20(a)(i) and (ii) only mandate determining a source of health care for the child, determining a schedule of care and determining the child's "health status". (Ex. G, Program Performance Standards for Operation of Head Start Programs).

        (iii)     Another reason for the genital exams was to look for signs of abuse in any of the children. (Ex. H, Depo. of Misti Dubbs, page 57, lines 9-14, page 72, lines 2-19).

        (iv)     Several Plaintiffs have stated that exam reports by their private physicians had already been turned in, making a second exam in fulfillment of this purported requirement superfluous. (Ex. I, Depo. of Elisha Porterfield, page 35; Ex. J, Depo. of Shanika Crowley, page 24; Ex. K, Depo. of Raichelle Loftin, page 7; Ex. L, Depo. of Daphine Suddarth, page 77; Ex. H, Depo. of Misti Dubbs, page 38).

    5.     (i)     Plaintiffs dispute that each parent or guardian is explained said requirement

or that Plaintiffs were so advised. There is no evidence provided of this assertion.

(ii)     Plaintiffs also dispute that CAP has provided an offer of such exams if no record of the examination is received under the evidence presented by CAP in its Motion.

(iii)    Plaintiffs also dispute that an offer of genital exams was made clear. (Ex. M, Depo. of Mary Jacqueline Hope, pages 70-71; Ex. N, Depo. of Keenya Cowans, pages 22-27, 32-39, 56, 65, 75, 172, 177-181 and 225; Ex. O, Depo. of Joy Brown, pages 3, 19 and 99; Ex. P, Depo. of Jack Dubbs, pages 63-66 and 73-79; Ex. K, Depo. of Raichelle Loftin, pages 30-31; Ex. J, Depo. of Shanika Crowley, pages 33-36, 85, 91-92; Ex. Q, Depo. of Francisco Aguirre, pages 15-16; and Ex. I, Depo. of Elisha Porterfield, page 26, lines 8-23, page 30, lines 1-8 and 18-25, page 31, lines 1-18, page 32, lines 1-25, page 34, lines 8-24 page 35, lines 9-22, line 25-page 37, line 4; Ex. L, Depo. of Daphine Suddarth page 154, page 63, page 72-74).

(iv)    A CAP employee mischaracterized the exam to a KD Enterprises employee. (Ex. H, Depo. of Misti Dubbs, page 20, lines 17-19).

6.    Disputed.

(i)     No evidence of any written policy is provided. No policy at all is in evidence except the self-serving Affidavit of Jerome Lee. Activities of CAP employee Peggy Terry and the drafting of inadequate consent forms by CAP employees indicate custom or policy or acts by the highest decision maker, as well as failure to train or reprimand. (Ex. R, Depo. of Jerome Lee, page 37, line 24, page 39, lines 9-13, page 43, lines 16, 24, page 57, lines 9-14, page 61, lines 7-11, page 66, lines 22-23, page 70, line 22, page 72, lines 2-19, page 159, lines 19-20; Ex. H, Depo. of Misti Dubbs, page 93, page 121, lines 3-23, page 165, line 13, page 166, line 9).

(ii)    Plaintiffs dispute that CAP's policy is not to conduct physical examinations

3

of minor children without parental consent. It is undisputed that said examinations took place. Apparently CAP did not provide any notices or discuss what would be provided to obtain consent with the nurses doing the exams. (Ex. S, Depo. of Mary Ann Welker, p. 16, lines 24-25, page 17, lines 21-23; Ex. T, Depo. of Doug Ressler, page 31, lines 18-25, page 22, lines 14-17; and Ex. H, Depo. of Misti Dubbs, page 22, lines 21-23; and page 92, lines 3-22).

        (iii)      The nurses did not wear lab coats or other uniforms which would have identified them as professionals, thereby foreseeably creating confusion as to the identity of the examiners in the minds of children who cannot read name tags. CAP allowed this to happen at the site. (Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, page 6).

        (iv)      Community Action Project, through employees Jackie Hope and Peggy Terry, were responsible for the consents and notice pertaining to the physical exams and one or both induced nurses to do exams without furnishing them documents of consent. (Ex. U, Depo. of Jacqueline Strayhorn, page 60; Ex. H, Depo. of Misti Dubbs, page 22, lines 12-13, pages 50 and 92-93; Ex. V, Depo. of Dr. Frederick Nelson, page 278, lines 15-16, admission of counsel William Helfand: "But I'm telling you my client used that not just for emergency treatment but for exams that occurred at Roosevelt Elementary"; Ex. W, Agreement between CAP & TCCHD, and see Paragraph 6, above; Ex. S, Depo. of Mary Ann Welker, page 16, lines 24-25).

        (v)      Once told there was no consent for the exams, CAP went forward regardless. (Ex. H, Depo. of Misti Dubbs, page 93, lines 5-22, page 22, lines 12-23, and pages 110-112).

        7.      (i)      Undisputed except that said authorization does not constitute examinations at school nor examinations by nurses nor examinations not for emergent care. (Ex. X, CAP's

Authorization for Treatment to Minors).

(ii)     Furthermore, KD Enterprises employee Misti Dubbs saw that no consents were on file and notified all in authority.  (Ex. H, Depo. of Misti Dubbs, page 93, lines 3-22, pages 51-54 entire).

(iii)     See also facts 17 and 18 below.

8.     Disputed.  There are no attachments to Defendant's Ex. A.  Nothing was provided to the parents to put them on notice of a genital exam.  (See Paragraph 5, above and see also Paragraph 16 below).

9.     Plaintiffs dispute that upon receiving defective consent forms, Community Action Project reasonably should believe it has consent to perform genital exams.  Otherwise undisputed.

10.     Disputed.

(i)     No written policy of CAP has been provided herein. Plaintiffs furthermore dispute that "the examinations" includes any notification of genital exams.  (See Paragraph 5, above).

(ii)     Apparently the policy of CAP was to give notification forms to three-year-old children.  (Ex. D, Affidavit of Jerome Lee, page 2).  "Notice about [examinations] should not be transmitted to parents by letters taken home by students".  *The Law of Torts*, 3rd Ed. Oscar S. Gray, Editor, 1999 Cumulative Supplement No. 1., 1999, pages 327-28.

11.     (i)     It is undisputed that notification letters did not go out.  It is disputed that this procedure constituted adequate policy any way.  (See Paragraph 10, above).

(ii)     The custom of CAP was not to mail such items (Ex. R, Depo. of Jerome Lee, page 65, line 13) but they were to be "distributed" to the children to take home to their

parents". (See Defendant CAP's Undisputed Fact 11).

12-14. Undisputed.

15. Undisputed except that Misti Dubbs immediately withdrew consent upon seeing that a genital exam was being conducted on her step-child.

16. (i) Undisputed except that said authorization does not constitute examinations at school nor examinations by nurses nor examinations not for emergent care. (Ex. X, CAP's Authorization for Treatment to Minors).

(ii) Furthermore, KD Enterprises employee Misti Dubbs saw that no consents were on file and notified all in authority. (Ex. H, Depo. of Misti Dubbs, page 93, lines 3-22, pages 51-54 entire).

17. It is undisputed that said form does not mention genital exams or finger stick blood samples. Nor do any forms offered to the Court by Defendant explain any risks of any of the procedures done.

18. Disputed.

(i) Misti Dubbs vigorously withdrew her consent. (Ex. H, Depo. of Misti Dubbs, page 23, line 18 through page 24, line 4 and page 139, lines 1-25).

(ii) Raichelle Loftin states that her signature on her form is not her handwriting. (Ex. K, Depo. of Raichelle Loftin, pages 97, 101, 104-5).

(iii) Keenya Cowans states that "that question never did come up". (Ex. N, Depo. of Keenya Cowans, page 63, lines 1-15).

(iv) The Depo. of Elisha Porterfield, page 42 cited by CAP, refers to "this consent" lines 21 and 23, which Plaintiffs deny was informed consent.

(v)     The Depo. of Shanika Crowley, page 74, cited by CAP, refers to "this document", which Plaintiffs also deny provided informed consent.

(vi)    Misti Dubbs, as an employee of KD Enterprises, who knew contents of files, told CAP workers that no consents were in any children's files and that the CAP nurses "had no consent to be touching these children." (Ex. H, Depo. of Misti Dubbs, page 22, lines 12-23 and page 159, lines 19-20).

19-22. Undisputed.

23.     Undisputed except that CAP's Ex. G, page 10, is unrelated to the claimed fact.

24.     (i)     Undisputed except that in CAP's Ex. H, Shanika Crowley testified that her daughter did Ex. unusual behavior after the exam. (Ex. J, Depo. of Shanika Crowley, page 29, lines 10-25).

(ii)    Regarding CAP's Ex. I, Depo. of Joy Brown, Ms. Brown in fact refused to speculate as to what her child would have been like apart from the exam.

(iii)   It is undisputed that parents did not see their children's reactions at the time except for Misti Dubbs (Ex. H, Depo. of Misti Dubbs, page 23, line 18-page 24, line 4) and crying and crying out for parents as well as children's attempts to escape, were observed by an employee of the Tulsa City-County Health Department. (Ex. Y, Depo. of Jackie Jordan, page 23, lines 18-25; Ex. H, Depo. of Misti Dubbs, pages 43 and 73).

25.     Disputed. CAP's Ex. D refers to an unrelated event.

26.     Undisputed that this was his mother's testimony. However, page 32 of this Depo., lines 4-19 indicate he may have been traumatized.

27.     Undisputed. It is undisputed that Misti Dubbs' step-child did not continue.

28-29. Undisputed.

30.    Disputed. The evidence does not demonstrate that these problems were significant or would not have been known otherwise.

31.    (i)    Disputed.

(ii)    It is not standard procedure to do a genital examination on three to four year old children who have already recently had them and for whom parental consent is not documented and without another adult present. (Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, pages 6-8; Ex. Z, Depo. of Hugh Graham, page 20, lines 1-4, page 21, lines 18-25, page 22, lines 1-3; and Ex. AA, Depo. of Rosemary Ligouri, pages 46-48).

(iii)    Furthermore, the Child Health Record Form 3, (Ex. BB attached hereto) used by Head Start and Tulsa City-County Health Department in this case indicates at Item 2 that certain examinations are required. A check of "genitalia" is not required by either Head Start nor recommended by the American Academy of Pediatrics according to "Item 2". (Ex. I, Depo. of Elisha Porterfield, page 35, lines 1-25).

(iv)    Even if it were, parents herein had a right to choose a nurse who would use gloves for a genital exam. (Ex. V, Depo. of Frederick Nelson, page 24, lines 7-23, page 56, line 25, page 57, lines 1-25, and page 58, lines 1-2; and see also Paragraph 35, below; Ex. Q, Depo. of Francisco Aguirre, page 18, lines 1-4, page 26, lines 1-4; Ex. O, Depo. of Joy Brown, pages 40-44; Ex. I, Depo. of Elisha Porterfield, page 36, lines 17-25 and page 37, lines 1-4).

32.    It is disputed that CAP's Ex. E supports their statement. The expert actually said "it may be included. It is a reasonable inclusion maybe once every few years." (Ex. V, Depo. of Dr. Frederick Nelson, page 149, lines 14 and 15).

33.     Plaintiffs dispute that their expert witness finds no fault at all with the "manner in which the examinations were conducted". His words were, "I do not fault at all the conduct of the examinations that they did". The setting, training, justification for and lack of consent for the exams did, however, come in for criticism by the expert. Dr. Nelson also reserved the right to revise his opinion; not all depositions had been taken at the time his Depo. had been given and he said he had read no depositions by Defendants. (Ex. V, Depo. of Dr. Frederick Nelson, page 66, lines 19-20, page 229, lines 8-11 and page 279, lines 10-11 and Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, pages 2-8).

34.     Disputed. No doctor testified that genital exams are appropriately done without parental consent. No evidence has been provided to the Court that unconsented genital exams are practiced by physicians. (Ex. CC, Depo. of Sylvia August, page 24, lines 1-16 and pages 15, line 16 to page 16, line 9; Ex. DD, Depo. of Muhammad Suhail, page 22, lines 14-16 and page 50, lines 15-18; Ex. Z, Depo. of Hugh Graham, page 10, line 5, page 20, lines 1-4; Ex. M, Depo. of Mary Jacqueline Hope, page 62, lines 1-8).

35.     (i)     Plaintiffs do not dispute that Dr. Suhail testified as stated. However, Dr. Suhail was addressing exams done in the presence of a witness. Dr. Suhail was also referring to the presence of the parent. (Ex. DD, Depo. of Dr. Muhammad Suhail, page 19, lines 15-24, page 55, lines 17-25).

(ii)     Dr. Suhail also testified that he makes a practice to discuss parental consent. (*Id.* at page 52, lines 9-10).

(iii)     Plaintiffs dispute the general statement of CAP in Item 19 because the phrase "when a doctor secures permission of a parent to treat a child generally" is ambiguous and

circular.

36.     Undisputed that Raichelle Loftin testified as CAP has stated at that point. However, she also denies consent. (Ex. K, Depo. of Raichelle Loftin, pages 17-20, inclusive).

37.     Disputed. Francisco Aguirre testified to a question phrased in the past tense, "Yes, I will." This is ambiguous and certainly not consistent with his other testimony on pages 15-16, 19-20, 37-38, 61-62, 108-110, 113-116. (Ex. Q, Depo. of Francisco Aguirre, pages 15-16, 19-20, 37-38, 61-62, 108-110, 113-116, all inclusive). Jack Dubbs testified on page 19, cited by CAP that he would not have objected to "an exam" had he been notified. But he would have objected to a genital exam. (Ex. P, Depo. of Jack Dubbs, pages 63-66 and 73-79, inclusive).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.C.P. Rule 56(c). In applying this standard, the Court should examine the factual record and draw reasonable inferences therefrom in a light most favorable to the non-moving party. *Burlington v. United Air Lines*, 186 F.3d 1301, 1313 (10th Cir. 1999). As the moving party, a defendant shoulders "the initial burden to show that there is an absence of evidence to support the non-moving party's case". *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995).

## ARGUMENT AND AUTHORITIES

### I. Consent and the Fourth Amendment

The evidence shows that CAP violated the Federal Constitution. The unconsented exams of Plaintiffs' children violated the children's Fourth Amendment rights because the exams

constituted an unreasonable search and seizure under U.S. Const. Amend. IV. In a school context, we balance the state's interest against the right violated. *Vernonia School Dist. 47 J v. Acton*, 515 U.S. 646, 652-3 (1995). The Defendant's interest is relatively small.

Defendants have repeatedly claimed that exams of Head Start enrollees are required so as to address health problems *which might interfere with participation in Head Start*. (Ex. D, Affidavit of Jerome Lee, page 1). CAP has not provided this Court with any other justification for said exams. The requirement of receiving a physical exam within ninety days appears to be a matter of administrative convenience and uniformity and Defendant offers no evidence to the contrary. (Ex. F, Opinion of Dr. Nelson, October 23, 2000, page 6; Ex. H, Depo. of Misti Dubbs, page 121, lines 3-23).

Consent to a search is a waiver of a fundamental constitutional right. The Supreme Court has repeatedly said that the court should indulge in every reasonable presumption against waiver of procedural due process and an individual's constitutional rights. *Fuentes v. Shevin*, 407 U.S. 67, 92 Sup. Ct. 1983, 32 L. Ed. 2d. 556 (1971). *Brady v. U.S.*, 397 U.S. 742, 90 Sup. Ct. 1463, 25 L. Ed. 2d 747 (1969), said "waivers of constitutional rights not only must be voluntary but must be **knowing, intelligent and done with sufficient awareness of the relevant circumstances and likely consequences**". (Emphasis added). According to *The Law of* Torts, 3rd Ed., Oscar S. Gray, ed., 1999 Cumulative Supp. No. 1, at 327-8, of "Those charged with administering [screening programs for children]", here, CAP, "At a minimum, parents should be notified of the tests' availability, the purpose of the exams, probable risks and benefits, as well as other relevant follow-up information. Notice about the tests should not be transmitted to parents by letters taken home by students. . . . A sound procedure to inform parents and to gain their

11

cooperation is the most satisfactory means of dealing with school-based screening programs."
CAP did not have a sound procedure. It does not save CAP to argue that parents were mistaken.
If there was a mistake as to consent, and Defendant induced the mistake, a battery will be found.
*Scott v. Bradford*, 606 P.2d 554 (Okla. 1979), *Restatement 2d of Torts*, §3.10 at 3:42, and
§892B(2). CAP's health manager, Jackie Hope, or other CAP employee created the defective
forms, though no one was responsible to train her about consent. (Ex. R, Depo. of Jerome Lee,
page 39, lines 9-13, page 43, line 24, page 70, line 22). CAP employee Peggy Terry induced
nurses to believe there was consent. (Ex. R, Depo. of Jerome Lee, page 66, lines 22-23 and Ex.
U, Depo. of Jacqueline Strayhorn, page 61). Parent Plaintiffs have repeatedly stated they gave no
such consent. Defendant offers no evidence that they were explicitly told of genital exams or
blood sampling, or of the risks of such procedures. The guarantee of personal privacy within
Plaintiffs' families and in the children's bodies has been recognized in such cases as *Meyer v.
Nebraska*, 262 U.S. 390, 399, 43 Sup. Ct. 625, 67 L. Ed. 1042 (1923), *Skinner v. Oklahoma*, 316
U.S. 535, 541-542, 62 Sup. Ct. 1110, 86 L. Ed. 1655 (1942), *Pierce v. Society of Sisters*, 268
U.S. 510, 535, 45 Sup. Ct. 571, 69 L. Ed. 1070 (1925), *Terry v. Ohio*, 392 U.S. 1, 8-9, 88 Sup.
Ct. 1868, 20 L. Ed. 2d 889 (1968). Neither the right to parental liberty guaranteed by the First
Amendment (*Haldermen v. Pennhurst State School*, 465 U.S. 89 (1984)) and Fourteenth
Amendments nor the Fourth Amendment right to privacy of the children were waived. Perhaps
CAP staff member Jerome Lee said it best when he said of the parents regarding this incident "I
understand how they feel, I have a three-year-old myself". (Ex. T, Depo. of Doug Ressler, page
37, lines 12-13).

    The children "are not second class citizens. Protections of the constitution are available to

the newborn infant and as to the most responsible and venerable adult in the nation". *Miller v. Gillis*, 315 F. Supp. 94 (N.D. Illinois 1969) cited approvingly in *Merrikan v. Cressman*, 364 F. Supp. 913 (E.D. Pennsylvania 1973). In *Tinker v. Des Moines*, 393 U.S. 503, 511, 89 Sup. Ct. 733, at 739, 21 L. Ed. 2d 731, (1968), the court said, "school officials to do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our constitution. They are possessed of fundamental rights which the State must respect. . ." Certainly the State sometimes can investigate persons' bodies. But "where the Supreme Court has upheld limited investigation of body characteristics not justified by individualized suspicion, it has done so on the grounds that the particular characteristic was routinely exhibited to the public". *U.S. v. Dionisio*, 410 U.S. 1, 93 Sup. Ct. 764, 35 L. Ed. 2d 67 (1973). According to Misti Dubbs, Peggy Terry of CAP stated that they were looking for signs of abuse. (Ex. H, Depo. of Misti Dubbs, pages 57 and 72). *Horton v. Goose Creek Ind. School Dist.*, 690 F. 2d 470 (1982), found dog sniffing of students unconstitutional. That court said, "the students' persons certainly are not the subject of lowered expectations of privacy. On the contrary, society recognizes in the integrity of one's person and the Fourth Amendment applies with the fullest vigor against any intrusion on the human body." (*Id.* at 478). In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the Court declared the "search of a child's person is undoubtedly a severe violation of subjective expectations of privacy under the 4th Amendment". Note that the court's language repeatedly stresses the obviousness of the rights involved. It is clearly established law that a person's body cannot be searched unreasonably. Furthermore, the Supreme Court has held that children have a "substantial" liberty interest independent of their parents and that procedural due process must accompany a child's confinement or medical treatment. In *Parham v. J.R.*, 442 U.S.

584, 600-01, 99 Sup. Ct. 2493 (1979), quoted in *J.B. v. Washington County*, 127 F.3d 919 (10th Cir. 1997) and in *Doe v. Renfrow*, 631, F2d 91, 92-93 (7th Cir. 1980), the court held "It does not take a Constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that it is a violation of any known principle of human dignity", quoted in *Good v. Dauphin County Social Services*, 891 F.2d 1087 (3rd Cir. 1989) and in *Calabretta v. Floyd*, 189 F.3d 808, n. 41 (9th Cir. 1999). *Schall v. Martin*, 467 U.S. 253, 104 Sup. Ct. 2403, 81 L. Ed. 2d. 207 (1984). Damages to these rights are foreseeable and obvious. Speaking of school searches, one court has said, "in this regard, **no one would seriously dispute** that a nude search of a child is traumatic." *Cornfield v. School Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) at 1321 and citations therein including, *Darryl H. v. Coler*, 801 F.2d 893, 901 (7th Cir. 1986) (emphasis added).

In *Merrikan v. Cressman*, supra, children were given a questionnaire without affirmative parental consent. The court noted that "informed consent for personality testing should be comparable to the informed consent ideally obtained by a physician prior to the performance of surgery". *Merrikan* at 920, quoting Charles W. Sheerer and Ronald A. Roston, "Some Legal and Psychological Concerns About Personality Testing in the Public Schools" 3 Federal Bar Journal 111 (1971) at 1114-115. The court went on to say, "however good may be the intent and motive of the defendant, the presentation of the [questionnaire] to the student and the student's parents is far from candid and any attempt at informed consent does not reach the level that this court would consider adequate as in the 'consent ideally obtained by a physician prior to the performance of surgery'. The parents are not aware of the consequences and there is no substitute for candor and honesty in fact . . . .". The court held that the "ultimate decision maker" [there the school board]

14

"should give our citizenry a more forthright approach". It held that the attempted consent "lacks the necessary substance to give the parent the opportunity to give knowing, intelligent and aware consent". (*Id.* at 920). "The test of reasonableness under the Fourth Amendment. . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559, 99 Sup. Ct. 1861, 1884 (1979)". In the case at bar, only a routine, dragnet-type screening to possibly bolster a preschool experience has been offered to this Court as justification for unconsented genital exams in a school room. No physician has been cited to say that an exam such as this was justified.

The "Authorization for Treatment of Minors" was not attached to CAP's Brief. The authorization, attached hereto as Ex. X, authorizes examination, diagnosis or treatment "by any physician or dentist, . . . whether such diagnosis or treatment is rendered at the office of the physician or dentist. . . ." It is undisputed that Jacqueline Strayhorn and Kim Baker are not physicians or dentists and that the exam complained of did not take place in the office of a physician or dentist. Plaintiffs furthermore assert that the Authorization for Treatment to Minors referred to authorizes no such exam as is complained of herein, but only emergent treatment in a medical facility. According to the American Academy of Pediatrics and Plaintiffs' expert, the forms referred to did not constitute consent. (Ex. V, Depo. of Frederick Nelson, page 288, lines 11-25, page 289, lines 1-25; Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, pages 4 and 5; and Ex. X, Authorization for Treatment to Minors).

Parents herein have repeatedly stated they were never told of a genital or finger stick

exam. (See Controverted Material Fact 5, above). "To be effective, the assent must be given to the precise invasion or substantially the same invasion as that suffered". Fowler V. Harper, et al. *The Law of Torts*, 3d Ed 1999 Cumulative Supp. No. 1 Vol. 1, 1999 at 3:44, and see Fay Rosovsky, *Consent to Treatment*, 2d Ed., (1990). "Under common law, touching another person without his or her express consent is a battery, while placing someone in the fear of being touched is an assault." *Law for Physicians: An Overview of Medical/Legal Issues*, Horn, C. et al., eds. AMA 2000 p. 94. It can also be treated as negligence or malpractice. 88 ALR 3d 1008, §3.46-47.

CAP's "Parent Consent Form", attached hereto as Ex. BB, states: "I give permission for (child's name) to have the following if needed: TB test, speech language services", etc. It nowhere gives consent for examinations not listed. A genital exam is not mentioned on the form, and a hemoglobin/HCT is listed "if needed" but not explained. Regarding even listed procedures, if risks accompany them, consent was not adequate. Under the Oklahoma Uniform Jury Instructions (Civil 1998) 14.11 and 14.13, treatment without informed consent after disclosure of risks and benefits is a battery.

Although it is undisputed that the Community Action Project is a private, non-profit, charitable organization funded in part by private donations (Ex. B, Depo. of George Robert Charlton, page 11, lines 4-12, and page 23, line 20), it clearly was capable of violating Fourth Amendment rights by its joint action with the state. *Gallegher v. Neil Young Freedom Concert*, 49 F.3d 1442 (C.A. Utah).

The search of these children clearly was an investigatory search conducted by state actors. (Ex. G, Performance Standards 1.304.20(A)(1)(i) and (ii), although Plaintiffs make no admission

that genital or finger stick exam was required by these Performance Standards). The evidence shows that the state was looking for child abuse. (Ex. H, Depo. of Misti Dubbs, page 72 and Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, page 8). Fourth Amendment protections are violated, as CAP admits, when "state authorities have children undergo medical procedures for investigatory purposes," citing *Kia P. v. McIntyre*, 2 F. Supp. 2d. 281 (E.D. NY 1988).

## II. 42 U.S.C. §1983

Under 42 U.S.C. §1983, denial of a federally protected right is actionable. Under Part 1304, Program Performance Standards for Operation of Head Start Programs by Grantees [Community Action Project] and Delegate Agencies, it is a deficiency under 1304.3(a)(6)(i)(B) to deny "parents the exercise of their full roles and responsibilities related to program governance". (Ex. G, Part 1304 - Program Performance Standards for Operation of Head Start Programs by Grantees and Delegate Agencies page 38).

It should also be remembered that §1983 provides relief against "anyone who subjects, or causes to be subjected," another to a loss of federally protected rights. It is this indirect causation contemplated in §1983 that we see playing out in the facts here. CAP policies were unwritten, (failure to adopt or implement a policy created liability for supervisors, *Sutton v. Utah State School*, 173 F.3d 1226 at 1239, 1241, (10th Cir. 1999), citing *Green v. Branson*, 108 F.3d 1296, 1302-3 (10th Cir. 1997), notices were sent home with preschoolers, or not sent home at all (Ex. D, Affidavit of Jerome Lee, pages 2-3), misleading consent forms were relied upon by caregivers, and employees of the private agency, CAP, induced nurces to think consent had been given when it had not. (Ex. EE, Depo. of Kim Baker, page 39; Ex. H, Depo. of Misti Dubbs, pages 93-94). All of these things caused children and parents to be subjected to a foreseeable deprivation of

17

rights. CAP's many faults and failures were a significant "moving force", *J.B. v. Washington County*, 127 F.3d 919, 923-4 (10th Cir. 1997), anticipated in §1983, causing harm. Finally, by vigorously defending the actions of its employees and agents, and those of other Defendants, it has ratified their acts, making it liable. *McIntire v. Bethel School Dist.*, 804 F. Supp. 1415 (W.D. Okla. 1992). Although CAP executive director is involved in "making and setting policies and procedures" for CAP (Ex. E, Depo. of Steven Dow, page 24, line 16) and "ultimately supervises" people responsible for notifying parents of such exams, he seems to have either ratified Defendant's acts or delegated all authority to them, being currously involved and ignorant of his own agency's policies. (Ex. E, Depo. of Steven Dow, page 17, lines 21-24, page 18, lines 8-14, page 23, lines 10-24, page 27, line 14-9, page 31, lines 7-14, and page 34, line 6).

### III. The Fourteenth Amendment

Violations of Fourteenth Amendment liberty have been shown. The parent plaintiffs were entitled not to have their parental liberty violated without due process of law. *Blair v. S. Ct. of Wyoming*, 671 F.2d 389 (10th Cir. 1982), recognized this right. Apparently in this case there was a complete breakdown of due process. It is undisputed that the Head Start program administered by CAP was a new effort. (Ex. C, First Amendment to Agreement for Services, Page 1, Recital 1). Tulsa County Head Start and Community Action Project apologized for the "miscommunication and breakdown in paperwork". (Ex. FF, letter dated November 19, 1998 addressed to parents of Plaintiffs). Parents who had already had their children examined by their chosen physician and had turned in their health reports discovered their children had been examined again. (Ex. H, Depo. of Misti Dubbs, page 40; Ex. K, Depo. of Raichelle Loftin, pages 24, 69-70, Ex. U, Depo. of Jacqueline Strayhorn, page 24; and Ex. N, Depo. of Keenya Cowans,

18

pages 22-27, 65, 172). Persons at the site were told not to do the exams and proceeded anyway. (Ex. H, Depo. of Misti Dubbs, pages 40, 50-51, 93-94). Staff were not told to expect the exams. (Ex. H, Depo. of Misti Dubbs, pages 52, 73). Exams occurred without consent. (Ex. H, Depo. of Misti Dubbs, pages 54-55). Apparently the mechanism to send home forms for other reasons, and which would have been used for these forms had they been sent, was to entrust them to three-year-olds and not to mail them. This was the custom or policy of CAP. (Ex. D, Affidavit of Jerome Lee, page 2 and Ex. R, Depo. of Jerome Lee page 65, line 13).

To show that the Constitutionally required process was afforded, a court must consider 1) the private interest involved 2) the government's interest, which is defined both by the importance of the government function involved and the burdens of alternative procedures, and 3) the risk of erroneous deprivation through the procedures used and the probable value of additional or substitute safeguards. *Gilbert v. Homar*, 520 U.S. 924, 931-32, 117 Sup. Ct. 1807, 1812 (1997). The private interest of parental and children's liberty is very high and is of constitutional magnitude. One evidence of this is 70 O.S. §11-107, which provides that even eliciting personal information from a child without parental consent regarding sexual behavior and attitudes of the family is unlawful. The U.S. Supreme Court has recognized that even children have a limited liberty interest "and that procedural due process must accompany a child's confinement". *Schall v. Martin*, supra. The government's interest, according to Defendants, is that some physical conditions may possibly impair a child's ability to learn in the Head Start program. The governmental interest in medical exams of these children certainly can not logically exceed a medical interest in the medical exams. Medical witnesses repeatedly stated that if a child protested at all a genital exam wasn't done. Therefore the medical necessity of such exam cannot

19

be very great. The same is true of a finger stick blood sample. (Ex. Y, Depo. of Jackie Jordan, page 31, lines 1-10; Ex. U, Depo. of Jacqueline Strayhorn, pages 43, 46; and Ex. Z, Depo. of Hugh Graham, page 10, page 20, lines 1-4, page 21, lines 18-25, page 23, lines 4-5). The burdens entailed by alternative safeguards are small. In fact, Community Action Project has since simply re-worded its Physical Exam Consent Form. It is now titled "Community Action Project Tulsa County Head Start Program Consent for Health Services". (Ex. GG, Community Action Project Tulsa County Head Start Program Consent for Health Services). The burdens entailed by mailing out a consent form which advises parents explicitly of a genital exam and explains the risks of any procedures are small. Such burdens are no greater than any others entailed in communicating with Head Start parents. The relationship of parents in the Head Start program is repeatedly called a partnership and emphasizes parent involvement. (Ex. HH, CAPTC/Tulsa County Head Start Parent Interest Sheet, included in Plaintiffs' Trial Ex. 18; Ex. G, Part 1304 - Program Performance Standards for Operation of Head Start Programs by Grantees and Delegate Agencies page 38). It is stated in 45 C.F.R., §1304, app B, 1996 that a "primary aim" of Head Start is "parent participation and involvement. The risk of erroneous deprivation through the procedures used was great and foreseeable. (Ex. CC, Depo. of Sylvia August, page 24, lines 1-16 and page 15, line 16-page 16, line 9). Although CAP has re-worded its consent form, the new form still does not make explicit that genital exams will be done on children. There is absolutely no reason and no evidence has been adduced for any reason not to make this simple inclusion in a consent form when parents in two lawsuits have repeatedly stated that they did not understand that a genital exam would be done.

## IV. The Oklahoma Constitution was Violated

States can give greater protections to civil liberties than does the Federal Constitution. In *Oregon v. Hass*, 420 U.S. 714, 719 (1975), the court found that the state could restrict its police power to protect Fourth Amendment rights more than was required under Federal law, accord, *Cooper v. California*, 386 U.S. 58 (1967). While that has not proved true in Oklahoma regarding the Fourth Amendment, (see *Sloan v. Sprouse*, 968 P.2d 1254, 1258 [Okla. Crim. App. 1998], but see *Turner v. City of Lawton*, 733 P.2d 375, 380 (Okla. 1986), noting that Oklahoma's exclusionary rule is broader than the federal). Law that has arisen under the Oklahoma Constitution gives great deference to the civil rights of parents and their children regarding medical procedures. Annotations to Ok. Const. Ar. 1 Sec. 2, "Religious Liberty", include 21 O.S. 852 and 10 O.S. 413, codifying the state's public policy on parental freedom even to deny medical treatment for their children. In *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 Sup. Ct. 2386 (1995), at 657 at 2395, the court said according to the academy of pediatrics, most public schools 'provide vision and hearing screening and dental and dermatological checks. . . others also mandate scoliosis screening at appropriate grade levels'". As mentioned above, genitals exams are not included in this list nor recommended on Head Start's consent form by the American Academy of Pediatrics. Defendant goes on to cite *Vernonia* thus: "particularly with regard to medical examinations . . . 'students within the school environment have a lesser expectation of privacy than the members of the population generally'". This refers without doubt to medical exams done with consent. Absent consent, persons have a reasonable expectation of complete privacy. There is no evidence that the American Academy of Pediatrics recommends genital exams of anyone without their consent.

## V. State Law Claims

Plaintiffs rely on their arguments and evidence at I and II above establishing the failure of consent to also establish battery and their other state claims. They rely on their arguments and evidence above regarding the obviousness of the privacy interest and foreseeability to establish outrageous conduct, I and II above. State law claims survive. Even if this Court cannot look with favor on any of the federal claims stated by Plaintiffs, it can exercise supplemental jurisdiction under 28 U.S.C. Section 1367 over remaining state law claims.

A.    **Invasion Of Privacy.**  Defendant argues to this Court that an adult stranger can examine the genitals of a child without parental knowledge or consent and not be guilty of invading the child's privacy. Yet the Restatement, 2d, of Torts, Section 652 B says that, "Even in a public place, however, there may be some matters about the Plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters." The treatise goes on to cite the case of *Fields v. Atchison, Topeka, and Santa Fe Ry. Co.*, 985 F. Supp. 1308 (D. Kan. 1997) in saying, "[I]t is both the manner of the intrusion as well as the nature of the information acquired that must rise to the level of being highly offensive to a reasonable person." Plaintiffs urge this approach to the allegations herein. The stated reasons for the exams of the meatal opening of the penis were "just to see that it was there". (Ex. EE, Depo. of Kim Baker, page 49). This is absurd. The child would not have urinated for four years if it were not there. The exam for the rectum was likewise "just a visual inspection just to see that it . . . was there". (Ex. EE, Depo. of Kim Baker, pages 48-49). The labia were exposed "just to make sure that both the . . . the labia are there". (Ex. EE, Depo. of Kim Baker, page 54). The government has no need to see if any female has two labia or to see if persons have rectums - unless they are wearing colostomy bags they will not live to attend Head

22

Start. There is no balancing test which should justify an unconsented intrusion.

**B.     Intentional Infliction Of Emotional Distress.**     Whether the actions of the Defendants rise to the level of extreme and outrageous conduct is a fact-sensitive issue which can only become manifest upon trial.   The allegations met the criteria of Oklahoma Uniform Jury Instructions (Civil) 20.2.   See also Oscar S. Gray, ed., *The Law of Torts*, 3rd Ed., 1999 Cumulative Supp. No. 1, Vol. 1, N.Y.: Aspen Law and Business, 1999, Section 5.11.3, "Obtaining Consent", which says that "A sound procedure to inform parents and to gain their cooperation is the most satisfactory means of dealing with school-based screening programs." The Defendant cites *Vernonia School District v. Acton*, 515 U.S. 646 (1995) in justifying superficial checks such as vision and hearing screening and dermatological checks.   All the examinations cited can be done fully clothed, and do not involve obtaining bodily fluids, unlike what was done here.   The difference is that between reasonable, non-intrusive, standard procedures, and unwarranted, intrusive, painful, and unusual procedures.   Vaccinations, also mentioned in the opinion, under Oklahoma law are subject to some exemptions for conscience (see above at II, B and C) and therefore do not prove Defendant's point.

**C.     Negligent Infliction Of Emotional Distress.**     Defendant tries to tell the Court that lancing a child's fingertip over his or her protest, or removing his or her clothing and touching the genitals without parents present, does not injure the child.   It is alarming that this attitude is taken, and indicates the need for the injunctive relief Plaintiffs are seeking in this suit. It is clearly alleged that the children were upset and that some cried at the procedures done to them, and the pleadings meet the standards of the case law and of Oklahoma Jury Instructions (Civil) No. 19.1-9.

23

**D.     Battery.**   Any unconsented touching is battery.   Plaintiffs are not alleging persisting physical injury, but the evidence shows that battery occurred when exams were made without consent.   *Scott v. Bradford*, 606 P.2d 554 (Okla. 1979) and Oklahoma Uniform Jury Instructions (Civil) 14.12-14.14.

**E.     Damages.**   Plaintiff parents testified to varying degrees of damages including mental pain in their children resulting from the exams.   (Ex. L, Depo. of Daphine Suddarth, pages 73, 82-83; Ex. O, Depo. of Joy Brown, pages 30-31; Ex. H, Depo. of Misti Dubbs, pages 73, 93-94; Ex. N, Depo. of Keenya Cowans, pages 22-27, 55-56; Ex. P, Depo. of Jack Dubbs, page 41; Ex. Q, Depo. of Francisco Aguirre, pages 19, 20, 37, 38, 61-62, 108-110, 113-116; and Ex. II, Depo. of Judith Adams, pages 67-69, 168).

**F.     Consent.**   CAP also induced mistaken consent from Misti Dubbs by characterizing the exams wrongly.   "The way they explained it to me, it was just jump up and down on a step, bounce a ball.   That didn't bother me."   (Ex. H, Depo. of Misti Dubbs, page 22, lines 12-13 and 21-23).

**G.     Negligence.**   Under 76 O.S. Sec. 21, it may be that a presumption of negligence should apply.   Plaintiffs would offer an alternative theory to their standard negligence allegations in proof.   The Plaintiffs suffered injuries while under the control of Defendants and such injury does not ordinarily occur absent negligence on the part of the Defendant.   This is the theory *res ipsa loquitur, Harder v. F.C. Clinton, Oklahoma,* 948 P.2d 298 (Okla. 1997).

**H.     *Respondeat Superior.***   CAP is liable, to the extent it is a private employer on the theory of *respondeat superior* for the acts of its employees.   See Disputed Facts 3, above and Paragraphs I, II and III, above.   **It has claimed no immunity under the Oklahoma**

24

**Governmental Tort Claims Act.**

## VI. Damages

Plaintiffs have never alleged that the children involved suffered injury in the sense of a permanent or physical harm. However, parents and children herein have suffered legal damages. The violation of their rights has been discussed above and the children have been left open to possible abusers in the future because they have been confused by examinations of their genitals by strangers in street clothes, in their school without their parents present. (Ex. F, Opinion of Dr. Frederick Nelson, October 23, 2000, page 6). In some cases the children suffered observable mental pain. (Ex. H, Depo. of Misti Dubbs, pages 43, 93-94). Furthermore, as stated in *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000), paragraphs 14 and 15, "The right to family association includes the right of parents to make important medical decisions for their children and of the children to have the decisions made by their parents rather than the state. . . . Parents have a right to be with their children while they are receiving medical attention . . . and children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, particularly those that are invasive or upsetting." These rights are compensable.

## CONCLUSION

There are genuine issues of material fact in controversy before this Court. A jury should have a chance to consider the shadings of reasonableness, notice and credibility of witnesses, which must be resolved in this case. Therefore, Plaintiffs move this Court to overrule Defendant's Motion for Summary Judgment and allow Plaintiffs to proceed to trial.

Respectfully submitted,

CHRISTOPHER W. GOREE (OBA #16226)
JACK Y. GOREE (OBA #3481)


By: _Christopher W. Goree_
    Attorneys for Plaintiffs

6901 South Yorktown, Suite E
Tulsa, Oklahoma 74136-3983
(918) 496-3382 Telephone
(918) 496-8275 Facsimile

## CERTIFICATE OF MAILING

I hereby certify that on the 12th day of January, 2001, I mailed a true and correct copy of the above and foregoing document to the following with sufficient postage thereon fully prepaid:

Mr. John E. Dowdell
Ms. Christine D. Little
Norman Wohlgemuth Chandler & Dowdell
2900 Mid-Continent Tower
Tulsa, Oklahoma 74103
**Attorneys for Defendant Community Action Project**

Mr. J. Douglas Mann
Attorney at Law
525 South Main, Suite 700
Tulsa, Oklahoma 74103-4508
**Attorneys for Independent School District No. 1 of Tulsa County, Oklahoma**

Mr. Michael P. Atkinson
Mr. Eric J. Begin
Ms. Roni S. Rierson
Attorneys at Law
1500 ParkCentre
525 South Main
Tulsa, Oklahoma 74103-4524
**Tulsa City-County Health Department, Jackie Strayhorn, and Kim Baker**

Mr. Scott B. Wood
Attorney at Law
3600 First Place Tower
15 East 5th Street
Tulsa, Oklahoma 74103
**Attorney for Defendant, KD Enterprises, Inc.**

Mr. William S. Helfand
Attorney at Law
3600 One Houston Center
1221 McKinney
Houston, Texas 77010
**Attorney for Defendant Community Action Project**


_Christopher W. Goree_
Christopher W. Goree

A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

SHATILYA BARNES, Individually, and §
SHATILYA BARNES as Mother §
and Next Friend of GERALD BARNES, §
a minor; et al. §
§
          Plaintiffs, §
§
vs. §       No. 99-CV-733-K(E)
§
HEAD START, INC., an Oklahoma §
Corporation, et al, §
§
          Defendants. §

**F I L E D**

JUL 2 7 2000

Phil Lombardi, Clerk
U.S. DISTRICT COURT

## COMMUNITY ACTION PROJECT OF TULSA COUNTY, OKLAHOMA'S
## ANSWER TO PLAINTIFF'S AMENDED COMPLAINT

TO THIS HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW COMMUNITY ACTION PROJECT OF TULSA COUNTY, OKLAHOMA

("CAP"), named among the Defendants in the above-entitled and numbered cause and, in response

to the Plaintiffs' allegations and claims contained within Plaintiffs' Amended Complaint, would

respectfully show as follows:

### ANSWER

1.     CAP admits the factual allegation set forth in ¶ 52 of the Plaintiffs' Amended

Complaint.

2.     CAP denies the factual allegations set forth in ¶¶ 1-16, 18, 30, 33, 35-49, 51, 53-67,

69-78, 80-85, 87-90, 92-94, 96, 98, 100, 102, 104, 106, 108, 110, 112-115, and 117-118 of the

Plaintiffs' Amended Complaint.

3.     CAP is unable to admit or deny the factual allegations set forth in ¶¶ 23, 24, 26, 27,

31, and 32 of the Plaintiffs' Amended Complaint.

4. CAP denies that the Plaintiffs are entitled to attorney's fees and costs, as set forth in ¶ 17 of the Plaintiffs' Amended Complaint.

5. CAP denies that the Plaintiffs are entitled to any injunctive relief, as alleged in ¶ 19 of the Plaintiffs' Amended Complaint.

6. CAP admits that this Court has jurisdiction over the Plaintiffs' claims, as alleged in ¶ 20-22 of the Plaintiffs' Amended Complaint.

7. CAP admits that it received a Notice of Claim from Plaintiff's counsel on or about April 6, 1999. CAP denies the remaining factual allegations as set forth in ¶ 25 of the Plaintiffs' Amended Complaint.

8. CAP admits that Ronisha Suddarth is a minor female child who resides with her mother Daphine Suddarth. CAP is unable to admit or deny the remaining factual allegations as set forth in ¶ 28 of the Plaintiffs' Amended Complaint.

9. CAP denies that Ronisha Suddarth was enrolled in the Head Start Program at Wiley Post Elementary School at the time giving rise to this suit. CAP admits the remaining factual allegations set forth in ¶ 29 of the Plaintiffs' Amended Complaint.

10. CAP admits that it is an Oklahoma non-profit organization that is the local grantee of the federal Head Start program, as set forth in ¶ 34 of the Plaintiffs' Amended Complaint.

11. CAP admits that on or about September 9, 1998, well-child examinations were performed on the minor Plaintiffs. CAP denies the remaining factual allegations set forth in ¶ 50 of Plaintiff's Amended Complaint.

12. CAP denies that the Plaintiffs are entitled to any of the relief sought in their Prayer.

## **AFFIRMATIVE DEFENSES**

13.     Plaintiffs have failed to state a claim upon which relief can be granted.

14.     Plaintiffs consented to the conduct of which they complain.

15.     CAP reserves the right to assert additional affirmative defenses as may be determined during the course of discovery.

## **PRAYER**

CONSIDERING THE FOREGOING, Defendant CAP respectfully requests that this Court dismiss Plaintiffs' claims against it, render judgment in favor of this Defendant either prior to, or at the conclusion of the trial in this matter, and that Defendant recover all costs of Court as well as other relief to which it is entitled.

Respectfully submitted,

MAGENHEIM, BATEMAN & HELFAND, PLLC

William S. Helfand
SBOT 09388250
Rachel D. Ziolkowski
SBOT 24003234
3600 One Houston Center
1221 McKinney Street
Houston, Texas 77010
(713) 609-7700 Telephone
(713) 609-7777 Facsimile

- and -

4.      CAP denies that the Plaintiffs are entitled to attorney's fees and costs, as set forth in ¶ 17 of the Plaintiffs' Amended Complaint.

5.      CAP denies that the Plaintiffs are entitled to any injunctive relief, as alleged in ¶ 19 of the Plaintiffs' Amended Complaint.

6.      CAP admits that this Court has jurisdiction over the Plaintiffs' claims, as alleged in ¶ 20-22 of the Plaintiffs' Amended Complaint.

7.      CAP admits that it received a Notice of Claim from Plaintiff's counsel on or about April 6, 1999. CAP denies the remaining factual allegations as set forth in ¶ 25 of the Plaintiffs' Amended Complaint.

8.      CAP admits that Ronisha Suddarth is a minor female child who resides with her mother Daphine Suddarth. CAP is unable to admit or deny the remaining factual allegations as set forth in ¶ 28 of the Plaintiffs' Amended Complaint.

9.      CAP denies that Ronisha Suddarth was enrolled in the Head Start Program at Wiley Post Elementary School at the time giving rise to this suit. CAP admits the remaining factual allegations set forth in ¶ 29 of the Plaintiffs' Amended Complaint.

10.     CAP admits that it is an Oklahoma non-profit organization that is the local grantee of the federal Head Start program, as set forth in ¶ 34 of the Plaintiffs' Amended Complaint.

11.     CAP admits that on or about September 9, 1998, well-child examinations were performed on the minor Plaintiffs. CAP denies the remaining factual allegations set forth in ¶ 50 of Plaintiff's Amended Complaint.

12.     CAP denies that the Plaintiffs are entitled to any of the relief sought in their Prayer.

NORMAN WOHLGEMUTH CHANDLER & DOWDELL

*[signature]*

John E. Dowdell, OBA #2460
Christine D. Little, OBA #16677
2900 Mid-Continent Tower
Tulsa, Oklahoma 74103
(918)583-7571 (Telephone)
(918)584-7847 (Facsimile)

**ATTORNEYS FOR DEFENDANT,
COMMUNITY ACTION PROJECT OF TULSA
COUNTY, OKLAHOMA**

## CERTIFICATE OF MAILING

I hereby certify that on the 27th day of July, 2000, a true and correct copy of the above and foregoing instrument was mailed to:

Christopher W. Goree, Esq.
Jack Y. Goree, Esq.
Goree & Goree, P.C.
6901 South Yorktown, Suite E
Tulsa, Oklahoma 74136

Leah Farish, Esq.
2834 East 26th Place
Tulsa, Oklahoma 74114-4310

Mr. David L. Fist
Mr. J. Douglas Mann
Attorneys at Law
525 South Main, Suite 700
Tulsa, Oklahoma 74103-4508

Fred R. Gibson, Jr., Esq.
University of Oklahoma
Health Sciences Center
Office of Legal Counsel
1000 Stanton L. Young Blvd., Rm. 233
Oklahoma City, OK 73117

Michael Pearce Atkinson, Esq.
Eric James Begin, Esq.
Marthanda J. Beckworth, Esq.
Roni Sue Rierson, Esq.
ATKINSON HASKINS NELLIS BOUDREAUX HOLEMAN
PHIPPS & BRITTINGHAM
525 South Main, Ste. 1500
Tulsa, Oklahoma 74103

Scott B. Wood
Whitten, McGuire, Wood, Terry,
Roselius & Dittrich
3600 First Place Tower
15 East Fifth Street
Tulsa, Oklahoma 74103

Joseph Harroz, Jr.
660 Parrington Oval, St. 213
Norman, OK 73019

Kenneth W. Elliott
Elliott & Morris
City Place Building
204 North Robinson, 22nd Floor
Oklahoma, OK 73102

Christine D. Little

B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al, and        )
SHANTILYA BARNES, et al,       )
                               )
               Plaintiffs,     )
                               )
    vs.                        )    Case No. 99-CV-0732K(E)
                               )    Case No. 99-CV-733K (B)
HEAD START, INC., et al        )
                               )
               Defendants.     )


        DEPOSITION OF GEORGE ROBERT CHARLTON, JR., taken at
2900 Mid-Continent Building, Tulsa, Oklahoma, on the 27th day
of October, 2000, on behalf of the plaintiffs, before the
undersigned Certified Shorthand Reporter, pursuant to
stipulations of the parties.

        Fee for original, $        paid by plaintiffs.



Michael A. Bailey, CSR-RPR-CLVS

COPY

1      A     No, sir.

2      Q     Is it a stock corporation?

3      A     No, sir.

4      Q     Is it a charitable corporation?

5      A     Definition of charitable?

6      Q     Well, I think that's a matter of tax law.  I'm not

7 sure.

8            MR. HELFAND:  You mean a 501(c)3?

9            MR. GOREE:  Yeah.

10     A     Yeah, I think it is.

11     Q     (By Mr. Goree) And when was Community Action Project

12 incorporated?

13     A     Three years ago.

14     Q     And you said you were one of the incorporators?

15     A     Yes, sir.

16     Q     Did you have three?

17     A     There were four or five of us.

18     Q     And who were those incorporators other than yourself,

19 if you recall?

20     A     I don't remember.

21     Q     Do you remember the names of any of them?

22     A     I sure don't.

23     Q     Is Community Action Project an Oklahoma corporation?

24     A     Yes, sir.

25     Q     When you say that you are chairman of the board, what

1    A    No, sir.

2    Q    You simply sit as a good citizen doing civic

3    responsibilities; is that right?

4    A    Yes, sir.  Yes.

5    Q    Does a Community Action Project have a financial budget

6    approved annually?

7    A    Yes, sir.

8    Q    Is Community Action Project involved in voting bonds

9    for funding projects in any way?

10   A    I'm not understanding that question.

11   Q    Then you probably don't.

12        MR. HELFAND:  Talking about authorizing the issuance

13   bonds?

14   Q    (By Mr. Goree) Right.

15   A    No, sir.

16   Q    Okay.  How does Community Action Project get its

17   funding to do its assigned projects for Head Start?

18   A    From wherever we can get it.  We get money from the

19   city, CDBG funds, home funds.  We get federal monies, get

20   donations from interested citizens and those sorts of sources.

21   Foundations.

22   Q    Is Community Action Project a member of INCOG, Indian

23   Nations Council of Governments?

24   A    Not to my knowledge, no, sir.

25   Q    But you think you do get some BGCO grants?

C

## FIRST AMENDMENT TO AGREEMENT FOR SERVICES

This First Amendment to Agreement is entered into by and between the Tulsa City-County Health Department, hereinafter referred to as "TCCHD", and the Community Action Project of Tulsa County, Inc., a non-profit organization for the benefit of its Tulsa County Head Start Program, hereinafter referred to as "Head Start".

### RECITALS:

1. On or about the 15th day of October, 1998, Head Start and TCCHD entered into an agreement whereby the latter would supply to the former comprehensive child health services ("Agreement").

2. Head Start and TCCHD wish to amend the Agreement to include additional services, to specify the costs of all services provided, and to change the termination date to conform to the termination of the fiscal year of each party.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and intending to be legally bound, TCCHD and Head Start agree as set forth below:

1. The Agreement is amended hereby by adding thereto in paragraph 2, the comprehensive child health services, immediately following subparagraph F, additional subparagraphs G and H, as follows:

"G    On-site Observations – Requested on-site observations of the Head Start classrooms and students will be conducted by a Child Guidance Clinic consultant. Each Head Start classroom will be visited by a consultant for no less than two one-hour observations and no less than two one-hour verbal feedback sessions with classroom teacher and other relevant staff members. A one-week advance notice to schedule the observation will be made with the Head Start mental health specialist. A feedback/staffing session will be scheduled following observations at all sites. During the on-site observation, the Child Guidance Clinic consultant's duties are:

    (1)    Observe classroom procedures, management, atmosphere, and teacher-student interaction in relation to mental health.

    (2)    Observe students who may need possible referrals for further evaluation. This observation of students by the consultant should actively involve the classroom teacher's impressions, knowledge and observations of the students.

    (3)    Written observations and recommendations will be made during the on-site visit on the forms provided by Head Start. During the verbal feedback staffing session, the consultant will review the observations and make recommendations to Head Start staff.

PLAINTIFF'S
EXHIBIT
2

(4)     The appropriate Head Start content area specialists and teachers will be responsible for following up on recommendations and/or referrals.

H.     <u>Workshops and Group Meetings</u> – Child Guidance or Child Health Clinic staff may be scheduled for pre-service and/or in-service workshops at the request of the Head Start director or the content area specialists. Availability of Child Guidance Clinic or Child Health Clinic staff may be influenced by other duties and thus dates and locations will be mutually agreed upon."

2.     The Agreement is amended further hereby by striking therefrom numerical paragraph 4 on page 3 and inserting in lieu thereof the following:

"4.     This agreement shall become effective on the 15th day of October, 1998 and shall terminate on June 30, 1999. Provided, however, it is acknowledged by Head Start and TCCHD that TCCHD is a governmental entity subject to budget constraints imposed by law; however, it is the intent that this agreement may be renewed annually by mutual agreement."

3.     The Agreement is amended further hereby on page 3, by inserting therein immediately following numerical paragraph 7, paragraphs 8, 9 and 10 as follows:

"8.     As appropriate, Head Start or TCCHD will make arrangements for any referrals to outside health care facilities deemed necessary by the screenings.

9.     All direct psychological, speech/language, child development services will be rendered in the TCCHD facilities. All in-class observations will be rendered in the Head Start centers. Clinical staffings will be scheduled in either the Head Start centers or the TCCHD facilities.

10.     TCCHD shall commence additional services consisting of speech and hearing and developmental evaluations beginning February 1, 1999."

4.     The Agreement is amended further hereby by adding thereto and including therein by addendum and incorporating by reference the consideration and cost of services as follows:

2

TCCHD Contract #7-55
Community Action Project of Tulsa Co., Inc.
10/15/98 – 6/30/99

## "ADDENDUM

### COST OF SERVICE:

| Service | Service Fee | In-Kind Contribution | Fee Billed Head Start |
|---|---|---|---|
| A. Child Health Diagnostic (Evaluation) Encounter -- W3095 | $210.00 | -0- | $210.00 |
| B. Individual or Group Guidance Treatment Encounters (primary intervention Speech, language, hearing, Psychological) – W3080 | $ 35.00 (per ½ hr) | $ 10.00 | $ 25.00 (per ½ hr) |
| C. Consultation (Consultative Services) | $ 35.00 (per ½ hr) | $ 10.00 | $ 25.00 (per ½ hr) |
| D. On-site Observations | $ 35.00 (per ½ hr) | $ 10.00 | $ 25.00 |
| E. Workshops/Group Meetings | $ 35.00 (per ½ hr) | $ 10.00 | $ 25.00 (per ½ hr) |

F. Travel necessary to reach site of service to be provided will be reimbursed at the prevailing state rate per mile.

G. In-kind contribution made by TCCHD shall not exceed the respective amounts set forth in this Addendum.

H. Head Start shall pay to TCCHD as compensation for services as shown above. Provided, however, the total compensation paid during the term of this Agreement shall not exceed Ten Thousand Dollars ($10,000)."

5.    All other terms and conditions of the Agreement shall remain unchanged.

3

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Agreement at Tulsa, Oklahoma on the dates shown below.

COMMUNITY ACTION PROJECT OF
TULSA COUNTY, INC.

By _____
                    President

Date _____6/23/99_____

ATTEST:

By _____
        Secretary

Com\CAP755

TULSA CITY-COUNTY BOARD OF
HEALTH

By _____
    Beverly J. Mathis, D.O.
    Chair

Date _____4-28-99_____

TULSA CITY-COUNTY HEALTH
DEPARTMENT

By _____
    Gary Cox, J.D.
    Director

Date _____4-28-99_____

4

D

## AFFIDAVIT OF JEROME LEE

STATE OF OKLAHOMA    §
                            §
COUNTY OF _Tulsa_     §

BEFORE ME, the undersigned notary public, on this day personally appeared Jerome Lee,

who being by me duly sworn on his oath, deposed and stated as follows:

My name is Jerome Lee. I am over the age of twenty-one (21) and am in all other ways qualified to make this affidavit. The statements contained herein are true and correct and, as the Director of the Head Start and First Start programs for the Community Action Project of Tulsa County, Oklahoma ("CAP"), I am authorized to make the statements contained herein. The statements herein are made of my own personal knowledge because they relate to my own actions or things which I personally observed.

Since 1998, CAP has been the local grantee for the federal Head Start program. In order to maintain its funding, CAP is required to comply with all federal Head Start regulations. As part of the federal Head Start regulations, all enrollees of the Head Start program are required to receive a physical examination within ninety days of enrollment. The purpose of this requirement is to identify any physical and developmental impediments that may prevent a child from fully participating in the program. Because many Head Start enrollees do not have a regular pediatrician, as a service to the families, CAP makes physical examinations available to its Head Start enrollees free of charge. In 1998, CAP contracted with both the University of Oklahoma and the Tulsa City/County Health Department to conduct these examinations at different Head Start locations.

I understand that there has been an allegation in this lawsuit that the purpose of these examinations was to investigate for child abuse. This statement is simply false. At the time these examinations were conducted, there was no indication or suggestion that any of these children who were examined were sexually abused. No law enforcement or other investigatory authorities were involved in these examinations. None of the findings of these examinations were reported to any law enforcement authorities. The sole purpose of these examinations was to identify any physical or developmental impediments a child may have that may prevent a child from fully participating in the program consistent with the federal Head Start requirements.

In addition, I also understand that there is an allegation that CAP had a policy of conducting examinations without informed, parental consent. This is also simply wrong. It is CAP's policy that all examinations be conducted with parental consent. If any examination was conducted without parental consent, such an examination would be in direct derogation of CAP's policies.

Further Affiant Sayeth Not.

Jerome Lee

SUBSCRIBED AND SWORN TO BEFORE ME on this 20th day of November 2000.

NOTARY PUBLIC IN AND FOR THE
STATE OF OKLAHOMA

MY COMMISSION EXPIRES FEBRUARY 28, 2001

E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al, and          )
SHANTILYA BARNES, et al,        )
                                )
                    Plaintiffs, )
                                )
     vs.                        )     Case No. 99-CV-0732K(E)
                                )     Case No. 99-CV-733K (B)
HEAD START, INC., et al         )
                                )
                    Defendants. )

       DEPOSITION OF STEVEN HOWARD DOW, taken at 2900
Mid-Continetnt Building, Tulsa, Oklahoma, on the 27th day of
October, 2000, on behalf of the plaintiffs, before the
undersigned Certified Shorthand Reporter, pursuant to
stipulations of the parties.

          Fee for original, $        paid by plaintiffs.

Michael A. Bailey, CSR-RPR-CLVS

COPY

1    initial concern seemed to have been brought to Mr. Lee's

2    attention.  I don't recall the date specifically.

3        Q    And how was it brought to your attention?

4        A    Mr. Lee advised me that -- that there were some

5    concerns.

6        Q    What did you understand the concerns were at that early

7    date?

8        A    The concerns that I understood that were brought to his

9    attention were that some of the children seemed not to have

10   been potentially given all of the proper notifications that the

11   -- that the examinations were happening.

12       Q    What, if anything, did you personally do to remedy any

13   possibility of a problem?

14       A    I asked Mr. Lee whether or not he was working on

15   solving the problem and communicating with the parents and

16   undertaking to understand what happened with respect to the

17   incident.

18       Q    Other than that, did you actually do anything toward

19   that end?

20       A    No.  Not at that time.

21       Q    Were you present at any of the meetings at Roosevelt

22   Elementary School where parents expressed concern about the

23   examinations?

24       A    No, I was not.

25       Q    Before November 5th, 1998, were you familiar with the

1  protocol that the health department was to use in examining

2  children including the genitals of the children?

3     A   Was I familiar with the protocol of the -- could you be

4  more specific? You mean --

5     Q   Yeah. Had you read the protocol or did you know what

6  the health department protocol was for those exams?

7     A   No, sir.

8     Q   Do you know if Community Action Project had some type

9  of protocol that it required the director of the program to

10  follow as far as medical examinations?

11     A   I assumed that we did.

12     Q   Have you made a search to see if there is any such

13  protocol in your records?

14     A   I have not done any sort of search on that, no, sir.

15     Q   Have you ever been a defendant in a prior civil action?

16     A   No, sir.

17     Q   Is Community Action Project involved in anything other

18  than the Head Start programs at this time?

19     A   Yes, sir.

20     Q   What other types of programs is it involved in?

21     A   A variety of antipoverty initiatives.

22     Q   Are all of those funded through charitable giving of

23  individuals and organizations?

24     A   No, sir.

25     Q   Are some of them funded by federal and state grants?

1     A    Yes, sir.

2     Q    What other method of funding is there for the C-A-P?

3     A    A variety of contract services, real estate and

4 development fees, other assorted income.

5     Q    I realize that Community Action Project is a not-for-

6 profit corporation, but did it receive any reimbursement for

7 funding of employees who were conducting the Head Start program

8 at Roosevelt?

9     A    I'm not sure I understand that question.

10    Q    Was there some form of financial compensation that

11 Community Action Project brought in as a result of

12 reimbursement for Community Action Project employees working on

13 Head Start?  Did I make it clear enough yet?

14    A    Maybe to others, not to me.

15    Q    Well, you are the only one that matters right now so --

16    A    Okay.  So try again.

17    Q    -- let me try again.  Was Community Action Project paid

18 anything for the employees of Community Action Project that

19 worked in the Head Start program?

20    A    I guess the answer to that would be no.  I mean, we had

21 a contract with Tulsa Public Schools under which Tulsa Public

22 Schools passed through funding that it received from the State

23 Department of Education pursuant to our providing early

24 childhood education services for four-year-olds.

25    Q    What is the relationship with the Community Action

1      A    Are you -- are you asking if I'm aware whether or not

2  that's a legal requirement?

3      Q    Any kind of requirement, whether it's legal or ethical

4  or decent or -- is there any requirement as far as you know?

5      A    Which one?

6      MR. HELFAND:  I don't think you need to answer that

7  question.

8      A    Which one?  I'm certainly not in a position to opine as

9  to whether or not it's legally required.

10     Q    (By Mr. Goree) Well, as an attorney and a member of the

11  bar of the state of Oklahoma and a fairly recent graduate of

12  Yale Law School, do you know whether or not it is lawful for

13  someone to conduct a physical examination of minor children,

14  including the genitalia and the taking of blood, without a

15  written informed consent of the parent of the child?

16     MR. BEGIN:  Object to the form.

17     MR. HELFAND:  Object to the form of the question.

18     A    I don't recall whether or not we actually studied that

19  in law school.  I don't -- and I certainly don't recall whether

20  or not that was a question on the bar exam, so I'm going to say

21  that I do not know whether or not I can say that that is or

22  isn't a legal requirement.  I'm sure I could consult -- there

23  appear to be a number of attorneys sitting around the table.

24  My guess is they could tell us.

25     Q    Well, it might surprise you that there is disagreement

1  among people at the table on that issue.

2      MR. HELFAND:  Should come as no surprise.  We wouldn't

3  be sitting here if there wasn't.

4      Q    (By Mr. Goree)  Did you, yourself, do anything before

5  November 5th, 1998, to cause written consent forms to be

6  obtained from parents of children in the Head Start program?

7      MR. HELFAND:  Object to the form of the question.

8      A    Did I specifically -- can you restate the question?

9      Q    Yes, sir.  Did you, yourself, do anything before

10  November 5th, 1998, to determine whether written consent of

11  parents would be obtained before medical examinations of

12  children was conducted?

13      A    I myself did not specifically do anything, no, sir.

14      Q    As part of your job as the executive director of

15  Community Action Project, are you involved in making and

16  setting policies and procedures?

17      A    Yes, sir.

18      Q    And do you sit in on the monthly board meetings of the

19  Community Action Project?

20      A    Yes, sir.

21      Q    Are you required to show your presence on the record

22  of the minutes when you attend meetings?

23      A    I don't think I am required to, no, sir.

24      Q    Let me ask you this way.  Is it the practice or the

25  custom of the person making minutes at the monthly meetings of

1    Q    Were you somehow involved in the development of that

2    form, Plaintiff's Exhibit Number 14?

3    A    Not that I recall.

4    Q    Is that a Community Action Project form?

5    A    I don't know whether or not it is.  It appears to have

6    the Head Start logo on here, but it nowhere on here refers to

7    Community Action Project of Tulsa County.

8    Q    Are you saying that you don't know whether it is a

9    Community Action Project form or not?

10   A    I am saying I do not know whether or not it is a

11   Community Action Project form or not.

12   Q    Do you know if that is a form currently being used by

13   the Community Action Project in Tulsa?

14   A    I do not know one way or another.

15   Q    Have you ever seen a copy of Plaintiff's Exhibit Number

16   14 before today?

17   A    Not that I recall.

18   Q    What is Head Start Health Services?

19   A    I -- I assume that is the general area that -- health

20   services that we offer as a part of the Head Start program.

21   Q    I'm going to show you a document which was offered in

22   the Jerome Lee deposition, Plaintiff's Exhibit Number 13, and

23   ask you if you have seen a copy of that document before.

24   A    And what's the question?

25   Q    The question is:  Have you ever seen a copy of that

1    of them, the 717 South Houston address where I work.

2       Q    When you said they wouldn't be in your office, did you

3    mean in your personal office that you have wouldn't find them

4    in there generally?

5       A    Yes, sir.  I can't find very many things in my personal

6    office.

7       Q    What role, if any, did you have in notifying parents

8    that medical examinations were to take place at Roosevelt

9    Elementary School on November 5th, 1998?

10      A    No specific role.

11      Q    Was there a general role?

12      A    I'm the executive director of the agency and the -- and

13   ultimately supervise people who -- whose responsibilities those

14   included.

15      Q    Do you know of any information which would indicate

16   whether Tulsa Public Schools knew before November 5th, 1998,

17   that there would be physical examinations conducted of

18   enrollees of Head Start?

19      A    I know that generally when we discussed our

20   relationship with Tulsa Public Schools we explained to them the

21   full scope of the Head Start program which included health

22   services and examinations of children.

23      Q    Do you know whether Tulsa Public Schools were actually

24   aware specifically that on November 5th, 1998, medical

25   examinations were going to be done at Roosevelt Elementary

1    A    I have not.

2    Q    I think one last area that I want to ask you about.

3    Were any of the Community Action Project employees disciplined

4    in any way related to the November 5th, 1998, medical

5    examinations at Roosevelt Elementary?

6    A    I don't recall one way or another.

7         MR. GOREE:  I have no further questions.

8         MR. BEGIN:  I have no questions.

9         MR. MANN:  I have no questions of this witness at this

10   time.

11        MS. HART:  I have no questions.

12        MR. ELLIOTT:  And I have no questions.

13        MR. HELFAND:  Reserve ours until a later time.

14        Read and sign.

15   (THEREUPON, THE TAKING OF THE DEPOSITION WAS CONCLUDED.)

16

17

18

19

20

21

22

23

24

25

F



**ASTWICK PEDIATRICS**
FREDRIC P. NELSON, M.D.
ANN M. CRAIG, M.D.
REGINA CLARK, M.D.
Suite Two
2801 Island Avenue
Philadelphia, PA 19153

Telephone (215) 365-0205

Children
are a gift
from the
Lord.
*Psalm*
127:3

# An Opinion Prepared by Fredric P. Nelson, MD

JACK DUBBS, et al., Plaintiffs,

vs.

Head Start, Inc., et al., Defendants

No. 99-CV-0732K (E)

Depositions reviewed to date are those of:

1. Jack Dubbs
2. Misti Dubbs
3. Shanika Crowley
4. Daphine Suddarth
5. Joy Brown
6. Keena Cowans
7. Raichelle Loftin
8. Francisco Aguirre
9. Andrea Rutherford
10. Kaysondra Wilson

It is my understanding that not all depositions have been taken, and I therefore reserve the right to revise my opinion as material facts are brought to light.

## Ruptured Communication with Parents

There was a lack of reasonable and appropriate communications prior to and following the routine physical examinations done at the Head Start program. When children were dropped off at Head Start on the day the physical examinations, parents were not told that a physical examination was to be done that day.


DEFENDANT'S DEPOSITION EXHIBIT

A. Rutherford tried to obtain pertinent information after the incident and people were too busy, didn't have the time, did not return calls and was unable to get a copy of her daughter's records.[1] S. Crowley was informed that the nurses would provide her with information on the physical examinations, which she never received.[2]

Trust was lost.[3]

"Effective physician communication is at the heart of establishing a therapeutic alliance."[4] Parents were not involved as historians, chaperones, or recipients of findings.

"The parent/child care partnership is vital. Participation of parents in decisions concerning children is a primary goal of Head Start."[5]

## Unnecessary Examinations

A number of children had routine physical examination forms completed by a private physician and turned in to the Head Start program. These included Kwanita Crowley,[6] Quenten Loftin,[7] Ronisha Suddarth,[8] and Tiffani Dubbs.[9]

## Inadequate Physical Examinations

Every routine physical examination begins with a history. Nelsons Textbook lists the components of a routine physical examination from age 1 week to 21 years, each of which begins with a number of historical questions.[10] The initial 8 items for the 3, 4 and 5 year old examinations are obtained by history. Without history, routine screening is almost worthless.

"Taking the history should be viewed as the beginning of the management process."[11]

---

[1] Deposition of A. Rutherford p. 137

[2] Deposition of S. Crowley. p. 121-123

[3] Deposition of M. Dubbs. p. 68

[4] *Nelson Textbook of Pediatrics*. Behrman, R., MD Editor, et al. 16th Edition. W.B. Saunders Co. 2000. p. 14

[5] *Caring For Our Children, National Health and Safety Performance Standards: Guidelines for Out-of-Home Child Care Programs*. A Joint Collaborative Project of the American Public Health Association and the American Academy of Pediatrics. 1992. p. 334

[6] Deposition of S. Crowley. p. 24

[7] Deposition of R. Loftin. p. 69

[8] Deposition of D. Suddarth. p. 77

[9] Deposition of M. Dubbs. p. 38

[10] *Nelson*, 16th Edition. p. 15

[11] *Pediatrics*. Rudolph, A. et al, Editors, 18th Edition. Appleton & Lange. 1987. p. 817



## Do No Harm

"The central ethical principle that should justify screening programs is no different from that which should guide all medical care: do no harm without compensating benefit and informed consent. (...) Screening has become such a ubiquitous and accepted component of the health care of healthy and sick patients that its benefits are often assumed and the risk is rarely assessed. Routine pediatric procedures, such as the annual physical examination, urine cultures, and the developmental screening prior to school entry may be examples of common interventions of uncertain benefit and potential risks, organic and psychological."[12]

## Improper Setting

Physical examinations of children should be done one-at-a-time, in a private space, out of the view and hearing of other individuals, especially young children. Facilities should include reasonable exam surfaces and have disposable paper coverings or be cleaned between each use.

## Informed Consent and Informed Permission

The policy statement of the American Academy of Pediatrics, Informed Consent, Parental Permission, and Assent in Pediatric Practice, contains the following statements and quotes:[13]

1. The theory that "doctor knows best" is unacceptably paternalistic.
2. Physicians "have a duty to respect the autonomy, rights, and preferences of their patients and their surrogates."
3. Physicians are to "respect persons by fully and accurately providing information relevant to exercising their decision-making rights."
4. "The patient has the freedom to choose among the medical alternatives without coercion or manipulation."
5. "A patient's reluctance or refusal to assent should carry considerable weight when the proposed intervention is not essential to his or her welfare and/or can be deferred without substantial risk."

"The permission by which parents allow the pediatrician to initiate care for a child should be 'informed.' Informed consent has become, in recent years, standard practice in medical

---

[12] *Nelson Textbook of Pediatrics*. Behrman, R., MD Editor, et al. 14th Edition. W.B. Saunders Co. 1992. p. 8
[13] Informed Consent, Parental Permission, and Assent in Pediatric Practice (RE9510). *Policies and Clinical Practice Guidelines of the American Academy of Pediatrics*. February, 1995.

3

care;(...)"[14]

"Children are presumed to be incompetent to consent to treatment. Their parents exercise that right for them."[15]

Guidelines for out-of-home child care programs have been published.[16] They include the following:

1. Parental consent, confidentiality, and the sharing of information useful in the provision of service to the children and family shall be addressed. For centers, these shall be written policies and procedures. [p. 288]
2. (C) Signed parent agreement at enrollment, including the following: (...) f) Any health service obtained for the child by the facility on behalf of the parent. Such consent shall be specific for the type of care provided to meet the tests for "informed consent" to cover on-site screenings or other services provided. [p. 333,334]

## Consent Forms

The consent form, "Authorization For Treatment to Minors," is a form giving permission for the medical or surgical management of an acute problem that is emergent or an emergency. The form is not a parental permission form for conducting a routine physical examination. This is obvious for the following reasons:

1. The form primarily authorizes treatment, and it authorizes diagnosis prior to treatment. A routine physical examination is for data collection, not treatment.
2. The first paragraph initially requests authorization for x-rays and anesthesia, modalities which would be used in an emergent or emergency situation.
3. The second paragraph begins with the sentence, "It is understood that this consent is given in advance of any specified diagnosis or treatment being required." Nothing about a routine physical examination is emergently required. The routine physical examination is administratively required.
4. The second paragraph ends with the wording that the physician or dentist is "to exercise his/their best judgment as to the requirements of such diagnosis or medical or dental or surgical treatment." The "requirements of such diagnosis" refers to "any specific diagnosis or treatment being required," which is an emergent or emergency medical event. A routine physical examination is not "medically required". The routine physical examination is administratively required.
5. Under Permission To Transport Child, the following terms are used, "for emergency care", "for emergency dental care", "nearest available source of assistance", "life

---

[14] *Pediatrics.* Rudolph. p. 8
[15] *Law for Physicians: An Overview of Medical Legal Issues.* Horn, C. et al., Editors. American Medical Association. 2000. p. 103
[16] *Caring For Our Children, National Health and Safety Performance Standards.* p. 288

threatening illness or injury", "911", "transport him/her immediately to the nearest hospital". Each of these terms implies an emergent, if not emergency, medical situation.

6. Under Refusal to Grant Permission, the following terms are used, "For emergency medical/dental care", "In the event of illness or injury", and "emergency medical/dental treatment.

Using this form to claim that parental signature is consent for a routine physical examination is ludicrous.

## Falsification of Consent Forms

Raichelle Loftins's name was forged on a "Parent Consent Form".[17] This is falsification of a medical record.

## Chaperones

Children are entitled to have a chaperone with them during a routine physical examination, usually a parent, relative or guardian. A chaperone can be present only if the parent or guardian is informed of the pending physical examination some time prior to the actual occurrence of the examination.

## Absence of Consent Known

Several individuals in the chain of command were informed at the time of the physical examinations that there were no signed parental consent forms on file. They include the nurse- Peggy Doe, Edna, and Jackie Strayhorn.[18]

## Consent/Assent Withdrawn

Denise Rutherford attempted to avoid the physical examination by running out of the exam room while naked. She was frightened, crying and screaming. She was caught, returned to the exam room and examined.[19]

Denise had withdrawn her assent. Since there is no immediate need to perform a routine physical examination, the examination should have been terminated and proceeded only with parental consent and parental presence.

---

[17] Deposition of R. Loftin. p. 97
[18] Deposition of M. Dubbs. pp. 50,92,93
[19] Deposition of A. Rutherford p. 21,127-9

## Deferred Examinations

There is no medical rational to perform a routine physical examination prior to obtaining parental consent and obtaining a relevant history.

"When recommended treatment [or lack of treatment as in a screening physical examination] is not crucial for the child's life or fundamental health, the parental refusal can be respected."[20]

## Genital Examinations

The American Academy of Pediatrics recommends that external genital examinations be done on all routine physical examinations from the newborn period through the teen years.

The external genitalia of girls age 3 years to 5 years are easily visualized. With the girl lying on her back and with the panties pulled down to the ankles, the hips and knees are flexed and the knees abducted. Usually the labia majora separate and the labia majora, clitoris, urethra and vaginal opening are easily visualized. Occasionally the skin overlying the proximal thighs, superiorly, needs to be pulled laterally to open the labia majora. All this can be done without touching the genitals and gloves need not be used. Hands need to be washed after the examination of each child.

I, personally, examine the external genitalia in this manner in 100% of the physical examinations I do on girls ages 3 years through age 5 years, and I do not use gloves.

## Perceptions of Children

The physical examinations would teach children that adults are in charge and that they have the authority to perform a physical examination, including a genital examination, without parental knowledge, presence, or approval. This negates and undermines parental education about "Touch/No Touch" body areas and opens the child to abuse, including sexual abuse, by unknown adults.

## Mandatory examinations

On the day of the physical examinations, every child at Head Start was required to have a physical examination whether-or-not the child had received an examination by a private physician. As noted above, several children had a completed physical examination on file. If it was determined that the form was administratively incomplete, the form should have been returned to the parent to correct.

---

[20] *Pediatrics.* 18th Edition. p. 8

Mandatory screenings of all children strongly suggests that the physical examination was done, in part, for a reason, or reasons, not associated with a routine physical examination.

## Coerced Examinations

Ms. Dubbs was threatened with the expulsion of her child if the examination was not carried out.[21] [22]

## Unlawful Search

It is the perception of several parents that one motive for performing a "routine physical examination" on the children in the Head Start program was to search for signs of child abuse, including sexual abuse.[23] In her deposition, M. Dubbs stated that she was specifically informed by the nurse, Peggy Doe, that one of the goals of the physical examination was to screen for abuse.[24]

States have mandated head start providers, among others, to report suspected child abuse. States have never permitted providers to search for child abuse and/or sexual abuse. The use of the "routine physical examination" as a pretense for searching for child abuse and sexual abuse is reprehensible.

Amendment 4 of the Constitution of the United States of America reads, in part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...

"Under common law, touching another person without his or her express consent is a battery, while placing someone in the fear of being touched is an assault."[25]

---

[21] Deposition of J. Dubbs. p. 79
[22] Deposition of M. Dubbs. p. 49
[23] Deposition of D. Suddarth. p. 125
[24] Deposition of M. Dubbs. p. 72
[25] *Law for Physicians: An Overview of Medical Legal Issues.* Horn, C. et al., Editors. American Medical Association. 2000. p. 94



FPN, MD
October 23, 2000

## Conclusion

It is my opinion that:

1. The physical examinations conducted by Head Start were not routine physical examinations.
2. The physical examinations were done without parental notification or consent.
3. The physical examinations were not essential to the immediate welfare of any child and could have been deferred without any risk to any of the children.
4. Children were denied the chaperone of their choice.
5. The facilities for the physical examinations were sub-optimal.
6. Some of the children had had routine physical examinations done by a practitioner and a mandatory, repeat examination by Head Start was neither medically necessary nor appropriate.
7. The lack of a medical history rendered all of the medical examinations dubious.
8. Communication with parents was ruptured and trust lost.
9. The examinations were coerced.
10. Though the examinations were planned and conducted for several reasons, one fundamental reason for the examinations was a systematic search for child abuse, including sexual abuse, in all the children attending the Head Start Program. This is apparent because: a.) Parental consent was neither sought nor obtained; b.) At the opening of school on the day of the examination, the teachers were unaware that physical examinations were to be done; c.) At the opening of school on the day of the examination, parents were not informed that physical examinations were to be done; d.) All children were examined, even those who had a completed physical examination on file; e.) Physical examinations continued even though three individuals in the chain of command knew that parental consent had not been given; f.) The nurse in charge of the examinations stated that one reason the examinations were being conducted was to search for signs of abuse; and g.) The entire body surface of each child was examined.
11. The systematic search for child abuse, including sexual abuse, was neither medically warranted nor justifiable.

Signed on October 23, 2000.

Fredric P. Nelson, MD

8

G

# PART 1304 — PROGRAM PERFORMANCE STANDARDS FOR OPERATION OF HEAD START PROGRAMS BY GRANTEES AND DELEGATE AGENCIES

## Subpart A — General

### 1304.1 Purpose and scope.

This part describes regulations implementing sections 641A, 644(a) and (c), and 645A(h) of the Head Start Act, as amended (42 U.S.C. 9801 *et seq.*). Section 641A, paragraph (a)(3)(C) directs the Secretary of Health and Human Services to review and revise, as necessary, the Head Start Program Performance Standards in effect under prior law. This paragraph further provides that any revisions should not result in an elimination or reduction of requirements regarding the scope or types of Head Start services to a level below that of the requirements in effect on November 2, 1978. Section 641A(a) directs the Secretary to issue regulations establishing performance standards and minimum requirements with respect to health, education, parent involvement, nutrition, social, transition, and other Head Start services as well as administrative and financial management, facilities, and other appropriate program areas. Sections 644(a) and (c) require the issuance of regulations setting standards for the organization, management, and administration of Head Start programs. Section 645A(h) requires that the Secretary develop and publish performance standards for the newly authorized program for low-income pregnant women and families with infants and toddlers, entitled "Early Head Start." The following regulations respond to these provisions in the Head Start Act, as amended, for new or revised Head Start Program Performance Standards. These new regulations define standards and minimum requirements for the entire range of Early Head Start and Head Start services, including those specified in the authorizing legislation. They are applicable to both Head Start and Early Head Start programs, with the exceptions noted, and are to be used in conjunction with the regulations at 45 CFR parts 1301, 1302, 1303, 1305, 1306, and 1308.

### 1304.2 Effective dates.

Early Head Start and Head Start grantee and delegate agencies must comply with these requirements on January 1, 1998. Nothing in this part prohibits grantee or delegate agencies from voluntarily complying with these regulations prior to the effective date.

### 1304.3 Definitions.

(a) As used in this part:

(1) *Assessment* means the ongoing procedures used by appropriate qualified personnel throughout the period of a child's eligibility to identify:

(i) The child's unique strengths and needs and the services appropriate to meet those needs; and

(ii) The resources, priorities, and concerns of the family and the supports and services necessary to enhance the family's capacity to meet the developmental needs of their child.

(2) *Children with disabilities* means, for children ages 3 to 5, those with mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness,


PLAINTIFF'S EXHIBIT 5

serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, specific learning disabilities, deaf-blindness, or multiple disabilities, and who, by reason thereof, need special education and related services. The term "children with disabilities" for children aged 3 to 5, inclusive, may, at a State's discretion, include children experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: Physical development, cognitive development, communication development, social or emotional development, or adaptive development; and who, by reason thereof, need special education and related services. Infants and toddlers with disabilities are those from birth to three years, as identified under the Part C Program (Individuals with Disabilities Education Act) in their State.

(3) *Collaboration and collaborative relationships:*

(i) With other agencies, means planning and working with them in order to improve, share and augment services, staff, information and funds; and

(ii) With parents, means working in partnership with them.

(4) *Contagious* means capable of being transmitted from one person to another.

(5) *Curriculum* means a written plan that includes:

(i) The goals for children's development and learning;

(ii) The experiences through which they will achieve these goals;

(iii) What staff and parents do to help children achieve these goals; and

(iv) The materials needed to support the implementation of the curriculum.

The curriculum is consistent with the Head Start Program Performance Standards and is based on sound child development principles about how children grow and learn.

(6) *Deficiency* means:

(i) An area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this title, and which involves:

(A) A threat to the health, safety, or civil rights of children or staff;

(B) A denial to parents of the exercise of their full roles and responsibilities related to program governance;

(C) A failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management; or

(D) The misuse of Head Start grant funds.

(ii) The loss of legal status or financial viability, as defined in part 1302 of this title, loss of permits, debarment from receiving Federal grants or contracts or the improper use of Federal funds; or

(iii) Any other violation of Federal or State requirements including, but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this title, and which the grantee has shown an unwillingness or inability to correct within the period specified by the responsible HHS official, of which the responsible HHS official has given the grantee written notice of pursuant to section 1304.61.

(7) *Developmentally appropriate* means any behavior or experience that is appropriate for the age span of the children and is implemented with attention to the different needs, interests, and developmental levels and cultural backgrounds of individual children.

(8) *Early Head Start* program means a program that provides low-income pregnant women and families with children from birth to age 3 with family-centered services that facilitate child development, support parental roles, and promote self-sufficiency.

(9) *Family* means for the purposes of the regulations in this part all persons:

(i) Living in the same household who are:

(A) Supported by the income of the parent(s) or guardian(s) of the child enrolling or participating in the program; or

(B) Related to the child by blood, marriage, or adoption; or

(ii) Related to the child enrolling or participating in the program as parents or siblings, by blood, marriage, or adoption.

(10) *Guardian* means a person legally responsible for a child.

(11) *Health* means medical, dental, and mental well-being.

(12) *Home visitor* means the staff member in the home-based program option assigned to work with parents to provide comprehensive services to children and their families through home visits and group socialization activities.

(13) *Individualized Family Service Plan (IFSP)* means a written plan for providing early intervention services to a child eligible under Part C of the Individuals with Disabilities Act (IDEA). (See 34 CFR 303.340-303.346 for regulations concerning IFSP's.)

(14) *Minimum requirements* means that each Early Head Start and Head Start grantee must demonstrate a level of compliance with Federal and State requirements such that no deficiency, as defined in this part, exists in its program.

(15) *Policy group* means the formal group of parents and community representatives required to be established by the agency to assist in decisions about the planning and operation of the program.

(16) *Program attendance* means the actual presence and participation in the program of a child enrolled in an Early Head Start or Head Start program.

(17) *Referral* means directing an Early Head Start or Head Start child or family member(s) to an appropriate source or resource for help, treatment or information.

(18) *Staff* means paid adults who have responsibilities related to children and their families who are enrolled in Early Head Start or Head Start programs.

(19) *Teacher* means an adult who has direct responsibility for the care and development of children from birth to 5 years of age.

(20) *Volunteer* means an unpaid person who is trained to assist in implementing ongoing program activities on a regular basis under the supervision of a staff person in areas such as health, education, transportation, nutrition, and management.

(b) In addition to the definitions in this section, the definitions as set forth in 45 CFR 1301.2, 1302.2, 1303.2, 1305.2, 1306.3, and 1308.3 also apply, as used in this part.

**1304.20**

## Child Health and Developmental Services

(a) Determining Child Health Status

(b) Screening for Developmental, Sensory, and Behavioral Concerns

(c) Extended Follow-up and Treatment

(d) Ongoing Care

(e) Involving Parents

(f) Individualization of the Program

## SUBPART B — EARLY CHILDHOOD DEVELOPMENT AND HEALTH SERVICES

### INTRODUCTION TO 1304.20

Head Start's commitment to wellness embraces a comprehensive vision of health for children, families, and staff. The objective of 45 CFR 1304.20 is to ensure that, through collaboration among families, staff, and health professionals, all child health and developmental concerns are identified, and children and families are linked to an ongoing source of continuous, accessible care to meet their basic health needs.

The standards in this section address the initial determination of a child's health status and developmental needs, and discuss ongoing services provided in collaboration with parents and professional service providers.



## Performance Standard 1304.20(a)(1)(i)

(a) Determining child health status.

(1) In collaboration with the parents and as quickly as possible, but no later than 90 calendar days (with the exception noted in paragraph (a)(2) of this section) from the child's entry into the program (for the purposes of 45 CFR 1304.20(a)(1), 45 CFR 1304.20(a)(2), and 45 CFR 1304.20(b)(1), "entry" means the first day that Early Head Start or Head Start services are provided to the child), grantee and delegate agencies must:

(i) Make a determination as to whether or not each child has an ongoing source of continuous, accessible health care. If a child does not have a source of ongoing health care, grantee and delegate agencies must assist the parents in accessing a source of care;

*Rationale:* To promote healthy development, every child needs a source of continuous, accessible health care that is available even after the child leaves Head Start. Each child visits this health care provider, on a schedule of preventive and primary health care, to ensure that problems are quickly identified and addressed, as early identification and treatment for health problems reduce complications and improve health outcomes. Because parents have the primary, long-term responsibility for their children's health, it is critical for them to be as involved as possible in this health care process. *This rationale serves 45 CFR 1304.20(a)(1)-(2).*

*Related Information:* See 45 CFR 1304.20(e)(4) and 45 CFR 1304.40(f)(2)(i) for further information on assisting families to enroll and participate in a system of ongoing health care.

*Guidance:* Parents, as the primary caregivers of their children, play a central role in child health and developmental services. They provide important information, and their concerns about their child's health and development are carefully addressed. Parents are encouraged to participate in health promotion activities, well child care, treatment for health problems, and follow-up health care, and to receive training and information on child health and development.

Staff also serve an important role in coordinating health services with families. Through interviews and through reviewing medical documents with parents, they help make a determination as to whether or not each child has a source of continuous, accessible, coordinated care that serves as a "medical home," one that can continue beyond the time of Head Start enrollment. Staff also help determine whether or not each child has a source of funding for health services, which is necessary to assure a prompt and complete assessment of a child's health status.

If a child does not have a continuous source of care, staff and parents work together to plan strategies to ensure that the family acquires a medical home. Strategies include:

- Seeking assistance from the Health Services Advisory Committee to identify long-term providers, sources of funding for health services, and ways to inform community health providers about the health needs of Head Start children and families;

- Working with local Medicaid agencies to determine a child's eligibility for medical assistance; and

- Carefully and periodically reviewing health records to ensure that recommended treatment and preventive services are being provided, and that plans are developed for treatment and follow-up.

It may be advantageous for staff to conduct enrollment activities and assist families in accessing health care prior to the time of the child's entry into the program. Although the time frame for

determining a child's health status is 90 days after entry into the program, agencies strive to make this determination for each child as early as possible. Due to the rapid development of infants and toddlers, it is particularly important to begin services as early as possible.

## Performance Standard 1304.20(a)(1)(ii)

(ii) Obtain from a health care professional a determination as to whether the child is up-to-date on a schedule of age appropriate preventive and primary health care which includes medical, dental and mental health. Such a schedule must incorporate the requirements for a schedule of well child care utilized by the Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program of the *Medicaid agency of the State* in which they operate, and the latest immunization recommendations issued by the Centers for Disease Control and Prevention, as well as any additional recommendations from the local Health Services Advisory Committee that are based on prevalent community health problems:

**Related Information:** Refer to the schedule of well child care employed by the EPSDT program of the State Medicaid agency.

Schedules and recommendations for well child care will evolve over time, and it is the responsibility of each grantee to obtain current information. Sources for this information include the State Health Department and, for American Indian grantees, the Indian Health Service. Screenings to identify children who may have disabilities requiring further assessment are carried out within 45 days after a child enters the program. See 45 CFR 1304.20(b) and 1308.6(b) for additional screening information; and see 45 CFR 1304.20(a)(2) for time frames for programs operating 90 days or less.

**Guidance:** Each child's health provider has primary responsibility for making decisions about the child's health status and appropriate health services. One role of Head Start staff in determining that children's well child care is up-to-date is to work with parents to ensure that health care professionals have conducted the required review of the child's health. and have provided diagnostic testing and treatment, as needed.

The Health Services Advisory Committee (HSAC) strengthens recommended child health care guidelines by drawing upon its knowledge of the community. For example, the HSAC provides guidelines regarding:

- standards for prenatal care,
- the frequency of tuberculin and lead testing,
- the frequency of dental visits,
- preventive recommendations regarding the use of community water fluoridation, the topical use of fluoride, and various other dental services,
- testing and preventive measures for community health problems such as sickle cell anemia, intestinal parasites, Fetal Alcohol Syndrome/Effect, baby bottle tooth decay (infant dental caries), head lice, and Hepatitis A,
- recommendations for additional immunizations (e.g., children at high risk could be immunized against Hepatitis A), and
- whether the schedule of EPSDT services, as implemented in the community, adequately addresses all aspects of health.

Head Start staff and parents work with health care providers to ensure that after medical and dental examinations take place, results of the examination and the treatment plan, if necessary, become part of the child's health record. In addition, records indicate progress in completing treatment for all conditions in need of follow-up.

Health records contain information of a confidential nature, and, therefore, are kept in a place not accessible to unauthorized persons. Those portions of the health information providing helpful guidance to staff are shared through reports and through conferences that translate the confidential health information into useful educational and administrative recommendations. The need for, and the nature of, such sharing is explained to the parents, and their written authorization obtained. Staff review health records with parents (see 45 CFR 1304.51(g) and 1304.52(h)(1)(ii) for additional guidance).

## Performance Standard 1304.20(a)(1)(iii) & (iv)

(iii) Obtain or arrange further diagnostic testing, examination, and treatment by an appropriate licensed or certified professional for each child with an observable, known or suspected health or developmental problem; and

(iv) Develop and implement a follow-up plan for any condition identified in 45 CFR 1304.20(a)(1)(ii) and (iii) so that any needed treatment has begun.

*Guidance:* The evaluations and screenings required by 45 CFR 1304.20 are helpful in identifying a child in need of further examination or treatment. For such a child, staff responsible for tracking the delivery of health services, together with parents, assume responsibility for ensuring that health or developmental problems receive competent and continuing care until the issues are remedied, or until a pattern of ongoing care is established. To accomplish this, staff responsible for tracking the delivery of health services:

- Check regularly with parents and other staff members to determine if examinations or treatments have taken place;

- Collaborate with center-based and family child care staff and home visitors, for the careful and repeated review of health records;

- Encourage health professionals to explain all procedures to families; and

- Ensure that parents understand how to navigate the referral procedures in various health care delivery systems.

Whenever possible, health services treatment and follow-up are completed by the end of the program year. However, if completion is not possible, a system is established for continuing the treatment after the child leaves the program. Staff in migrant programs are urged to assist families in identifying follow-up care at their new location.

## Performance Standard 1304.20(a)(2)

(2) Grantee and delegate agencies operating programs of shorter durations (90 days or less) must complete the above processes and those in 45 CFR 1304.20(b)(1) within 30 calendar days from the child's entry into the program.

*Related Information:* See 45 CFR 1304.20(a)(1)(i)-(ii) for further guidance on determining a child's health status.

*Guidance:* To make a health status determination, and to secure preventive care or immunizations as quickly as possible, a good working relationship with State and local health agencies is essential. To facilitate timely services, Head Start staff in programs operating for 90 days or less can arrange for and schedule health services to take place before or during the first weeks of the program. For example, appointments for health services can be scheduled before migrant families arrive. In addition, night and weekend appointments can be made to accommodate the migrant family work schedules.

Other strategies that facilitate the provision of health services include:

- Coordinating with community agencies to provide screenings on site;

- Certifying Head Start health staff to perform screenings and measurements, when possible; and

- Facilitating transitions for families by learning where families will be going next, so that child health records may be transferred, with parental consent, to a Head Start agency, elementary school, or other child development program near the family's new home (see 45 CFR 1304.41(c)(1)(i) on the transfer of records).

## Performance Standard 1304.20(b)(1)

(b) Screening for developmental, sensory, and behavioral concerns.

(1) In collaboration with each child's parent, and within 45 calendar days of the child's entry into the program, grantee and delegate agencies must perform or obtain linguistically and age appropriate screening procedures to identify concerns regarding a child's developmental, sensory (visual and auditory), behavioral, motor, language, social, cognitive, perceptual, and emotional skills (see 45 CFR 1308.6(b)(3) for additional information). To the greatest extent possible, these screening procedures must be sensitive to the child's cultural background.

*Rationale:* A timely and systematic approach toward screening indicates which children require a formal assessment of their developmental needs. An approach which uses multiple sources of information and is sensitive to a child's cultural background provides a more valid "picture" of the child. *This rationale serves 45 CFR 1304.20(b)(1)-(3).*

*Related Information:* See 45 CFR 1308.6 for a description of the process of assessing children suspected of having disabilities.

*Guidance:* The screening process identifies children who need to be referred for more formal assessments in order to receive the benefit of interventions such as vision or hearing aids, mental health services, special education, or other related services. A coordinated review of pre-existing information, such as results from a recent vision screening performed through the EPSDT program, is combined with or supplemented by information gathered within the first 45 days of entry into the program.

The *Head Start Program Performance Standards* do not require that any particular strategy, instrument or technique be used. Appropriate procedures, however, should conform to sound early childhood practice and be valid, measuring what they are supposed to measure, and reliable, yielding consistent results over time and across users. Agencies consult with the program's content area experts in health, child development and mental health, with parents, and with the Health Services Advisory Committee as they design and implement a developmental screening approach.

Milestones in the development of motor, language, social, cognitive, perceptual, and emotional domains should be viewed flexibly – particularly since a child's development is affected by many factors, including heredity, health status, temperament and childrearing practices. The following are suggestions for performing and interpreting screenings:

- Consider the cultural, linguistic, and developmental background of the child when selecting tools or when conducting screenings and interpreting screening outcomes;

- Recognize that there is not widespread support for the use of any single screening instrument for identifying young children needing further assessment for behavioral or social-emotional concerns. A systematic and effective approach taps multiple sources, including

    — staff and parent observations of actions and behaviors,

    — health history,

    — developmental history and current status, and

    — family functioning, including relationships between the child and his or her parents and caregivers; and

- Review the results to determine if the findings "match" what staff and the family know about the child.

## Performance Standard 1304.20(b)(2)

(2) Grantee and delegate agencies must obtain direct guidance from a mental health or child development professional on how to use the findings to address identified needs.

*Related Information:* See 45 CFR 1304.24(a)(3)(i) on consulting with a mental health professional to design and implement program practices responsive to identified mental health needs.

*Guidance:* Agencies have a health, mental health or child development professional available to:

- Advise program staff on how to make timely referrals for comprehensive assessments by qualified professionals;
- Provide guidance for staff on the next steps to take should screening results indicate a need for further assessment;
- Assist home visitors in planning and delivering findings and other relevant information to parents;
- Solicit ideas on how to address children's needs in the program and in the home; and
- Assist staff in determining appropriate procedures for developmental screening.

All professionals respect family cultural backgrounds and lifestyles.

## Performance Standard 1304.20(b)(3)

(3) Grantee and delegate agencies must utilize multiple sources of information on all aspects of each child's development and behavior, including input from family members, teachers, and other relevant staff who are familiar with the child's typical behavior.

*Guidance:* The formal screening process is only one of several methods that can be used to establish developmental profiles of Head Start children. A system ensures that staff and parent observations are part of all screening processes, which include:

- screening instruments as described in 45 CFR Part 1308,
- the systematically recorded observations of teachers, home visitors, and parents (see 45 CFR 1304.20(d) for guidance on observational techniques),
- collections of representative work by children, such as artwork, dictated stories, or tape recordings of language samples,
- interviews with preschool children,
- videotapes and audiotapes,
- staff summaries of children's progress as individuals and as members of groups, and
- parent feedback.

## Performance Standard 1304.20(c)(4)

(4) Grantee and delegate agencies must assist with the provision of related services addressing health concerns in accordance with the Individualized Education Program (IEP) and the Individualized Family Service Plan (IFSP).

*Rationale:* Addressing the health concerns of children with disabilities will enhance their opportunity to participate in, or fully benefit from, the Early Head Start and Head Start experience.

*Guidance:* The Individualized Education Program (IEP) for preschoolers or Individualized Family Service Plan (IFSP) for infants and toddlers represents an agreed-upon plan of action to support the achievement of important developmental outcomes for children including, in the case of infants and toddlers, supports for families. In these individualized agreements, agencies are expected to clearly identify the related services to be provided, in order to permit the participation of children with health concerns in Head Start or Early Head Start programs.

When the IEP or IFSP calls for the provision of a related service, staff are trained and supported for the roles they assume in securing or providing such services. Clear communication with parents regarding the type and schedule of related services to be provided is important.

## Performance Standard 1304.20(c)(5)

(5) Early Head Start and Head Start funds may be used for professional medical and dental services when no other source of funding is available. When Early Head Start or Head Start funds are used for such services, grantee and delegate agencies must have written documentation of their efforts to access other available sources of funding.

*Rationale:* Head Start programs help families to access and to use existing services and resources. Head Start agencies supplement these resources when there is no other alternative for providing families with the services needed.

*Related Information:* See 45 CFR 1304.41(a)(2) for information on establishing ongoing and collaborative relationships with community organizations.

*Guidance:* A number of Federal, State, Tribal, and local programs provide treatment, referrals, or payments for medical and dental health care or for related services, including:

- Medicaid Early and Periodic Screening, Diagnosis and Treatment (EPSDT),
- Public Health Service programs, such as the Indian Health Service, the Migrant Health Program, Maternal and Child Health Bureau services, State Maternal and Child Health services, and State Children with Special Health Care Needs services,
- Supplemental Nutrition Program for Women, Infants, and Children (WIC) clinics, and
- Health departments (State, Tribal, or local).

Developing partnerships with local providers may take time and perseverance. When contacting community providers, agencies record information such as the date, name of contact, organization contacted, and the results of this contact. This record serves as documentation of their efforts to access funding sources.

The Health Services Advisory Committee also may be helpful in identifying other resources.

## Performance Standard 1304.20(d)

(d) Ongoing care.

In addition to assuring children's participation in a schedule of well child care, as described in section 1304.20(a) of this part, grantee and delegate agencies must implement ongoing procedures by which Early Head Start and Head Start staff can identify any new or recurring medical, dental, or developmental concerns so that they may quickly make appropriate referrals. These procedures must include: periodic observations and recordings, as appropriate, of individual children's developmental progress, changes in physical appearance (e.g., signs of injury or illness) and emotional and behavioral patterns. In addition, these procedures must include observations from parents and staff.

Resources need not be utilized solely because they are free. If existing service programs do not meet the needs of Head Start families, Head Start funds may be used as a supplement, but only after community resources and third-party payments have been used.

***Rationale:*** Because of the rapid development of young children, annual observations are not sufficient to record changes that have an impact upon a child's health and development. It is important, therefore, to implement ongoing evaluation procedures that identify health or developmental concerns in a timely fashion.

***Related Information:*** For additional information on child observations, see 45 CFR 1304.21(c)(2) and 45 CFR 1304.20(b)(3).

***Guidance:*** Strategies for gathering observations and recordings on individual children include:

- When parents or staff observe changes, those observations are shared with a health professional. All sources of information are used in evaluating each child;

- For infants and toddlers, ongoing observations include patterns of eating, sleeping, elimination, and general activity, and this information is shared with parents daily;

- Children are observed throughout the day, as they participate in indoor and outdoor activities, routines, transitions, arrivals, and departures; and

- Parents are regularly provided with information on developmental milestones, and are asked for their observations concerning their child's development.

Even when a child does not exhibit health or developmental problems, staff continue to assess his or her physical, social, emotional, and cognitive development to ensure the quick identification of health or developmental problems, as well as to be aware of the child's developmental progress.

## Performance Standard 1304.20(e)(1)

(e) Involving parents.

In conducting the process, as described in sections 1304.20(a), (b), and (c), and in making all possible efforts to ensure that each child is enrolled in and receiving appropriate health care services, grantee and delegate agencies must:

(1) Consult with parents immediately when child health or developmental problems are suspected or identified;

## Performance Standard 1304.20(e)(2)

(2) Familiarize parents with the use of and rationale for all health and developmental procedures administered through the program or by contract or agreement, and obtain advance parent or guardian authorization for such procedures. Grantee and delegate agencies also must ensure that the results of diagnostic and treatment procedures and ongoing care are shared with and understood by the parents;

*Rationale:* As the primary caregivers and advocates for their children, it is important that parents be involved in all decisions regarding their children's health care. Parents should be consulted when a health problem is suspected, informed of the reasons and benefits of all procedures recommended, and told about the results of all procedures. In addition, parents should be encouraged to prepare their children for health and developmental procedures, in order to increase their children's comfort levels, reduce their fears and anxieties, and optimize children's performance and the validity of the procedure. *This rationale serves 1304.20(e)(1)-(5).*

*Related Information:* See 45 CFR 1304.40(f)(2)(i)-(iii) for information on involving parents in a system of ongoing health care and in medical and dental health education programs.

*Guidance:* Staff develop skills to communicate with parents in a supportive manner, especially in discussing concerns about a child's development.

Parents know their children and their family, and thus interpret a child's behavior within the context of their own family and culture. In order to accurately assess a child's health and development, parents share their observations and concerns with all appropriate individuals; and, in turn, parents are informed about observations made by others regarding their child. Parents are involved in all decisions and follow-ups for further evaluation and intervention. It is useful for parents and staff to meet frequently to share observations and concerns, and to jointly make plans for further evaluation and intervention. Such consultations and observations should be documented (see 45 CFR 1304.51(g) for information on record-keeping).

*Guidance:* Agencies use fact sheets or other educational materials to familiarize parents with the use and rationale of all health-related procedures, as well as to familiarize them with the types of questions to ask health care providers. The results of diagnostic and treatment procedures are shared and discussed with parents. Group meetings or one-on-one sessions are used to convey information, as parents need understandable information about what the results of procedures mean for their child's health and development.

## Performance Standard 1304.20(e)(3)

(3) Talk with parents about how to familiarize their children in a developmentally appropriate way and in advance about all of the procedures they will receive while enrolled in the program;

*Guidance:* Staff speak with parents about how to provide information on medical procedures to their children. Staff model, explain, and give examples in the program setting, during home visits, or during parent meetings on how to prepare children for health procedures — emphasizing that the demonstration or "acting out" of procedures ahead of time helps children to prepare for what takes place.

## Performance Standard 1304.20(e)(4)

(4) Assist parents in accordance with 45 CFR 1304.40(f)(2)(i) and (ii) to enroll and participate in a system of ongoing family health care and encourage parents to be active partners in their children's health care process; and

*Guidance:* Involving parents in their children's health care includes:

- Promoting preventive health care for all family members;

- Introducing parents to existing resources, and helping them to become effective consumers of health care and to develop good relationships with health providers, so that they will feel comfortable utilizing managed care and fee-for-service systems, making appointments, calling for information, and communicating with the provider during visits;

- Encouraging parents to take their children to health and developmental appointments, and offering them access to safe transportation and other needed resources;

- Stressing the importance of keeping up-to-date health records in a safe place; and

- Encouraging parents to participate on the Health Services Advisory Committee.

In encouraging parents to accompany their children on health appointments, staff need to be aware of parents' work schedules and work conditions, especially with regard to the parents of children in migrant programs. Staff make every effort to ensure that services take place when parents are able to attend; services are not delayed or denied due to parents' working conditions.

Within a complex and changing health care system, Head Start staff, community partners, and other parents play an important role in helping families advocate for health needs. Effective health advocacy skills contribute to improved health care for Head Start children and family members. Head Start helps promote families' health advocacy skills, such as identifying and documenting health concerns, networking with other families who may have similar needs, identifying available resources for information and services, and communicating effectively with health professionals and administrators — and, thereby, assist parents in accessing the health information and services they need.

## Performance Standard 1304.20(e)(5)

(5) If a parent or other legally responsible adult refuses to give authorization for health services, grantee and delegate agencies must maintain written documentation of the refusal.

**Guidance:** Staff obtain timely, informed, and written parental consent for authorization of all health services provided or arranged. When parents raise concerns about recommended procedures, it is useful to speak with them about why they refuse treatment, and to describe the benefits and reasons for the recommended procedures. When parents express discomfort working with a provider or have concerns regarding services or procedures, staff assume the role of "liaison" between the parents and the provider, consulting with the Health Services Advisory Committee, as needed. When families refuse their authorization, those refusals need to be documented. See 45 CFR 1304.22(a)(5) for guidance in determining when a refusal for treatment may be considered child abuse or neglect.

## Performance Standard 1304.20(f)(1)

(f) Individualization of the program.

(1) Grantee and delegate agencies must use the information from the screenings for developmental, sensory, and behavioral concerns, the ongoing observations, medical and dental evaluations and treatments, and insights from the child's parents to help staff and parents determine how the program can best respond to each child's individual characteristics, strengths and needs.

**Rationale:** Each child has an individual pattern of growth and an individual learning style. Most children will not require special education services to address their needs. However, children with disabilities often require a particular set of special services. *This rationale serves 45 CFR 1304.20(f)(1)-(2).*

**Related Information:** See 45 CFR Part 1308 for a description of required services for children with disabilities.

**Guidance:** Building upon the results of screenings, observations, and evaluations, activities are tailored, the curriculum adapted, and the physical environment modified to support each child's learning style, and to be responsive to differences in style (see 45 CFR 1304.21(c)(2)).

Should a screening identify a child in need of further evaluation or diagnostic testing, and the subsequent results indicate that the child meets the eligibility criteria for a disability requiring special education services, an Individualized Education Program (IEP) or Individualized Family Service Plan (IFSP) is developed, and services begin as soon as possible.

## Performance Standard 1304.23(a)(1)

(1) Any relevant nutrition-related assessment data (height, weight, hemoglobin/hematocrit) obtained under 45 CFR 1304.20(a);

**Guidance:** The child's current health or medical history record contains important information related to nutritional status. These data are particularly critical for identifying children who are over- or underweight, underheight, or anemic.

In assessing children's nutritional status, it is important to recognize that healthy children have individual differences and patterns of growth. Thus, one should refrain from comparing one child's development to another's. Rather, it is important to involve a health professional or a nutrition specialist in the review of nutritional data, as well as in the development of treatment and follow-up plans. Other local resources, such as the Supplemental Nutrition Program for Women, Infants, and Children (WIC), also are helpful in providing assistance. Discussions with parents on nutritional needs and treatment strategies that can be followed during program hours and at home further support this process; and providing staff and parents with information on typical growth patterns is another method that is used to facilitate the identification of unusual, nutrition-related situations.

## Performance Standard 1304.23(a)(2)

(2) Information about family eating patterns, including cultural preferences, special dietary requirements for each child with nutrition-related health problems, and the feeding requirements of infants and toddlers and each child with disabilities (see 45 CFR 1308.20);

**Guidance:** Family eating patterns vary according to many factors, including the availability of certain foods, family preferences, and family income. A registered dietitian or qualified nutritionist can provide staff with background information about how to conduct discussions related to nutritional needs and health, while taking proper dietary guidelines and family preferences and income into consideration. Topics that may be raised in discussions with parents include:

- cultural, religious, ethical, or personal food preferences (such as vegetarianism), and medically prescribed diets that should be taken into account when planning menus,

- nutrition-related health problems diagnosed by a health professional, such as obesity, iron deficiency, failure-to-thrive, food allergies and intolerances, such as milk allergies and lactose intolerance, that require special dietary considerations,

- healthy eating on a family budget, and

- any adaptations or accommodations needed for children with disabilities.

## Performance Standard 1304.23(b)(1)(i)

(i) All Early Head Start and Head Start grantee and delegate agencies must use funds from USDA Food and Consumer Services Child Nutrition Programs as the primary source of payment for meal services. Early Head Start and Head Start funds may be used to cover those allowable costs not covered by the USDA.

*Related Information:* See 7 CFR Parts 210, 220 and 226 for information on USDA meal pattern requirements.

*Guidance:* The USDA Child and Adult Care Food Program (CACFP) is the primary source of reimbursement for meals for Head Start children. Therefore, agencies need to know about any changes in the CACFP program. Currently, agencies can claim reimbursement from CACFP for a daily maximum of two meals and one snack, or two snacks and one meal, for each enrolled child in attendance.

For individual children with special medical or dietary needs, substitutions can be made in meal patterns without approval from the USDA, if a supporting statement signed by a recognized medical authority is on file, and if that statement specifies how each child's diet is restricted and which foods provided by the program or the parents must be substituted. The USDA requires agencies to make substitutions or modifications in the standard meal patterns for children who are unable to consume program meals due to mental or physical disabilities that limit one or more major life activities.

Children who arrive early, stay late, or simply are hungry may require an additional snack or meal. If the CACFP or other funding sources will not provide reimbursement, Head Start funds may be used. For example, a child who arrives at a migrant program at 4 a.m. may require and, therefore, is provided with a nutritious snack before breakfast. In such cases, Head Start funds may be used as the dollars of last resort.

## Performance Standard 1304.23(b)(1)(ii)

(ii) Each child in a part-day center-based setting must receive meals and snacks that provide at least 1/3 of the child's daily nutritional needs. Each child in a center-based full-day program must receive meals and snacks that provide 1/2 to 2/3 of the child's daily nutritional needs, depending upon the length of the program day.

*Related Information:* See 45 CFR 1304.23(b)(1)(iv) for information on introducing new foods to children, and 7 CFR 226.20 for Child and Adult Care Food Program (CACFP) meal requirements and 45 CFR 1304.23(b)(2) and 1306.33 for requirements in the home-based program options.

*Guidance:* The Recommended Dietary Allowances (RDAs) of the National Research Council of the National Academy of Sciences are used to establish the nutritional needs of children. Analyses of nutrients in food served and Nutrition Facts Labels on most processed foods can be compared to the RDAs, as a cross-check to ensure that one-third of the nutritional needs of children in part-day programs, and one-half to two-thirds of the nutritional needs of children in full-day programs are met. Guidelines for the meal patterns of the Child and Adult Care Food Program (CACFP) provide a variety of options.

Use of cycle menus of three weeks or longer helps in formulating balanced and varied menus, as well as in planning purchase orders and work schedules. Before starting a new cycle of menus, children's acceptance of food items on the menu can be checked, so that changes can be made. Posting menus in the food preparation and dining areas and sending menus home to parents helps to facilitate the integration of nutrition activities, especially if such

## Performance Standard 1304.52(d)(1)

(1) Education and child development services must be supported by staff or consultants with training and experience in areas that include: the theories and principles of child growth and development, early childhood education, and family support. In addition, staff or consultants must meet the qualifications for classroom teachers, as specified in section 648A of the Head Start Act and any subsequent amendments regarding the qualifications of teachers.

*Related Information:* Content area experts in education services must meet the qualifications for classroom teachers specified in section 648A of the Head Start Act, which include:

- a current Child Development Associate (CDA) credential that is appropriate to the program option(s) used and to the age of the children served, or

- a State-awarded certificate for preschool teachers that meets or exceeds the requirements for a CDA credential, or

- an associate, baccalaureate, or advanced degree in early childhood education, or

- a degree in a field related to early childhood education, with experience in teaching preschool children and a State-awarded certificate to teach in a preschool program.

*Guidance:* To ensure that appropriately qualified content area experts in education and child development services are employed, agencies require the general abilities defined in the guidance to 45 CFR 1304.52(d), above, and other specific abilities, such as to:

- Guide the planning and implementation of a comprehensive child development program that meets the Head Start definition of curriculum in all program options and settings;

- Put into practice theories and sound principles of child and adult education; and

- Embrace the role of the parent as the primary educator of the child and promote and support attachment between parent and child.

## Performance Standard 1304.52(d)(2)

(2) Health services must be supported by staff or consultants with training and experience in public health, nursing, health education, maternal and child health, or health administration. In addition, when a health procedure must be performed only by a licensed/certified health professional, the agency must assure that the requirement is followed.

*Guidance:* To ensure that appropriately qualified content area experts in health services are employed, agencies require the general abilities defined in the guidance to 45 CFR 1304.52(d) and other specific abilities, such as to:

- Link families with an ongoing system of health care, assist parents in the selection of health providers, counsel them about child or family health problems, and promote parent involvement in all aspects of the health program;

- Negotiate with the Health Services Advisory Committee and local health care professionals and service providers to ensure that services for families are available and accessible;

- Review, evaluate, and interpret health records and other vital health service data; and

- Promote health and safety practices in the program and coordinate safety and sanitation procedures, first aid, and emergency medical procedures.

When health staff perform screenings, immunizations, or other health procedures for children, which, by State or Tribal regulation,

# H

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OKLAHOMA

3   JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
4   TIFFIANI DUBBS, a minor, et al.,

5                  Plaintiffs,

6   vs.                            No. 99-CV-0732K(E)

7   HEAD START, INC., an Oklahoma
    Corporation; INDEPENDENT SCHOOL
8   DISTRICT NO. 1 OF TULSA COUNTY,
    OKLAHOMA; COMMUNITY ACTION PROJECT
9   OF TULSA COUNTY, OKLAHOMA, an Oklahoma
    Not-For-Profit Corporation; TULSA
10  CITY-COUNTY HEALTH DEPARTMENT;
    KD ENTERPRISES, INC., an Oklahoma
11  Corporation; DOE GOVERNMENT AGENTS
    1 through 5; JACKIE STRAYHORN, ARNP;
12  K. BAKER, RN; PEGGY DOE; JOHN DOES
    1 through 10; JANE DOES 1 through 10,
13
                   Defendants.
14

15          **DEPOSITION OF MISTI DUBBS**,

16  before the undersigned Certified Shorthand Reporter,
    taken on behalf of the Defendants at 2900
17  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
    3:30 p.m., on July 19, 2000, pursuant to notice.

18

19

20        _____  _____

21        KATHLEEN McCLANAHAN, CSR #283

22

23           NICHOLS McCLANAHAN REPORTING
                   Two Main Plaza
24          616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                  918/585-9969

1     A.    In the beginning, I did not have any

2 intentions of enrolling her in it, but I had to

3 because she was there for so long during the day.

4     Q.    Okay.  Before you went to work for KD

5 Enterprises, where did you work?

6     A.    I was a housewife.

7     Q.    Okay.  When the time came for the medical

8 examination at the school, did somebody tell you that

9 in order for Tiffani to continue in the Head Start

10 program she had to have this medical examination?

11     A.    Yes.

12     Q.    And who told you that?

13     A.    She was a nurse named Peggy.  I

14 haven't -- I have no idea what her last name was.

15     Q.    Okay.  Was it all right with you that

16 Tiffani have this medical examination?

17     A.    The way they explained it to me, it was

18 just she was going to jump up and down on a step,

19 bounce a ball.  That didn't bother me, no.

20     Q.    Okay.  So from what you understood, it

21 was okay if she had a medical examination?

22     A.    Yes.

23     Q.    Okay.  And then throughout the medical

24 examination that Tiffani had that your husband is

25 suing over, you actually were with her, weren't you?

1     A.     Yes.

2     Q.     Okay.  Was there ever a time that the --

3  that Tiffani was being examined in any way, in

4  connection with the medical examination your husband

5  is suing over, where you were not in the same room as

6  your daughter?

7     A.     No.

8     Q.     Okay.  Did you ever tell anyone,

9  regardless of who they were working for, that you did

10  not agree or you would not agree to allow Tiffani to

11  have the examination?

12     A.     I told everyone that we had no parental

13  consent form signed.

14     Q.     That's not the answer to any question

15  I've asked you, Ms. Dubbs.

16     A.     Well, ask it again, then, sir.

17     Q.     Did you ever tell anyone that you did not

18  consent to allow Tiffani's exam to go forward?

19     A.     Now, I want you to think about that

20  question.  How can I give consent for Tiffani to get

21  a physical when I'm not her legal guardian?

22     Q.     Listen again to my question, Ms. Dubbs.

23     A.     I don't have that authority, sir.

24     Q.     So is the answer no?

25     A.     That would be up to your father.

1      Right, no.

2          Q.    Is the answer no?

3      Okay.   That's what I want you to do, I want you

4  to answer my question.   Rather than telling me why,

5  just tell me yes or no.   Yes or no, did you ever tell

6  anyone that you did not consent to Tiffani having the

7  medical exam?

8          A.    Yes.

9          Q.    And who did you tell that to?

10         A.    Peggy.

11         Q.    And what did you tell her specifically?

12         A.    I told her that she had no consent to be

13  touching these children, and she --

14         Q.    Okay.

15         A.    Want me to finish or --

16         Q.    No.

17         A.    Okay.

18         Q.    Because you've gone off in the wrong

19  direction already.   I wasn't asking about these

20  children.

21         A.    I'm including Tiffani in that too.   I

22  told her no, she cannot touch that child, no, she has

23  no consent to do it.

24         Q.    Okay.   Why did you not then just take

25  Tiffani away?

1      A.      I did, sir, sure did.  I did.

2      Q.      But you did so, Ms. Dubbs, after some of

3  the exam had already been done?

4      A.      No, that's not how it worked at all.

5      Q.      Okay.  Well, let me see, because I'm

6  presupposing something that I may be wrong about.

7      Did Tiffani Dubbs participate in any aspect of

8  the medical examination being administered by the

9  Head Start -- under the auspices of the Head Start

10  program at Roosevelt Elementary?

11      A.      Yes, yes.

12      Q.      And were you there during whatever

13  medical examination was done with Tiffani?

14      A.      Yes.

15      Q.      Okay.  So you did participate, you were

16  there while Tiffani was being examined?

17      A.      Yes.

18      Q.      Okay.  When was it that you chose to

19  discontinue Tiffani's examination?

20      A.      Okay.  We went behind a partition, and

21  they were listening to her heart, perfectly normal.

22  I'm looking over another direction and I see another

23  little boy in our class with his pants down and a

24  nurse over there looking at his private areas.  When

25  I looked back around, they were starting to pull my

1  daughter's -- she had tights and a skirt on, down,

2  and getting ready to look at their -- her private

3  area, and I pulled her off the table and said they

4  are not going to do that to her.

5      Q.    Okay.  Did somebody look at your

6  daughter's private parts before you pulled her away?

7      A.    They was -- had their fingers right down

8  in her little private area getting ready to pull it

9  apart when I looked back.

10     Q.    Okay.  But, now, see if you can answer my

11  question.

12     A.    I answered your question.  Yes, they did.

13     Q.    Okay.  So you actually removed your

14  daughter after they had examined her private parts?

15     A.    Before.  They was on the verge of

16  touching it, and I took her off the table.

17     Q.    Okay.  My questions really don't require

18  the level of explanation that you are trying to give

19  me.

20     Did you discontinue the exam before or after

21  Tiffani Dubbs' private parts were examined?

22     A.    I'll tell you one more time.  I pulled

23  her off the table when I seen her pulling her private

24  parts, getting ready to pull her privates parts open,

25  like this, no gloves, and I pulled her off the table.

1   right or left, but also whether they have a good diet

2   and whether they're physically fit and ready to

3   learn?

4      A.    Yes.

5      Q.    And you understand that the Head Start

6   program is required by the federal government to

7   require that participants have children evaluated

8   within 90 days of starting the program?

9      A.    Yes, I do.

10      Q.    Okay.  And did Tiffani have a visit with

11  any doctor within 90 days of starting the Head Start

12  program?

13      A.    Yes.

14      Q.    And who was that?

15      A.    Doctor Miller.

16      Q.    And did Doctor Miller give you evidence

17  of that evaluation to bring to the Head Start

18  program?

19      A.    Yes.

20      Q.    And who did you turn that over to?

21      A.    I put it in the file.

22      Q.    You put it in the file yourself?

23      A.    Yes.

24      Q.    Okay.  Who did you notify that you were

25  doing that?

1          Q.      So listen to the whole question.

2          My question, ma'am, was if Head Start records

3     show that your daughter had not had a physical exam

4     within 90 days as we agreed was required, can you

5     tell me who notified representatives from Head Start,

6     from CAP, Community Action Project, that your

7     daughter had fulfilled that requirement?

8          A.      Edna Brown.

9          Q.      All right.  You know Ms. Brown notified

10    somebody?

11         A.      Yes.

12         Q.      Who did she notify?

13         A.      Whoever she had to, I don't know.

14         Q.      Well, how do you know that she --

15         A.      She was the director.

16         Q.      How do you know that Ms. Brown did it?

17         A.      Because she told me she did.

18         Q.      And who did she tell you that she did

19    that to?

20         A.      I have no idea.

21         Q.      And when did she tell you she made that

22    notification?

23         A.      The same day.

24         Q.      And I'm wondering how that came up in

25    conversation.  You asked Ms. Brown what that prompted

1    they got a finger prick for the blood test?

2          A.     Yes.

3          Q.     And who was that child?

4          A.     LaQuante Porterfield.

5          Q.     Okay.  And if your concern was that there

6    wasn't authorization to do these exams, why were you

7    holding a child to let them -- to let the medical

8    personnel take their blood?

9          A.     Because he was screaming, hysterical.

10   Ms. Dubbs, Ms. Dubbs, don't let them do it.  Peggy

11   was going to hold him down.  He would rather me held

12   him, and I didn't have to hold him down, I just set

13   him on my lap.

14         Q.     Great.  Okay.

15         In fact, did you tell Peggy that you were doing

16   that because he had been anxious?

17         A.     No.

18         Q.     Okay.  But regardless of whether you used

19   those words, is that what you're telling me, that he

20   was upset or anxious about it?

21         A.     He was upset, yes.

22         Q.     Okay.  I'm sorry, I may have asked you

23   this already; but after you and Tiffani left where

24   the exams were being done, didn't you bring Tiffani

25   back to do the Denver II test?

1    A.    Yes.

2    Q.    You made certain choices to allow certain

3  tests to be done?

4    A.    Yes.

5    Q.    And that at some point you chose to

6  discontinue the testing or evaluation or examination?

7    A.    Yes.

8    Q.    But the decision of when to stop it was

9  your own?

10    A.    Yes.

11    Q.    Okay.  Now, you're telling me there

12  are -- you felt as though there were reasons that you

13  should let it go forward?

14    A.    Yes.

15    Q.    But that choice was ultimately yours?

16    A.    Yes.

17    Q.    And you said we don't have medical

18  releases from these -- for these children.  How did

19  you know that KDE or CAP or the City-County Health

20  Department didn't have medical releases for all of

21  the children that were being evaluated, or any of the

22  children, other than your own?

23    A.    Because I worked there, I was aware of

24  everything.

25    Q.    Okay.

1    A.    I have -- I mean, I am the one who took

2    the physical forms from them when they brought them

3    back. I worked there.

4    Q.    Okay. And I am duly impressed by your

5    omniscience, but what I'm wondering is what -- I

6    mean, how do you know that there weren't releases in

7    the file that you didn't know about?

8    A.    Okay, I can answer that.

9    MR. CHRISTOPHER GOREE: I would request

10    that you wouldn't harass my client by being duly

11    impressed with omniscience.

12    MR. HELFAND: Well, I think omniscience

13    is quite impressive, actually; but if it's a

14    commonplace thing here in Tulsa, I understand.

15    A.    There is files in our office for every

16    child. There is a checklist. We have to -- At the

17    beginning of the year, we have to go through and make

18    sure what was there and what wasn't there. And every

19    day we had contact with that file, what was in them

20    and what was not in them. There was no -- I hadn't

21    signed one, so I knew the other parents hadn't been

22    given one.

23    Q.    (By Mr. Helfand) Well, but you wouldn't

24    sign one.

25    A.    Right. I would have took it home for my

1   husband to sign.

2       Q.    Right.

3       A.    So but it would have been given to me.

4       Q.    Right.

5       But is there something on the checklist that

6   said release to do physicals at school?

7       A.    I would hope so.  I mean, I don't know.

8   I can't remember.  I have no idea, I can't remember.

9       Q.    Well, --

10      A.    We wasn't even made aware of the

11  physicals until that day.

12      Q.    Okay.  And then you're not omniscient, I

13  guess, if you didn't know the answer to that

14  question.

15      But you're telling me you know what's in the

16  files, but you don't even know what's on the

17  checklist?

18      A.    My Lord, sir, it's been two years.  I

19  can't -- I don't have a photographic memory.

20      Q.    Okay.  And you're telling me also that

21  you went through the file of every child who was

22  examined that day, you had been through their files?

23      A.    Yes.

24      Q.    And you had looked to see whether there

25  were releases for medical examinations?

1     A.    No.

2     Q.    Okay. Now, did you attend a meeting with

3 representatives from the Community Action Project for

4 my client after the examinations of some of these

5 children had occurred?

6     A.    Would this be Head Start, Jerome Lee

7 would be --

8     Q.    Right.

9     A.    Okay, yes.

10    Q.    Right. Jerome Lee oversees Head Start

11 for the Community Action Project.

12    A.    Yes.

13    Q.    Were you at a meeting like that?

14    A.    Yes.

15    Q.    And was your husband at a meeting like

16 that?

17    A.    Yes.

18    Q.    And did attend you one of those meetings

19 or more than one meeting where that was discussed?

20    A.    More than one.

21    Q.    Okay. How many meetings was your husband

22 at?

23    A.    Same amount as me. We was at two or

24 three.

25    Q.    Okay. At the meeting, did somebody, on

1  behalf of Head Start or Community Action Project,

2  make the representation that it was their intent and

3  desire that parents know about the intent to do the

4  medical exams before the exams were done?

5      A.    I don't really -- He apologized.  I don't

6  really understand the question.  I don't --

7      Q.    Okay, let me just give you a new

8  question, then.

9      Did Mr. Lee or somebody else from Community

10  Action Project/Head Start say at any of the meetings

11  that you went to that their goal, their intent was to

12  let parents know, before the medical exams were being

13  done, that they were going to do them?

14      A.    Yes.

15      Q.    And did Mr. Lee or somebody else from

16  Community Action Project/Head Start say that in this

17  instance they had thought that they had properly

18  notified the parents, but learned later that they did

19  not?

20      A.    Yes.

21      Q.    Okay.  Did Mr. Lee admit or somebody else

22  from Community Action Project/Head Start admit that

23  they had mistakenly believed that they had given the

24  notification but had not?

25      A.    Yes.

1        Q.    Okay.  Did you, whether as part of your

2  working for KD Enterprises or in their meetings or

3  anywhere else, come to some understanding that that

4  was false, that the people at Head Start/Community

5  Action Project purposely didn't notify parents, as

6  opposed to it simply being a mistake?

7        A.    No.

8        Q.    Okay.  The people at Community Action

9  Project/Head Start say we meant to do this, and we --

10  and I say we, I mean one or more of the defendants,

11  mistakenly failed to do it.  Do you have any

12  information that it was anything other than a

13  mistake?

14        A.    No.

15        Q.    Do you have any information that it was

16  anything other than an honest mistake?

17        A.    No.

18        Q.    Do you have any reason to believe that

19  anybody who was involved in the physical exams was

20  trying to hide the physical exams from the parents,

21  purposely try to hide them?

22        A.    No.

23        Q.    Okay.  Did you come to -- Do you have

24  some reason to believe that part of the intent -- or

25  part of the medical exam was to attempt specifically

1    Q.    (By Mr. Helfand)  Was this one of the

2  nurses from the Tulsa City-County Health Department?

3    A.    No.  I believe she was through Head

4  Start.

5    Q.    Okay.  And how did the conversation --

6  how did the subject come up about what desire there

7  was to learn whether there had been any physical

8  abuse through these physical exams?

9    A.    After I had reported the physicals, the

10  in depth of them to my director, the director and I

11  and Peggy, she was explaining to Ms. Brown that one

12  of the things they were looking for was abuse.

13    Q.    Okay.  And you think Peggy worked for --

14    A.    Head Start.

15    Q.    -- Head Start?

16    A.    I cannot think of her last name.

17    Q.    Okay.

18    MR. HELFAND:  Well, I'm sure Mr. Begin is

19  hoping that she does.

20    A.    She was an older lady, a little heavyset,

21  long hair with a pigtail.

22    Q.    (By Mr. Helfand)  Was she white, black,

23  Hispanic?

24    A.    White.

25    Q.    About how old a lady would you say she

1          Q.      It's the way I asked the question.

2          In terms of whatever Peggy told you about

3    concern or observation or examination for the purpose

4    of determining that there was abuse, from what she

5    told you, was it your understanding that that was a

6    part of the goal of the exam or that that was the

7    goal of the exam?

8          A.      It was the goal of the physical exam.

9          Q.      Okay.  So that you understood the only

10   purpose for giving children a physical exam was to

11   see whether they were the victim of some abuse?

12         A.      Yes.

13         Q.      Okay.  And do you recall what Peggy's job

14   was?

15         A.      She was an LPN.

16         Q.      All right.

17         A.      That's -- She seemed like she was in

18   control of the whole situation; but if she actually

19   was, I do not know.

20         Q.      Okay.  Did you ever have occasion to meet

21   Jackie Hope?

22         A.      Is she a blond headed lady?  There's so

23   many Jackies that worked there.

24         Q.      Jackie Hope worked for Community Action

25   Project?

1    A.    An RN?

2    Q.    An RN.

3    A.    Yes.

4    Q.    Did you have occasion to meet her?

5    A.    Not personally meet her, no.

6    Q.    But have you ever been in the same room

7  as her?

8    A.    Yes.

9    Q.    Was that at one or more of the meetings

10  that had ensued after this incident?

11   A.    Yes.

12   Q.    Okay.  During any of the meetings, did

13  you or anyone else ever raise the question of whether

14  Peggy's assertion that the exam was done for

15  detecting physical abuse, whether that was in fact

16  the reason for doing the physical exam?

17   A.    No.  We -- Everyone was too upset that

18  they just -- that they had performed them without

19  their consent at that point.

20   Q.    Uh-huh.  But I guess what I'm asking is

21  did anybody say anything, did you or your husband or

22  anybody else that you overheard say anything like I

23  hear that the reason for the physical exam is to see

24  whether my child was abused, or what are you-all

25  doing checking my kid for abuse or anything?  I mean,

1  supervisor that was employed by KD Enterprises.

2       Q.    Okay.

3       A.    Jackie, once again, I -- Strayhorn or, I

4  don't know, she was a black lady.  I don't know her

5  last name.

6       Q.    Okay.  Now, do you know if she was

7  employed by KD Enterprises --

8       A.    Yes.

9       Q.    -- or by Community Action?

10      A.    KD Enterprises.

11            MR. HELFAND:  Nice try.

12      Q.    (By Ms. Hart)  Now, I've heard you

13 mention Peggy's name, who you said was a nurse,

14 several times?

15      A.    Yes.

16      Q.    She's not a nurse for KD Enterprises,

17 right?

18      A.    No, she wasn't.

19      Q.    Do you know who exactly she works for?

20      A.    I thought Head Start.  I could -- I could

21 be wrong.

22      Q.    Okay.

23      A.    I know she was an LPN.

24      Q.    Okay.

25      A.    She wasn't an RN, and I could have sworn

1    she was working through Head Start, but I -- I don't

2    know for sure.

3        Q.    Okay.  I heard you mention before that

4    you -- I'm not sure if this is exactly what you said,

5    but I think you said that you told everyone that they

6    did not have the informed consent of the parents for

7    the physical examination?

8        A.    Right.

9        Q.    Do I have that right?

10       A.    I told Peggy.

11       Q.    Okay.

12       A.    Peggy was the bulldog.

13       Q.    Okay.  Did you tell anyone from KD

14    Enterprises?

15       A.    We told -- I told Edna.

16       Q.    Uh-huh.

17       A.    Edna contacted Jackie.

18       Q.    Okay.

19       A.    And Jackie basically didn't do anything.

20    She just -- We told -- We went through the proper

21    channels when we found out there was no consent

22    forms, and nothing was done.

23       Q.    Okay.  What was your -- To the best of

24    your knowledge, what was the conversation between you

25    and Edna?

1    examinations?

2        A.    No.

3        Q.    Okay.  Tell me about any conversations

4    you had with Paula Belk?

5        A.    Right after I had reported to Ms. Brown

6    about Tiffani, Paula came in a few minutes behind me

7    and was telling her the same thing about Rachel

8    Williams, I believe is her last name, and was saying

9    the same thing I was saying.  And that's when

10   Ms. Brown got on the phone and called the director.

11   But we really -- we don't have a lot of conversation

12   and contact anymore.  We didn't -- Right after that I

13   stopped working there, and we didn't really talk much

14   after that.

15       Q.    Okay.  So is that one conversation where

16   you're standing there, Edna is standing there, and

17   Paula is standing there, is that the only

18   conversation that you can remember with Paula?

19       A.    I'm sure -- I believe we spoke again that

20   afternoon with the parents out in the hall, just

21   discussing the -- what had happened at the physicals

22   with them.

23       Q.    Okay.  What did Paula say to the parents?

24       A.    She was -- she was telling them -- She's

25   kind of dramatic.  She's -- she's -- She was just

1    telling them that Rachel, that they tried to look in

2    her vaginal area, and Rachel was very upset about it.

3    And she was letting the parents know that that's what

4    she had observed, and they was -- they discussed it.

5        Q.    What was her tone of voice when she was

6    telling this?

7        A.    Kind of -- I don't know how -- I wouldn't

8    know how to describe her tone of voice.  She's kind

9    of -- very hyperactive.

10        Q.    Was it like a normal voice like you and I

11    are talking, or was her voice raised?

12        A.    Probably more raised, more serious type

13    voice.

14        Q.    Did you overhear any other conversations

15    between Paula and any other KD Enterprise employees?

16        A.    No.

17        Q.    How about Paula and any Head Start

18    employees?

19        A.    She had a conversation with Peggy too at

20    the beginning of all this.

21        Q.    Okay.  What do you know about that

22    conversation?

23        A.    That she tried to inform Peggy that we

24    didn't have consent forms for the physicals, and

25    Peggy, of course, insisted that they needed to be

1    done.

2         Q.    The conversation that you had with Paula

3    Belk and Edna, this is after the examination of

4    Tiffani; is that correct?

5         A.    Yes.

6         Q.    Tell me about any policies and procedures

7    that KD Enterprises had regarding physical exams?

8         A.    I don't know any of their policies or

9    procedures.  I do know that we was told that the

10   parents had to have their children a physical

11   examination within 90 days for them to stay in the

12   program.  I don't know if that was KD Enterprises'

13   policy or Head Start, because all of the memos was

14   usually always on Community Action Project or Head

15   Start paper.  And we gave all the parents forms to

16   get their children physicals within 90 days.

17        Q.    Okay.  So that would have been a form

18   that the parents were giving before the children were

19   enrolled?

20        A.    The -- It was the day of the enrollment

21   or whenever they brought their children, a lot of

22   them was late enrolled.  And they gave them a packet,

23   and part of it was they had to go have a physical

24   examination and a dental examination before they

25   could start the program.

1   lunch.   10:00 or 11:00.

2        Q.     Okay.  And how did you learn about it?

3        A.     Peggy told us, she came in the room.

4        Q.     Okay.  What does Peggy say?

5        A.     She said we needed to get the kids'

6   physicals done.

7        Q.     And did anyone make any response or reply

8   to her?

9        A.     We told her, okay, because they had

10  already done vision, and she said they were doing

11  speech and stuff with balls, that kind of

12  talking-to-them type exams, and I believe Paula was

13  the first one to tell her that, well, we didn't know

14  anything about it, we didn't know there was anything

15  like this going on.  And she said, well, it has to be

16  done today.  So that she started rounding the kids up

17  and taking them.

18       Q.     So Peggy is the one who states this has

19  to be done today?

20       A.     Yes.

21       Q.     Is Peggy the one who physically gets the

22  children and takes them to go be examined?

23       A.     Yes.

24       Q.     So a teacher doesn't hold the kids' hand

25  and take them?

1    getting ready to look in her private area or examine

2    it, and I just took Tiffani off the table and told

3    her I didn't want her to do that.

4         Q.    Okay.  Any other statements between the

5    two of you that you recall?

6         A.    No.  There was -- there was no arguing, I

7    just left the room.

8         Q.    Okay.  She didn't say anything in

9    response to your statement that you're not going to

10   allow that to occur?

11        A.    No.

12        Q.    So you've told me everything about that

13   conversation you recall?

14        A.    Yes.

15        Q.    Was that the last conversation you had

16   with any person that you believed was a health

17   department employee?

18        A.    Yes.

19        Q.    Okay.  Now, with respect to conversations

20   maybe that you weren't a party to, did you overhear

21   any other person that you believe to be a health

22   department employee make any statements to anyone

23   else?

24        A.    No.

25        Q.    Okay.  So you won't be testifying about

1    rather than from the City-County Health Department?

2        A.    Yes.

3        Q.    All right.  So we've got a Jackie Hope

4    that you think was from Head Start.  We've got a

5    Jackie Strayhorn.  Did you know who a Jackie

6    Strayhorn was?

7        A.    There was -- No.  There was so many

8    Jackies.

9        Q.    All right.  And then there's a Jackie

10   last name unknown that you worked with and was higher

11   in the chain of command --

12       A.    Yes.

13       Q.    -- at the Head Start program with KD

14   Enterprises, right?

15       A.    Yes.  She was the area supervisor.

16       Q.    This Peggy lady, if you heard her last

17   name, would you know it?

18       A.    Yes.

19       Q.    Peggy Terry?

20       A.    Yes.

21       Q.    Okay.  And Peggy Terry is the same Peggy

22   that whenever Peggy's name came up in your

23   deposition, that's who you are referring to; is that

24   right?

25       A.    Yes.

1  supposed to have done something to notify the

2  parents?

3      A.      Jerome Lee.

4      Q.      Okay.  And this Exhibit Number 2, this

5  Jackie lady who works for KD Enterprises, she brought

6  it to the school before the meeting that night?

7      A.      Yes.

8      Q.      Okay.  And did this lady named Jackie

9  whose last name you don't know, did she say how long

10 she had been in possession of it or when she had

11 gotten it or where she had gotten it from?

12     A.      No.

13     Q.      Okay.  When you spoke to Peggy, you told

14 Peggy we don't have consent to do the exams, or did

15 you say we haven't told the parents we're doing the

16 exams?

17     A.      I said we -- I told her we did not have

18 any consent forms signed.

19     Q.      Okay.  Did Peggy say to you that we need

20 to get consent, but we're not going to worry about

21 that, or did she simply say we're doing the exams

22 today?

23     A.      We're doing the exams today.

24     Q.      Okay.  So what I'm wondering is, did

25 Peggy ever acknowledge to you, in any conversation

1   that you had with her, that some further consent was

2   needed to do the exams, or did she simply say we're

3   going to do the exams?

4       A.    She just simply said we are going to do

5   the exams.

6       Q.    Okay.  Did she ever say anything to

7   indicate to you that she thought some further consent

8   was necessary?

9       A.    No.

10      Q.    Okay.  When you overheard Peggy talking

11  to anybody else, did she say anything that made you

12  believe or that she directly acknowledged that some

13  further consent was necessary to do the exam?

14      A.    No.

15      Q.    Okay.  Can you think of any injury to

16  Tiffani that occurred as a result of any part of the

17  examination that she had that day?

18      A.    No.

19      Q.    Okay.

20      MR. HELFAND:  Then I don't have any other

21  questions at this time.  I appreciate that, and I

22  appreciate your willingness to come back after we've

23  reviewed the documents that you're going to produce.

24      Oh, one other question.

25      Q.    (By Mr. Helfand)  I was going to send you

# I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

                    Plaintiffs,

vs.                                    No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

                    Defendants.

                    **DEPOSITION OF ELISHA PORTERFIELD,**

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
2:15 p.m., on July 27, 2000, pursuant to notice.


                    _____
                    KATHLEEN McCLANAHAN, CSR #283



                    NICHOLS McCLANAHAN REPORTING
                         Two Main Plaza
                    616 South Main, Suite 302
                    Tulsa, Oklahoma  74119-1261
                         918/585-9969

1    he was in below average health?

2         A.    When he was having seizures, so three

3    years ago, four years ago.

4         Q.    I thought you told me a little while ago

5    that he had stopped having seizures two years ago?

6         A.    No, he stopped having seizures when he

7    was two.

8         Q.    Okay.  Have you ever felt like you needed

9    to take LaQuante to see a mental healthcare provider

10   of any type?

11        A.    No.

12        Q.    Okay.  Did LaQuante participate in the

13   Head Start program in 1998?

14        A.    Yes.

15        Q.    Prior to 1998, had he ever participated

16   in the Head Start program before?

17        A.    No.

18        Q.    After the 1998 school year, did he

19   participate in the Head Start program?

20        A.    No.

21        Q.    How did you find out about the Head Start

22   program?

23        A.    The radio.

24        Q.    Why did you enroll LaQuante in Head

25   Start?

1      A.      I wanted to prepare him for school, for
2  kindergarten.

3      Q.      And what was it about the Head Start
4  program that made you feel like he would -- it would
5  help him be prepared for school?

6      A.      In the Head Start program where he was
7  at, they taught him really a whole lot, as far as his
8  numbers, his name, colors, different songs, and how
9  to act around other children.  He learned a lot from
10 that Head Start.

11     Q.      Would you say that LaQuante benefitted
12 from being a part of the Head Start program?

13     A.      Yes.

14     Q.      Do you work, Ms. Porterfield?

15     A.      Yes.

16     Q.      What do you do for a living?

17     A.      I am a bill collector.

18     Q.      Do you work for a particular company?

19     A.      Yes.

20     Q.      What company is that?

21     A.      NCO Financial.

22     Q.      That's here in Tulsa?

23     A.      Yes.

24     Q.      How long have you been working for them?

25     A.      For six months.

1      Q.    Prior to that, were you employed?

2      A.    No.

3      Q.    What were you doing that you were not

4  employed?

5      A.    I was sitting at home pregnant.

6      Q.    Before becoming a bill collector for NCO

7  Financial, when was the last time you were employed?

8      A.    In September of '99.

9      Q.    And what did you do then?

10     A.    I was technical support for Comp USA.

11     Q.    And why did you leave that job?

12     A.    I moved back to Tulsa.  I moved to

13  Dallas.

14     Q.    Okay.  So when you were working for Comp

15  USA, where were you working at?

16     A.    In Dallas.

17     Q.    And what period of time were you living

18  in Dallas?

19     A.    From January of '99 until September of

20  '99.

21     Q.    Was LaQuante with you in Dallas?

22     A.    Yes.

23     Q.    Did he go to school in Dallas?

24     A.    Yes.

25     Q.    What school did he go to?

1   A.  I can't even think of the name.

2   Q.  Was he in the Dallas Independent School

3 District?

4   A.  Yes.  Actually, we lived in Plano, which

5 is --

6   Q.  I'm from that area, so --

7   A.  Yeah.

8   Q.  -- was he part of PISD or DISD?

9   A.  PISD.

10   Q.  And do you know where the school was

11 located?

12   A.  The school was located in between 15th on

13 Independence.

14   Q.  I'm trying to remember that school.

15   A.  I can't remember it either.

16   Q.  And so you lived in Plano from January of

17 1999 to September of 1999?

18   A.  Yes.

19   Q.  Where in Plano did you live?

20   A.  I lived on Huntington Drive.

21   Q.  And what's the nearest major intersection

22 there?

23   A.  Independence and Coit.

24   Q.  And why did you move to Plano?

25   A.  I was only here in Tulsa -- I was taking

1  care of my grandmother.  My grandmother had gotten

2  ill, and I was taking care of her.

3      Q.    So I just want to make sure I get this

4  clear.  Your grandmother, she lives here in Tulsa?

5      A.    She is now deceased.

6      Q.    Okay.

7      A.    She did live here in Tulsa.

8      Q.    Okay.  So you came back to Tulsa from

9  Plano?

10     A.    No.  I'm from -- I was born and raised in

11 Tulsa, Oklahoma.

12     Q.    Okay.

13     A.    I went to high school, and I moved to

14 Dallas, and I was living with my sister going to

15 school there, and I moved back because my grandmother

16 got ill.

17     Q.    Okay.  And when did you move back?

18     A.    '97.

19     Q.    Back to Tulsa?

20     A.    Yes.

21     Q.    Now, you said you went to school in

22 Dallas?

23     A.    In Dallas.

24     Q.    Did you go to school in Plano?

25     A.    No.  I went -- Actually, I went to school

1    in Irving.

2         Q.    Okay, what school?

3         A.    Why can't I think of it?  It wasn't

4    Career Point Business School.  It was -- Why can't I

5    think of the school?  I can't think of it, but it was

6    in Irving.

7         Q.    Okay.  So it was a trade school?

8         A.    Yes.

9         Q.    Okay.  And did you obtain any type of

10   degree from this trade school in Irving, Texas?

11        A.    No.

12        Q.    Where did you go to high school?

13        A.    McLain.

14        Q.    And where is that at?

15        A.    On Peoria, North Peoria.  I don't know

16   the exact address.

17        Q.    And that's here in Tulsa?

18        A.    Yes.

19        Q.    What grade was LaQuante in when you were

20   at -- when you were in Plano?

21        A.    He was in Head Start.

22        Q.    He was in Head Start in Plano?

23        A.    Yes.

24        Q.    Okay.  So did you leave the Head Start

25   program in Tulsa and then went straight into the Head

```
 1   Start program in Plano?

 2        A.    Yes.

 3        Q.    What's your sister's name?

 4        A.    I have three.

 5        Q.    Okay.  Which one when you said you were

 6   living with her in Plano?

 7        A.    Tonya Campbell.

 8        Q.    And where does Tonya live?

 9        A.    In Plano.

10        Q.    And do you know her address?

11        A.    Uh-huh.

12        Q.    What's her address?

13        A.    2105 Huntington Drive.

14        Q.    You said you had two other sisters?

15        A.    Yes.

16        Q.    What are their names?

17        A.    Kanisha Porterfield.

18        Q.    And where does she live?

19        A.    In Plano.

20        Q.    And does she live with your other sister?

21        A.    No.

22        Q.    And where does she live in Plano?

23        A.    She lives on Parker.

24        Q.    Okay.  And what's your other sister's

25   name?
```

1    A.    Camilla Porterfield.

2    Q.    Where does Camilla live?

3    A.    In Plano.

4    Q.    Where at?

5    A.    On McCullum Drive.  McCullum Road, I'm

6    sorry.

7    Q.    Does LaQuante have any type of

8    relationship with his aunts?

9    A.    Yes.

10    Q.    How would you describe his relationship

11    with his aunts?

12    A.    They -- they talk to him just as much as

13    he talks to me.

14    Q.    Okay.  What's your relationship like with

15    LaQuante?

16    A.    He's my son, I'm his mother.

17    Q.    Well, what does that mean?

18    A.    We have a good relationship.  A

19    mother-son relationship.

20    Q.    Has this medical examination affected

21    your relationship with your child in any way?

22    A.    No.

23    Q.    Let's talk a little bit about the medical

24    examination made subject of this suit.  Were you

25    present when the medical examinations were done?

1    A.    No.

2    Q.    So everything you've learned about these

3 medical examinations was what someone else had told

4 you?

5    A.    And from what my child had told me.

6    Q.    Okay.  What has LaQuante told you about

7 this examination?

8    A.    LaQuante told me that they poked him with

9 a needle, that they pulled his pants down and looked

10 at his weenie, that's what he calls it, and that was

11 really it.

12    Q.    Okay.  When did LaQuante tell you these

13 things?

14    A.    The night that it happened.

15    Q.    Was this something that LaQuante just

16 told you, or was this in response to a question that

17 you were asking him?

18    A.    He told me.  My son is very -- he's -- I

19 call him the informer.  He tells everything.

20    Q.    When your son told you about the

21 examination that evening, was this the first time you

22 had learned of these medical examinations?

23    A.    No.  I heard about it earlier from the

24 teachers.

25    Q.    What teachers are those?

1    Q.    Okay.  So that they examined your child?

2    A.    Yes.

3    Q.    They had no gloves on?

4    A.    Yes.

5    Q.    Looked at their genitals?

6    A.    Yes.

7    Q.    And the kids were crying?

8    A.    Yes.

9    Q.    Anything else do you remember?

10    A.    I remember her saying that she wouldn't

11 let them do her daughter, that she wouldn't let -- I

12 can't remember word for word, but her daughter went

13 in, and they wouldn't let her -- they didn't want to

14 let her go in, but she didn't go through with it, or

15 something to that nature.

16    Q.    And how did you respond when you were

17 told this?

18    A.    I was mad.  I in turn got my son and we

19 left.

20    Q.    Did you speak to your son about the

21 medical examination on the ride home?

22    A.    No.  He -- he spoke to me about it.

23    Q.    LaQuante spoke to you on the ride home?

24    A.    Yes.

25    Q.    Okay.  What did he tell you?

1      A.    He said, Mama, these women was looking in

2 my pants and they were looking in my ears, and that

3 was really it. He didn't say nothing about the no

4 gloves or nothing, because he didn't understand that.

5      Q.    Okay. So LaQuante told you that some

6 women looked in his pants and looked in his ears?

7      A.    Yes.

8      Q.    Anything else?

9      A.    No. He said that the kids -- he said

10 some of the kids were crying.

11      Q.    Did LaQuante tell you if he cried?

12      A.    No. I asked him, I said did you cry, he

13 said no.

14      Q.    How was LaQuante behaving when you were

15 asking him these questions?

16      A.    He was behaving normal, he was having a

17 conversation with me like we would have any other

18 day.

19      Q.    Did he appear upset at all?

20      A.    No.

21      Q.    Did LaQuante suffer any type of physical

22 injury as a result of this medical exam?

23      A.    No.

24      Q.    Has he suffered any type of emotional

25 injury?

1       A.      No.  But he got a ringworm, I think, by

2   his inner thigh.  We went to the doctor, and the

3   doctor told him to pull down his pants so he could

4   see.  And he asked me, Mom, did you say he could look

5   in my pants; and I said yes.  And every time -- a

6   couple of times when we went to the doctor, he said,

7   Mama, did you say that he could do this, and he would

8   say that to my doctor, my family doctor.

9       Q.      Okay.  But you're not saying that you

10  think LaQuante got ringworm as a result of this

11  incident?

12      A.      No, no.

13      Q.      Okay.  So what I think I'm hearing you

14  telling me, and correct me if I'm wrong, is that,

15  since this incident, now LaQuante makes sure that

16  people have your permission to --

17      A.      Yes.

18      Q.       -- examine him before they examine him?

19      A.      Yes.

20      Q.      And do you know why he does that?

21      A.      He heard me -- I'm going to say probably

22  he heard me discussing what happened, and he's -- he

23  was five and four, and he -- he was just saying

24  stuff, because he's a kid, he picked up on it.  And

25  he just picked up on that and took it from there.

1     A.     Yes.

2     Q.     So do you understand that one of the

3 reasons for conducting this medical examination was

4 to make sure that these children were in the best

5 physical shape possible to participate in the Head

6 Start program?

7     A.     Yes.

8     Q.     What is it exactly about this physical

9 examination that you have a problem with?

10     A.     I have a problem with someone pulling

11 down my -- my son's pants in a little classroom.  He

12 goes to the doctor, and his doctor doesn't even pull

13 down his pants and look at him unless I feel like

14 there's a problem.  So I certainly wouldn't authorize

15 a nurse of any kind to look at my son's genitals

16 without my knowledge, or me even being there, period.

17     Q.     If you had been notified of this exam,

18 would you have any problem with the examination

19 taking place?

20     A.     Yes.

21     Q.     And what would that problem be?

22     A.     That problem would be they had no reason

23 to look at my son's genital parts.  He has a doctor

24 for that.

25     Q.     Prior to this examination as part of Head

1    Start, when was the last time that LaQuante had had a

2    medical examination?

3         A.    A little bit before Head Start started.

4         Q.    And what doctor conducted that

5    examination?

6         A.    Dr. Ronald English.

7               MS. CLARKE:  I'm sorry, who?

8         A.    Ronald English.

9         Q.    (By Ms. Ziolkowski)  And what was the

10   reason for this examination with Doctor English?

11        A.    To have a physical to get into Head

12   Start.

13        Q.    At the physical with Doctor English, did

14   Doctor English check LaQuante's genital region?

15        A.    No, he sure didn't.

16        Q.    And you were present for this physical

17   examination?

18        A.    Yes.

19        Q.    Has there ever been a time where Doctor

20   English has had occasion to examine LaQuante's

21   genitals?

22        A.    No, not since he was a baby.

23              MR. MANN:  I'm sorry?

24        A.    No, not since he was a baby.

25        Q.    (By Ms. Ziolkowski)  How do you feel that

1    this examination greatly exceeded another type -- a

2    usual medical examination for a child?

3         A.    Okay, explain, I don't understand.

4         Q.    Okay.  Part of your allegations in this

5    lawsuit is that this medical examination greatly

6    exceeded that of a normal medical examination.

7         A.    Correct.

8         Q.    How did it greatly exceed?

9         A.    It greatly exceeded because there was

10   nothing -- How do I explain?  My son doesn't even get

11   a genital examination unless I feel like something is

12   wrong with him down there and I take him to the

13   doctor.  I feel like they invaded my son's privacy,

14   not his rights, his privacy as a person, to go in his

15   pants and look at him.  He was young, he may not have

16   understood, but it was still wrong.

17        And, also, for my benefit, as a parent to my

18   child, I'm not accusing the other kids of having any

19   type of diseases or anything, the fact that she or

20   whoever did not have on gloves examining these

21   children, if they were touching below the parts, from

22   my understanding, in the mouth, if anything, a open

23   cut on the hand to the mouth, anything my son could

24   have contracted anything from these other children.

25   I'm not saying that anything is wrong with them, but

1   that's just not using safety measures, for one, not

2   to mention that they didn't get the consent. It's

3   just -- It's a whole bunch of things in how they went

4   about doing it.

5       Q.    Do you have any information that leads

6   you to believe that LaQuante refused to participate

7   in this exam in any way?

8       A.    No.

9       Q.    Would you agree with me that there is a

10  relationship between your child's physical health and

11  his ability to learn?

12      A.    Yes.

13      Q.    And if LaQuante was having trouble

14  getting started in school and it was a physical

15  problem that was causing that, you would want someone

16  to notify you of that, correct?

17      A.    Yes.

18      Q.    Now, you told me a little while ago that

19  Doctor English had performed an examination --

20      A.    Yes.

21      Q.     -- on LaQuante prior to him starting

22  school?

23      A.    Yes.

24      Q.    Did you give any written documentation

25  regarding this examination to anyone at Head Start?

1  custodian of the minor, whether such diagnosis or

2  treatment is rendered at the office of the physician

3  or dentist to call any necessary consultants, in his

4  or her directions.

5      Q.    I think that's discretion.

6      A.    Oh, I'm sorry, discretion.

7      Q.    Okay.  Since the document speaks for

8  itself, did you ever tell my clients that they could

9  not perform medical procedures on your child?

10          MR. GOREE:  I object to the form of the

11 question.

12     A.    No.  But in this, it says whether such --

13     Q.    (By Ms. Ziolkowski)  You answered my

14 question, thank you.

15          MR. GOREE:  You can let her continue

16 answering the question.

17          MS. ZIOLKOWSKI:  Well, she's answered my

18 question.

19     Q.    (By Ms. Ziolkowski)  Did you ever notify

20 the Head Start program that you would in any way

21 modify this consent?

22     A.    No.

23     Q.    Have you ever rescinded this consent from

24 the Head Start program?

25     A.    No.

J

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3   JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
    TIFFANI DUBBS, a minor, et al.,
4
                    Plaintiffs,
5
    vs.                              No. 99-CV-0732K(E)
6
    HEAD START, INC., an Oklahoma
7   Corporation; INDEPENDENT SCHOOL
    DISTRICT NO. 1 OF TULSA COUNTY,
8   OKLAHOMA; COMMUNITY ACTION PROJECT
    OF TULSA COUNTY, OKLAHOMA, an Oklahoma
9   Not-For-Profit Corporation; TULSA
    CITY-COUNTY HEALTH DEPARTMENT;
10  KD ENTERPRISES, INC., an Oklahoma
    Corporation; DOE GOVERNMENT AGENTS
11  1 through 5; JACKIE STRAYHORN, ARNP;
    K. BAKER, RN; PEGGY DOE; JOHN DOES
12  1 through 10; JANE DOES 1 through 10,

13                  Defendants.

14

15          DEPOSITION OF SHANIKA CROWLEY,

16  before the undersigned Certified Shorthand Reporter,
    taken on behalf of the Defendants at 2900
17  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
    9:40 a.m., on July 27, 2000, pursuant to notice.

18

19

20          _____
            KATHLEEN McCLANAHAN, CSR #283
21

22

23          NICHOLS McCLANAHAN REPORTING
                  Two Main Plaza
24          616 South Main, Suite 302
            Tulsa, Oklahoma  74119-1261
25                918/585-9969
```

1     Q.     Anything else?

2     A.     Without wearing gloves.

3     Q.     I just want to make sure I get this

4 clear. Your inflection there indicated to me that

5 without wearing gloves was a follow-up to the looking

6 at your daughter's privates without wearing gloves,

7 or was it --

8     A.     Period.

9     Q.     Period?

10     A.     Yes.

11     Q.     Okay. So --

12     A.     Looking at her, period.

13     Q.     Looking at her, period, was what you had

14 a problem with?

15     A.     Yes.

16     Q.     If you had had notification that these

17 medical examinations were going to take place, would

18 you have had a problem with the examinations?

19     A.     Yes.

20     Q.     How so?

21     A.     She already had one.

22     Q.     And who performed the other medical

23 examination on your daughter that you're referring

24 to?

25     A.     Her doctor.

1    A.    I don't remember.

2    Q.    Has it been recently, not so recently,

3    the last month, year?

4    A.    Maybe last year.

5    Q.    Have you ever felt any type of need to

6    send Kwanita to any type of mental healthcare

7    provider, psychiatrist, psychologist, counselor of

8    any sort as a result of this examination?

9    A.    No.

10   Q.    How has this medical examination affected

11   your daughter?

12   A.    I know for a while she didn't like nobody

13   touching her.  Her and her friend took a bath and

14   didn't want to get out of the tub.

15   Q.    Anything else?

16   A.    No.

17   Q.    Okay.  When you say she didn't like

18   anybody touching her, what do you mean by that?

19   A.    Like when she took a bath, she didn't

20   like for me to wash her off.

21   Q.    And when did this start happening?

22   A.    After the exam.

23   Q.    How long after the exam?

24   A.    That same night.

25   Q.    Did she say anything to you about it?

```
 1        A.      Just that night and the next night.

 2        Q.      Okay.  And other than a change in your

 3    daughter's bathing routine that next week, was there

 4    anything else different about your daughter's -- how

 5    your daughter was feeling or acting that you could

 6    pick up on?

 7        A.      No.

 8        Q.      Okay.  Did any part of this examination

 9    physically injure your child in any way?

10        A.      No.

11        Q.      Has she suffered any type of emotional

12    injury?

13        A.      No.

14        Q.      Do you know of any information that leads

15    you to believe that your child refused to participate

16    in this exam in any way?

17        A.      No.

18        Q.      If Community Action Project had told you

19    that this exam was going to take place, would you

20    have refused to do it?

21        A.      Yes.

22        Q.      Why?

23        A.      Because she had already had a physical.

24        Q.      Well, let's say she hadn't had a

25    physical.  If she had not had a physical, would you
```

1    have allowed this examination to take place?

2         A.    No.

3         Q.    And why not?

4         A.    Because she has a doctor.

5         Q.    And so is what I'm hearing from you, and

6    please correct me if I'm wrong here, that you would

7    prefer that your child's own doctor give her any type

8    of physical examination versus a doctor from a school

9    or anything like that?

10        A.    Yes.

11        Q.    Okay.  Do you believe that there is a

12   relationship between a child's physical health and

13   their ability to learn?

14        A.    What?

15        Q.    Do you think that there is some type of

16   connection between how a child is physically feeling

17   and how a child is learning?

18        A.    Yes.

19        Q.    Okay.  And do you understand one of the

20   purposes of the Head Start program is to remove any

21   type of impediment for learning before that child

22   starts school?

23        A.    I don't understand what you're asking me.

24        Q.    Okay.  Well, do you understand that one

25   of the goals of the Head Start program is to be able

1     to identify any type of impediment?

2          Do you understand what the word impediment

3     means?

4          A.     No.

5          Q.     Okay, maybe that's where we're having the

6     problem.  Any obstacles.  Is that better?

7          A.     Yeah.

8          Q.     One of the goals -- do you understand

9     that one of the goals of the Head Start program is to

10    remove any -- to identify and to perhaps remove any

11    obstacles a child has to learning before they start

12    school?

13         A.     Did I know?

14         Q.     Do you understand that to be the case?

15         A.     Yeah.

16         Q.     Okay.  Because if your child was having

17    trouble getting started in school and one of the

18    reasons that they were having that trouble was

19    because they had something physically wrong with

20    them, you would want to know about that, wouldn't

21    you?

22         A.     Can you repeat that?

23         Q.     Sure.

24         If your child was having trouble getting started

25    in school and one of the reasons that she was having

1  trouble getting started in school was that there was

2  something physically wrong with her, you would want

3  someone to identify that, wouldn't you?

4      A.    I don't know.

5      Q.    Okay.  Well, if your child was having

6  trouble seeing, she was having trouble reading what

7  was on the board while she was at school, and that

8  was making it difficult for her to keep up with the

9  rest of the class, you would want to know that,

10  wouldn't you?

11      A.    Yes.

12      Q.    Okay.

13      A.    What does that have to do with her

14  private area?

15      Q.    Well, do you understand that in

16  attempting to make sure that each child is in the

17  best condition possible to participate in the Head

18  Start program that Head Start has an incentive to

19  make sure that each child is in good physical health?

20      A.    Yeah.

21      Q.    Okay.  Now, you said you had a doctor

22  give your child an examination prior to the beginning

23  of the school year, correct?

24      A.    Yes.

25      Q.    Did you give Head Start any type of

1    document.  It says that you hereby authorize any

2    x-ray examination, anesthetic, dental, medical, or

3    surgical diagnosis or treatment by any physician or

4    dentist, correct?

5         A.    Yeah.

6         Q.    Okay.  Now, is this an -- would you agree

7    that that language right there gives my client

8    authorization to perform these certain medical

9    procedures on your child?

10             MR. GOREE:  I object to the form of the

11   question.

12        Q.    (By Ms. Ziolkowski)  You can answer.

13        A.    That still doesn't give them the right to

14   do what they did.

15        Q.    Well, that's not -- that's not the answer

16   to my question.

17        A.    Repeat it.

18        Q.    Sure.

19        Now I want you to read through this document for

20   me, this first paragraph, and it says we, the

21   undersigned parent or legal guardian of the minor

22   listed below, and then it lists your daughter's name,

23   correct?

24        A.    Yes.

25        Q.    Okay.  And that's your signature at the

1     Q.    Thirty-five thousand dollars.  And is

2    that just for my client, Community Action Project, or

3    is this from each defendant?

4     A.    Each.

5     Q.    And how did you come up with that

6    35,000-dollar per defendant number?

7     A.    I don't remember.

8     Q.    Other than this monetary amount, is there

9    anything else you hope to gain from this lawsuit?

10     A.    Is there anything else I hope to gain?

11     Q.    Yes, ma'am.

12     A.    I hope that they won't do it to nobody

13    else.

14     Q.    Did you attend the meeting at the school

15    after this incident?

16     A.    Yes.

17     Q.    And did you realize at this meeting my

18    client acknowledged that they would have preferred

19    that you had notice of this examination?

20     A.    Yes.

21     Q.    And do you also know that my client has

22    since put safeguards in place to prevent this type of

23    incident from happening again?

24     A.    Repeat what you just said.

25     Q.    Sure.

1    A.    Because -- because they're the ones who

2  did the exams.

3    Q.    Do you believe that the nurses

4  intentionally did an exam without consent?

5    A.    Yes.

6    Q.    Okay.  What if the evidence shows that

7  the nurses made an effort to find out if consent had

8  been obtained and were told that consent had been

9  obtained from the parents and then went on with the

10  exam, does that change your perspective as to the

11  nurses doing something intentionally to your daughter

12  or intentionally violating your rights as a parent?

13    A.    The nurses could have asked for papers

14  showing that we gave consent.

15    Q.    What if they were told we have the

16  papers, they're just not here?  Does that change your

17  idea that anything intentionally was done to violate

18  your rights as a parent?

19    A.    Not really.

20    Q.    No, because you think they should have

21  done something else?

22    A.    Yes.

23    Q.    What is it you think they should have

24  done?

25    A.    They should have waited until they did

1    get the papers.

2         Q.    Until they had the papers in hand?

3         A.    Yes.

4         Q.    Okay.  I'm going to skip around a little

5    bit just so I don't cover some of the same ground.  I

6    don't know if I heard what your birth date was?

7         A.    April 5th, 1978.

8         Q.    Okay.  And your daughter's father's name

9    is Antonio Henderson?

10        A.    Yes.

11        Q.    Is he married?

12        A.    Yes.

13        Q.    And who is he married to?

14        A.    Jessica.

15        Q.    Henderson?

16        A.    Yes.

17        Q.    And where do they live?

18        A.    I don't know the address.

19        Q.    Do you know about --

20        A.    They live in Tulsa --

21        Huh?

22        Q.    Do you know the cross streets?  I can

23   barely remember my own address.  Just the cross

24   streets?

25        A.    Off of Sheridan.

K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

Plaintiffs,

vs.                                No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

Defendants.

**DEPOSITION OF RAICHELLE LOFTIN,**

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:15 a.m., on August 21, 2000, pursuant to notice.

_____
KATHLEEN McCLANAHAN, CSR #283

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma  74119-1261
918/585-9969

```
 1      Q.    And how is the marriage working right
 2   now?
 3      A.    Good.
 4      Q.    Do you have any children?
 5      A.    Yes.
 6      Q.    How many children do you have?
 7      A.    Two.
 8      Q.    What are their names?
 9      A.    Quenten and Cambren.
10      Q.    Can you spell that last one for me?
11      A.    Cambren is C-A-M-B-R-E-N.
12      Q.    And how old is Quenten?
13      A.    Quenten is six.
14      Q.    And Cambren?
15      A.    He's one.
16      Q.    And who is Quenten's father?
17      A.    Jonathan.
18      Q.    And Cambren?
19      A.    Jonathan.
20      Q.    When is Quenten's birthday?
21      A.    02/19 of '94.
22      Q.    And how about Cambren?
23      A.    12/04 of '98.
24      Q.    And ,I'm sorry, is Cambren a girl or boy?
25      A.    It's a boy.
```

1     Q.    Did he suffer any type of emotional

2  injury?

3     A.    No.

4     Q.    I show you what's going to be marked as

5  Exhibit Number 2 to the deposition.  The notice will

6  be Number 1.  Have you ever seen that document before

7  today?

8     A.    Yes, I believe so.

9     Q.    Okay.  Can you please tell me the title

10  of the document for the record?

11     A.    It's called the parent consent form.

12     Q.    Okay.  And is that your signature at the

13  bottom?

14     A.    No.

15     Q.    Where it says Raichelle Loftin?

16     A.    That's not my signature, but -- no.

17     Q.    Do you know whose signature that is?

18     A.    I have no idea.

19     MR. GOREE:  Can I have a copy of that

20  Exhibit Number 2?

21     MS. ZIOLKOWSKI:  Uh-huh.

22     MR. GOREE:  Thank you.

23     Q.    (By Ms. Ziolkowski)  Now, you said you

24  saw this document before today.  Where did you see

25  this document before today?

```
 1        A.     If I'm not mistaken, I think -- Let me

 2   see.  I believe this is the form they handed me the

 3   day I came and picked my son up.

 4        Q.     What day you picked your son up?

 5        A.     The day of the incident.

 6        Q.     Who handed you this form?

 7        A.     One of the teachers.

 8        Q.     Do you know what teacher that was?

 9        A.     No, I can't recall.

10        Q.     And was this form completed --

11        A.     No.

12        Q.      -- when it was --

13        A.     I'm sorry.

14        Q.      -- given to you?

15        A.     No.

16        Q.     Is it your testimony that you never

17   completed this form?

18        A.     That's correct.

19        Q.     Okay.  If you had been given this form --

20             MR. GOREE:  I'll object to the form of

21   the question.

22             MS. ZIOLKOWSKI:  Can you let me finish my

23   question before you object to it?

24             MR. GOREE:  Yes.

25             MS. ZIOLKOWSKI:  Okay, thanks.
```

1    Q.    (By Ms. Ziolkowski)  If you had been

2  given this form, how would you have completed it

3  differently?

4          MR. GOREE:  I'll object to the form of

5  the question.

6    A.    I would not have completed it, because he

7  had already had his physical.

8    Q.    (By Ms. Ziolkowski)  Well, let me ask you

9  this, then:  Now, you notice on the form it has boxes

10  for yes and no?

11    A.    (Nods.)

12    Q.    Okay.  Is it your testimony that you

13  would not have answered either yes or no to any of

14  these boxes?

15    A.    I would have answered -- If I'm

16  understanding the question right, first, what I would

17  have done is asked, did I have to fill this form out,

18  because I didn't want him to go through this.  If I

19  did, I would have went ahead and checked yes to

20  everything that I agreed with, something that he

21  might not have had done at the doctor.

22    Q.    Okay, ma'am, that's what I'm asking you.

23  What would you have not agreed with?

24    A.    Everything except I probably would have

25  let them do the -- the speech.

1     Q.    So I want to make sure I understand you

2  correctly.

3     A.    Okay.

4     Q.    You would have checked no to everything

5  but the speech section?

6          MR. GOREE:  I'll object to the form of

7  the question.

8     A.    Yeah.

9     Q.    (By Ms. Ziolkowski)  Why?

10    A.    Because the doctor didn't do a speech

11  test on him, so I would have let them do that to tell

12  me where my son was in his language.

13    Q.    What doctor did Quenten see?

14    A.    He seen, oh, Kent Farrish.

15    Q.    Can you spell that last name?

16    A.    F-A-R-R-I-S-H.

17    Q.    And is there a particular office or

18  clinic that Doctor Farrish works out of?

19    A.    He works at the MCAT clinic on Denver.

20    Q.    Is that here in Tulsa?

21    A.    Yes.

22    Q.    And when -- Prior to this physical

23  examination at Roosevelt, when was the last time that

24  Quenten had seen Doctor Farrish?

25    A.    He doesn't go to the -- We only seen him

1 Farrish, did he complete a form for you?

2     A.    Yes.

3     Q.    And what did you do with the form?

4     A.    I kept it, and I took it to Head Start

5 the first day.

6     Q.    And who at Head Start did you turn it in

7 to?

8     A.    At that time, it was another teacher

9 there, I don't remember her name, I think it -- Well,

10 I don't want to -- I think her name was Ms. Flowers.

11     Q.    Was she black, white, Hispanic?

12     A.    She's white.

13     Q.    And about how old of a lady was she?

14     A.    About maybe 45, 50, closer.

15     Q.    Do you remember her hair color?

16     A.    No, I sure don't.

17     Q.    Okay.  Do you know of any information

18 that leads you to believe that Quenten refused to

19 participate in this medical examination in any way?

20     A.    No.

21     Q.    Do you believe that there is a

22 relationship between a child's physical health and

23 their ability to learn?

24     A.    Yes.

25     Q.    Okay.  So do you understand why Head

1    because you were at the meeting, that my client has

2    acknowledged -- I represent the Community Action

3    Project -- has acknowledged that they would have

4    preferred that you had notice of this examination?

5         A.    Yes.

6              MR. GOREE:  I'll object to the form of

7    the question.

8         Q.    (By Ms. Ziolkowski)  And are you also

9    aware that my client has put in safeguards to prevent

10   this thing from happening again?

11             MR. GOREE:  I'll object to the form of

12   the question?

13        A.    No.

14        Q.    (By Ms. Ziolkowski)  Well, if you learned

15   that my client has put in safeguards to prevent this

16   type of thing from happening again, what more do you

17   hope to obtain from this lawsuit?

18             MR. GOREE:  I'll object to the form of

19   the question.

20        A.    Well, I don't know if this is answering

21   your question.  That's good.  If your client has done

22   that to prevent this from happening again, that's one

23   of the -- the monetary damages and them not making

24   this mistake again with anyone else's kids is the two

25   things that I hope to accomplish from this.

1      Q.    (By Ms. Ziolkowski)  What damages have

2  you suffered as a result of this lawsuit?

3      A.    I just consider my damages to be that my

4  rights basically as a parent was taken away when I

5  didn't -- I wasn't informed that my child was going

6  to be examined by people I didn't even know.

7      Q.    Anything else?

8      A.    That's about it.

9      Q.    Tell me everything that you believe was

10  improper about the examination itself.

11      A.    The examination itself.  I do think that

12  they should have used gloves on the kids, that they

13  should have had it in a more proper place, instead of

14  in a classroom, instead of laying them on mats and

15  desk tops, I believe, table tops, something like

16  that.  I just wish they would have used gloves and

17  had it in a better place.

18      Q.    Do you believe that this examination

19  greatly exceeded a reasonable medical examination?

20      A.    No.

21      Q.    Have you thought about how this lawsuit

22  will affect Quenten?

23      A.    No.

24      Q.    Have you ever spoken to Quenten about

25  this lawsuit?

1    are suing for your parental liberty rights being

2    violated, but your husband has chosen not to sue for

3    his parental liberty rights being violated?

4         A.    I guess that's correct.

5              MR. GOREE:   I object to the form of the

6    question.

7         Q.    (By Mr. Mann)   Now, I would like for you,

8    if you would, ma'am, to put Loftin Exhibit 3 in front

9    of you, if you would please.

10        A.    Okay.

11        Q.    This purports to be something called a

12   child health record form 3 screenings, physical

13   examination/assessment.   Did your mother pick up this

14   form in blank when she enrolled Quenten in the Head

15   Start program at Family and Children's Services?

16        A.    Yes.

17        Q.    And then did you take Quenten to this

18   Doctor Farrish for him to fill this out?

19        A.    Yes.

20        Q.    Did you read over this form prior to the

21   time that you took him to Doctor Farrish?

22        A.    Yes, I did.

23        Q.    And did you see under item number two

24   that it says that starred items are required by Head

25   Start.   Do you see that?

1  A.  Yes.

2  Q.  And were you aware that there were

3 certain items that the doctor was going to be

4 required to fill out with regard to Quenten in order

5 for him to be enrolled in Head Start?

6  A.  Yes.

7  Q.  Now, when you got this back, did you read

8 it over to see if everything was filled in that

9 needed to be filled in?

10  A.  Yes, I did.

11  Q.  And did you notice that there were some

12 things that weren't filled in that needed to be

13 filled in?

14  A.  No, no, not that I can remember, no.

15  Q.  Well, would you look at 2-e?

16  A.  Okay.

17  Q.  Do you see where it says hematocrit or

18 hemoglobin?

19  A.  Uh-huh.

20  Q.  Is that a yes?

21  A.  Yes.  I'm sorry.

22  Q.  That's blank, isn't it?

23  A.  Yes, it is.

24  Q.  And there's an asterisk next to

25 hemoglobin, isn't there?

<u>CROSS EXAMINATION</u>

BY MR. GOREE:

    Q.    I'm going to place in front of you what has been previously marked as Exhibit 2 to the Loftin deposition. It's titled parent consent form. At the bottom of this document there are two names that have been written in with what appears to be an ink pen. Can you read those two names for me?

    A.    Raichelle Loftin and Melissa Robinson.

    Q.    And is that correct -- is that the correct spelling of your name, Raichelle Loftin?

    A.    Yes.

    Q.    Is that your signature?

    A.    No.

    Q.    How do you know that's not your signature?

    A.    I don't write like that. It looks better than my writing, but that's not me.

    Q.    On the last name Loftin, someone has placed a dot over the I. Is that in fact a dot or a circle, or how would you describe that?

    A.    It's a circle.

    Q.    Do you sign your name Loftin with a dot or a circle, or how is it different, --

    A.    A dot.

1  child?

2      A.      No.

3      Q.      Do you have any knowledge right now that

4  someone at Community Action Project forged your name?

5      A.      Can you repeat that?

6      Q.      Yes.

7      Do you know of any individual at Head Start that

8  may have forged your name on this document?

9      A.      No.

10     Q.      And do you believe that this document is

11 a forgery?

12     A.      It has to be, because I didn't sign it.

13     Q.      Earlier in your deposition you were asked

14 some questions by the attorney for Community Action

15 Project.  Do you remember the gist of a question that

16 asked you if a failure to notify you was anything

17 other than a mistake?  Do you remember that line of

18 questioning?

19     A.      (Nods.)

20             MS. ZIOLKOWSKI:  Is that a yes or no?

21     A.      Oh, I'm sorry.  Yes.

22     Q.      (By Mr. Goree)  You nodded your head

23 there, didn't you?

24     A.      Yeah.

25     Q.      Do you remember the attorney for

1  know her new address, but she lives here.

2      Q.      Okay, in Tulsa?

3      A.      Uh-huh.

4      Q.      And what is her current phone number?

5      A.      It's 587-3771.

6      Q.      Okay.  And when did your mother sign up

7  Quenten for Head Start?

8      A.      Sometime in -- it could have been in --

9  It was between May and July, I believe.

10     Q.      Okay.  And when you gave your mother

11 permission to sign Quenten up for Head Start, did you

12 also give her permission to sign any documents

13 related to enrolling Quenten in Head Start?

14     A.      Yes.

15     Q.      Okay.  Is it possible that the signature

16 on this parent consent form in Exhibit Number 2 is

17 your mother's signature?

18             MR. GOREE:  Object to the form of the

19 question.

20     A.      I don't know.  It seems like she would

21 have signed her own name, she wouldn't have signed my

22 signature, so I don't think it's her.

23     Q.      (By Ms. Ziolkowski)  But is it possible?

24     A.      It is possible.

25             MR. GOREE:  Object to the form of the

1    question.

2            MS. ZIOLKOWSKI:  I don't have any further

3    questions at this time.

4            MS. HART:  No questions.

5                REDIRECT EXAMINATION

6    BY MR. MANN:

7        Q.    You never asked your mother if she signed

8    your name?

9        A.    No.  She wouldn't have any reason to.

10       Q.    Ma'am, have you ever asked your mother if

11   she signed your name?

12       A.    No.

13           MR. GOREE:  Object to the form of the

14   question.

15       Q.    (By Mr. Mann)  What is your mother's

16   address?

17       A.    I don't know, she just moved, just about

18   three weeks ago.

19       Q.    Where does she live approximately?

20       A.    Off of -- The name of the street I know

21   is Gillette, Gillette, something like that.

22       Q.    But this -- this phone number 587-3771,

23   that's her current phone number at her new place?

24       A.    That's correct.

25       Q.    Would you mind getting your mother's

L

*Suddarth*

1 IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

2

3 JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
4 TIFFIANI DUBBS, a minor, et al.,



5 Plaintiffs,

6 vs. No. 99-CV-0732K(E)

7 HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
8 DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
9 OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
10 CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
11 Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
12 K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

13

Defendants.

14

15 **DEPOSITION OF DAPHINE SUDDARTH,**

16 before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
17 Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:45 a.m., on July 19, 2000, pursuant to notice.

18

19

20 ──────────────────────
KATHLEEN McCLANAHAN, CSR #283
21

22

23 NICHOLS McCLANAHAN REPORTING
Two Main Plaza
24 616 South Main, Suite 302
Tulsa, Oklahoma 74119-1261
25 918/585-9969

1   quote, normal physical examination, close quotes,

2   given to minor children in similar circumstances and

3   do not conform to then current recognized standards.

4        Do you see what I have just read that you

5   alleged in this lawsuit?

6        A.    Yes, sir.

7        Q.    Okay.  What was different about the

8   physical examination that you're suing over and any

9   other physical exam your daughter has ever had that

10  makes you believe that the exam you're suing over in

11  your words, quote, greatly exceeded that of a normal

12  physical examination?

13       A.    Greatly exceeded was at a school, in a

14  room, with taking clothes off and putting on a bare

15  table.  That exceeded.

16       Q.    Well, so your complaint is partly where

17  the exam occurred?

18       A.    How and where.

19       Q.    Well, but let's start with -- I said

20  partly is where the exam occurred?

21       A.    Partly.

22       Q.    I have to think of things in parts, so

23  let me just go one piece at a time, okay?

24       A.    Yes, sir.

25       Q.    And what you're telling me is when you

1      A.     That -- No, sir.

2      Q.     You know that somebody else has examined

3 your doctor's vagina in a normal medical examination?

4      A.     No, sir.

5      Q.     Okay.  Has any other doctor, to your

6 knowledge, ever, or any other medical personnel, ever

7 touched your daughter's vagina as part of a normal

8 medical examination?

9      A.     No, sir.

10     Q.     Okay.  So if that happened in the Head

11 Start examination, that's the only normal medical

12 exam you know of that that's ever happened?

13     A.     Yes, sir.

14     Q.     Okay.  Now, did the -- did any part of

15 the examination that happened at Head Start

16 physically injure your daughter in any way?

17     A.     I guess it would be safe to say, if

18 that's the word, emotional, she didn't quite

19 understand it, why that happened to her at school.

20     Q.     Okay, and that's an emotional injury

21 you're talking about, --

22     A.     Okay.

23     Q.     -- right?

24     A.     I think so.

25     Q.     Okay.

1      A.     If that's emotional, yes, sir.

2      Q.     My first question was did she have any

3 physical injury --

4      A.     Oh, no.

5      Q.     -- as a result of the exam?

6      A.     No physical.

7      Q.     And you understand when I say the exam, I

8 mean the exam at Head Start?

9      A.     Yes, sir.

10     Q.     Now, you think she may have had some

11 emotional injury?

12     A.     Yes, sir.

13     Q.     And how has that presented itself?  What

14 is it about that that makes you think your daughter

15 may have had some emotional injury?

16     A.     She was disturbed when she told me about

17 it as if -- kind of like hurt or -- like she didn't

18 understand, basically.

19     Q.     Did she tell you she didn't understand?

20     A.     No, sir.

21     Q.     Okay.  So you're inferring that from her?

22     A.     Yes, sir, what I sensed.

23     Q.     Did you ask your daughter do you

24 understand that you had a normal physical

25 examination?

1      A.      No, sir.

2      Q.      Okay.  Did you explain anything to your

3   daughter about it to try and make her understand

4   better or feel better about it, it being the

5   examination?

6      A.      No, sir.

7      Q.      Okay.  You didn't think that was

8   necessary?

9      A.      I can't say I didn't think it was

10  necessary.

11     Q.      Well, if you thought it was necessary,

12  why wouldn't you do it?

13     A.      I think my main thing was to let her know

14  that it's wrong, that was wrong, and it should not

15  have happened to her, to let her know not to let

16  people do that to her --

17     Q.      Okay.  Give her a physical exam?

18     A.      -- without Mommy being there.

19          Yes, sir.

20     Q.      But -- Okay.  Do you have any information

21  that leads you to believe that, before the

22  examination or during the examination, Ronisha

23  refused to participate or attempted to not

24  participate or protested in any way about the

25  examination being done?

1    the Head Start program, your child must have a full

2    physical exam, right?

3         A.    Yes, sir.

4         Q.    And if your child has a physical exam by

5    a doctor or medical professional outside of the Head

6    Start program, then you are to provide that medical

7    information to Head Start, aren't you?

8         A.    Yes, sir.

9         Q.    All right.  And did you have your

10   daughter examined by Doctor Balachandra or some other

11   outside medical professional as part of the

12   requirement that she get that exam?

13        A.    Yes, sir.

14        Q.    And did you turn those medical records

15   over to Head Start?

16        A.    I believe so, yes, sir.

17        Q.    You say you believe so.  Do you

18   specifically recall doing it?

19        A.    Yes, sir.

20        Q.    You do specifically recall?

21        A.    Yes, sir.

22        Q.    And when did you do that?

23        A.    I can't -- That, I don't know exactly,

24   I'm sorry, --

25        Q.    Well, when in relation --

1    identified that she needs any type of psychological

2    counseling or social work type counseling or lay

3    counseling for any reason other than the reason you

4    told me at the beginning of the deposition?

5         A.    Can you rephrase that, please?

6         Q.    Has there ever been a time that you

7    thought your daughter needed to see some type of a

8    counselor for any type of psychological or emotional

9    problems other than when you have recently considered

10   it in connection with her understanding your

11   relationship with your husband?

12        A.    Oh, yes, sir, at the very beginning when

13   it first happened, I saw that, but I didn't take her

14   to see anyone, no, sir.

15        Q.    You saw what?

16        A.    That she could probably use to talk to

17   somebody as far as the way she kind of acted.

18        Q.    How long did she act that way?

19        A.    Not for very long.

20        Q.    Okay.  She certainly stopped acting that

21   way in 1999, I assume?

22        A.    Yes, sir.

23        Q.    Okay.  And how was she acting in 1998,

24   that you thought she might need some counseling?

25        A.    I can tell my daughter by when I ask

1    questions, she seems -- kind of maybe evasive.  She

2    has a way of letting me know that it's kind of

3    bothering her, the question, and so I will leave the

4    question be sometime because I don't want to offend

5    her.  So someone with more experience in that field

6    could have probably did better than me, but I left

7    some things alone because I didn't want to upset her.

8         Q.    Well, how do we know that what was

9    bothering her was you questioning her, as opposed to

10   the exam?

11        A.    I'm sorry, rephrase that, please.

12        Q.    Yes.

13   How do we know that what was bothering her

14   wasn't you questioning her about the exam, as opposed

15   to the exam itself?

16        A.    I -- I don't know.

17        Q.    Okay.  Every time you've ever talked with

18   your daughter about the exam, it was for you -- that

19   you recall, it was for you to ask her questions about

20   it, correct?

21        A.    Yes, sir.

22        Q.    Okay.  Do you have a good relationship

23   with your daughter, a very good relationship with

24   your daughter, an excellent relationship with your

25   daughter, or a poor?  How would you describe your

1    page you allege the defendants acted in bad faith.

2    You see where it says that?

3         A.    Yes, sir.

4         Q.    Tell me all facts that you have personal

5    knowledge of supporting that statement?

6         A.    Well, my facts of supporting that is I

7    trusted them with the care of my daughter as I sent

8    her to school like any other day, and it wasn't any

9    other day.  It was bad faith that they done that to

10   her without my knowledge, without me being there.

11        Q.    Okay.  Is that the extent of your factual

12   support for that statement?

13        A.    With what I understand, yes, sir.

14        Q.    Okay.  If you'll turn to page ten of your

15   complaint.

16        A.    (Complies.)

17        Q.    Are you there?

18        A.    Yes, sir.

19        Q.    See the paragraph numbered 55?

20        A.    Yes, sir.

21        Q.    You've made an allegation that the

22   actions of the defendants in this case were

23   purportedly to ascertain certain information relating

24   to health problems of the children.  You see those

25   statements?

```
1      A.      Yes, sir.

2      Q.      Do you have any information which would

3   indicate any of the defendants in this case did

4   anything for any other reason?

5      A.      Yes, sir.

6      Q.      Okay.  Tell me all other reasons that you

7   believe the defendants were acting pursuant to?

8      A.      I believe they went behind our back for

9   abuse.

10     Q.      Tell me what you mean they went behind

11  your back for abuse?

12     A.      To see if there was any abuse to my

13  daughter, without my knowledge.

14     Q.      Okay.  And tell me everything that you

15  rely upon in making that complaint?

16     A.      I just rely upon why else -- why else

17  would you go behind somebody's back, a parent's back

18  and not let her know, as if something -- they had

19  something to hide, didn't want me to know, that's

20  what I base it on.

21     Q.      So that's your suspicion?

22     A.      Yes, sir.

23     Q.      Have you had any conversations with

24  anyone or seen any documents to support that

25  suspicion?
```

1    took care of your daughter, as well as other

2    children?

3        A.    Yes, sir.

4        Q.    Okay.  The only other thing I was

5    wondering about was, at the meeting that you went to,

6    didn't somebody from Head Start tell you that they

7    wanted to notify you or intended to notify you about

8    the medical exam that was coming up, but had

9    mistakenly failed to do so?

10       A.    Yes, sir.

11       Q.    Okay.  Do you have some reason, some

12   information that makes you believe that that's

13   untrue, that it was simply a mistake that they didn't

14   notify you?

15       A.    Yes, sir.

16       Q.    And what's that?

17       A.    Because it was done so discretely.

18       Q.    What was done discretely?

19       A.    I didn't have any knowledge of it.

20       Q.    I understand.

21   My client told you that they intended to notify

22   you, but mistakenly failed to do so, right?

23       A.    Yes, sir.

24       Q.    Okay.  So do you have any information

25   that it was anything more than simply somebody meant

1    to do it and mistakenly failed to do it?

2         A.    No, sir.

3         Q.    Okay.

4              MR. HELFAND:  Then I don't have any other

5    questions for right now, thank you.

6                   FURTHER DIRECT EXAMINATION

7    BY MS. HART:

8         Q.    The teachers didn't perform the physical

9    examinations, did they?

10        A.    No, ma'am.

11        Q.    Okay.  Do you have any information that

12   they knew that the exams were going to occur before

13   they did?

14        A.    No, ma'am.

15        Q.    Okay.  If the teachers didn't know about

16   it and they didn't know the details of what was going

17   to happen, why should the teachers or the employer of

18   the teachers be liable for what happened?

19        A.    Somebody has to be reliable [sic].  She

20   was in their care.

21        Q.    Okay.

22        A.    She wasn't with me.

23        Q.    Okay.

24              MR. BEGIN:  Is that it?

25              MS. HART:  Uh-huh.

M

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al, and )
SHATILYA BARNES, et al, )
)
                    Plaintiffs, )
)
    vs.                        )   Case No. 99-CV-0732K(E)
                               )   Case No. 99-CV-733-K(J)
HEAD START, INC., et al        )
                               )
                               )
                    Defendants. )


        DEPOSITION OF MARY JACQUELINE HOPE, taken at 2900
Mid-Continent Building, Tulsa, Oklahoma, on the 24th day of
October, 2000, on behalf of the plaintiffs, before the
undersigned Certified Shorthand Reporter, pursuant to
stipulations of the parties.

        Fee for original, $        paid by plaintiffs.


_____
Michael A. Bailey, CSR-RPR-CLVS

COPY

1    Q    Are RNs authorized to pull the pants down of male and

2    female children under the age of 18 and examine their genitalia

3    without someone giving you permission?

4         MR. HELFAND:  Object to the form of the question.

5    Q    (By Mr. Jack Goree) I'm waiting for an answer, if you

6    are going to answer it.

7    A    I need a specific.  If you are asking me if I would do

8    that, I said no.  I answered your question.

9    Q    That wasn't my question, though, was it?

10   A    Well, would you like to rephrase?

11   Q    No, I'm not going to rephrase --

12   A    Say it again.

13   Q    -- it, but I will ask the reporter to read it back

14   again.  And we may be here a while, but we are going to do it

15   this way now.

16        MR. JACK GOREE:  Mr. Reporter, please get that

17   question.

18     (THEREUPON, the question was read back by the reporter.)

19   A    No.

20        MR. HELFAND:  My objection, restate my objection.

21   Q    (By Mr. Jack Goree) As a registered nurse, have you

22   been trained that patients must give consent before

23   examinations or treatment can be afforded?

24   A    Yes.

25   Q    As an RN, are you taught that parents of minor children

1    didn't get it out within a week.

2              MR. HELFAND:  You're referring to this letter, the --

3              THE WITNESS:  This.

4              MR. HELFAND:  The witness is tapping on Exhibit Number

5    2.

6        Q    (By Mr. Jack Goree) Did you dictate or type or write in

7    the information in this letter before November 5th, 1998?

8        A    No.

9        Q    Did anyone, so far as you know, at Community Action

10   Project prepare a notification of any kind for parents of Head

11   Start enrollees advising them there would be a November 5th,

12   1998 examination?

13       A    Yes.

14       Q    And was such a thing prepared before November 5th,

15   1998?

16       A    Yes.

17       Q    Did you sign that one also?

18       A    Yes.

19       Q    What was the date of that one, if you recall?

20       A    I can't recall the exact date.

21       Q    Was it more than one day before November 5th, 1998?

22       A    Yes, yes.

23       Q    And what was the substance of the letter if -- you

24   probably can't tell me exactly what was in it, but what was the

25   substance of that letter?

1    A    It told the parents that we would be there on November

2    5th from such and such a time.

3    Q    And did it tell them that someone would conduct

4    examinations of the genitalia of their children?

5    A    No.

6    Q    Did it instruct the parents that someone would be

7    examining or doing a finger prick of the children?

8    A    No.

9    Q    What did you do with that correspondence after you

10   created it?

11   A    It was given to -- by me to my LPN, Peggy Terry, who

12   took it out to the location.

13   Q    And how do you know she took it out to the location?

14   A    She told me she did.

15   Q    When did you give it to her to take out there?

16   A    Approximately a week.  I don't know the exact date.

17   Q    Did you get a report back from Peggy Terry as to

18   whether she took it out to Roosevelt Elementary School before

19   November 5th, 1998 examinations were done?

20   A    Yes.

21   Q    And what did she tell you?

22   A    She delivered it the same day that I gave it to her.

23   Q    And did she say to whom she delivered it?

24   A    I believe to Edna Brown.

25   Q    And who is Edna Brown?

N

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

        Plaintiffs,

vs.                            No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

        Defendants.

COPY

**VOLUME I OF THE DEPOSITION OF KEENYA COWANS,**

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants, at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:45 a.m., on July 28, 2000, pursuant to notice and
subpoena.

DANA L. YOUNG, CSR #01168

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma  74119-1261
918/585-9969

1    She told you they stuck her finger with a needle.

2  They checked her eyes.  They checked her hearing.

3  They checked her private area.  They checked her

4  stomach and her chest for her heartbeat?

5    A.    Yes.

6    Q.    They wore no gloves.  And that she didn't

7  like what they had done because her doctor didn't do

8  it that way?

9    A.    Yes.

10    MR. GOREE:  Object to the form question.

11    Q.    (By Ms. Ziolkowski)  Is there anything I'm

12  missing?

13    A.    And that she said, too, that they laid her

14  on a mat and a desktop also.

15    Q.    Have you told me everything that Keymiya

16  has told you about the examination?

17    A.    Yes.

18    Q.    Okay.  Now I'm going to ask you some more

19  specific questions about each -- some of these things.

20    Keymiya told you that they checked her private

21  area.

22    A.    Yes.

23    Q.    Did she explain to you how they checked her

24  private area?

25    A.    Yes, she did.

1     Q.    Tell me what she told you.

2     A.    She told me that they didn't have no

3 gloves, and they looked down in her private area and

4 touched. And that was all she told me about that

5 part.

6     Q.    When they told -- when she told you that

7 they touched, did you ask her what she meant by that?

8     A.    Yes, I did.

9     Q.    What did she tell you?

10    A.    She told me that, "They touched me down

11 there with their hand like they was looking for

12 something."

13    Q.    And how did you respond?

14    A.    Well, I was so upset about this -- the

15 whole situation anyway, I really didn't respond to

16 that. And I really didn't know what to say. I just

17 didn't say nothing.

18    Q.    When -- now, did Keymiya tell you that they

19 wore no gloves; or did she -- did you ask her, "Did

20 they wear gloves" and she responded?

21    A.    She told me they did not wear gloves.

22    Q.    Had you ever spoken to Keymiya before about

23 doctors wearing gloves?

24    A.    No. Because each and every time she went

25 to the doctor, the nurse or the doctor wore gloves.

1   And I think a child probably knows the difference in

2   between that.

3           MS. ZIOLKOWSKI:  Object to that last part

4   as nonresponsive.

5       Q.    (By Ms. Ziolkowski)  When -- prior to this

6   examination, when was the last time that Keymiya had

7   had a medical exam?

8       A.    Before this had happened?

9       Q.    Yes, ma'am.

10      A.    She had a physical exam -- it was in

11  between -- I don't know the exact date and month, but

12  it was before November the 5th, it was -- it had to be

13  sometime in October of '98, because we had 90 days to

14  get it done.

15      Q.    Okay.  What doctor performed this physical?

16      A.    I don't know.

17      Q.    Did you take Keymiya to a particular

18  clinic --

19      A.    Yes.

20      Q.    -- for this physical?

21  What was the name of the clinic?

22      A.    Indian Health Care Resource Center.

23      Q.    And were you present at that physical

24  examination?

25      A.    Yes.

1     Q.    How was this physical examination at Indian

2   Health Care different from the physical your child

3   received at the school?

4     A.    The one that she had at Indian Health Care,

5   she had her eyes checked, ears checked, and he checked

6   her stomach area, too, and her heartbeat.  I mean

7   there was no clothes taken off, pulled down, nothing

8   of that nature.  It was just a regular physical that

9   should be formed correctly, and it was formed

10  correctly.

11       MS. ZIOLKOWSKI:  I would object to that

12  last part as nonresponsive.

13     Q.   (By Ms. Ziolkowski)  Have you been present

14  at all of your daughter's physicals?

15     A.    Yes.

16     Q.    Has -- before this incident, had Keymiya

17  ever had her genitals looked at by a doctor before for

18  any reason?

19     A.    No.

20     Q.    Has she ever had a physical which consisted

21  of an examination of the genitals?

22     A.    No.

23     Q.    Do you know if this physical taken at

24  Indian Health Care complied with Medicaid

25  requirements?

1     A.   No.

2     Q.   You don't know or --

3     A.   I don't know.

4     Q.   Okay.  What is it about the physical at the

5 school that you're suing over?

6     A.   Could you repeat that question?

7     Q.   Sure.

8 What is it about this physical at the school that

9 you're suing over?

10    A.   The exam that happened at the school, I

11 felt that it wasn't right.  And --

12    Q.   Are you finished with your answer?

13    A.   No.

14    Q.   Okay.  Go ahead.

15    A.   The exam -- physical exam that was done on

16 her, it shouldn't have been done, because she had had

17 a physical already way before this had happened.

18    Q.   Anything else?

19    A.   No.

20    Q.   Okay.  Now, you told me that you felt like

21 the physical wasn't right.

22    A.   Right.

23    Q.   What is it about the physical that wasn't

24 right?

25    A.   Well, first of all, I didn't have any

1  parental consent form sent home stating that this was

2  going to happen. And she had already had a physical

3  done, so why were they doing this?

4      Q.    Okay. Other than the notification issue

5  and what you're telling me that she already had had a

6  physical --

7      A.    Yes.

8      Q.    -- was there anything else about this exam

9  that wasn't right?

10     A.    Yes.

11     Q.    What was it?

12     A.    The simple fact that it was done at a

13 school and it was done in a room of some sort like

14 activity room, an old activity room. And these kids

15 was three, four, five years old. And if a physical

16 was going to be done, it should have been done by a

17 doctor, not a nurse. It should have been done at a --

18 their doctor's office or wherever besides a school.

19     Q.    Is there anything else?

20     A.    Yes. And I think it was done behind a lot

21 of the parents' backs. We had no notice, nothing.

22     Q.    Have you told me everything that you

23 believe wasn't right about this physical?

24     A.    Yes.

25     Q.    Okay. Now, the one thing I noticed you

1           MR. GOREE:  Yes.

2           MS. ZIOLKOWSKI:  Okay.

3           MR. GOREE:  You have everything now

4 pursuant to that subpoena duces tecum.

5           MR. MANN:  Excuse me.  Are those documents

6 specifically delineated as to which of the items in

7 the subpoena?

8           MS. ZIOLKOWSKI:  They are not, but I will

9 go through the subpoena duces tecum and have her

10 identify what documents are responsive to what

11 request.

12           MR. MANN:  Thank you.

13    Q.   (By Ms. Ziolkowski)  First tell me, of

14 these documents that I've just been handed by your

15 counsel -- you know, let's take a real quick break and

16 make a copy of this so everyone can have these copies.

17           MR. GOREE:  Let's do.

18           (Off the record.)

19    Q.   (By Ms. Ziolkowski)  Ms. Cowans, we'll talk

20 to you a little bit about the letter that Misti Dubbs

21 gave you.  Tell me everything that Misti Dubbs told

22 you when you arrived at school that day.

23    A.   When I arrived, like I was saying earlier,

24 about 2:45 to pick up Keymiya, her -- Misti Dubbs and

25 the other teacher, Paula Belk, which she was the head

1    teacher at the time, approached me with this letter

2    stating -- this is the letter that they gave stating

3    that they were going to be doing physicals and they

4    already done physicals today on Keymiya and all the

5    other kids in the class.

6        Q.    Who said that?

7        A.    Misti Dubbs.

8        Q.    Okay.  What else -- how did you -- did you

9    respond to that or did Misti Dubbs continue after she

10   made that statement?

11       A.    I responded to that.

12       Q.    How did you respond?

13       A.    Very upset and angry.  And I said some

14   things that I can't say now.

15       Q.    Okay.  Well, we're all adults here, so why

16   don't you please tell me what you said.

17       A.    Well, it was a lot of cursing.  I mean I

18   don't remember exactly what I said, but I know I said

19   a lot of curse words.

20       Q.    Was Keymiya there at the time?

21       A.    She was in the classroom.

22       Q.    And where did this conversation take place?

23       A.    Out in the hallway outside of the -- a

24   little bit further down from the classroom.  I said in

25   the midway of the hall.

1      Q.    Okay.  After you swore, did you say

2  anything else?

3      A.    Yes.

4      Q.    What did you say?

5      A.    I mean I said a lot of things.  Like I

6  said, a lot of cursing; just, you know, why -- when

7  did this happen?  Why didn't you all call me?  You

8  know, just all kinds of things.

9      Q.    Okay.  Well, I wasn't there and the jury

10  wasn't there.

11      A.    Right.

12      Q.    So I need you -- when you say "all kinds of

13  things," I need you to tell me everything that you can

14  remember that you said that day.

15      A.    Like I said, I can't remember exactly what

16  I said.

17      Q.    Tell me generally what you said.

18      A.    To Misti Dubbs and Paula Belk I said,

19  "Where the hell were you all?  You're all the

20  teachers.  You all couldn't stop this?  You all

21  couldn't call none of the parents?  You all couldn't

22  do nothing?"

23           MR. GOREE:  You might slow down just a

24  little bit for the court reporter.

25      A.    Okay.

1    And, "Who did this?  Where did they do this at?

2 How come I didn't have any consent forms?"

3    Really, I had got angry at them because I thought

4 they was the cause of this by not giving us no

5 information or sending anything home about this being

6 done.  But they didn't even know nothing about it.  So

7 after all that happened, then we talked and everything

8 got calmed down and --

9    Q.    (By Ms. Ziolkowski)  Okay.

10    A.    -- that was that.

11    Then I also talked to -- I think at the time

12 Ms. -- I don't know her first name.  Her name is

13 Mrs. Brown.  She was the -- like the director of the

14 Head Start of that school.

15    Q.    Okay.  And you talked to her after you

16 talked to Misti Dubbs and Ms. Belk?

17    A.    Yes.  Yes.

18    MR. GOREE:  I'll object to the form of the

19 question.

20    Q.    (By Ms. Ziolkowski)  Let me just -- let's

21 first concentrate on the conversation with Misti Dubbs

22 and Ms. Belk.

23    After you made these statements --

24    A.    Uh-huh.

25    Q.    -- who responded?

1    A.    They both did.  They were both coming at

2  each other, trying to explain what had happened to me.

3  They were both talking to me at the same time.  I was

4  getting frustrated by that.

5    Q.    Okay.  Tell me everything that Misti Dubbs

6  told you.

7    A.    Misti Dubbs, she was upset at the time and

8  she was saying a lot of things too.  And she was like,

9  "Well, I'm a witness of what went on.  I was in there.

10  I went in there with my little girl," because I guess

11  her little girl was scared.  And at the time, her

12  little girl was three, so that's why she was in there

13  with her.

14    And she said that she witnessed them doing all

15  these things, like the physical.  And she said as they

16  were going on with her little girl's physical, they

17  started pulling down her little girl's pants, and she

18  asked them, "What in the hell are you all doing?  You

19  know, this is just supposed to be -- you guys said

20  this was just supposed to be a physical, but you all

21  looking at these kids, looking under these kids'

22  clothes, making them take their clothes off."

23    And she said that -- like I said, she was -- the

24  little girl -- her little girl was on the table.  And

25  as they were pulling down her clothes, she, I guess,

1    yanked her daughter up and said, like I said, "What in

2    the hell are you all doing?  Have you done this to all

3    these kids?"  And, you know, "You guys can't do this.

4    What is this for?"

5         She said a lot of different things that I really

6    don't remember.

7         Q.    Have you told me everything that you

8    remember?

9         A.    Yes.

10        Q.    How did you feel about Misti Dubbs when she

11   told you these things?

12        A.    I got upset even more.

13        Q.    Did you get upset with Misti Dubbs?

14        A.    No.

15        Q.    Why not?

16        A.    I got upset at the whole situation.

17        Q.    But Misti Dubbs was there, wasn't she?

18        A.    Yes.

19             MR. GOREE:  Object to the form of the

20   question.

21        Q.    (By Ms. Ziolkowski)  And Misti Dubbs saw

22   these things happening?

23        A.    Yes.

24             MR. GOREE:  Object to the form of the

25   question.

1      Q.    (By Ms. Ziolkowski)  Did you ask Misti

2  Dubbs why she didn't stop this?

3      A.    Yes.

4      Q.    What did she respond?

5      MR. GOREE:  Object to the form of the

6  question.

7      A.    She said that -- I guess she had went off

8  on one of the nurses, and they told her that:  These

9  physicals has to be done and you don't have nothing to

10  do with this, and like that.

11      But that's about it.

12      Q.    (By Ms. Ziolkowski)  Okay.  Tell me

13  everything that Mrs. Belk told you.

14      A.    Mrs. Belk, she had told me that she had

15  went in there with one of the kids.

16      Q.    What child?  Do you know?

17      A.    No, I don't.  I know it was a little girl.

18  I don't know her name.

19      And because the little girl, she's, I guess, one

20  of those hyper kids and no one could settle her down

21  but Ms. Belk.  And so she had to stay in there with

22  her.  And I guess she seen all this done to the little

23  girl.

24      Q.    And what did she tell you about it?

25      A.    She told me that they did physicals on them

1    and they drew blood; wore no gloves while drawing the

2    blood; checked their eyes, their teeth, their hearing.

3    And then she said that she tried to get the little

4    girl -- I guess the nurse had Ms. Belk to lay the

5    little girl down and I guess she wouldn't lay down or

6    something.  Ms. Belk had to kind of help the lady.

7    And at the time she said she didn't know what they

8    were getting ready to do next, and that's when the

9    genital exams occurred.  And the pulling down the

10   pants or pulling up the skirt or whatever she had on

11   that day, I don't know.

12       So from there on, I mean she said she tried to

13   stop them and asked them why were they doing this and

14   that the parents didn't know nothing about this and

15   she said she didn't even know nothing about it or the

16   other teachers.

17       And there was really nothing that she could do

18   because -- I forget the nurse's name that was in there

19   at the time.  She said that the nurse was really rude

20   with her about the exam.  And she said that, "This

21   exam is required and it's supposed to be done and it's

22   going to be done."

23       She just said some smart things to her.  She

24   didn't really go on and say -- finish telling me what

25   she had said, because at the time I really didn't want

1    A.    Yes.

2    Q.    And what has she told you?

3    A.    She told me that no one has ever touched

4 her like that during the physical that she had.  She

5 has never been touched like that in any kind of way.

6    Q.    Have you asked Kwanita to explain to her

7 exactly how they touched her?

8    A.    Keymiya.

9    Q.    I'm sorry.  Keymiya, did you ask her how

10 exactly did they touch her?

11    A.    Yes, I did.

12    Q.    What did she tell you?

13    A.    She told me that they made her lay down on

14 a desktop or a mat.  I'm not for sure about that.

15    Q.    Is it you don't know what she told you, or

16 Keymiya didn't know what it was?

17    A.    Well, at the time, like I said, it happened

18 a year and a half, almost two years ago.  I don't know

19 if, like I said, she told me the desktop or the mat.

20    Q.    Okay.  I want you to tell me everything you

21 know.  I don't want you to guess at anything here.

22 Okay?

23    A.    (Nods head.)

24    Q.    Tell me everything you know about what

25 Keymiya told you.

1     A.    Okay.

2     Q.    About how they touched her.

3     A.    She told me that they touched her and she

4 shouldn't have been touched there.

5     Q.    Are those Keymiya's words?

6     A.    Yes.

7     Q.    Did you ask her to show you where they

8 touched her?

9     A.    Yes.

10    Q.    What did she do?

11    A.    Well, she sat down on the floor and she

12 like spreaded her legs and she just pointed down

13 there.  And I was like, "What are you pointing at?"

14 She said, "Down there."

15 I was like, "Okay."

16    Q.    Anything else that she told you?

17    A.    Yes.  She asked me why did they do it.

18    Q.    What did you tell her?

19    A.    I said, "I'm going to find out, Keymiya."

20    Q.    Has Keymiya suffered any type of emotional

21 injury as a result of this examination?

22    A.    Yes.

23    Q.    Tell me about that.

24    A.    Well, it's been since then, previous times

25 she'll talk about the situation, even if I don't say

1    dental, medical or surgical diagnosis or treatment by

2    any physician or dentist licensed by the State of

3    Oklahoma and hospital service that may be rendered to

4    said -- to said minor under the general, specific or

5    special consent of Tulsa County Head Start Program,

6    the temporary custodian of the minor, whether such

7    diagnosis or treatment is rendered at office -- at the

8    office of the physician or dentist to call in any

9    necessary consultants in his or their discretion.

10        Q.    Since the document speaks for itself, did

11   you ever tell my client that they could not perform

12   medical procedures on your child?

13             MR. GOREE:  I will object to the form of

14   the question.

15        A.    No.    That question never did come up.

16        Q.    (By Ms. Ziolkowski)  Did you ever notify

17   anyone at Head Start that you were going to limit or

18   withdraw this consent?

19        A.    No.

20        Q.    Now, there's a second part to this

21   document, is there not?

22        A.    Yes.

23             MR. GOREE:  Object to the form of the

24   question.

25        Q.    (By Ms. Ziolkowski)  Okay.  Tell me about

1      Q.    (By Ms. Ziolkowski)  Is Dr. Hough here in

2 Tulsa?

3      A.    He's not anymore.

4      And then I don't know her doctor's name when she

5 was born.

6      Q.    Why did Keymiya go see Dr. Hough?

7      A.    This was during the time when she was

8 little.  Then she switched over to another doctor that

9 took his spot.

10     Q.    Okay.  When you say that Dr. Hough is not

11 her doctor anymore, is that because he's no longer a

12 practicing doctor; or is it because --

13     A.    He moved out of state.

14     Q.    Okay.  Has Keymiya been to the emergency

15 room for any reason?

16     A.    No.

17     Q.    Other than her birth, has Keymiya had to

18 stay at the hospital for any reason?

19     A.    No.

20     Q.    When was the last time that Keymiya's had

21 to see a doctor?

22     A.    The last time she seen her doctor was -- it

23 was before -- it was for her physical that was -- that

24 they had asked for within that 90-day period when she

25 was in Head Start.

1　he ever been investigated by DHS?

2　　　A.　I don't know.

3　　　Q.　Have you ever filed a report against

4　Keymiya's father with the DHS?

5　　　A.　No.

6　　　Q.　How about Mr. Surratt, have you ever -- has

7　Mr. Surratt ever been investigated by the DHS?

8　　　A.　I don't know.

9　　　Q.　Have you ever talked to him about that?

10　　　A.　No.

11　　　Q.　Have you ever had the occasion to file a

12　report on Mr. Surratt --

13　　　A.　No.

14　　　Q.　-- with the DHS?

15　　　A.　No.

16　　　Q.　Is it your testimony here today, ma'am,

17　that if my client had told you about this examination

18　prior to its occurrence, that you would have refused

19　to do it?

20　　　　　MR. GOREE:　I object to the form of the

21　question.

22　　　A.　Would I refuse?

23　　　Q.　(By Ms. Ziolkowski)　Yes, ma'am.

24　　　A.　Yes.

25　　　Q.　Why?

1     Q.   Lawson.  How many times has Keymiya been to

2 see Dr. Lawson?

3     A.   I would say -- since the physical?

4     Q.   Since birth.

5     A.   Oh, since birth?

6     Q.   Uh-huh.

7     A.   Well, she didn't change doctors.  She had

8 Dr. Hough was her doctor when she was small.

9     Q.   Okay.

10    A.   Then he left and Dr. Lawson took over his

11 spot.

12    Q.   Okay.

13    A.   And then he done her physical for Head

14 Start.

15    Q.   Okay.  So Dr. Hough and Dr. Lawson are both

16 at the Indian Health Care Clinic?

17    A.   Yeah, Dr. Hough was, but he moved out of

18 state.

19    Q.   Okay.  How many times has Keymiya been seen

20 at the Indian Health Care Clinic since birth?

21    A.   Oh --

22    Q.   And your best estimate is fine.

23    A.   Okay.  Up until now?

24    Q.   Yeah.  I wouldn't expect you to tell me

25 future.

1          MR. GOREE:  I object to the form of the

2     question.

3          Q.    (By Ms. Clarke)  And as a government

4     program, you understand that medical examinations were

5     required under the regulations or the statutes;

6     correct?

7          MR. GOREE:  I object to the form of the

8     question.

9          A.    Correct.

10         Q.    (By Ms. Clarke)  Okay.

11         A.    But I didn't know of genital exams.

12         Q.    Well, that's going to be my next question.

13    If it's a requirement under these regulations or

14    statutes or rules that within this examination that

15    genitalia be examined, you would expect that that

16    examination occur because it is required as a

17    government program; right?

18         MR. GOREE:  I'll object to the form of the

19    question.

20         A.    No.

21         Q.    (By Ms. Clarke)  You would want -- did you

22    not understand my question or --

23         A.    I understood it.  But that's not a form --

24    I mean for her age for an exam.

25         Q.    Well, I understand what you're saying.  But

1    to, before they conduct an exam, to call you up and

2    ask and make sure that they have consent?

3         A.    Well --

4         Q.    Because, see, I'm asking you my question to

5    assume that the nurses had a good faith basis and

6    believed that they had consent.  Okay?  So if they had

7    -- if they thought they had consent and acted on that

8    belief, you wouldn't hold that against them; right?

9         MR. GOREE:  I'll object to the form of the

10    question.

11         A.    Well, first, I wouldn't even let them do

12    it.

13         Q.    (By Ms. Clarke)  I understand that.  But

14    that's separate from what I'm asking.

15         A.    I mean I guess I'm just getting straight to

16    the point.

17         Q.    Right.  But --

18         A.    You see?

19         Q.    I understand what you've said, because

20    you've testified to all that earlier.  But I'm wanting

21    to narrow my questions a little bit, because I want

22    you to assume -- and I know it's hard sometimes, but I

23    want you just to kind of live in a little box with me

24    for a minute.  Okay?  And assume that my nurses and

25    the Tulsa City-County Health Department believed they

1    that you can go to find that out; is that fair?

2         A.    Not to my knowledge.

3         Q.    As I understand it, there were no Tulsa

4    Public Schools employees involved in the Head Start

5    program; is that your understanding?

6         A.    That's my understanding.

7         Q.    And as I understand it, no Tulsa Public

8    Schools employee was involved in administering these

9    physical exams; is that your understanding?

10         A.    That's my understanding.

11         Q.    And I take it that you're not aware of any

12    evidence or facts that the Tulsa School District had

13    any control over your daughter or other kids while

14    these physical exams were going on; is that correct?

15         A.    Correct.

16         Q.    And you're not aware of any evidence or

17    facts that anyone from the Tulsa Public Schools

18    actually knew that these exams were going to occur

19    prior to the time that they occurred; is that correct?

20         A.    Correct.

21         Q.    As a matter of fact, as I understand it

22    from your testimony, not even Ms. Dubbs, Ms. Belk or

23    Ms. Brown, at least according to what they told you,

24    were aware that these physicals were going to occur

25    prior to the time that they occurred; is that correct?



```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2
   JACK DUBBS, Individually, and JACK
 3 DUBBS as Father and Next Friend of
   TIFFANI DUBBS, a minor, et al.,
 4
                    Plaintiffs,
 5
   vs.                              No. 99-CV-0732K(E)
 6
   HEAD START, INC., an Oklahoma
 7 Corporation; INDEPENDENT SCHOOL
   DISTRICT NO. 1 OF TULSA COUNTY,
 8 OKLAHOMA; COMMUNITY ACTION PROJECT
   OF TULSA COUNTY, OKLAHOMA, an Oklahoma
 9 Not-For-Profit Corporation; TULSA
   CITY-COUNTY HEALTH DEPARTMENT;
10 KD ENTERPRISES, INC., an Oklahoma
   Corporation; DOE GOVERNMENT AGENTS
11 1 through 5; JACKIE STRAYHORN, ARNP;
   K. BAKER, RN; PEGGY DOE; JOHN DOES
12 1 through 10; JANE DOES 1 through 10,
13                  Defendants.
14            DEPOSITION OF JOY BROWN,
15 before the undersigned Certified Shorthand Reporter,
   taken on behalf of the Defendants at 2900
16 Mid-Continent Tower, Tulsa, Oklahoma, commencing at
   4:30 p.m., on July 27, 2000, pursuant to notice.
17
18
19
20        _____
          KATHLEEN McCLANAHAN, CSR #283
21
22
23            NICHOLS McCLANAHAN REPORTING
                    Two Main Plaza
24            616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                  918/585-9969
```

1        A.      The past two months.

2        Q.      Has Marii ever visited the emergency room

3    for any reason?

4        A.      No, she has not.

5        Q.      If you had to take Marii to the emergency

6    room, what emergency room would you take her to?

7        A.      I believe it is St. John.  I just got

8    medical insurance on my job, so how about Preferred

9    Community Health for employees.

10       Q.      Where do you work at?

11       A.      Sooner Bolt and Supply, Inc.

12       Q.      How long have you worked there?

13       A.      One year and a month.

14       Q.      And what do you do there?

15       A.      I am a machine shop specialist.  I make

16   paint ball guns and BB guns for Daisy and Brass

17   Eagle.

18       Q.      And how do you like your job thus far?

19       A.      I love my job.

20       Q.      Good.

21       Have you ever felt the need to take Marii to any

22   type of mental healthcare provider, --

23       A.      No.

24       Q.      -- psychiatrist, psychologist of any

25   type?

1     Q.    Okay.  So when -- Did she get any shots

2  when she had the tissue in her ear?

3     A.    No, she did not.

4     Q.    And did she have any shots when she had

5  the ear infection?

6     A.    No, she did not.

7     Q.    Did she have her finger pricked --

8     A.    No, she did not.

9     Q.    -- when she had the tissue in her ear?

10     A.    No, she did not.

11     Q.    Did she have her finger pricked when she

12  had the ear infection?

13     A.    No, she did not.

14     Q.    Then how can you say, Ms. Brown, that

15  Marii doesn't like to get her finger pricked when she

16  goes to the doctor and gets a physical?

17     A.    Because she asks are you going to stick

18  me in any finger, are you going to give me a shot, I

19  don't like shots.

20     Q.    So she asks the questions of the doctors?

21     A.    Correct.

22     Q.    So other than Marii's dislike of shots

23  and doctors, has any other type of emotional injury

24  presented itself?

25     A.    Emotional injuries meaning?

1    Q.    Well, that's what I'm asking you.  It's

2  your lawsuit, ma'am.

3    A.    Meaning --

4    Q.    How has this -- how has this examination

5  affected your child, give me all the reasons?

6    A.    I'm going to say that it hasn't affected

7  her emotionally.

8    Q.    Is Marii any different today than she

9  would have been had she not received this

10  examination?

11    A.    Well, I can't answer that question

12  because she did have this examination.

13    Q.    What exactly is it about this exam that

14  you're suing over?

15    A.    That it happened, period, in Tulsa Public

16  Schools, without my consent and against her will.

17    Q.    Do you know of any information that leads

18  you to believe that Marii refused to participate in

19  this?

20    A.    She told me she didn't want to go.

21    Q.    Well, did Marii tell you that she

22  physically resisted in any way?

23    A.    No, she did not.

24    Q.    Did Marii tell you that she told anybody

25  that she didn't want to go?

1   didn't have the forms so --

2       Q.      Okay, well, --

3       A.      -- I don't like your question.

4       Q.      -- I'm asking you to assume some things

5   for me, okay?  Assume that my client believed -- I

6   just need you to take this as, for the purpose of

7   this question, take this as a fact or as true, okay?

8   For the purpose of my question.  All right?

9       A.      Yes.

10      Q.      Okay.  If my client believed that they

11  had informed consent to conduct the physical

12  examination, you would not be suing them today,

13  correct?

14              MR. GOREE:  Object to the form of the

15  question.

16      A.      Correct.

17      Q.      (By Ms. Clarke)  Okay.  And if they

18  believed they had informed consent before they began

19  conducting the examination --

20      Let me strike that.  I'm getting myself confused

21  now.

22      What information do you base your belief that

23  there was no safety gloves or safety precautions used

24  during the examination?

25      A.      Based on the fact that that is what I was

1  informed from the teachers and Mrs. Dubbs, teachers

2  being Paula Belk and Ms. Dubbs, Ms. Brown.

3      Q.     Did your daughter tell you that there

4  were no gloves?

5      A.     She also said they're not -- they did not

6  wear gloves.

7      Q.     Did she offer that information, or did

8  you ask her that?

9      A.     No, she -- she told me.

10     Q.     She told you this in the hallway?

11     A.     Yeah.

12     Q.     I would like for you to walk me through

13 your conversation with your daughter in the hallway,

14 to the best of your recollection, as it occurred.

15     A.     We usually start out with how was your

16 day, what did you do today.  Pictures; after

17 pictures, we had a physical; in between there we had

18 breakfast and lunch.  I said what kind of -- what

19 kind of physical, who -- what kind of physical, who

20 was there.  And she told me that the nurse put her

21 hands in between her legs and wiggled her hands

22 around.  And I said she wiggled her hands around in

23 your pants.  And she was like I didn't have my pants

24 on, she took my pants off when she put me on top of

25 the desk.  Then she said that they sucked the blood

1    out of her finger and they didn't wear gloves.  She

2    knows about rubber gloves and sanitation because my

3    grandmother owns a residential care home.  Always

4    wear gloves.

5        Q.    How old was your daughter at the time of

6    the examination?

7        A.    She was five.  She was four.

8        Q.    Four?

9        A.    (Nods.)

10       Q.    And did she spend a lot of time at your

11   grandmother's -- What is it a --

12       A.    Yes, she did.

13       Q.    I'm sorry, what was it?

14       A.    A residential care home.

15       Q.    What is that?

16       A.    A place where you send your grandparents

17   when you don't want them to stay with you.

18       Q.    Like a nursing home?

19       A.    Or your parents.

20       Q.    Like a nursing home?

21       A.    Yes, yes.

22       Q.    Which nursing home does your grandmother

23   own?

24       A.    It's not a nursing home, it's a private

25   care home.  It is called the Marii Cooperation.

1     Q.    Is it named after your daughter?

2     A.    Correct.

3     Q.    Where is it located?

4     A.    In Broken Arrow, off of 101st and 145th.

5     Q.    Is that where Ms. Porterfield used to

6 work?

7     A.    No.  It's not a nursing home, it is a

8 residential care home.  They live there.

9     Q.    It's like assisted living?

10    A.    Correct.

11    Q.    Why don't you give me just a minute and

12 I'll wrap up?

13    If the evidence shows that safety precautions

14 were utilized in the examinations on November 5th,

15 1998, then you would have no complaint against my

16 client, correct?

17     MR. GOREE:  I object to the form of the

18 question.

19    A.    And yes, I would.

20    Q.    (By Ms. Clarke)  Let me specify that,

21 regarding the use of safety precautions, if there is

22 evidence that safety precautions were used, then you

23 would have no complaint against my client for not

24 using safety precautions?

25    A.    Yes, I would.

1          MR. GOREE:  Object to the form of the
2   question.
3          Q.    (By Ms. Clarke)  Okay.  What would your
4   complaint be?
5          A.    I was not present, and I don't know what
6   kind of proof they have of saying that they had latex
7   gloves, they had disposable trash cans, that
8   justified these things.  I would say no.
9          Q.    (By Ms. Clarke)  Because your
10  four-year-old daughter told you that no gloves were
11  used?
12         A.    True.
13         Q.    And did anybody else tell you no gloves
14  were used?
15         A.    Yes.  Misti Dubbs also.
16         Q.    Was Misti Dubbs present during the
17  examination of your daughter?
18         A.    I have no idea.  She said she wasn't.
19  She went in with her child.  But I have no idea who
20  was there on that day.  I wasn't.
21         Q.    Do you know if her child was examined
22  before yours or after yours?
23         A.    I believe my child was one of the first
24  ones to go, because they said they went in
25  alphabetical order backwards, so --in alphabetical

1    speak in a harsh tone toward my client during this

2    deposition.

3            MR. MANN:  Well, I did not --

4            MR. GOREE:  She can hear you in a

5    soft-spoken voice.

6            MR. MANN:  I have not raised my voice,

7    and I have not spoken in a harsh tone.  You have

8    characterized that.  I suspect I could get other

9    people in here to characterize it to the opposite.

10           Q.    (By Mr. Mann)  My question is this,

11   Ms. Brown:  Do you have any knowledge that your child

12   has ever been on a cumulative record in the Tulsa

13   Public Schools at Roosevelt Elementary School?

14           A.    Yes, I do.

15           Q.    You have seen that?

16           A.    Yes.

17           Q.    When did you see it?

18           A.    I had to --

19           Q.    Have you seen the document, Mrs. Brown?

20           A.    Have you seen the document?

21           Q.    Have you seen the document -- See, the

22   good part about this is I get to ask, you get to

23   answer.

24           A.    Oh, yes.

25           Q.    The question is have you ever seen a

P

1         IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OKLAHOMA

3  JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
4  TIFFIANI DUBBS, a minor, et al.,

5            Plaintiffs,

6  vs.               No. 99-CV-0732K(E)

7  HEAD START, INC., an Oklahoma
    Corporation; INDEPENDENT SCHOOL
8  DISTRICT NO. 1 OF TULSA COUNTY,
    OKLAHOMA; COMMUNITY ACTION PROJECT
9  OF TULSA COUNTY, OKLAHOMA, an Oklahoma
    Not-For-Profit Corporation; TULSA
10  CITY-COUNTY HEALTH DEPARTMENT;
    KD ENTERPRISES, INC., an Oklahoma
11  Corporation; DOE GOVERNMENT AGENTS
    1 through 5; JACKIE STRAYHORN, ARNP;
12  K. BAKER, RN; PEGGY DOE; JOHN DOES
    1 through 10; JANE DOES 1 through 10,
13
            Defendants.
14

15         **DEPOSITION OF JACK DUBBS**,

16  before the undersigned Certified Shorthand Reporter,
    taken on behalf of the Defendants at 2900
17  Mid-Continent Tower, Tulsa, Oklahoma, commencing at
    1:50 p.m., on July 19, 2000, pursuant to notice.
18

19

20        _____

        KATHLEEN McCLANAHAN, CSR #283
21

22

23       NICHOLS McCLANAHAN REPORTING
           Two Main Plaza
24      616 South Main, Suite 302
       Tulsa, Oklahoma  74119-1261
25         918/585-9969

1    from, but that would be the only place I would know.

2    Other than that, not that I know of, no.

3         Q.    Okay.  Have you had any other healthcare

4    providers tell you that not using rubber gloves

5    during a physical examination violated some standard

6    of care in the state?

7         A.    No, sir.

8         Q.    And do you have any evidence of that

9    fact?

10        A.    No, sir.

11        Q.    Okay.  Are you claiming any type of

12   out-of-pocket expenses as a result of these physical

13   examinations that were performed?

14        A.    This meeting today, yes, sir.

15        Q.    Okay.  You're claiming what expenses for

16   your deposition today?

17        A.    Taking the day off.

18        Q.    Okay.  And how much time would you have

19   worked today but for this deposition?

20        A.    Ten hours.

21        Q.    Okay.  And what's your hourly rate?

22        A.    $12 an hour.

23        Q.    Okay.  And that's the only item of

24   out-of-pocket expenses that you're claiming in this

25   lawsuit?

1    have a lawsuit?

2        A.    Yes, sir.

3        Q.    Okay.  So the choice to do the things

4    that are taking you away from work are yours, not

5    ours?

6        A.    Yes, sir.

7        Q.    Have you considered the potential

8    emotional effect that putting your daughter through

9    litigation may cause?

10       A.    I hadn't thought about that, no, sir.

11       Q.    I mean, have you considered the

12   possibility that the day may come that your daughter

13   has to sit in a chair like that and answer questions,

14   maybe not the --

15       A.    Well, now that you ask me that, I had not

16   thought about that, no.

17       Q.    And understanding that you have no

18   out-of-pocket expenses, you have -- you have no

19   observed difference in your daughter, no observed

20   difference in your relationship with your daughter,

21   what is it that you're suing for, sir?

22       A.    That it don't happen again.

23       Q.    Okay.

24       A.    I may have -- I may have another child

25   that decides that they want to go to Head Start in

1    four or five years and the same thing happens.  You

2    think I want to see that happen again?

3        Q.    Okay.  Is there something right now that

4    leads you to believe that it will happen again?

5        A.    No, but there wasn't nothing in the first

6    place leading me to believe that it would happen the

7    first time.

8        Q.    I understand that, but that's not the

9    answer to my question.  My question was, is there

10   something that leads you to believe right now that

11   there will be a problem like this in the future?

12       A.    No, sir.

13       Q.    Okay.  So I take it -- But you're suing

14   for money, aren't you?

15       A.    Yes, sir.

16       Q.    And how much money are you suing for?

17       A.    I have no idea.

18       Q.    Okay.  And this potential that you may

19   have a child and that it may happen again, to you

20   that's worth putting your daughter and your family

21   through litigation?

22       A.    I don't know.  I hadn't really had time

23   to stop and just think about that, you just now

24   brought that up.

25       Q.    And if I understand what you're saying,

1   really, is you want my client, and maybe some of the

2   other defendants, to pay money so that that loss of

3   money will hopefully motivate somebody to be more

4   careful in the future?

5       A.      Exactly.

6       Q.      Okay.  You understand my client is a

7   nonprofit, federally funded program?

8       A.      Well, I didn't know that until earlier, I

9   heard it earlier.

10      Q.      Okay.  You understand the people who

11  worked for Community Action Project all work for a

12  nonprofit organization?

13      A.      Yes, sir.

14      Q.      You understand that the money that

15  comes -- My client is essentially a charity; do you

16  understand that?

17      A.      Yes, sir.

18      Q.      Okay.  So you would like some of this

19  money that's being given to my client, as part of a

20  charity, to be taken as punishment from them so that

21  they will potentially avoid a problem that may exist

22  in the future?

23              MR. CHRISTOPHER GOREE:  I object to the

24  form of the question.

25      Q.      (By Mr. Helfand)  Do I understand you

1      correctly?

2          A.     If that will stop from now on, then,

3      yeah, that would be worth it.

4          Q.     But what assurance do you have --

5          A.     I don't have no assurance.

6          Q.     Well, listen to my question.

7          What assurance is it -- What information is it

8      that you have that indicates that it's necessary that

9      these people be penalized in order to fix the

10     problem, as opposed to having the responsibility of

11     fixing the problem without you levying some penalty

12     against them?

13         A.     Well, I can't very well go over there and

14     kick the dog crap out of them, can I?

15         Q.     Well, my question is what indicates to

16     you the need to do that?

17         A.     Because my daughter was touched without

18     my permission.

19         Q.     I understand.

20         But we can't do anything about that now, right?

21         A.     Right, exactly.

22         Q.     I understood you're suing so it doesn't

23     happen again?

24         A.     That's right.

25         Q.     And my question to you, then, was why is

1     suspected your ex-wife's boyfriend of sexually

2     molesting --

3         A.     It was only about five, six months ago.

4         Q.     Okay.   So earlier in the year 2000?

5         A.     Yeah.

6         Q.     Okay.   Was it one particular instance

7     that you suspected him of --

8         A.     Yes.

9         Q.     -- or was it ongoing?

10        A.     Just one, yes.

11        Q.     Do you have any evidence that any health

12     department employee had any prior knowledge of who

13     the kids were at Roosevelt before getting there that

14     day?

15        A.     No, sir.

16            MR. BEGIN:   That's all I have.

17            MR. MANN:   I have nothing further.

18            MR. HELFAND:   Thank you for your time,

19     sir.   I appreciate it.

20            MR. CHRISTOPHER GOREE:   I have a few

21     short questions.

22            MR. HELFAND:   Oh, good.

23                CROSS EXAMINATION

24     BY MR. CHRISTOPHER GOREE:

25         Q.     Mr. Dubbs, would you have agreed to a

1    medical exam at Head Start if you knew they were

2    going to do an examination of your daughter's private

3    parts?

4         A.    No, not of her private parts.

5         Q.    Mr. Dubbs, would you have agreed to a

6    medical exam at Head Start if you would have known

7    that someone was going to perform a physical

8    examination on your daughter without rubber or latex

9    gloves?

10        A.    No, sir.

11             MR. CHRISTOPHER GOREE:   That's all I

12   have.

13                REDIRECT EXAMINATION

14   BY MR. HELFAND:

15        Q.    Why wouldn't you agree, Mr. Dubbs, to

16   allow medical professionals from the Tulsa

17   City-County Health Department to examine your

18   daughter if it included an examination of her private

19   parts?

20        A.    Well, because I wouldn't have cared if

21   they had done ears, mouth, nose, breathing, whatever,

22   but something like that needs to be at a doctor's

23   office.   I don't care what you or anybody else think,

24   that's my child, and that's what I think.

25        Q.    But why is what I'm asking?

1      A.    I think it's cleaner there, it's more

2  professional than just dragging in, lining them up

3  like cattle and bringing them in there and throwing

4  them on a table and looking at them and sending them

5  on their way.

6      Q.    Okay.  But then what I think you're

7  telling me is that you would be concerned about the

8  way they did the examination, not whether they did

9  the examination.  Do I misunderstand you?

10     A.    Right.

11     Q.    Okay.  But so what you're telling me, if

12  I understand you correctly, I want you to correct me

13  if I'm wrong, is your concern -- you would not have

14  necessarily objected to an examination of her private

15  parts if it had been done in a professional way?

16     A.    Let me clear this up for you.

17     Q.    Thank you.

18     A.    Head Start could have hired the health

19  department and took her to a doctor's office, that

20  would have been fine.

21     Q.    Okay.  But we know that didn't happen, so

22  what I really need is an answer to my question.

23     You told -- In response to your attorney's

24  question, you said you wouldn't have consented to

25  have a physical examination of her private parts?

1       A.      Right.

2       Q.      Okay.  But don't you understand that

3  generally a physical examination of a child includes

4  the examination of their private parts?

5       A.      No, I did not know that.

6       Q.      Okay.  But you're not telling me that's

7  not the case, you're just telling me you don't know

8  one way or the other?

9       A.      Right.

10      Q.      In other words, if your wife is taking

11  your daughter down to the doctor's office, you don't

12  say to her, well, now, don't let them touch her

13  private parts, do you?

14      A.      Right.

15      Q.      Because if that's part of the exam, then

16  that's part of the exam, correct?

17      A.      Right.

18      Q.      If I understand you, -- and I want you to

19  tell me if I'm wrong.  But if I understood what I

20  heard you just say when I asked you why, it was --

21  you said it's not the fact that they examined her

22  private parts, it's the way that she was in a room

23  with other people when they did that?

24      A.      Exactly.

25      Q.      Okay.  So what you're really saying, if I

1    hear you correctly, is you object to the way they

2    examined her private parts?

3        A.    Exactly.

4        Q.    But not the simple fact that they

5    examined her private parts?

6        A.    Exactly.

7        Q.    Okay.  Had it been done in a way that you

8    thought was more professional, you might have agreed

9    to allow an exam of her private parts?

10       A.    Yes, sir; yes, sir.

11       Q.    And if somebody from the health

12   department explained that they were using sanitary

13   and hygienic techniques that made it so they didn't

14   need to use gloves, might you have taken that into

15   consideration before making a decision as to whether

16   gloves were necessary?

17       A.    Not at the school, no, sir.

18       Q.    Okay.  What is it about the school that

19   requires the use of gloves?

20       A.    That's just not a place for a vaginal

21   exam.

22       Q.    Without gloves?

23       A.    With or without gloves.

24       Q.    Okay.  Well, then you kind of brought me

25   back to the other question.

1      A.     But surely not without gloves.

2      Q.     Okay.  Well, but we don't even know

3 whether Doctor Miller uses gloves --

4      A.     Right.

5      Q.     -- when he does the same exam, right?

6      A.     Right.

7      Q.     What I'm wondering is -- Well, let me ask

8 it this way:  If your wife didn't want the people who

9 were doing the exam to do the physical exam, your

10 wife could have taken your daughter and left,

11 couldn't she?

12     A.     Oh, I'm sure she could have, yes.

13     Q.     And she could have done it at any part in

14 the examination?

15     A.     I'm sure she could have, but she was at

16 work.

17     Q.     But she was with your daughter?

18     A.     Right, she was at work, and my child was

19 at -- is -- Should my child be any different than

20 anybody else's, just because her mother is right

21 there with her?

22     Q.     I'm not sure if your question answers the

23 question I've asked you.

24     My question was, if your wife wanted to

25 interrupt the examination at any point, --

1    A.    Yes, she could have left.

2    Q.    -- she could have?

3    A.    Yes, she could have left.

4    Q.    And I don't mean physically leave the

5    building, she could have simply said don't examine

6    this young lady?

7    A.    She told them that, and Peggy said, no,

8    in order for her to be in this class, she has to have

9    this physical exam right now --

10   Q.    Okay.

11   A.    -- with the other class.

12   Q.    And having been told that, your wife then

13   decided to let the exam go forward?

14   A.    Exactly.

15   Q.    Okay.  But your wife had to make a choice

16   then, didn't she?

17   A.    Right.

18   Q.    And the choice was, based upon what she

19   had been told, to allow the exam to go forward?

20   A.    Yes.

21   Q.    Okay.  And if your wife did not, was

22   willing to, if what Peggy said was correct, if your

23   wife was willing to allow your daughter to not be in

24   the program, she could have said, that's all right,

25   she doesn't need to be in the program, because she



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

                    Plaintiffs,

vs.                                  No. 99-CV-0732K(E)
HEAD START, INC., an Oklahoma
Corporation; INDEPENDENT SCHOOL
DISTRICT NO. 1 OF TULSA COUNTY,
OKLAHOMA; COMMUNITY ACTION PROJECT
OF TULSA COUNTY, OKLAHOMA, an Oklahoma
Not-For-Profit Corporation; TULSA
CITY-COUNTY HEALTH DEPARTMENT;
KD ENTERPRISES, INC., an Oklahoma
Corporation; DOE GOVERNMENT AGENTS
1 through 5; JACKIE STRAYHORN, ARNP;
K. BAKER, RN; PEGGY DOE; JOHN DOES
1 through 10; JANE DOES 1 through 10,

                    Defendants.


            **DEPOSITION OF FRANCISCO AGUIRRE**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
11:10 a.m., on July 24, 2000, pursuant to notice.



            _____
            KATHLEEN McCLANAHAN, CSR #283



            NICHOLS McCLANAHAN REPORTING
                    Two Main Plaza
            616 South Main, Suite 302
            Tulsa, Oklahoma  74119-1261
                    918/585-9969

```
 1        A.      Five months.

 2        Q.      And before that, what did you do?

 3        A.      I work at O-Z/Gedney.  That's a foundry.

 4        Q.      A foundry?

 5        A.      O-Z/Gedney, G-E-D-N-E-Y.

 6        Q.      And how long did you work there?

 7        A.      Eight and a half years.

 8        Q.      Is there any particular reason you left

 9   there?

10        A.      They closed the foundry.

11        Q.      Okay.  Now, you understand that you've

12   brought suit in this matter regarding a medical

13   examination that was conducted on your daughter at

14   Roosevelt Elementary.  Do you understand that?

15        A.      Yes.

16        Q.      What is it about this examination that

17   you're bringing suit for?

18        A.      Well, what it is, is I didn't know

19   nothing about it, I was unaware of that until the day

20   it happened.

21        Q.      Do you have any problem with the way the

22   medical examination was conducted, other than the

23   fact that you weren't notified?

24        A.      Yes.

25        Q.      And what would that be?
```

1      A.      That they didn't use no gloves.

2      Q.      Anything else?

3      A.      And they didn't let no parents be in

4  there with the children when they conducted.

5      Q.      Had you been notified of this

6  examination, would you have allowed Jessica to have

7  had the examination?

8      A.      Yes, I will.

9      Q.      Were you present when this medical

10 examination was done?

11     A.      No.

12     Q.      So would it be correct, sir, that

13 everything that you know about this medical

14 examination would be based on what someone else has

15 told you?

16     A.      Yes.

17     Q.      Okay.  Who have you spoken to about this

18 medical examination?

19     A.      My wife and a teacher from school.

20     Q.      And what teacher is that?

21     A.      I don't remember her name.

22     Q.      Was she a teacher, or was she a teacher's

23 assistant, do you know?

24     A.      I don't know.

25     Q.      Okay.  Can you describe her for me at

1      Q.    And what did this teacher tell you?

2      A.    That they were doing physical -- they did

3 the physical examination without they knowing and

4 they didn't have no gloves when they did it.

5      Q.    Anything else this teacher told you?

6      A.    No, that's all.

7      Q.    Okay.  Have you ever spoken to Jessica

8 about this examination?

9      A.    My wife has spoken to her.

10     Q.    Were you present when your wife spoke to

11 Jessica about it?

12     A.    No, I wasn't.

13     Q.    What did your wife tell you about what

14 her and Jessica talked about?

15     A.    Well, that they made her bend over and

16 open up.

17     Q.    Anything else?

18     A.    No, that's all.

19     Q.    Did your wife tell you if it was Jessica

20 who brought up this conversation or did your wife

21 initiate the conversation?

22     A.    My wife.  She had a hard time -- She was

23 shy, she was -- she didn't want to speak, so my wife

24 had to go little by little.

25     Q.    Other than this time your wife spoke to

1    Jessica about it, have either you or your wife spoken

2    to your daughter again about the examination?

3         A.    No.

4         Q.    Has Jessica ever brought it up before?

5         A.    No.  We just don't want her to remember.

6         Q.    Did any part of this exam physically

7    injure your child in any way?

8         A.    Excuse me, can you --

9         Q.    Sure.

10        Did any part of this examination injure your

11   child in any way?  Was she hurt at all by this

12   physical examination?

13        A.    Emotionally.

14        Q.    Okay, but let's first talk about any

15   physical injury, did she suffer any physical

16   injury --

17        A.    No.

18        Q.    -- as a result of this examination?

19        Okay.  You've advised me that Jessica has some

20   emotional injury.  How does that present itself?

21        A.    She used to go home and just be sad and

22   used to go to her room and just -- every time you

23   tried to speak to her, her eyes would go down.  She

24   was shy, shy to talk about.

25        Q.    Prior to this examination, had she been a

1    shy little girl before?

2         A.    No.

3         Q.    And about how long after this examination

4    did she present herself with these -- this emotional

5    injury?

6         A.    That same day.

7         Q.    And how long did that go on?

8         A.    For about a week, week and a half.

9         Q.    And did you ever feel the need to take

10   Jessica to a doctor or talk to a priest or anything

11   like that regarding her shyness?

12        A.    I took to -- I took Jessica the next day

13   to her own doctor.

14        Q.    And why did you do that?

15        A.    To see if it was right or if they did any

16   damage on her on that physical.

17        Q.    And what did the doctor tell you?

18        A.    No, that she was all right.

19        Q.    When Jessica goes to the doctor for a

20   physical examination, who is the one that usually

21   takes her, you or your wife?

22        A.    My wife.

23        Q.    Okay.  Have you ever been present for a

24   medical examination --

25        A.    Yes, sir [sic].

```
 1        A.      No.

 2        Q.      Okay.  And there is a place for a

 3   parent's legal signature on there.  Who is the

 4   signature on that?

 5        A.      That's my wife.

 6        Q.      And that's Norma?

 7        A.      Norma Aguirre.

 8        Q.      Okay.  And when is that dated?

 9        A.      08/06/98.

10        Q.      Okay.  Is that your wife's handwriting?

11        A.      Yes.

12        Q.      Have you ever spoken to your wife about

13   this document before?

14        A.      No.

15        Q.      Okay.  Now, I want to also give you the

16   opportunity to read through this document, and just

17   let me know when you're finished.

18        A.      Okay.

19        Q.      And have you read through the entire

20   document?

21        A.      All this too?

22        Q.      Yes, sir.

23        A.      Okay.

24        Q.      Okay.  Let me ask you one question before

25   we start.  Does your wife, like yourself, also read
```

1    Q.    Okay.  Has there ever been a time where

2  you disagreed with your wife regarding the medical

3  treatment -- care and treatment of your children?

4    A.    No.

5    Q.    Okay.  Have you ever felt that your wife

6  has ever done something which was not in the best

7  interest of your child?

8    A.    No.

9    Q.    Okay.  Now, how much in monetary amount,

10  the amount of money are you suing for for this

11  lawsuit?

12    A.    I don't know.

13    Q.    Well, what types of damages do you

14  believe you or Jessica have suffered as a result of

15  this examination?

16    A.    Emotional damage.

17    Q.    And can you put any type of number on

18  that?

19    A.    No.

20    Q.    Well, how would we or the jury calculate

21  that number?

22    A.    I don't know.

23    Q.    Okay.  How, if at all, has the fact that

24  Jessica had this examination affected her in any way?

25    A.    We try not to talk about that, as it was

1    pretty hard that first week for her.

2        Q.    How so?

3        A.    Well, she used to go home and just hide

4    herself.

5        Q.    And you said this lasted about a week?

6        A.    A week and a half.

7        Q.    Okay.  Is Jessica any different today

8    than she would have been had she not had the

9    examination?

10       A.    No.

11       Q.    What has happened to your daughter as a

12   result of this examination that has in any way

13   affected your daughter's life?

14       A.    We try to tell her to talk more to us,

15   whether any young or old people will make -- try to

16   make to her, you know, try to put hands around,

17   whatever, somebody wants to touch her or do something

18   they don't supposed to.

19       Q.    Okay.  Please correct me if I'm

20   mischaracterizing you in any way.  So as a result of

21   this examination, you've been able to have a more

22   open conversation with your daughter regarding

23   strangers and other people touching her?

24       A.    Yes.

25       Q.    Has this medical examination in any way

```
1        A.      Just so you can copy it.

2        Q.      Thank you.

3                MR. GOREE:  If you want to read that into

4    the record, it may help the court reporter.

5                MS. CLARKE:  It says Norris, a Dover

6    Resource Company.  N-O-R-R-I-S.

7        Q.      (By Ms. Clarke)  And what do you do for

8    them?

9        A.      I'm material handler.

10       Q.      What does that mean?

11       A.      I -- I stack couplings for shipping.

12       Q.      Okay.  You said that Jessica was -- or

13   that the exam that was performed at Roosevelt was

14   pretty hard on Jessica.  Other than her talking with

15   her mom and going to Doctor Graham, did you take her

16   to anyone else or seek counseling for her?

17       A.      No.

18       Q.      No?  You just kind of decided to let

19   it -- let's see where it goes?

20       A.      Yes.

21       Q.      And she seems to be doing just fine now?

22       A.      For now, yes.

23       Q.      Are you anticipating that she's not going

24   to be doing well?  I mean, it's been two years.

25       A.      Well, we haven't talked.  I don't know if
```

1    by talking to her about what happened that's going to

2    bother her.

3        Q.    Okay.

4        A.    It would bring it up in trying to talk to

5    her about it, may -- maybe it will bother her very

6    much.

7        Q.    But at this point, we just don't know?

8        A.    We don't know, because I haven't

9    mentioned to her about that.

10       Q.    Do you know who actually physically

11   performed the exam on your daughter, this exam?  Let

12   me back up.

13       I'm understanding that I know you have issues

14   with -- that there were no gloves used and that the

15   exam was performed without your knowing about it and

16   that there was an examination of her genitalia, but

17   specifically talking about the examination of her

18   genitalia and of the physical exam herself, do you

19   know who performed that individually?

20       A.    No, I don't know who did it.

21       Q.    Do you know why they would perform that

22   exam?

23       A.    No clue.

24       Q.    Have you ever asked anyone at Head Start

25   why that was done?

1  talk to Jessica, but she wouldn't say nothing.

2      Q.    Okay.  When you spoke to your wife when

3  you got home from work, what did she tell you?

4      A.    That they had performed an exam, and that

5  Jessica was -- was sad, she was in her room, and then

6  we went to school and find out from the teacher what

7  had happened.

8      Q.    Okay.  And you and your wife went to

9  school that same day?

10     A.    Yes.

11     Q.    Okay.  When your wife first told you

12  about the exam, how did you react?

13     A.    Well, I was surprised, you know, 'cause

14  that was the first time that ever happened.

15     Q.    Okay.  When you say you're surprised, how

16  did your surprise culminate, how did it come about?

17     A.    Well, I felt a little bit anger.

18     Q.    Did you raise your voice to your wife?

19     A.    No.

20     Q.    Okay.  When you spoke to Jessica, what

21  was your demeanor?

22     A.    Well, she wouldn't say nothing.

23     Q.    Okay.  What did you -- Were you able to

24  talk to her at all about the examination?

25     A.    I tried to talk to her, but my wife is

1    the one that got more words on her.

2        Q.    Okay.  And tell me what -- When you said

3    you tried to talk to her that day when you got home,

4    what did you say to her?

5        A.    What -- what was going on, and she only

6    turn her eyes down, and she wouldn't say nothing.

7        Q.    What was your tone of voice?

8        A.    Mine?

9        Q.    Yes, sir.

10       A.    Oh, it was just easy, calm.

11       Q.    Now, when Jessica was examined the next

12    day at Doctor Graham's office, was this the first

13    time, other than the time at Roosevelt Elementary,

14    that she had had a vaginal or a genital examination?

15       A.    Well, I cannot recall that.

16       Q.    Okay.  Would your wife know better?

17       A.    Maybe.

18       Q.    Okay.  Now, the next day when you took

19    Jessica to see Doctor Graham, did she go back to

20    school after that examination?

21       A.    Yes.

22       Q.    Was Jessica's emotional state better or

23    worse than -- after she received the examination from

24    Doctor Graham?

25       A.    Well, she was still afraid.

1       Q.    Was she more afraid the day she received

2  the exam from Doctor -- after she received the exam

3  from Doctor Graham than she was when she received the

4  exam at Head Start?

5       A.    Yes.

6       Q.    So let me make sure I understand you.

7  Jessica was more afraid after she received the

8  examination from Doctor Graham?

9       A.    She was --

10       MR. GOREE:  I object to the form of the

11  question.

12       A.    She was afraid.  She was telling that --

13  Well, she was afraid.

14       Q.    (By Ms. Ziolkowski)  Okay, but was she

15  more or less afraid the next day --

16       A.    More afraid.

17       Q.    -- when she received the examination?

18       A.    She was more afraid.

19       Q.    Okay.  Did you bring any documents

20  responsive -- Did you bring any documents here today

21  to your deposition?

22       A.    No.

23       Q.    Okay.

24       MS. ZIOLKOWSKI:  Mr. Goree, are we going

25  to have any documents responsive to the subpoena

1    Q.    Okay.  I'm going to present to you what's

2  called an authority to release medical and/or

3  hospital records.  I ask that you review this, your

4  attorney has already reviewed it, and then sign that

5  at the completion of the deposition.  Do you have any

6  problem with that?

7    A.    No.

8        MS. ZIOLKOWSKI:  Okay.  I don't have any

9  further questions.

10        FURTHER REDIRECT EXAMINATION

11  BY MS. CLARKE:

12    Q.    I think I just have one.

13        It sounded to me like you were about to say

14  either when you were going to or from the visit with

15  Doctor Graham that Jessica was telling you something.

16  Was she saying anything to you, or did -- when you

17  took her to see Doctor Graham or when you were coming

18  back from Doctor Graham, about the examination?

19    A.    I didn't say nothing like that.

20    Q.    I know you didn't.  It sounded to me like

21  you were going to and you stopped yourself.

22    A.    No.  No, I wasn't.

23    Q.    So Jessica never expressed anything to

24  you about, one, the examination --

25    A.    She just sat down and be lonely.

1    Q.    So she never spoke to you, only to your

2  wife about the examination performed by Head Start,

3  correct?

4    A.    Yes.

5    Q.    What about the examination from Doctor

6  Graham, did she express anything to you about that

7  examination --

8    A.    No.

9    Q.    -- or to your wife?

10   A.    No.

11   Q.    And in the car ride over there, she

12 didn't talk to you about the examination, and when

13 I -- Let me rephrase that so it's more clear.

14    On the car ride to the examination at Doctor

15 Graham's office, did you discuss the Head Start

16 examination?

17   A.    No.

18   Q.    Did you discuss with Jessica why she was

19 going to Doctor Graham's?

20   A.    No.

21   Q.    So Jessica had no idea why she was going

22 to Doctor Graham's for an examination?

23   A.    No.

24   Q.    On the way -- Did you take Jessica

25 directly to school from Doctor Graham's office?

1     A.     No.

2     Q.     Where did you go?

3     A.     Home.

4     Q.     And did she go to school that day at all?

5     A.     I don't remember if she did.

6     Q.     On your way back from Doctor Graham's to

7 home, did you discuss the examination?

8     A.     No.

9     Q.     Okay.  And you didn't discuss the Head

10 Start examination?

11     A.     No.

12     Q.     Did she ever talk to you about the

13 individuals who performed -- or to your wife, did she

14 ever discuss the individuals who performed the Head

15 Start examination?

16     A.     No, she didn't.

17     Q.     Okay.  And in your meetings with the

18 parents and Head Start, did you ever discuss the

19 individuals who performed the examination?

20     A.     Well, we discussed about why they never

21 were present whenever we had our meeting.

22     Q.     Why the examiners were not there?

23     A.     Yes.

24     Q.     Or the nurses?

25     A.     The nurses.

1      Q.    And what was -- Did you ask them why they

2  weren't there?

3      A.    Yes.

4      Q.    And what was their response?

5      A.    That that was their manager's fault, the

6  supervisor's fault.

7      Q.    It was the supervisor's fault that they

8  weren't there?

9      A.    Uh-huh.

10     Q.    Were they instructed, to your

11  understanding, not to be there?

12     A.    Not to be there.

13     Q.    Was there somebody there representing

14  them?

15     A.    Yes.

16     Q.    Who?

17     A.    A man.  There were about -- some people

18  there, I don't know.

19     Q.    And were they able to answer your

20  questions?

21     A.    They were only apologizing, not answering

22  any questions.

23     Q.    Okay.

24           MS. CLARKE:  I think those are all my

25  questions.

R

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al, and )
SHANTILYA BARNES, et al, )
)
           Plaintiffs, )
)
    vs. )          Case No. 99-CV-0732K(E)
)                 Case No. 99-CV-733K (B)
HEAD START, INC., et al )
)
           Defendants. )


        DEPOSITION OF JEROME LEE, taken at 2900 Mid-Continent
Building, Tulsa, Oklahoma, on the 26th day of October, 2000, on
behalf of the plaintiffs, before the undersigned Certified
Shorthand Reporter, pursuant to stipulations of the parties.

        Fee for original, $        paid by plaintiffs.


_____
Michael A. Bailey, CSR-RPR-CLVS




COPY

A     No.  Although I was there.

Q     Have you gone through the same type of training that Jackie Hope went through there in Dallas?

A     No.

Q     Was Jackie Hope the health manager for Community Action Project on and before November 5th, 1998?

A     Yes.

Q     And what was the health manager responsible for?

A     The health manager is responsible for ensuring that we meet the performance standards, the portion of the performance standards outlined in the health and education portion, primarily responsible for the health portion of the performance standards.

Q     And from what entity did those performance standards come?

A     The federal government.

Q     And do you have copies of those standards within the records of Community Action Project?

A     Yes.

Q     Were you in a superior position to Jackie Hope on or about November 5th, 1998?

A     Yes.

Q     Who was her immediate supervisor?

A     Me.

Q     Was Jackie Hope an employee of Community Action Project

1    A    Would you rephrase the question?

2    Q    (By Mr. Goree) Yes, sir.  Would it then be part of your

3    requirement before November 5th, 1998, to give Jackie Hope any

4    instructions about obtaining written parental consent for

5    examination of enrollees of Head Start?

6            MR. HELFAND:  Same objection.

7    A    I'm not sure exactly what you are asking or what you're

8    saying.

9    Q    (By Mr. Goree) Was anyone responsible for the training

10   of Jackie Hope concerning written consent of parents for

11   medical examinations in the Head Start program?

12           MR. HELFAND:  Object to the form of the question.

13   A    No.

14   Q    (By Mr. Goree) Do you personally believe that it is

15   required that you get written consents from parents of minor

16   children in the program before physical examinations are

17   conducted?

18           MR. BEGIN:  Object to the form.

19           MR. HELFAND:  Object to the form of the question.

20   A    Would you rephrase your question for me?

21   Q    (By Mr. Goree) Are you, Jerome Lee, personally of the

22   opinion that you should obtain written consent forms from

23   parents before your employees or someone under their direction

24   or contract conduct physical medical examinations of minor

25   children in the Head Start program?

1    they're in these books.

2        Q    (By Mr. Goree) What, if anything, did you personally,

3    Jerome Lee, do before November 5th, 1998, concerning proper

4    consent forms for the parents of the children who were examined

5    at Roosevelt Elementary School on November 5th, 1998?

6        A    Would you repeat the question again?

7        Q    What, if anything, did you, Jerome Lee, personally do

8    concerning consent of parents for the examination of their

9    minor children enrolled at the Head Start program at Roosevelt

10   Elementary School on November 5th, 1998?

11       A    Could you repeat that one more time, please?

12       Q    Would you mind if we just have the reporter read back?

13       A    That would be fine.  That would be fine, thanks.

14       (Thereupon, the last question by counsel was read back by

15   the reporter.)

16       A    I personally did nothing.

17       Q    (By Mr. Goree) If you personally did nothing in that

18   context, did anyone for Community Action Project do anything in

19   that connection?

20       A    Yes.

21       Q    Who did something?

22       A    Our health department -- our health area.

23       Q    And who was in the health area?

24       A    Jackie Hope and our LPNs.

25       Q    What did Jackie Hope do in that context, if you know?

1    plaintiff's custody, possession or control, made by any

2    defendant or any of its employees, agents or representatives.

3        To date, I have not received any such statements from any

4    of the plaintiffs in this matter.  If you have any statements

5    made by any CAP employee or representative, including Mr. Lee,

6    you must produce them to me immediately unless you have

7    provided a copy of these statements to either me or Bill prior

8    to the deposition, no CAP deponent will offer any testimony

9    regarding these alleged statements at their depositions."

10   This was faxed to you on October -- actually, it was faxed

11   to your son, Christopher, on October 23rd, 2000.  That was

12   Monday.  I have heard nothing back from you.  Why in the world

13   don't I have these in response to a subpoena duces tecum that

14   was served months ago?

15       MR. GOREE:  I have not seen that letter before and you

16   are characterizing this as meeting that qualification.  I'm not

17   sure that it does.

18       MR. HELFAND:  Are you going to ask him about statements

19   he made in here?

20       MR. GOREE:  Of course I am.

21       MR. HELFAND:  He's not going to testify to them.  That

22   letter stands.  I have faxed proof that you received it.

23   Whether you have seen it is not my concern.  It's been

24   delivered to your office.

25       MR. GOREE:  You asked, sir, that it be provided

1    Q    (By Mr. Goree) Did someone tell you they had had a

2    lapse of memory about anything that you reported to at that

3    meeting?

4         MR. BEGIN:  Object to the form.

5         MR. HELFAND:  I will join the objection.

6    A    I'm not sure what you're --

7    Q    (By Mr. Goree) Did you talk with Peggy Terry after

8    November 5th, 1998, about the notices to parents?

9    A    Yes.

10   Q    What did you ask her about, if you did?

11   A    I don't remember the general conversation.

12   Q    Did you talk with Jackie Hope about the notices to the

13   parents after November 5th, 1998?

14   A    Yes.

15   Q    What did she tell you about that?

16        MR. HELFAND:  Excuse me.  You need to limit that

17   question in time, please.

18   Q    (By Mr. Goree) Okay.  Let me ask you again.  Did you

19   talk to Jackie Hope after November 5th, 1998, but before the

20   meeting in the cafeteria on or about November 11th, 1998, about

21   the notices?

22   A    Yes.

23   Q    What did she tell you?

24   A    Again, I don't remember the general conversation.

25   Q    Did you tell the parents that you dropped the ball on

1   were examined on November 5th, 1998, who had had several other

2   genital exams by the Tulsa City-County Health Department before

3   November 5th, 1998?

4     A   No.

5         MR. HELFAND:  Object to the form of the question.

6     Q   (By Mr. Goree) Mr. Lee, do you know whether any of the

7   minor plaintiff children in this case had medical reports from

8   doctors already furnished to Head Start before November 5th,

9   1998?

10     A   No.

11     Q   You have said in answer to one of my questions that

12  notices were not mailed to parents.  Was any notice of the

13  impending examinations sent to parents in any other way?

14     A   I don't have -- I don't know.

15     Q   Has Jackie Hope told you who she gave notices of

16  examinations to?

17     A   No.

18     Q   After November 5th of 1998, and before November 11th,

19  1998, did you talk to Edna Brown about the examinations?

20     A   I don't remember.

21     Q   Was Peggy Terry an employee of Community Action Project

22  on November 5th, 1998?

23     A   Yes.

24     Q   Mr. Lee, I'm going to hand you a plaintiff's exhibit

25  marked number 1 which was identified in a previous deposition

1    language in there gives that consent?

2            MR. HELFAND:  Object to the form of the question.

3    A    I'm not sure I can answer that.

4    Q    (By Mr. Goree) Would you agree with me that the word

5    "genitalia" does not appear anywhere on Plaintiff's Exhibit

6    Number 7?

7    A    Yes.

8    Q    Would you agree with me that the word "blood" does not

9    appear anywhere on Plaintiff's Exhibit Number 7?

10   A    Yes.

11   Q    I'm going to hand you now a copy of Plaintiff's Exhibit

12   Number 8 which was used in a previous deposition.  Will you

13   take a look at that?

14           MS. HART:  Jack, what is Plaintiff's Exhibit Number 8?

15           MR. GOREE:  Community Action Project form that says

16   "Parent Consent Form" at the top.

17           MS. HART:  Thank you.

18   Q    (By Mr. Goree) Does that say "Parent Consent Form" at

19   the top?

20   A    Yes.

21   Q    What company created this form, if you know?

22   A    Community Action Project.

23   Q    And do you see anywhere in Plaintiff's Exhibit Number 8

24   that gives someone the permission to examine the genitalia of

25   children in the Head Start program?

1    contact about our coming over to review documents at your

2    office?

3          MR. HELFAND:  Don't answer questions about

4    conversations between me and him.

5          MR. GOREE:  Well, I think you told me that you would

6    make these available.  I just want to know if he is going to

7    direct it.

8          MR. HELFAND:  You contact me; I will make them

9    available.

10         MR. GOREE:  I will do that.

11         MR. HELFAND:  He's not going to discuss with you who he

12   talks to, what he talks to the lawyers about.

13         MR. GOREE:  Counsel, did you bring copies of this for

14   everyone?

15         MR. HELFAND:  No, I need to make copies of that.

16         MR. GOREE:  Do you think it would be appropriate to ask

17   this law firm here to copy it before we all leave?

18         MR. HELFAND:  I will do just that, yeah.

19         MR. GOREE:  Off the record.

20    (Plaintiff's Exhibits Numbers 13 through 15 marked for

21    identification.)

22    Q    (By Mr. Goree) Mr. Lee, I'm going to hand you what I

23   have just marked as Plaintiff's Exhibit Number 13.  Will you

24   take a look at that?

25    A    (Witness complies.)

S

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al,                    )
                                      )
                Plaintiffs,           )
                                      )
        vs.                           )    Case No. 99-CV-0732K(E)
                                      )
HEAD START, INC., et al               )
                                      )
                Defendants.           )

      <u>DEPOSITION OF MARY ANN WELKER</u>, taken at 525 South Main, Suite 1400, Tulsa, Oklahoma, on the 15th day of November, 2000, on behalf of the plaintiffs, before the undersigned Certified Shorthand Reporter, pursuant to stipulations of the parties.

      Fee for original, $      paid by plaintiffs.

_____
Michael A. Bailey, CSR-RPR-CLVS

COPY

1    finish my question --

2    A    Okay.

3    Q    -- until you answer.

4    A    Yes, sir.

5    Q    Tell me who you did arrange to send out there from the

6    Tulsa City-County Health Department on November 5th, 1998?

7    A    Jackie Strayhorn, Kim Baker, Jackie Jordan.  There were

8    guidance people, but I was not responsible for scheduling them.

9    And I don't remember any -- anybody else.

10   Q    All right.  Is it likely there were other people you

11   just don't remember or there probably weren't?

12   A    That I was responsible for scheduling?

13   Q    Yes, ma'am?

14   A    No, sir.

15   Q    Now, what was the -- I'm going to back up a little

16   bit.  At some point in time before you arranged to have Jackie

17   Strayhorn, Kim Baker, and Jackie Jordan go out to Roosevelt to

18   conduct these, did you have a discussion with anyone from

19   Community Action Project, Head Start, about getting consent

20   from parents?

21   A    That was covered at the meeting that we had initially.

22   Q    And who said anything about consent of parents at that

23   meeting?

24   A    They apparently had permission in the -- that they have

25   used in the past they were going to use.  Doug Ressler offered

1    our paperwork, the ones that we use, but they felt comfortable

2    were their own.

3        Q    Did you personally take a look at the forms that Head

4    Start was going to use to obtain permission?

5        A    No, sir.

6        Q    Who did you talk to later, if you did, about written

7    consent of parents?

8            MS. PHILLIPS:   Objection.   That's pretty vague.

9        A    Excuse me?

10       Q    (By Mr. Goree)   Did you speak with anyone after that

11   planning meeting about obtaining written informed consent from

12   parents?

13       A    No, sir.

14       Q    If Jackie Hope has testified that she discussed that

15   with you, do you think she's just wrong or maybe you don't

16   remember?

17       A    I don't remember.

18       Q    All right.   Did anyone at Community Action Project or

19   Head Start make any statements that they would be responsible

20   for obtaining the informed written consent of parents?

21       A    That's what we just spoke of.   At the meeting, they

22   were going to be responsible for getting permission from the

23   parents.

24       Q    All right.   Now, what, if anything, did you do before

25   November 5th, 1998, to determine if written informed consent of

T

1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT

3    JACK DUBBS, et al,                    )
                                           )
4                   Plaintiffs,            )
                                           )
5       vs.                                )   Case No. 99-CV-0732K(E)
                                           )
6    HEAD START, INC., et al               )
     EVANS,                                )
7                                          )
                    Defendants.   )
8

9

10       DEPOSITION OF DOUGLAS ROBERT RESSLER, taken at 525
     South Main Street, Suite 1500, Tulsa, Oklahoma, on the 19th day
     of October, 2000, on behalf of the plaintiffs, before the
11   undersigned Certified Shorthand Reporter, pursuant to
     stipulations of the parties.
12

13           Fee for original, $        paid by plaintiffs.

14   _____
     Michael A. Bailey, CSR-RPR-CLVS
15

16

17

18

19

20

21

22   COPY

23

24

25

1     A     It would have been August -- late August 1998.

2     Q     And what were the circumstances of your discussing

3     that?  Did you bring it up or did she is what I want to know.

4     A     We were -- when we were talking about all the details

5     of setting up the clinics, one was the which records are to be

6     used and which forms and such, and at that point we said this

7     is -- these are some suggested consents to be used and forms

8     and -- and that was what brought it up there, what -- because

9     they were starting out from scratch.

10    Q     Did you ultimately agree upon a Tulsa City-County

11    Health Department form for consents?

12    A     We did not -- we did not -- did not approve their

13    form.  We didn't really see a form after they had made it.

14    Q     All right.  Did Community Action Project agree to

15    obtain written informed parental consent before you did medical

16    exams?

17    A     Yes, sir.

18    Q     And when was that agreement made -- in the contract?

19    A     I don't believe that was in the contract.  That was an

20    agreement that we had between them on August 31st, that they

21    would take that responsibility.

22    Q     All right.  Now, do you just remember offhand when the

23    contract was entered into with --

24    A     I think the Board of Health signed it in November 1998.

25    Q     All right.

1          MS. ZIOLKOWSKI:  Object to the form.

2      A    I asked Mary Ann Welker, the manager, what their

3  understanding was of the exams that day, if there had been any

4  abnormalities at all.

5      Q    (By Mr. Goree) Abnormalities in the results or the

6  examination process?

7      A    The process.

8      Q    And what did she tell you?

9      A    There was no -- nothing abnormal as far as her -- from

10 her perspective.

11     Q    Did she, Mary Ann Welker, tell you that she had assured

12 the nurses that were going out there that Community Action

13 Project was taking care of the parental consent?

14     A    Yes.

15     Q    When you went to the meeting at the cafeteria out at

16 the school, did you and Mr. Lee address the audience?

17     A    I feel -- Mr. Lee did, yes.  He had a statement for

18 them and I was -- as I recall, I was asked two questions from a

19 couple of the parents.

20     Q    And do you recall what those questions were?

21     A    One parent, a father, asked why the genital exam was

22 performed; that he had spoken with his physician and that he

23 was told by his physician that the genital exam was not a

24 routine part of the exam.  I just said that it was a routine

25 part of standard procedure for our procedure -- our exams and

1  to be disciplined or punished or something of that type?

2      A    No.

3      Q    Did you hear Mr. Lee at the meeting on November 11th,

4  1998, state that in the future both he and the health manager

5  will have cellular phones and they will make adjustment in the

6  forms that are currently used?

7      A    I don't recall a cellular phone statement at all.

8      Q    If this newspaper reporter said that Mr. Lee, quote,

9  "The person had a memory lapse," you don't remember that?

10     A    No, sir.

11     Q    At the meeting on or about November 11th, 1998, did you

12  hear Jerome Lee state, quote, "We dropped the ball.  I

13  understand how they feel, I have a three-year-old myself"?

14     A    I recall that, yes.

15     Q    Do you recall he said, "We should have double checked

16  to make sure the consent forms were sent"?

17     A    No, I don't recall that one.

18     Q    What was the primary purpose of the Tulsa City-County

19  Health Department conducting physicals of the Head Start

20  enrollees at the Roosevelt Elementary School on November 5th,

21  1998?

22     A    To offer access to the children on-site physicals.

23     Q    But what was the purpose of doing the -- offering the

24  exam and having the exams?

25          MR. BEGIN:  Asked and answered.  You can answer it

U

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

JACK DUBBS, et al,                    )
                                      )
                    Plaintiffs,       )
                                      )
        vs.                           )    Case No. 99-CV-0732K(E)
                                      )
HEAD START, INC., et al               )
                                      )
                    Defendants.       )


        DEPOSITION OF JACQUELINE LOU STRAYHORN, taken at 20
East Fifth Street, Suite 405, Tulsa, Oklahoma, on the 17th day
of October, 2000, on behalf of the plaintiffs, before the
undersigned Certified Shorthand Reporter, pursuant to notice.

        Fee for original, $      paid by plaintiffs.


Michael A. Bailey, CSR-RPR-CLVS

COPY

1    1998?

2    A    In the child health clinic.

3    Q    And where was that?

4    A    Third and Utica.

5    Q    That was the Tulsa City-County Health Department,

6    correct?

7    A    Yes.

8    Q    And did you get any forms or documents to take with you

9    when you went out to the Roosevelt Elementary School?

10   A    No.

11   Q    Did you have a briefcase or something which contained

12   documents which you usually carry with you?

13   A    No.

14   Q    Did you take anything of instruments or tools or --

15   A    Yes.

16   Q    -- documents?

17   A    I took my own otoscope, stethoscope.

18   Q    What else?

19   A    That's all.

20   Q    Did you take a biohazard box?

21   A    I didn't take it personally.

22   Q    Was there one out there provided?

23   A    Yes.

24   Q    And so basically, all you took then was your

25   stethoscope?

1    Q    Do you look for red blood cells --

2    A    Yes.

3    Q    -- in the hemocrit?

4    A    Yes.

5    Q    Now, is the hemocrit the test --

6    MR. BEGIN:  I think it's a hematocrit.

7    A    Hematocrit.

8    Q    (By Mr. Goree) Hematocrit.  Excuse me, hematocrit.

9    A    Uh-huh.

10    Q    Now I forgot my question

11    MR. BEGIN:  I'm sorry.

12    Q    (By Mr. Goree) Is the hematocrit the name of the test?

13    A    Yes.

14    Q    What other instrument was used with the hematocrit

15 test?

16    A    It's called a hemacue.

17    Q    Spell that, please.

18    A    It's just like it sounds, only I think it's C-U-E,

19 uh-huh.

20    Q    H-E-M-A-T-A-C-U-E?

21    A    C-U-E. H -- hemacue.

22    Q    All right.  And hema means blood, doesn't it?

23    A    Right.

24    Q    And cue usually means an interpretation of some kind,

25 doesn't it?

1    Q    So as far as you know, none of the blood of the

2    children actually left the premises there?

3    A    No.

4    Q    Now, what, if anything, did you do to sterilize the

5    plastic mat on which these examinations were done?

6    A    You don't have to.

7    Q    Why not?

8    A    Because the blood doesn't touch the -- it's all inside

9    the little glass.  It's not a tube, it's flat.  The blood goes

10   between two parts.  No blood gets on it.

11   Q    Okay.  So we are talking right now about the blood

12   test, but there were other sections to be tested as well; is

13   that right.  Other parts of the examination other than the

14   blood test?

15   A    I don't -- I'm not sure what you're --

16   Q    Okay.  Did you use your stethoscope in conducting

17   examinations?

18   A    Oh yeah, yes.

19   Q    Did you use the otoscope, I believe you described?

20   A    Yes.

21   Q    And you looked in the nose, the mouth, and the eyes and

22   the ears of each of the children you examined; did you not?

23   A    Yes, I did.

24   Q    And between times, that particular instrument was lying

25   on the mat on top of the desk, wasn't it?

1        THE WITNESS: I can?

2        MR. BEGIN: Yeah.

3    A    It is not an invasive procedure.

4    Q    All right. Are you familiar with the -- I'm going to

5 get into that later, strike that. Where was Peggy at the time

6 you were conducting the examinations on your part of it?

7    A    I don't know.

8    Q    Was she in and out of the area?

9    A    I believe she was.

10    Q    Was this room like a gymnasium?

11    A    It was pretty big.

12    Q    Did it have a wooden floor?

13    A    Yes.

14    Q    Was it well lighted in there?

15    A    Yes.

16    Q    Did you bring lights with you of any kind --

17    A    No.

18    Q    -- from the health department?

19    A    No.

20    Q    Did you feel that it was necessary as you conducted

21 your examinations to have additional lighting?

22    A    No.

23    Q    You felt the lighting was adequate in that room then?

24    A    Yes.

25    Q    Did it have illumination there other than natural light

1    coming through windows?

2    A    There were lights on.

3    Q    Were there overhead lights?

4    A    Yes.

5    Q    Was this a particularly high ceiling or do you know?

6    A    I don't remember.  Not particularly.

7    Q    Mrs. Strayhorn, prior to conducting any of these

8    medical examinations of those children there, did you see any

9    written parental permission forms?

10   A    No.

11   Q    Did you look?

12   A    Yes.

13   Q    Where did you look?

14   A    In the folder.

15   Q    Was there a folder on each child?

16   A    Yes.

17   Q    And did you look and determine that there were no

18   written parental permission forms in any of the folders?

19   A    Yes.

20   Q    Who gave you permission to conduct the physical

21   examinations of the children?

22   A    I was told that Community Action Project would take

23   care of the releases being signed, and that I -- that was not

24   for me to do.

25   Q    By your answer, does that mean that you knew that they

V

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

        Plaintiffs,

vs.                  No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; et al.,

        Defendants.
_____
SHANTILYA BARNES, Individually,
and SHANTILYA BARNES as Mother.
and Next Friend of GERALD BARNES,
a minor; et al.,

        Plaintiffs,

vs.                  No. 99-CV-0733K(J)

HEAD START, INC., an Oklahoma.
Corporation; et al.,

        Defendants.

**DEPOSITION OF FREDRIC P. NELSON, M.D.**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants, at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:10 a.m., on December 4, 2000, pursuant to notice and
subpoena.

DANA L. YOUNG, CSR #01168

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma 74119-1261
918/585-9969

1    here about?

2         A.    Yes.

3         Q.    Great.

4    And have you brought correspondence between you

5    and Mr. Goree's office regarding your proposed report

6    and testimony?

7         A.    Yes.

8         Q.    Great.

9    Have you brought with you drafts of any

10   documents, memoranda or writings you've made with

11   respect to any issue in either of the lawsuits we're

12   here about?

13        A.    Yes.

14        Q.    All right.  Have you had any communications

15   with any representatives of the Rutherford Institute

16   regarding any of the incidents in either of these two

17   cases?

18        A.    No.

19        Q.    Are you a member of the Rutherford

20   Institute?

21        A.    No.

22        Q.    Do you donate money to the Rutherford

23   Institute?

24        A.    No.

25        Q.    Did the Rutherford Institute pay all or any

1    Q.    Okay.  I want to skip first to what I

2  identify -- and I'll invite you to show me otherwise

3  after we're finished.  But I want to skip first to

4  page 6 and the section titled "Genital Examinations."

5  Do you see where I'm talking about?

6    A.    Yes.

7    Q.    Okay.  Now, I see in these three paragraphs

8  essentially medical expertise as to the propriety,

9  nature, and conduct of the examination of genitalia of

10  children.  Do I see this generally correctly?

11    A.    Yes.

12    Q.    This is -- so here -- tell me if I'm wrong.

13  Here you are a pediatrician, a Fellow of the American

14  Academy of Pediatricians, telling us what

15  pediatricians ordinarily do with respect to genital

16  examinations of children in the age range of three to

17  five.

18    A.    That's correct.

19    Q.    All right.  And as a pediatrician and a

20  Fellow, I take it that it is within your expertise to

21  tell us what pediatricians do?

22    A.    That is correct.

23    Q.    Okay.  Let's take a look at that for a

24  second.

25    First of all, the American Academy of Pediatrics

1   recommends external genital examinations on all

2   routine physical examinations for children within the

3   three to five age range and actually before and after

4   that?

5       A.   Yes, actually any time a routine

6   examination is conducted, they consider a genital

7   examination part of that routine examination.

8       Q.   All right.  Would you then assert that any

9   pediatrician who does a routine examination should do

10  a genital examination of a child regardless of whether

11  it's a boy or girl?

12      A.   That's correct.

13      Q.   All right.  And any parent then that would

14  observe the examination of their child, whether it was

15  this examination or another, if it were a routine

16  examination, would likely have observed, if it were

17  conducted properly, a genital examination of the

18  manner which is recommended by the American Academy of

19  Pediatrics?

20      A.   Presumably, if all pediatricians are

21  performing that examination.  But some choose not to

22  for various reasons.

23      Q.   All right.  But you would expect them to do

24  so generally?

25      A.   I would expect them to do so.  But the

1    question is:  Would parents have been exposed to that?

2    I don't know.  Not necessarily.

3         Q.    All right.  Then the second paragraph tells

4    us particularly about the specific mechanism of

5    examination of the genitalia of a female patient.

6    Right?

7         A.    Between the ages of three and five, yes.

8         Q.    Okay.  And again, obviously I don't need to

9    read it, but can I paraphrase it by basically saying

10   that the child's genital area is exposed and

11   visualization of the genital area is appropriate?

12        A.    Yes, that's correct.

13        Q.    Is palpation or touching of the majora

14   labia -- excuse me -- the labia majora from the labia

15   minor appropriate in order to determine whether there

16   are any adhesions?

17        A.    Generally that is not necessary.  With a

18   child three to five years of age lying on an exam

19   table, if you've started -- usually I have -- I start

20   with them sitting up and I start with the ears, eyes,

21   nose, throat.  Work my way down to the lungs.  Have

22   them lie down and listen to the heart.  Then palpate

23   the abdomen.  Then take the panties off.  And you have

24   them flex the knees and the hips and then abduct or

25   spread the knees, usually the gen -- the external

1    gloves for that?

2        A.    Not in this age group, no.

3        Q.    Is there a need to use gloves and you

4    simply don't?  Or is that simply a reasonable risk to

5    not use gloves?

6        A.    There's no risk if you wash your hands.

7        Q.    Okay.  Now, did you find any information in

8    any of the -- anything you've reviewed in this case to

9    indicate that any of the health-care providers failed

10    to wash their hands like you do in between exams?

11        A.    Well, there was very sketchy information on

12    it.  In the depositions, there was a reference to the

13    fact that the nurse practitioners cleaned their hands.

14    From my visualization of the setup, it doesn't seem

15    that, you know, there was soap and water available.

16    It sounded like they probably had wipes.  But that's

17    purely speculation and maybe they did wash their

18    hands.

19        I don't fault -- I do not fault at all the

20    conduct of the examinations that they did.

21        Q.    Okay.  Do you find any unusual or septic

22    techniques that were utilized in the exams at either

23    Wiley Post or Roosevelt from anything that you've

24    seen?

25        A.    Everything is relative.

1      Q.    In order to do hemoglobin testing, is it

2 required that some blood be extracted from the child?

3      A.    Yes.

4      Q.    Is that normally done with a pinprick or a

5 finger prick?

6      A.    Either that or a needle draw.

7      Q.    In this case, how was it done?  Do you

8 know?

9      A.    No.  Well, I shouldn't say that.  I think

10 they did finger pricks.

11      Q.    Okay.  And would hemoglobin testing be part

12 of -- an appropriate part of a well child examination

13 of a three-to-five-year-old child?

14      A.    It may be included.  It is a reasonable

15 inclusion maybe once every few years.

16      Q.    Have you looked at the Oklahoma standards

17 for when children should be tested for hemoglobin?

18      A.    No.

19      Q.    Okay.  And are children tested for

20 hemoglobin outside the context of an examination?

21      A.    Certainly.

22      Q.    Okay.  And so you would think that a parent

23 going down this sheet, Exhibit Number 3, would be

24 thinking they were authorizing these medical tests

25 outside the context of an examination of their child?

1    individual's role was, can you criticize one health

2    care provider for relying upon another licensed health

3    care provider as to the status of consent forms and

4    proceeding with physicals at that point?

5          A.    Well, I guess I'll initially answer it no.

6          Q.    Okay.  Do you have a supplemental answer or

7    a subsequent answer?

8          A.    Well, like I'm very much in the dark.  It's

9    hard to give answers that have, you know, sound and

10   that will have any meaning whatsoever unless I have

11   all the reasonable facts.

12         Q.    Okay.  You said earlier that -- and I think

13   you indicate in your report that physical exams

14   without medical history are -- I think you referred to

15   it as dubious at some point and ludicrous at another

16   point.

17         A.    No, not at all.  The only mention of

18   ludicrous was using it as a consent form.  That

19   ludicrous was used with that.

20         Q.    Okay.  Can you and I agree that there are

21   certain physical developmental problems that can be

22   assessed and diagnosed without any history whatsoever?

23         A.    Well, yes.

24         Q.    Okay.  So under that scenario, a well child

25   physical would be helpful in the continuum of care,

1   there have been some problems the way it's been

2   conducted here in the Head Start program here in

3   Tulsa, Oklahoma.

4       Q.   Well, but let's just take, for example, you

5   pointed to the consents.  I've shown you Exhibits 2

6   and 3 to the Brown deposition.

7       Are those different from the consents that are

8   used, for example, at the Head Start program in

9   Cleveland, Ohio, or Philadelphia, Pennsylvania?

10      A.   Well, certainly there would be some minor

11   differences as far as the fact that this refers to

12   Tulsa County.  Outside of that, I cannot say that this

13   form is not used elsewhere in obtaining emergency

14   treatment.

15      Q.   Well, no.  But I'm telling you my client

16   used that not just for emergency treatment, but for

17   exams that occurred at Roosevelt Elementary.  My

18   question is:  Do you know whether other Head Start

19   programs around the country use identical or

20   substantially similar forms for the same purpose?

21         MR. GOREE:  I'll object to the form of the

22   question.

23      A.   First of all, I don't think we've

24   established that this form was used for parental

25   permission for routine physical care.  You alluded to

1   that.  That has never -- that has not been

2   established, number one.  And number two, I have -- I

3   do not know if other Head Start programs use identical

4   form for obtaining treatment and care or for -- as a

5   form of consent for routine physical examinations.

6        Q.   (By Mr. Helfand)  Okay.  What you've told

7   me first is you don't even know whether 2 and 3 were

8   the forms utilized by the Head Start program as

9   consent for the examinations we're here about; right?

10       A.   I have stated that it doesn't give you

11  consent for routine physicals.

12       Q.   No, my question -- that's a different

13  question.  That's the answer to a question I didn't

14  ask you.

15       My question was:  You don't even know whether the

16  Head Start program, Community Action Project, relied

17  on Exhibits 2 and 3 to the Brown deposition as what

18  they believed was adequate consent for the

19  examinations in this case, do you?

20       A.   No.

21            MR. GOREE:  I'll object to the form of the

22  question.

23       Q.   (By Mr. Helfand)  So you can only learn

24  that from obtaining more evidence; right?

25       A.   That is true.

1     Q.    Right.

2     A.    So I have no objection to Exhibit 3 at all.

3     Exhibit 2 is taken separately from Exhibit 3 and

4     not to be confused with 2. And the question is: Is

5     there any specific body of medical literature? I

6     think, yes, and let me give you a copy of the policies

7     taken from the American Academy of Pediatrics.

8     (Off the record.)

9     Q.    Okay. Doctor, if you want to show us that

10    authority.

11    A.    It's titled "Informed Consent, Parental

12    Permission, and Assent in Pediatric Practice,

13    (RE9510)." Volume 95, Number 2, February 1995.

14    Published by the American Academy of Pediatrics by a

15    Committee on Bioethics.

16    Q.    Okay. And let me make a copy of that. And

17    before we do, just tell me the section that would tell

18    us that this form, Exhibit 2, could not be used for

19    routine examination for a well child exam. What part

20    of that article?

21    A.    You want my underlined version or the

22    un-underlined version?

23    Q.    The underlined version will be fine.

24    A.    You want the underlined one?

25    Q.    The underlined one is fine, sure.

1     A.    That would be a lot easier to pull the

2    information.

3     Okay.  "Changes in Medical Decision-Making"

4    states:  Patients have a right to know about their

5    health, to know about the available diagnostic and

6    treatment options and their risks and probable

7    benefits and to choose among the alternatives.

8     Q.    How does that tell us that Exhibit Number 2

9    to Ms. Brown's deposition was not permission to do a

10   well child examination?

11     A.    Okay.  Let me just --

12     Q.    Okay.

13     A.    Not a good example.

14    Under "Ethics and Informed Consent," Point 1:

15   Provision of information:  Patients should have

16   explanations, in understandable language, of the

17   nature of the ailment or condition; the nature of the

18   proposed diagnostic steps and/or treatments and the

19   probability of success; the existence and nature of

20   the risks involved and the existence, potential

21   benefits, and risks of recommended alternative

22   treatments.

23    And I think this fails to provide the reasonable

24   information the parent needs to give consent for a

25   routine physical examination.

W

## AGREEMENT

This Agreement is entered into between the Tulsa City-County Health Department, a governmental entity, hereinafter referred to as "TCCHD", and the Community Action Project of Tulsa County, Inc., a non-profit organization for the benefit of its Tulsa County Head Start Program, hereinafter referred to as "Head Start".

## RECITALS:

1.  Head Start is in need of comprehensive child health services including inter alia comprehensive development history, physical care, developmental screening, dental screening, psychosocial screening and hearing testing.

2.  TCCHD possesses expertise in these matters and wishes to supply such services.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and intending to be legally bound, the parties hereto agree as follows:

1.  The purpose of this Agreement is provision of comprehensive child health services as required by the Head Start performance standards to children enrolled in the Head Start Program. Children served by TCCHD pursuant to this Agreement shall be identified and referred to TCCHD directly by the Head Start Program.

2.  TCCHD agrees to provide such comprehensive child health services, which shall be include but not be limited to:

    A.  <u>Child Health Physical Screening</u> – As a minimum, will include a comprehensive development history, appropriate developmental screening, dental screening, psychosocial screening and appropriate hearing testing.

    B.  <u>Child Health Encounter</u> - May include a partial screening, diagnosis and treatment encounter and follow-up health encounter. A child health encounter may include a child health history, developmental assessment, social assessment and counseling or treatment of childhood conditions.

    C.  <u>Child Health Diagnostic Encounter</u> – Consists of the following procedures:
        (1) An intake process and diagnostic interview which reviews the relevant developmental, health, medical, psychosocial, educational and behavioral history;



PLAINTIFF'S
EXHIBIT

  (2)  Clinical observations and standardized assessment procedures regarding the client's overall development including emotional, speech, language or hearing abilities;

  (3)  Feedback regarding evaluation results which is provided to appropriate family and/or collaterals; and

  (4)  Development of a treatment plan.

D. Individual Guidance Treatment Encounter – May occur through the provision of individual, family or group treatment services to children who are identified as having specific disorders or delays in development, emotional or behavioral problems or disorders of speech, language or hearing. These types of encounters are initiated following the completion of a diagnostic encounter and subsequent development of treatment plan.

E. Group Guidance Treatment Encounter – May occur through the provision of individual, family or group treatment services to children who are identified as having specific disorders or delays in development, emotional or behavioral problems or disorders of speech, language or hearing. These types of encounters are initiated following the completion of a diagnostic encounter and subsequent development of a treatment plan.

F. Consultative Services – The Child Health and Guidance staff will be available for consultative visits as requested by the Head Start Director or the Disability Services Manager. Services may include the following:

  (1)  Consultation with Head Start staff in their screenings of students for developmental, behavioral, emotional and health problems.

  (2)  Observation of specific students and consultation on such students for which Head Start staff requests special consultation. Permission from the student's parents and/or guardian is required for Child Guidance Clinic or Child Health Program staff to selectively observe a student.

  (3)  Consultation with Head Start staff about local and non-local resources or services and to assist Head Start staff in arranging for diagnostic examinations or students with emotional or behavioral problems. The cost for such examinations is not included in the arrangement.

  (4)  Consultation with Head Start staff in the planning of mental health activities for their classrooms.

3. TCCHD and Head Start acknowledge and agree that reimbursement for services supplied by TCCHD hereunder shall be the responsibility of the Oklahoma State Department of Health via its Title V Program. Head Start shall not be responsible for nor shall it receive invoices from TCCHD for the services provided hereunder.

4.  This Agreement shall become effective of the 15th day October, 1998 and shall terminate on the 30th day of September, 1999.

5.  This Agreement may be amended by mutual agreement of TCCHD and Head Start, but only upon fully-disclosed written consent and approval by both.

6.  This Agreement may be terminated upon thirty (30) days written notice either party to the other, sent certified mail, return receipt requested, at the addresses set forth below:

    (1)  Tulsa City-County Health Department
         Attn:  Doug Ressler, Division Chief, Health Services
         315 South Utica
         Tulsa, OK 74104

    (2)  Community Action Project of Tulsa County
         Head Start Program
         Attn:  Jackie Hope
         6117-A East 21st Street
         Tulsa, OK 74114

    In the event TCCHD can no longer provide all or any part of the services hereunder, then that part or all of this Agreement may be canceled.

7.  TCCHD agrees to permit financial records kept pursuant to the Agreement to be audited by an internal and/or external auditor upon request of the Oklahoma State Department of Health.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement at Tulsa, Oklahoma, effective as of the day and year first above written.

COMMUNITY ACTION PROJECT OF          TULSA CITY-COUNTY BOARD OF
TULSA COUNTY                          HEALTH

By_____        By_____
        Legal Signatory                      James O. Goodwin, J.D.
                                             Chairman
Title____Exp. Dir._____

Date____1/4/99_____        Date_____11-13-98_____

3

**TULSA CITY-COUNTY HEALTH DEPT.**

By _Gary Cox_

Gary Cox, J.D.
Director

Date _11- 12 - 98_

Cont\TCAHeadStart755

Addendum:

Provided, no services shall be supplied until a written
informed Consent has been obtained for the patient and it has
been reveiwed and approved by both TCCHD and HEAD START.

1/4/99







**mmunity Action F⋅⋅j⋅⋅⋅**
### Tulsa County Head Start Program
*"We're off to a great Head Start"*

## Authorization For Treatment To Minors

We, the undersigned parent(s) or legal guardian of the minor listed below:

__Jessica Aguirre__    Birth date: __Oct-15-93__
Minor's Name

Do hereby authorize any x-ray examination, anesthetic, dental, medical or surgical diagnosis or treatment by any physician or dentist licensed by the State of Oklahoma and hospital service that may be rendered to said minor under the general, specific or special consent of *TULSA COUNTY HEAD START PROGRAM*, the temporary custodian of the minor, whether such diagnosis or treatment is rendered at the office of the physician or dentist to call in any necessary consultants, in his/their discretion.

It is understood that this consent is given in advance of any specific diagnosis or treatment being required, but is given to encourage those persons who have temporary custody of the minor, and said physician or dentist to exercise his/their best judgement as to the requirements of such diagnosis or medical or dental or surgical treatment.

This consent shall remain effective during the 1998/99 school year, unless sooner revoked in writing to the Tulsa County Head Start Program.

Parent's Legal Signature __Norma Aguirre__    Date __8-06-98__

## Permission To Transport Child

I give Tulsa County Head Start my permission to transport my child, __Jessica Aguirre__ to
Child's Name

__St Jonhs__ for emergency care or to __315 South Utica__ for emergency dental
Hospital                                      Dentist

care or to the nearest available source of assistance. I understand that if __Jessica Aguirre__ has a
Child's Name

life threatening illness or injury while at Tulsa County Head Start, that 911 will be called to transport

him/her immediately to the nearest hospital.

| Name of Physician or Clinic | Name of Dentist or Clinic |
|---|---|
| Hugh C. Graham. Jr. | John tomblin Dental Clinic |
| Address | Address |
| 1919 S. Wheeling Suite 304 | 315 South Utica |
| Telephone No. | Telephone No. |
| 748 7620 | 594 4860 |

## Refusal To Grant Permission

I do not give permission to Tulsa County Head Start to transport my child _____
For emergency medical/dental care. In the event of illness or injury which require emergency medical/dental treatment, I wish the following action to be taken:

_____

Parent's Legal Signature_____    Date_____    D-000004

PLAINTIFF'S EXHIBIT

Y

1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT

3  JACK DUBBS, et al,                    )
                                         )
4                      Plaintiffs,       )
                                         )
5       vs.                              )   Case No. 99-CV-0732K(E)
                                         )
6  HEAD START, INC., et al               )
                                         )
7                      Defendants.       )

8

9

         DEPOSITION OF JACQUELINE MAY JORDAN, taken at 525
10  South Main Street, Suite 1400, Tulsa, Oklahoma, on the 15th day
    of November, 2000, on behalf of the plaintiffs, before the
11  undersigned Certified Shorthand Reporter, pursuant to
    stipulations of the parties.

12

13          Fee for original, $       paid by plaintiffs.

14  _____
    Michael A. Bailey, CSR-RPR-CLVS
15

16

17

18

19

20

21

22                    COPY

23

24

25

Q    All right.  And so if a child is resistant to the point you think you can't really do it adequately, what do you do about that?

A    I tell them that I'm not going to do it.  And I write on the paper on their -- the file that they have that I couldn't do it.

Q    Do you recall whether that incident actually happened on November the 5th, 1998?

A    It seems like yes, that it did.

Q    You would have written that down on your notation?

A    Yes.

Q    Did any teachers or someone else hold a child during the blood testing which you did; any child?

A    Yes.

Q    And were they held to restrain them, or to reassure, or what was the reason?

A    More to reassure, because I just -- not to restrain.

Q    Did any of the children before or during the time you did the blood tests cry out for their mother or --

A    Yes.

Q    -- their father?  And when they did that, did the test go on anyway?

A    Sometimes.

Q    And I'm again talking about November 5th, 1998.

A    Uh-huh.

1    mean, they didn't really have time to protest too much.  You

2    know when they come in there whether or not you're going to be

3    able to do it.

4        Q    Just because they know what's going to happen?

5        A    That's right.

6        Q    All right.

7        A    And because I've been around kids a lot and done a lot

8    of these and I know which ones I can do and which ones that I'm

9    not going to do.

10       Q    All right.  And if they're upset you won't do them?

11       A    I do not do them.

12            MS. PHILLIPS:  All right.  That's all the questions we

13   have.

14            MR. GOREE:  I have no further questions.

15            MS. HART:  At this time I don't have any questions.

16            MR. MANN:  I have no questions of this witness at this

17   time.

18            MS. ZIOLKOWSKI:  I have no questions of this witness at

19   this time.

20            MS. PHILLIPS:  We'll read and sign.

21            (THEREUPON, THE TAKING OF THE DEPOSITION WAS

22            CONCLUDED.)

23

24

25

Z

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3    JACK DUBBS, Individually, and JACK
     DUBBS as Father and Next Friend of
4    TIFFANI DUBBS, a minor, et al.,

5                    Plaintiffs,

6    vs.                             No. 99-CV-0732K(E)

7    HEAD START, INC., an Oklahoma
     Corporation; INDEPENDENT SCHOOL
8    DISTRICT NO. 1 OF TULSA COUNTY,
     OKLAHOMA; COMMUNITY ACTION PROJECT
9    OF TULSA COUNTY, OKLAHOMA, an Oklahoma
     Not-For-Profit Corporation; TULSA
10   CITY-COUNTY HEALTH DEPARTMENT;
     KD ENTERPRISES, INC., an Oklahoma
11   Corporation; DOE GOVERNMENT AGENTS
     1 through 5; JACKIE STRAYHORN, ARNP;
12   K. BAKER, RN; PEGGY DOE; JOHN DOES
     1 through 10; JANE DOES 1 through 10,
13
                     Defendants.
14
             DEPOSITION OF HUGH GRAHAM, M.D.,
15
     before the undersigned Certified Shorthand Reporter,
16   taken on behalf of the Defendants at 2900
     Mid-Continent Tower, Tulsa, Oklahoma, commencing at
17   12:45 p.m., on November 20, 2000, pursuant to notice.

18

19

20          _____
            KATHLEEN McCLANAHAN, CSR #283
21

22

23            NICHOLS McCLANAHAN REPORTING
                    Two Main Plaza
24            616 South Main, Suite 302
              Tulsa, Oklahoma  74119-1261
25                  918/585-9969
```

1     Q.    Could you tell us -- Well, in a

2 well-child exam, not just this one, would you

3 ordinarily examine the genitalia of either the boy or

4 girl that you were examining?

5     A.    Usually one does.

6     Q.    Okay.  And in a girl, particularly, what

7 is the purpose of that examination?

8     A.    Just to be sure that they're -- that it

9 appears normal.

10     Q.    Okay.  And would you palpate or touch the

11 labia major and labia minor during that exam?

12     A.    Yes.

13     Q.    And what was the purpose for palpating or

14 touching that?

15     A.    It's to be sure that there are no

16 problems, so you have to separate the labia to get a

17 look and be sure that there's no problem.

18     Q.    Okay.  And you said you would usually do

19 that as part of an exam of a minor child?

20     A.    Frequently, yeah.

21     Q.    Very well.

22     You might note that the subjective information

23 that was provided to your office on November 6th

24 included a statement in the second sentence:  They

25 did a finger stick as well as a physical exam, comma,

1    personally performed a genital exam on a child three,

2    four, five years old without the parents' knowledge

3    at all?

4         A.    No.

5         Q.    Is it a fair statement that the Aguirre

6    family had access to medical care for Jessica during

7    the fall of 1998?

8         A.    Yes.

9         Q.    And would that be at the Omni Medical

10   Group?

11        A.    It would.

12        Q.    Okay.  And are you the family doctor or

13   were you the family doctor in '98 for the Aguirre

14   family?

15        A.    For the children.

16        Q.    Okay.  That's because you're a pediatric

17   doctor; is that right?

18        A.    That's right.

19        Q.    Regarding gloves, Mr. Helfand asked you a

20   moment ago about wearing gloves, and I believe you

21   said usually.  I don't mean to put words in your

22   mouth.  Are there times when you do wear gloves and

23   sometimes when you don't wear gloves when you do a

24   genital exam?

25        A.    Well, on a prepubertal girl, you're

1    really not -- you're just separating the labia to

2    take a look.

3        Q.    Uh-huh, uh-huh.

4        A.    So there's no internal exam done.

5        Q.    Okay.

6        A.    And some people might put on gloves for

7    that.  Some might put on gloves for the whole exam,

8    in this day and age I suppose.  But most

9    pediatricians that I know do not.

10        Q.    What if the doctor was going to examine a

11    great number of children consecutively, would a

12    doctor under that situation -- or would you under

13    that situation wear hygienic gloves?

14        A.    Either that or scrub between each

15    patient.

16        Q.    Okay.  I'm reviewing my notes to see if I

17    have any further questions for you.

18        From your review of the records and from being a

19    family doctor or doctor for Jessica Aguirre, did you

20    see any medical need for Jessica to have a genital

21    exam given at the Head Start location in November of

22    1998?

23            MR. HELFAND:  Object to the form of the

24    question.

25        A.    Do what?

1          MR. MANN:  Go ahead and answer.

2          MR. HELFAND:  You can answer?

3     A.    Oh.  No.

4          MR. GOREE:  That's all I have for right

5  now.

6                REDIRECT EXAMINATION

7  BY MR. HELFAND:

8     Q.    Well, Doctor, would you think it was

9  appropriate for somebody, if another medical

10 profession were doing an exam of a four-year-old

11 child to do it and omit the genital exam?

12         MR. GOREE:  I object to the form of the

13 question.

14    Q.    (By Mr. Helfand)  You can answer.

15    A.    Oh, I can?  Since I don't know the jargon

16 exactly.

17    Q.    Sure.

18    A.    The -- Could you state that again?

19    Q.    Yes, sir.

20 You answered the question you saw no medical

21 need for a genital exam; but if it turns out that the

22 examination of the genitalia was in the context of an

23 overall physical exam, my question is would you think

24 it proper for somebody doing an overall physical

25 exam, a medical profession doing an overall physical

1  exam --

2      A.    Sure, yes.

3      Q.    -- to omit the genitalia from their exam?

4      A.    I would -- I would think it would be all

5  right to do it either way.

6      Q.    All right.  I know you don't know what

7  happened during the exam of November 5th because it's

8  only been related to you by explanation.

9      A.    Yes.

10     Q.    But from what Ms. Aguirre explained to

11  you about the examination Jessica had on November

12  5th, did it sound like it differed in any way from

13  the ordinary well-child physical exam that you do

14  when you see Jessica Aguirre or any other

15  four-year-old child?

16        MR. GOREE:  I'll object to the form of

17  the question.

18     A.    It did not.

19        MR. HELFAND:  Okay, I have no other

20  questions at this time.

21        MS. PHILLIPS:  I've got one brief

22  question.

23            <u>DIRECT EXAMINATION</u>

24  BY MS. PHILLIPS:

25     Q.    Doctor Graham, I'm Martha Phillips, I

# AA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT

SHANTILYA BARNES, et al,                    )
                                            )
                    Plaintiffs,             )
                                            )
        vs.                                 )
                                            )   Case No. 99-CV-733K (B)
HEAD START, INC., et al,                    )
                                            )
                    Defendants.             )


        DEPOSITION OF ROSEMARY LIGUORI, taken at 2700 North
Atlantic Boulevard, Daytona Beach, Florida, on the 13th day of
November, 2000, on behalf of the plaintiffs, before the
undersigned Certified Shorthand Reporter, pursuant to
stipulations of the parties.

        Fee for original, $       paid by plaintiffs.


_____
Michael A. Bailey, CSR-RPR-CLVS

COPY

1　light, and -- and I can count on one hand how many times

2　children have been -- objected to having a genital exam, which

3　by the way, if a child does not give their assent to do a

4　genital exam, we do not do that exam.  And if they don't like

5　their ears looked into, we don't look into their ears.

6　　　　MR. ELLIOTT:  I think you have answered a lot more than

7　what he asked.

8　　　　THE WITNESS:  I'm sorry.

9　　　　MR. MANN:  But you didn't answer it loud enough.

10　A　　I am sorry.  Oh, no, no.

11　　　　MR. MANN:  But that's all right.  I don't ask that you

12　restate it, just please continue to speak up.

13　　　　THE WITNESS:  I will, Mr. Mann, thank you.

14　Q　　(By Mr. Goree) Is it a fair statement that if a child

15　tells you he is not comfortable with a genital exam or she is

16　not comfortable with a genital exam, that you would then not do

17　a genital exam?

18　A　　That's correct.

19　Q　　When you talked about discomfort relating to the ear

20　exam, do you mean pain discomfort, pressure discomfort, or

21　emotional discomfort?  Can you describe that for me, please?

22　A　　It could be any of the above.  It could be that the

23　child was afraid to have the ear looked at.  It could be -- and

24　when we do an ear exam, we do not cause pain.  So it's not --

25　but their perception of it could be painful.

1    Q    But it could be an emotionally uncomfortable?

2    A    If they have had past bad experiences, yes.  And then

3    we would not continue.

4    Q    In your experience doing Head Start genital exams, have

5    you ever had a child give you any sign of discomfort because of

6    the genital exam?

7         MR. HELFAND:  Excuse me, Doctor.  Object to the form

8    of the question.  You can answer.

9         MR. ELLIOTT:  Yeah, and I think the objection is --

10        MR. GOREE:  You can object to the form of the question,

11   but I do not want you to lead this witness.

12        MR. ELLIOTT:  Well, I want an explanation.

13        MR. GOREE:  I've asked my question.

14        MR. ELLIOTT:  The explanation that I want is what do

15   you mean by a Head Start genital exam?

16   Q    (By Mr. Goree) The exams that you personally have

17   given, have you ever had a child let you know in any way;

18   verbal cues, visible cues; that they had some discomfort with a

19   genital exam, whether that's emotional, afraid, pain, pressure,

20   or any of the above as we have talked about before?

21   A    I can -- I have two children, one was his mother was

22   there, and the mother was insisting on me to do the exam, and I

23   said, "No, let me tell you how to do it, and here's what you

24   look for."  We did not do that exam.  Another child said no, he

25   didn't want to be examined.  We said, "Fine," and that was it,

1    but never -- that's it.

2         Q    Have you ever given a genital exam to a child and then

3    be embarrassed?

4         A    The child embarrassed or me embarrassed?

5         Q    The child embarrassed from the genital exam.

6         A    Not usually.  Usually they're just -- it's done within

7    one minute and --

8         Q    I hate to interrupt, but I'll object to your question

9    as nonresponsive.  Have you ever --

10        A    Well, I'm trying to answer it.

11        Q    Have you ever had a child be embarrassed because of a

12   genital exam?

13             MR. ELLIOTT:  She is trying to answer your question,

14   Mr. Goree.  Please don't object to her answer before she

15   completes it.

16             MR. HELFAND:  Excuse me, Dr. Liguori, but for the

17   record, Mr. Goree, you need to let her answer, then object as

18   nonresponsive.  I want to hear her answer first.  It may not be

19   nonresponsive and the Court can't rule if you interrupt.

20        A    I would say most of the time the children giggled or

21   they didn't -- it didn't bother them.  If -- if a child, and of

22   course the exam was done and was embarrassed -- and I'm trying

23   to recall if there was any embarrassment.  If anything -- I

24   can't recall if they were embarrassed.

25        Q    Why do some of the children giggle when they have been

# BB

# CHILD HEALTH RECORD: FORM 3, SCREENINGS, PHYSICAL EXAMINATION/ASSESSM

CHILD'S NAME: Aguirre, Jessica          SEX: F     BIRTHDATE: 10-20-

HEAD START CENTER: _____          PHONE: _____

ADDRESS: _____

PART I. TO BE COMPLETED BY HEAD START STAFF OR HEALTH CARE PROVIDER BEFORE PHYSICAL EXAMINATION/ASSESSMENT

1. RELEVANT INFORMATION *(from Health History, Parent/Teacher Observations):*

2. SCREENING TESTS. *Starred Items (\*) are required by Head Start and recommended by the American Academy of Pediatrics* children 3-5 years. Enter dates if done previously. When recording results, enter *at a minimum* "N", "S", or "A" for NORM. SUSPECT, OR ATYPICAL/ABNORMAL, respectively.

| TEST | DATE | RESULTS | TEST | DATE | RESULTS |
|------|------|---------|------|------|---------|
| a. PRESENT AGE* | | ___Yrs., ___Mos. | g. VISION (Type of Test)*_____ | | |
| b. HEIGHT (no shoes, to nearest 1/8 in.)* | | | ACUITY, R/L | | |
| | | | RESCREENING | | |
| c. WEIGHT (light clothing to nearest 1/4 lb.;)* | | | STRABISMUS | | |
| | | | COMMENTS | | |
| d. BLOOD PRESSURE | | | | | |
| e. HEMATOCRIT or HEMOGLOBIN* | | | h. OTHER TESTS (if indicated) | | |
| | | | (1) TB ____ | | |
| f. HEARING (Type of Test)* ____ | | | (2) Sickle Cell ____ | | |
| RESULTS, R/L | | | (3) Lead ____ | | |
| RESCREENING | | | (4) Ova & Parasites ____ | | |
| COMMENTS | | | (5) Urinalysis ____ | | |
| | | | (6) Other ____ | | |

3. PHYSICAL EXAMINATION/ASSESSMENT. *Complete and return top three copies to Head Start.*

PART II. TO BE COMPLETED BY HEALTH CARE PROVIDER DURING AND AFTER PHYSICAL EXAMINATION/ASSESSMENT

| | NORMAL FOR AGE | ABNOR- MAL | NOT EVAL. | COMMENTS (Use Additional sheet if necessary) |
|------|------|------|------|------|
| a. GENERAL APPEARANCE | | | | |
| b. POSTURE, GAIT | | | | |
| c. SPEECH | | | | |
| d. HEAD | | | | |
| e. SKIN | | | | |
| f. EYES: (1) External Aspects | | | | |
| (2) Optic Fundiscopic | | | | |
| (3) Cover Test | | | | |
| g. EARS: (1) External & Canals | | | | |
| (2) Tympanic Membranes | | | | |
| h. NOSE, MOUTH, PHARYNX | | | | |
| i. TEETH | | | | |
| j. HEART | | | | |
| k. LUNGS | | | | |
| l. ABDOMEN (include hernia) | | | | |
| m. GENITALIA | | | | |
| n. BONES, JOINTS, MUSCLES | | | | |
| o. NEUROLOGICAL/SOCIAL | | | | |
| (1) Gross Motor | | | | |
| (2) Fine Motor | | | | |
| (3) Communication Skills | | | | |
| (4) Cognitive | | | | |
| (5) Self-Help Skills | | | | |
| (6) Social Skills | | | | |
| p. GLANDS (Lymphatic/Thyroid) | | | | |
| q. MUSCULAR COORDINATION | | | | |
| r. OTHER | | | | |

s. GENERAL STATEMENT ON CHILD'S PHYSICAL STATUS:

Good          Signature _____     Date 8/11/98

4. FINDINGS, TREATMENTS, AND RECOMMENDATIONS

| ABNORMAL FINDINGS/DIAGNOSIS | TREATMENT PLAN | RECOMMENDED FOLLOW-UP OR RESULTS (Initial when complete) | DATE |
|------|------|------|------|
| a. | | | |
| b. | | | |
| c. | | | |

D-000010

CC

1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF OKLAHOMA

3  JACK DUBBS, Individually, and JACK
    DUBBS as Father and Next Friend of
4  TIFFANI DUBBS, a minor, et al.,



5            Plaintiffs,

6  vs.                  No. 99-CV-0732K(E)

7  HEAD START, INC., an Oklahoma
    Corporation; INDEPENDENT SCHOOL
8  DISTRICT NO. 1 OF TULSA COUNTY,
    OKLAHOMA; COMMUNITY ACTION PROJECT
9  OF TULSA COUNTY, OKLAHOMA, an Oklahoma
    Not-For-Profit Corporation; TULSA
10  CITY-COUNTY HEALTH DEPARTMENT;
    KD ENTERPRISES, INC., an Oklahoma
11  Corporation; DOE GOVERNMENT AGENTS
    1 through 5; JACKIE STRAYHORN, ARNP;
12  K. BAKER, RN; PEGGY DOE; JOHN DOES
    1 through 10; JANE DOES 1 through 10,
13
             Defendants.
14
      **DEPOSITION OF SYLVIA AUGUST, M.D.**,
15
  before the undersigned Certified Shorthand Reporter,
16  taken on behalf of the Defendants at 2900
    Mid-Continent Tower, Tulsa, Oklahoma, commencing at
17  3:00 p.m., on November 20, 2000, pursuant to notice.

18

19

20        _____

        KATHLEEN McCLANAHAN, CSR #283
21

22

23        NICHOLS McCLANAHAN REPORTING
             Two Main Plaza
24       616 South Main, Suite 302
        Tulsa, Oklahoma 74119-1261
25          918/585-9969

1    brought to the clinic or contacted the clinic with

2    any concerns regarding Quenten's emotional well-being

3    or mental status?

4        A.    Let me go through these.  Not that I can

5    remember, but let me go through these quickly.

6        Apparently no.

7        Q.    Okay.  Now, when you're doing your exams,

8    I understand you told me if the parent is present,

9    you don't secure a specific written consent?

10       A.    Yeah.

11       Q.    And I understand that.

12       As you're doing the exam, do you ask the parent

13   for permission to do various aspects of the exam,

14   like looking in the child's ears or checking in their

15   throat or palpating the genital area?

16       A.    When I'm going to check the genitals,

17   I usually, mainly because of the little boy or girl

18   who is already five or four and they understand, I

19   kind of go, look, I'm going to check here, you know,

20   like -- but not asking permission to the mother, but

21   just informing them right there, you know, for that

22   part of the exam.

23       Q.    You tell that to the child, or you tell

24   that to the parent?

25       A.    I usually tell both.  I go to the mother,

1  I have to check the genitals, and then I turn the

2  child, hey, I have to check down here, is that okay.

3  That's usually enough.

4      Q.    Okay.  And if the child doesn't

5  significantly protest, then I take it you go on with

6  the exam?

7      A.    If the child significantly protests,

8  significantly, you know, start crying, which I have

9  every now and then one, I don't do it.

10     Q.    Okay.  But if the child doesn't protest,

11  then you would proceed with the exam?

12     A.    Oh, yes, yes.

13     Q.    And you told me that you do tell the

14  parent and the child here's what I am going to do

15  next?

16     A.    Yes.

17     Q.    But my question was more do you ask them

18  can I now do this?

19     A.    No, no, not like that, huh-uh.

20     Q.    Do you, in your practice, do you assume

21  that parents understand that part of the physical

22  exam of their child will include the genital

23  examination?

24     A.    Can you say it again, please?

25     Q.    Yes.

1    and the mother is not present, I just have this

2    paper, I usually try to get in touch and make sure

3    she understands.

4           Q.    Okay.  I understand that.

5           A.    Uh-huh, yeah.

6           Q.    But it does say on here --

7           A.    It does say.

8           Q.    -- laboratory examination?

9           A.    Should be enough.

10          Q.    That should be enough, in your opinion?

11          A.    Yeah, uh-huh, but I always try to.

12          Q.    Just out of an abundance of caution, you

13   tell --

14          A.    Yeah, because I'm a mom, and I kind of

15   think same way, you know, that you always want to

16   know exactly what's going on.  Okay.

17                MR. MANN:  That's all the questions I

18   have at this time, Doctor August.

19                THE WITNESS:  Okay, sure.

20                MR. HELFAND:  May I interrupt one second?

21   I'm going to say good-bye, this lady is going to

22   finish for me, if that's all right with everybody.

23                (Off the record.)

24                MS. PHILLIPS:  I don't have any questions

25   at this time.

# DD

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

              Plaintiffs,

vs.                              No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; et al.,

              Defendants.

SHANTILYA BARNES, Individually,
and SHANTILYA BARNES as Mother
and Next Friend of GERALD BARNES,
a minor, et al.,

              Plaintiffs,

vs.                              No. 99-CV-733K(B)

HEADSTART, INC., an
Oklahoma Corporation, et al.,

              Defendants.

**DEPOSITION OF MUHAMMAD SUHAIL, M.D.**,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 602 East Pine,
Tulsa, Oklahoma, commencing at 9:10 a.m., on November
20, 2000, pursuant to notice.

_____
KATHLEEN McCLANAHAN, CSR #283


NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma  74119-1261
918/585-9969

1     Q.    Okay.  Let's talk about your -- Well, let

2  me talk about something else with you first, and then

3  I'll get back to that May 12th visit.  Thank you for

4  going through that, by the way.

5     As part of your practice, do you ordinarily

6  examine three-, four-, and five-year-old children?

7     A.    We do.

8     Q.    And do you do well-child examinations,

9  and what I mean by well-child examinations is

10  examinations of children to determine development and

11  general functioning where there is no --

12     A.    True.

13     Q.    -- acute concern?

14     A.    We do.

15     Q.    Okay.  When you are doing an examination

16  of a child, do you secure from a parent specific

17  permission to conduct the exam, or do you infer that

18  from the fact that the parent is there?

19     A.    Actually, when the parents come in in

20  registration downstairs, they sign a thing that is

21  like they're permitting us to check their child.

22     Q.    All right.

23     A.    They sign it for us, and that's how we --

24  I mean, upstairs when they come, we check them.

25     Q.    And that's a standard form, I take it?

1     Q.    And you said that that's pursuant to the

2  standards.  And what standards are we talking about?

3     A.    The standards set by American Academy of

4  Pediatrics.

5     Q.    Okay.

6     A.    Yes.

7     Q.    Would it be appropriate to do an

8  examination of a child, a well child, and not, as

9  part of that exam, examine the child's genital area?

10     A.    That can be appropriate too, if sometimes

11  the child is having no problems, you're in a hurry,

12  and you know the child from behind like two years, a

13  year ago, you examined the area, there was nothing

14  there, and you know the child.  So at that time, you

15  might think, okay, why embarrass the child right now

16  and not do it.  So sometimes we may not do it.

17     Q.    But in your first visit with the child,

18  if it were a three-, four-, or five-year range, --

19     A.    Uh-huh.

20     Q.    -- you would do a genital examination?

21     A.    Yes, yes.

22     Q.    If you didn't know the child, that would

23  be an important part of your exam?

24     A.    Yes.

25     Q.    When you do the exam of the genital area

1    exam on that day?

2         A.    No.  '99, May 12th, '99.

3         Q.    So at no time during May of 1999, did she

4    have a vaginal exam by you?

5         A.    On these two visits, no.

6         Q.    Okay.

7         A.    No.

8         Q.    And the last one that you had performed

9    was a year before?

10        A.    True.

11        Q.    Okay.  Is there a reason you did not

12   perform a vaginal exam in May of 1999?

13        A.    I can imagine she was very sick.  Her

14   major problem at that time was high fever, and she

15   was having strep throat.  So I did not feel

16   comfortable doing the -- I mean, going -- she already

17   sick and all that, why should I put her through that

18   too, so I didn't do that.

19        Q.    All right.  It didn't have anything to

20   do about requests from the parent that you not do it

21   or --

22        A.    No, no, relationship to that, no.

23        Q.    -- protests from the child?

24        A.    No.

25        Q.    All right, I understand.

1  Q. So do you have a policy as to how often

2 they sign these consent forms?

3  A. Every year, at least.

4  Q. And once the parent signs this consent

5 form, then that provides you with the authority to do

6 whatever you think is medically necessary or any

7 procedure that you think is appropriate in the

8 examination of the child; is that correct?

9  A. That is correct, and we usually discuss

10 it.  If there is something out of routine, we try to

11 discuss with the parents that we are going to do

12 that.

13   MR. MANN:  That's all I have.

14   MR. GOREE:  I have some questions, I

15 don't know if anybody has any more before I start.

16   MR. MANN:  Do you want to --

17   MS. SZUHY:  Why don't you go ahead?

18   MR. GOREE:  Okay.

19     RECROSS EXAMINATION

20 BY MR. GOREE:

21  Q. I'm going to have you look at this form

22 again that Mr. Mann directed you to, and this is

23 titled medical treatment authorization.

24   MR. HELFAND:  I'm going to follow along

25 with that one, if I may.

1          MR. HELFAND:  Objection, nonresponsive.

2     Q.     (By Mr. Goree)  Did Ms. Suddarth's mother

3     request of you in any way to do a genital exam or

4     check her daughter's genitals on May 12th of 1998?

5     A.     I can't recollect, but even if she

6     didn't, I would request that I need to see that area.

7     Q.     Uh-huh.

8     A.     Because the problem was specific about

9     that area, and so I -- I really don't know whether

10    she requested or I asked her and we did it, I can't

11    tell.

12    Q.     Is that why Ms. Suddarth brought her

13    daughter on May 12th, 1998, so that she could have an

14    answer to her complaint about the genital discharge?

15    A.     Truly.

16    Q.     Okay.  Was she, and when I say she, I

17    mean this little girl's mother, was the little girl's

18    mother there with you when you did the exam?

19    A.     Yes, she was.

20    Q.     Why is that?

21    A.     Well, we keep that -- I mean, whenever

22    you're examining a female patient, you try to have

23    somebody witnessing that, and it's also for the

24    comfort of the child too.  The mother standing there,

25    you know, it's important.

EE

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT
 2

 3   JACK DUBBS, et al,                )
                                       )
 4                   Plaintiffs,       )
                                       )
 5        vs.                          )    Case No. 99-CV-0732K(E)
                                       )
 6   HEAD START, INC., et al,          )
                                       )
 7                   Defendants.       )

 8

 9
              DEPOSITION OF KIMBERLY MICHELLE BAKER, taken at 525
10   South Main Street, Suite 1500, Tulsa, Oklahoma, on the 19th day
     of October, 2000, on behalf of the plaintiffs, before the
11   undersigned Certified Shorthand Reporter, pursuant to
     stipulations of the parties.
12
              Fee for original, $         paid by plaintiffs.
13

14   _____
     Michael A. Bailey, CSR-RPR-CLVS
15

16

17

18

19

20

21

22

23                        COPY

24

25
```

```
 1    A    No, sir.

 2    Q    You're talking about Peggy Terry; are you not?

 3    A    Yes, sir.

 4    Q    When Peggy Terry would bring a child to your

 5  examination station, did she have a folder with her?

 6    A    Yes, sir.

 7    Q    Did you look inside the folder?

 8    A    Yes, sir.

 9    Q    What were you looking for?

10    A    The assessment form.

11    Q    What is the assessment form?

12    A    It's a piece of paper that lists different areas

13  included in a physical examination and it also lists the

14  child's name and date of birth.

15    Q    And what else were you looking for?

16    A    That was all I was looking for.

17    Q    Did you ask Peggy Terry about the consent forms?

18    A    Yes, sir.

19    Q    Did you ask her when the first patient came to you?

20    A    Yes, sir.

21    Q    What did you ask her?

22    A    I asked her if she had consent forms.  She told me they

23  were taken care of and I said where were they.  She didn't --

24  she said -- I can't remember exactly what she said.  They just

25  weren't with her.  She assured me they were taken care of.
```

1    A    Yes, sir.

2    Q    Now, what did you do first to determine whether they

3    had descended testicles or not?

4    A    You could, just by visual inspection, just look at it

5    to see if the -- the testicles were descended.

6    Q    And the child was, of course, lying on his back at the

7    time.

8    A    Yes, sir.

9    Q    And you could readily observe without touching whether

10   the testicles were properly descended?

11   A    On most children, yes, sir.

12   Q    And if you couldn't tell for sure, what would you have

13   to do?

14   A    You could just place their underwear to where it would

15   just touch the scrotum, and if the testicle didn't move, then

16   you would know that there was something.  If it didn't become

17   visual -- or when it did become visual, if it was not parallel,

18   then you could see that it hadn't descended.

19   Q    All right.  What else did you check physically then at

20   that point?

21   A    For the genital exam?

22   Q    Yes.

23   A    Their anus --

24   Q    All right.

25   A    -- or their rectum.

1     Q    How did you check the rectum or the anus?

2     A    Well, the rectum, I'm sorry.  Just a visual inspection

3 just to see that it -- it was there.

4     Q    Now, the anus is an internal organ, isn't it?

5     A    Yes, sir.

6     Q    So you didn't inspect --

7     A    I did not inspect the anus, no, sir.

8     Q    And did you do any touching examining the rectal area?

9     A    No, sir.

10    Q    Did you examine the penis?

11    A    Just a visual, yes, sir.

12    Q    What were you looking for there?

13    A    To -- just to make sure there were no infections, there

14 was no -- that it was just there.  That, you know, there

15 weren't any descended -- or undescended testicles.  And you can

16 also check for hypospadias to make sure that the urethra or the

17 -- I'm getting my terms confused.

18    Q    The ureter tube?

19    A    Not the tube, the opening --

20    Q    The opening, the meatal opening?

21    A    -- of the penis was there.

22    Q    And did you check it to see if it was a sufficient size

23 to have a -- a urine stream?

24    A    I didn't check the size of it, I just did a visual to

25 make sure it was where it was supposed to be.  If there were

1    vagina will spread open.  And it's just a visual.  Just to make

2    sure that both of the -- the labia are there.

3        Q    And is there some other purpose for spreading the labia

4    in that way?

5        A    Just to inspect the vagina.

6        Q    Do you use any kind of a light to do that?

7        A    No, sir.

8        Q    You just used the light, whatever is in the room for

9    that?

10       A    Overhead light, yes, sir.

11       Q    Now, what was the purpose for doing the genital exam on

12   the girls by spreading the labia?

13       A    It's part of a physical exam.

14       Q    And then after that was over, the same thing; they put

15   their clothes back on and went; is that right?

16       A    Yes, sir.

17       Q    At any time when you were conducting genital exams of

18   girls, did any of them become upset or disturbed?

19       A    I can't remember.

20       Q    Do you remember if any asked for their mother or dad?

21       A    I'm sorry, I couldn't -- I didn't hear you.  Could you

22   repeat the question?

23       Q    Yes.  At any time during the genital exam of the girls,

24   did any of them ask for their mother or their dad?

25       A    I can't remember.

**FF**



**Community Action Project**
Tulsa County Head Start Program
*"We're off to a great Head Start"*



November 19, 1998

Dear Parents:

Re: _Jessica Aguire_

In compliance with Performance Standard 1304.20 (a)(1)(i) & (ii) – Determining Child Health Status, physical and dental exams must be performed no later than 90 days of entry into the program. In an effort to help parents that had not been able to obtain these exams, the Tulsa City County Health department conducted examinations on November 5, 1998. Although, once again, I must apologize for the mis-communication and breakdown in paperwork, many of you have called and requested the findings of those exams. I wanted to respond in writing for your records.

The following was discovered during the exam.

_Had a ear infection in both of her ears. Her right_
_tympanic membrane had a bulge seen. Also had_
_possible cavities._

Please follow-up with your child's regular physician/dentist regarding these findings. He/she may already be very much aware of the situation but should be alerted to these findings. If you need any further information or help in locating a physician/dentist, please contact me @ 832-4017 for assistance.

Thank you for you assistance in this matter.

Sincerely,

Jackie Hope RN

Jackie Hope, R.N.
Health Services Manager

PLAINTIFF'S
EXHIBIT
17

D-000

GG

 

# COMMUNITY ACTION PROJECT
## TULSA COUNTY HEAD START PROGRAM
### Consent for Health Services

As partial fulfillment of my partnership with the Tulsa Head Start program, I hereby agree that my child, _____D.O.B._____:

- Shall receive all of the health services required by the Head Start Performance Standards, within the mandated timeframe of 45 days from the first day of attendance. I understand that these services may include, but are not limited to:
    - Height & Weight Assessments (up to three times per program year)
    - Blood Pressure Assessment
    - Vision Screening
    - Hearing Screening
    - Laboratory Testing (Hemoglobin/Hematocrit)
    - Speech/Language Screening
    - Developmental Screening/Observation
    - Social/Emotional/Behavioral/Mental Health Observations
- Will obtain a complete well-child physical examination and dental examination (with appropriate documentation). If one is not obtained within 60 days of entry into the program, I agree that Tulsa County Head Start may obtain an "unclothed" physical examination and dental examination for my child.
- Shall brush his/her teeth daily in the Head Start center with an ADA approved fluoride toothpaste and toothbrush provided by Head Start.
- **Head Start shall report any and all suspected cases of child abuse and/or neglect to the Department of Human Services Child Welfare Division, in accordance with Oklahoma State Law:**
- **Information regarding my child's health status, screenings, etc. may be shared with collaborative's and/or contracted providers.**

I have read and understand the above statements. I understand that all health-related information shall be kept strictly confidential by the Head Start staff. Records may be reviewed only by authorized personnel from Head Start, or medical professional consultants deemed appropriate by this Head Start program. I also understand that I may refuse all or part of the physical exam if desired. If a portion is refused, it must be clearly written and explained what is to be excluded from the exam.

_____        _____
Signature of Parent/Legal Guardian        Date

**REFUSAL OF SERVICES:**
**If for some reason you refuse these Health Services, your refusal must be in writing and you must sign below. Please attach your refusal to this form.**

_____        _____
Signature of Parent/Legal Guardian        Date

Original: Classroom File (white)
Copy:     Health File (yellow)
Copy:     Family Support (pink)
Copy:     Special Services (golden rod)

PLAINTIFF'S
EXHIBIT
45

# HH



**Community Action Project**
Tulsa County Head Start Program
*"We're off to a great Head Start"*

COMMUNITY ACTION PRO

*CAPTC/TULSA COUNTY HEAD START*
*PARENT INTEREST SHEET*

We are interested in providing Parents with the opportunity to be involved in the educational and recreational activities of their choice. To help us plan workshops, classes and activities for the coming school year, place a mark beside the subject(s) that would interest you.

| | |
|---|---|
| _____ Parenting Skills | _____ Aerobics |
| _____ Early Childhood Development | _____ Carpentry |
| _____ Effective Discipline | _____ Bowling |
| _____ Dealing with Stress | _____ Card Club |
| _____ Adult Basic Education | _____ Gardening |
| ✓ English as a Second Language | _____ Sewing |
| _____ GED Preparation | _____ Volleyball |
| _____ Job Readiness Skills | _____ Basketball Team |
| _____ Home Safety | _____ Flower Arranging |
| _____ First Aid/Health/CPR | _____ Other (List) |
| _____ Computer/Keyboarding Skills | _____ |
| _____ Budgeting /Money Management | _____ |
| _____ EZ Income Tax Preparation | _____ |
| _____ Basic Auto Mechanics | _____ |
| _____ Home Maintenance | _____ |
| _____ Meal Planning | _____ |
| _____ Cooking/Baking | _____ |

_Jessica Aguirre_
CHILD'S NAME

_Norma Aguirre_
PARENT'S NAME

_1911 W. Brady_
ADDRESS

_582-0425_
PHONE NUMBER

7/98

D-000049

# II

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JACK DUBBS, Individually, and JACK
DUBBS as Father and Next Friend of
TIFFANI DUBBS, a minor, et al.,

COPY

               Plaintiffs,

vs.                         No. 99-CV-0732K(E)

HEAD START, INC., an Oklahoma
Corporation; et al.,

               Defendants.

_____

SHANTILYA BARNES, Individually,
and SHANTILYA BARNES as Mother
and Next Friend of GERALD BARNES,
a minor, et al.,

               Plaintiffs,

vs.                         No. 99-CV-733K(B)

HEADSTART, INC., an
Oklahoma Corporation, et al.,

               Defendants.

### DEPOSITION OF JUDITH ADAMS, Ph.D.,

before the undersigned Certified Shorthand Reporter,
taken on behalf of the Defendants at 2900
Mid-Continent Tower, Tulsa, Oklahoma, commencing at
9:15 a.m., on December 5, 2000, pursuant to notice
and agreement.

_____

KATHLEEN McCLANAHAN, CSR #283

NICHOLS McCLANAHAN REPORTING
Two Main Plaza
616 South Main, Suite 302
Tulsa, Oklahoma 74119-1261
918/585-9969

1      Q.      So it would be important in evaluating

2  injury, if any, to know whether there was or wasn't

3  really consent for the examinations?

4      A.      Yes, you need to know whether this was a

5  truly informed consent.

6      Q.      Okay.  Because if there was consent for

7  them, then your opinion about the effect on the child

8  and family might change?

9      A.      I think that how you're using consent and

10 how I'm thinking about consent are different.

11     Q.      Well, I -- I don't know.

12     My question is you said these were nonconsensual

13 examinations, right?

14     A.      Yes.

15     Q.      Implying that your assumption is the

16 parents did not give permission for these

17 examinations, all right?

18     A.      Yes, that's true.

19     Q.      Okay.  And it is, I take it, and please

20 tell me if I'm wrong, it is, I take it, part of your

21 calculus of whether there was any injury, and, if so,

22 to what extent injury occurred, that you believe the

23 examinations went on without prior parental

24 permission?

25     A.      Yes.

1    Q.    And if you found out --

2    A.    Without truly informed consent.

3    Q.    Okay.  If you found out that there was

4 prior parental permission, that might change your

5 opinion as to any one or more of the children and

6 families as to whether they were injured, and if so,

7 to what extent?

8    A.    It would, but I don't think that happened

9 in this case.

10    Q.    Well, let me see if I can open your mind

11 to a possibility that you haven't yet considered.

12 Did you see the consent forms?

13    A.    I had some copies of some consents, yes.

14    Q.    Why didn't you bring them in response to

15 the subpoena?

16    A.    They're attached to each of those

17 documents.

18    Q.    Okay.  Did you see the consent forms that

19 were used at Wiley Post Elementary?

20    A.    I reviewed those, yes.

21    Q.    Okay.

22    A.    But as I said, I think how you're using

23 consent and how I'm using consent are different.

24    Q.    Well, I understand.  I'm -- I want you to

25 tell me how you're using consent, then, ma'am?

1    A.    As in -- I'm looking at consent, truly

2  informed consent, that the parent has to be fully

3  aware of the procedure and fully informed in order to

4  make a rational decision about this particular

5  procedure.

6    Q.    Okay.  And at Wiley Post Elementary, what

7  was lacking in the notification and consent of the

8  parents as to the fact that their children would have

9  a complete physical examination, which many of them

10  in deposition identify they believed was similar to

11  the physical examinations they had had with doctors?

12    MR. GOREE:  I object to the form of the

13  question.

14    Q.    (By Mr. Helfand)  What was lacking?

15    A.    I would say what was lacking was they

16  were not truly informed that this particular

17  procedure was going to be conducted.

18    Q.    Well, are you a parent?

19    A.    No.

20    Q.    Okay.  Have you ever accompanied a child

21  to a doctor's office for a well-child exam?

22    A.    No.

23    Q.    Did you observe that some of these

24  parents had done that prior to the examination of

25  their child at the school?

1    Q.    Have you had a chance to review her

2 deposition?

3    A.    Yes.

4    Q.    Earlier you were talking about that

5 children cannot always verbalize effects that things

6 have on them?

7    A.    Right.

8    Q.    And then you were talking about that you

9 have only reviewed statements that were made by the

10 parents. Would you agree with me that parents may

11 not know what signs to look for to see what effect

12 something had on a child?

13    A.    I think the parent -- No, I would not

14 agree with that.

15    Q.    Are the average parents trained as

16 psychologists to know what to look for?

17    A.    No, but they are the primary caregivers,

18 in most circumstances.

19    Q.    But since they don't have any training in

20 psychological area, they would not know what specific

21 symptoms or behaviors meant, would they?

22    A.    Well, they would -- I don't think they

23 would know from a psychological, you know, as -- but

24 they would know, as a parent, there was a change in

25 behavior. There's -- The child is not -- If a